# EXHIBIT A

## IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

**MARY RINGOLD**

      **Plaintiff,**

**v.**

**BANK OF AMERICA HOME LOANS;
BAC HOME LOAN SERVICING, L.P.;
NATIONWIDE TRUSTEE SERVICES, INC.
and WILSON & ASSOCIATES, P.L.L.C.**

      **Defendants.**

Docket No.: CH-11-1708

Part 3

---

### COMPLAINT FOR WRONGFUL FORECLOSURE, INJUNCTIVE, AND OTHER RELIEF

---

**TO THE HONORABLE CHANCELLOR OF THE CHANCERY COURT OF SHELBY
COUNTY TENNESSEE:**

      **COMES NOW**, Mary Ringold, and herewith states to the Court her allegations regarding

the wrongful foreclosure of her home located on real property in Shelby County, Tennessee and

any subsequent effort to remove her from her home and via a writ of Forcible Entry and Detainer

based on the facts and principals of law, as follows, to-wit:

### PARTIES

      1.    The Plaintiff Mary Ringold ("Ms. Ringold) purchased property located in

Cordova, Tennessee, and presently resides at 9245 Acadia Place, Shelby County, Tennessee

38018 (per Assessor).

      2.    Defendant, Bank of America Home Loans, is located nationwide and can be

served with process through its registered agent CT Corporation, located at 350 North St. Paul

Street #2900, Dallas, Texas, U.S.A.

3.      BAC Home Loan Servicing, L.P., ("BAC") is locate and can be served with process through its registered agent CT Corporation System, located at 350 North St. Paul Street #2900, Dallas, TX 75201, U.S.A.

4.      Nationwide Trustee Services is located 1587 Northeast Street Expressway, Atlanta, GA 30329 and can be served with process through its registered agent National Registered Agents, Inc. located at 2300 Hillsboro Road Ste. 305, Nashville, TN 37212 U.S.A.

## JURISDICTION

5.      The property involved in this lawsuit is located in Cordova, Tennessee which is part of Shelby County, Tennessee and upon information and belief Bank of America had recorded a Deed of Trust with the Shelby County Register of Deeds.

6.      All of the contracts, notes and deeds involved in this matter were negotiated and signed in Cordova, Tennessee.

7.      Therefore, the jurisdiction and venue lies within this Court.

## GENERAL ALLEGATIONS

8.      Ms. Ringold, the Plaintiff, in this cause, purchased a residence located at, 9245 Arcadia Place Cordova, Tennessee 38018, (Residence) approximately five (5) years ago. Subsequent to that purchase and throughout virtually the entire period of time the Ms. Ringold occupied and owned the Residence, the mortgage was paid in a timely fashion.

9.      Ms. Ringold financed her home through Bank of America, obtaining an Adjustable Rate Mortgage (Hereinafter referred to as "ARM"). Ms. Ringold, acutely aware that after a five (5) year period of time, her ARM would substantially increase her mortgage payments, Ms. Ringold sought a modification of her mortgage; however she continued making

2

timely payments.

10.     In early 2010, Ms. Ringold began working with The Neighborhood Assistance Corporation Association (Hereinafter referred to as "NACA") in order to assist her in obtaining a modification of her home mortgage loan, which at the time was with Bank of America. NACA initially requested that an escrow account be created, and set up for insurance and taxes on Ms. Ringold's residence.

11.     NACA sent Bank of America correspondence in order to begin the application process for the modification of Ms. Ringold's home mortgage. Bank of America Never responded to any of the correspondence. NACA also requested documents regarding a modification of Ms. Ringold's mortgage, which they never received.

12.     On November 11, 2011 and December 17, 2011, respectively, Ms. Ringold received a "Notice and Intent to Accelerate" from Bank of America Home Loans

13.     Because of all of the issues concerning her mortgage that Ms. Ringold was having, she reviewed her deed of trust and her promissory note, noticing that neither reflected that an escrow account was created. Ms. Ringold also noticed that Section 3 of her deed of trust actually stated that if Ms. Ringold failed to pay taxes and/or insurance that the lender would then create an escrow account and pay on her behalf; however, Ms. Ringold had always paid her taxes and insurance in a timely manner and was not deficient in any respect to payment of either.

14.     On March 8, 2011, Ms. Ringold received a notice of right to Foreclosure from Nationwide Trustee Services, Inc.

15.     On April 1, 2011, Ms. Ringold received a letter from Nationwide Trustee Services Inc., informing her that she might be eligible for certain opportunities for "reinstatement," "repayment," "modification," and "short sale."

16.     Ms. Ringold inquired about various federal programs but was told that she was not eligible.  Ultimately Ms. Ringold discovered that she qualified for various federal programs created by the federal government such as HAMP ("Home Affordable Modification Program"), or other federal programs such as MHA (Making Homes Affordable).

17.     Ms. Ringold had subsequently been informed that she was also eligible based upon guidelines issued by the Treasury Department of the federal government, the Supplemental directive 09-01 on April 6, 2009, which established the eligibility of Plaintiff for federal programs designed for those attempting to salvage their home in the then difficult financial times.

18.     Subsequently, Bank of America Home Loans, claimed owner of the mortgage and promissory note was directly contacted by the Ms. Ringold, who sought assistance with a modification of her mortgage.  Mrs. Ringold being acutely aware of her mortgage and its terms, knew that her adjustable rate mortgage was about to substantially increase her mortgage payments, thus, she believe that she could work out a modification with Bank of America prior to that increase.

19.     Ms. Ringold, alleges that Bank of America, and all other Defendants are and continue to be (deficient [right word??]) in the following manner with regard to Ms. Ringold's mortgage and subsequent attempt at obtaining a modification of the afore-mentioned mortgage:

    a)     In the assignment of Ms. Ringold's Deed of Trust and Promissory Note, the assignment was signed in March but not executed until May, wherein, it appears that Tom Garcia, of Eagle Mortgage and Funding apparently took a plane to California from Memphis and personally appeared before the notary In Ventura, California and executed the assignment

    b)     Ms. Ringold alleges that she did not receive the proper timely notice of the foreclosure as is required by the HAMP regulations (seven days prior to foreclosure) and by T.C.A. 35-5-117.

4

c)    Further, Ms. Ringold alleges that she did not receive the proper timely
notice of the foreclosure as is required by the HAMP regulations (seven
days prior to foreclosure) and by T.C.A. 35-5-117.

d)    Ms. Ringold alleges that she was entitled to receive a certified letter from
the loan servicer, to the effect that all possibilities for modifications had
been exhausted, and that she did not qualify for any of the federal
programs available to distressed property owners. Bank of America Home
Loans did not offer Ms. Ringold any alternative for which it maintained that
she would have qualified.

e)    Ms. Ringold alleges that the foreclosure sale should never have been pursued
because she was never advised of the federal programs for which she
qualified nor offered an alternative such as a forbearance plan making
payments as required by the forbearance plan by the Lender itself.

f)    Ms. Ringold alleges that the lender deliberately and intentionally set the
Plaintiff up such that the costs, the fees, and the deficit accrued on the
mortgage account as to allow the Lender to force a foreclosure even in the
face of knowledge on the part of the Lender and its attorneys that
Defendants' statements to the Plaintiff throughout the entire period of the
threatened foreclosure were confusing, misleading, and contradictory.

g)    Additionally, as a result of not receiving any meaningful notice, Defendants
have left the Plaintiffs with no timetable that is manageable for the
refinancing or reinstatement of the loan unless this Court enjoins the
foreclosure sale. Instead, Plaintiff was presented with an untenable
situation when the interest increased from 5.7.5% to 10.5%.

h)    The Plaintiff alleges that they have never been furnished with proof of the
current owner of the loan or a ledger card, account summary, or any other
discernible information which could be reviewed to show the status
on the loan with the Defendants

i)    Upon information and belief, the balance demanded by Defendants prior to
the foreclosure was incorrect.

## COUNTS

**COUNT I** – **TENNESSEE CONSUMER PROTECTION ACT VIOLATIONS BY BANK OF AMERICA f/k/a BAC HOME LOAN SERVICING, L.P.AND WILSON AND ASSOCIATES P.L.L.C.**

20.     Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

21.     The Defendants, in course of advertising, soliciting, selling, promoting and their Law firm, that all acted in conjunction with one another, have engaged in a courses or trade or commerce which constitutes unfair or deceptive acts or practices, and is therefore unlawful under the Tennessee Consumer Protection Act, Tenn. Ann. Code § 47-18-101 *et. seq.*, particularly Tenn. Ann. Code § 47-18-104(b) (2), (3), (14) and (27) the in the following manner:

    a)    T.C.A.  § 47-18-104 (b) (2) -  Causing likelihood of confusion or   of misunderstanding as to the source, sponsorship, approval or certification of goods or services by failing to provide accurate information to Plaintiff in obtaining a modification of Plaintiff's mortgage with Bank of America formerly known as BAC Home   Loan Servicing, L.P.;

    b)    T.C.A. § 47-18-104(b) (3) Causing likelihood of confusion or  misunderstanding as to affiliation, connection or association with, or certification by, another by failing to provide accurate and timely information to Plaintiff in obtaining a modification of Plaintiff's mortgage with Bank of America formerly known as BAC Home Loan Servicing, L.P.;

    c)    T.C.A. § 47-18-104 (b)(14) Causing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction by failing to provide the correct employee or employees for Plaintiff to contact in order to execute a    modification of Plaintiff's mortgage, and failing to respond to Plaintiff's request to obtain a modification of her mortgage;

    d)    T.C.A. § 47-18-104(b) (27) By falsifying a notary's signature on the assignment of Plaintiff's Deed of Trust and Promissory Note;

    e)    T.C.A. § 47-18-104(b)(27) By improperly imposing on Plaintiff and improperly

creating for Plaintiff  an escrow account in violation of Defendant's own contract;

f)      T.C.A. § 47-18- 104(b)(27) By fraudulently executing a substitution of trustee document that reflects that an attorney appeared personally before a notary  in May of 2011,but the document was executed in March of 2011.

22.      Through the above-described unlawful deceptive trade practices, Defendants have deceived and misled Plaintiff, and is therefore liable to Plaintiff for treble damages, punitive damages, and reasonable attorney's fees.

## COUNT II – BREACH OF CONTRACT BY BANK OF AMERICA f/k/a BAC HOME LOAN SERVICING, L.P.

23.      Plaintiff hereby incorporates and re-alleges each and every allegation as if set forth fully herein.

24.      Plaintiff entered into a mortgage contract with Defendant Bank of America and BAC Home Loan Servicing, L.P.

25.      Defendant s breached that contract by improperly establishing an escrow account for Plaintiff even though Plaintiff was not delinquent in her payments as required by the contract between Plaintiff and Defendants.

26.      Defendant's breach of their own contract is the proximate cause of Plaintiff's damages.

27.      Plaintiff has suffered damages in in amount to be proven at trial.

7

## COUNT III – INDUCING A BREACH OF CONTRACT IN VIOLATION OF TENNESSEE CODE § 47-5-109 BY BANK OF AMERICA f/k/a BAC HOME LOAN SERVICING, L.P.

28.     Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

29.     Defendants' actions as aforesaid constitute inducing a breach of contract within the meaning of: Tenn. Code § 47-50-109. Procurement of Breach of contracts unlawful - Damages.

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such a breach may bring suit for the breach and for such damages.

30.     Defendant and Plaintiff  had a legal mortgage contract, and by evidence to be provided during trial, Plaintiff will show that Defendant Bank of America through its improper creation and application of an escrow account and improperly applied fees willfully caused Plaintiff to breach the mortgage agreement between Plaintiff and Defendant,

31.     That the improperly created and applied escrow account, and improperly applied fees were ultimately the proximate cause of Plaintiff's breach, and cause of monetary damages to Plaintiff, and other damages to be determined at trial.

32.     That Defendant Bank of America is liable to Plaintiff, and Plaintiff is entitled to recover treble damages as a result of this procurement of breach.

33.     Therefore, Plaintiff demands judgment in her favor, for the value of its damage to be proven at trial.

## COUNT IV – VIOLATION OF THE CONVENANT OF GOOD FAITH AND FAIR DEALING BY BANK OF AMERICA, AND BAC HOME LOANS, L.P.

34.     Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

35.     Plaintiff had a valid mortgage contract with Defendant Bank of America and BAC Home Loans, L.P.

36.     Defendants breached their duty to refrain from any action which would render performance of the contract impossible which they breached when they improperly created and applied funds to an escrow account in violation of the agreement between Plaintiff and Defendants, and other violations to be presented at trial.

38.     Defendants also breached  their duty to perform all essential elements of the contract that were presupposed by the contract in order to accomplish the purpose of the contract which they breached for the reasons mentioned in paragraph 38 of this Complaint.

39.     Defendants by breaching their duties as mentioned in paragraphs 37 and 38. Defendants interfered and failed to cooperate with Plaintiff in the performance of the mortgage contract between the parties.

40.     Defendants conduct is the proximate cause of the damages to Plaintiff, and therefore, Defendants are liable to Plaintiff for damages resulting from its conduct in an amount to be proven at trial.

**COUNT V – NEGLIGENT AND INTENTIONAL MISREPRESENTATION BY BANK OF AMERICA AND BAC HOME LOAN SERVICING, L.P.**

41.     Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

42.     Defendants made material representations to Plaintiff in expressing to Plaintiff that Defendants would assist her in obtaining a modification of her mortgage contract with Defendants.

43.     Defendants knew at the time they expressed to Plaintiff that they would assist her they had no intention of ever allowing Plaintiff to modify her mortgage contract with Plaintiff.

44.     Defendants intended to cause Plaintiff to rely on their expressions, that they would assist Plaintiff in obtaining a modification of her mortgage contract.

45.     Plaintiff reasonably relied upon the misrepresentation to her detriment, ultimately having her home foreclosed upon after relying on the misrepresentations made by Defendants.

46.     Plaintiff was damaged in amount to be proven at trial.

**COUNT VI – PROMISSORY FRAUD BY BANK OF AMERICA AND BAC HOME LOAN SERVICING, L.P. , and NATION**

47.     Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

48.     Defendants made an intentional misrepresentation to Plaintiff in the following manner:

        a)     Defendants, on numerous occasions including but not

limited to an April 1, 2011 letter from Nationwide stating that Plaintiff might be eligible for   certain opportunities for "reinstatement, repayment, modification, and short sale."

b)   Defendant Bank of America on numerous occasions including but not November 11, 2011, and a December 17, 2011, letter to Plaintiff stating to Plaintiff that "if you are unable to cure the default on or before January 16, 2011, BAC Home Loans Servicing, LP to prevent a foreclosure sale of your property for example a Repayment Plan...Loan Modification...Sale of Your Property, [or a] Deed in lieu of..."

49.   Defendants knew, and as expressed by their subsequent actions that the representations made in those letters regarding assistant to Plaintiff were false.

50.   Plaintiff, to her detriment, reasonably relied on the misrepresentation in the above mentioned letters, and others to be presented at trial, and suffered damages as a result of the misrepresentations by the defendants.

51.   The misrepresentation by the Defendants embodied a promise of future action by the Defendants when the defendants, as evidenced by their subsequent behavior, had not intention of to carry out the promise to at least assist Plaintiff in submitting the correct information in to the Defendants in order for the Plaintiff to obtain a modification of her mortgage contract.

## COUNT XI – INJUNCTIVE RELIEF

52.   Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

53.   Pursuant to Rule 65 of the Tennessee Rules of Civil Procedure Plaintiff request a Temporary Restraining Order on Defendants, restraining Defendants from selling at auction the property subject to this lawsuit. If Defendants are not enjoined from selling, transferring, conveying or negotiating the sale, transfer or conveyance of the wrongfully foreclosed upon

11

property, substantial and irreparable injury will be inflicted upon the Plaintiff. Specifically, if the property subject to suit is sold to a third party, Plaintiff may lose certain legal and equitable rights.

54.     Plaintiff has no adequate remedy at law for the harm, damage and injury to her rights should the sale at auction of the property subject to this suit occur.

55.  The Plaintiffs pray that this court enjoin the Defendants from proceeding with the foreclosure sale, from removing them from their home until the Court has the opportunity to address the facts of this case.

**WHEREFORE,** Plaintiff prays that defendants be cited to appear and answer in this action and that upon the evidence, finding of the jury and applicable law, the court enter judgment:

1.     That Defendants be required to respond to this Complaint upon receiving service;

2.     That the Court determine that the Plaintiffs will suffer irreparable harm if the foreclosure sale occurs and they are forced to leave their home until this court determines whether the foreclosure in this cause is legal and rightful;

3.     That the Court rule that the Defendants in this cause acted wrongfully and in violation of the Tennessee Consumer Protection Act, and of the common law counts as expressed in in Counts II through VII , and  that punitive damages in at least the amount of $250,000 should be awarded to the Plaintiffs;

4.     Determining and awarding a reasonable attorney's fee and the costs and expenses of this action to plaintiff and her counsel against the Defendants, and providing for interim payment in the case of an appeal of the judgment by the Defendant.

5.      That the court grant such other relief as may be appropriate as the circumstances

of this cause dictate including attorney fees and treble damages as provided under the Tennessee

Consumer Protection Act; and.

6.      That the Court order such other relief as the Court deems appropriate under the

circumstances.

Respectfully submitted,

THE LAW OFFICES OF E.A. NICHOLS, P.C.

E.A. Nichols (BPR #028930)
The Law Office of al O. Mathes
8121 Walnut Run Road
Cordova, TN  38018
Tel:  (901) 591-1144
Fax: (901) 432-5235
eanichols@eanicholslaw.com (Email)

*Attorney for Plaintiff*

## NOTICE OF HEARING

In accordance with Tenn. Rule of Civil Procedure 65.04, Plaintiff gives notice that the foregoing request for temporary restraining order associated with the foregoing Complaint, will be presented to at the Shelby County Chancery Court, Part II, at 9:00 a.m. on October 26, 2011, or a soon thereafter as Plaintiff can be heard.  You are invited to attend and be heard

## FIAT

**TO THE CLERK OF THIS COURT:**

Issue Notice and set this matter for hearing on _____, the _____ day of April, 2011, at _____ o'clock _____.m.

Until such time, this court issues a temporary restraining order that enjoins all defendants and their agents, nominees, attorneys, employees, representatives or anyone acting in concert or participation with defendants from foreclosing, liquidating, selling, transferring, repossessing, or in any other way proceeding against or depriving plaintiff of his property unless and until this court finds thatdefendants acted in a lawful manner in their dealings with   plaintiff.

_____
Chancellor

Date: _____

## AFFIDAVIT OF MARY RINGOLD

**STATE OF TENNESSEE**
**COUNTY OF SHELBY**

After having been sworn, the affiant, Mary Ringold states that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge.

This the _____ day of October 2011.


_____

Mary Ringold

Personally appeared before me, the undersigned Notary Public, Mary Ringold, with whom I am personally acquainted or proved to me on the basis of satisfactory evidence to be said person, and who sworn under oath the truth of the content of the foregoing affidavit and who acknowledged the execution of the foregoing instrument for the purpose therein contained.

      **WITNESS** my hand and official seal on this the _____ day of October 2011.


_____

Notary Public


My commission expires:

COPY

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

FILED
SHELBY COUNTY
CHANCERY COURT
DEC 0 7 2011
DEWUN R. SETTLE C & M
TIME:_____ BY:_____

MARY RINGOLD,                    )
                                 )
        Plaintiff,               )
                                 )
v.                               )        Case No. CH-11-1708
                                 )
BANK OF AMERICA HOME LOANS;      )
BAC HOME LOAN SERVICING, L.P.;   )
NATIONWIDE TRUSTEE SERVICES,     )
INC.; and WILSON & ASSOCIATES, PLLC )
                                 )
        Defendants.              )

## MOTION TO DISMISS BY DEFENDANT BANK OF AMERICA, N.A. AND DEFENDANT IDENTIFIED AS BANK OF AMERICA HOME LOANS

Defendant Bank of America, N.A., as successor by merger to Bank of America Home Loans Servicing, L.P. and as defendant identified as Bank of America Home Loans,[1] ("BANA"), by and through counsel, hereby respectfully moves the Court for an Order dismissing Mary Ringold's ("Plaintiff") Complaint pursuant to Tenn. R. Civ. P. 8.01 for failing to provide a short and plain statement of the claim and failing to show that Plaintiff is entitled to any relief; and Rule 12.02(6) for failing to state a claim upon which relief may be granted. Plaintiff's claims against Defendant for breach of contract, inducing a breach of contract, violation of the covenant of good faith and fair dealing, promissory fraud, negligent and intentional misrepresentation, violation of the Tennessee Consumer Protection Act, and injunctive relief fail as a matter of law, and this Complaint should be dismissed in its entirety.

In further support, Defendant relies upon its concurrently filed memorandum of law.

---

[1] Plaintiff filed suit naming "Bank of America Home Loans" as a defendant. There is no known legal entity named "Bank of America Home Loans" ("BACHLS"), but that was a trade name for what is now Bank of America, N.A. ("BANA"). Further, as of July 1, 2011, BACHLS merged with and into BANA. Therefore, BANA responds as successor by merger to BACHLS.

This is the 5th day of December 2011.        Respectfully submitted,


Donna L. Roberts (BPR No. 22249
Paul Allen England (BPR No. 26288)
STITES & HARBISON, PLLC
401 Commerce Street
Suite 800
Nashville, TN  37219-2376
Telephone:  (615) 244-5200

*Counsel for Defendant Bank of America, N.A. and
Defendant identified as Bank of America Home
Loans*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by United States First Class Mail, postage prepaid, on this 5th day of December 2011 upon:

E.A. Nichols                          E.A. Nichols
The Law Offices of E.A. Nichols, P.C.    198 S. Reese Avenue
8121 Walnut Run Road                  Memphis, TN 38111
Cordova, TN 38018

*Counsel for Plaintiff*


Paul Allen England

918087:1:NASHVILLE                     2

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

COPY

SHELBY COUNTY
CHANCERY COURT

DEC 0 7 2011

DEWUN R. SETTLE C & M
TIME:_____ BY:_____

MARY RINGOLD,        )
        )
   Plaintiff,     )
        )
v.        )   Case No. CH-11-1708
        )
BANK OF AMERICA HOME LOANS;  )
BAC HOME LOAN SERVICING, L.P.;  )
NATIONWIDE TRUSTEE SERVICES,  )
INC.; and WILSON & ASSOCIATES, PLLC  )
        )
   Defendants.   )

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY DEFENDANT BANK OF AMERICA, N.A. AND DEFENDANT IDENTIFIED AS BANK OF AMERICA HOME LOANS

Defendant Bank of America, N.A., as successor by merger to Bank of America Home Loans Servicing, L.P. and as defendant identified as Bank of America Home Loans,[1] ("BANA"), by and through counsel, respectfully moves the Court to dismiss Plaintiff's Complaint pursuant to Tenn. R. Civ. P. 8.01 for failing to provide a short and plain statement of the claim and failing to show that Plaintiff is entitled to any relief; and Rule 12.02(6) for failing to state a claim upon which relief may be granted.  In support thereof, Defendant BANA provides the following memorandum of points and authorities.

### INTRODUCTION

Plaintiff's Complaint is comprised of poorly organized generalizations, broad speculation, and legal conclusions lacking any pertinent facts, the sum of which does not support any cognizable causes of action against Defendant BANA.  Essentially, Plaintiff's Complaint is a

---

[1]    Plaintiff filed suit naming "Bank of America Home Loans" as a defendant.  There is no known legal entity named "Bank of America Home Loans" ("BACHLS"), but that was a trade name for what is now Bank of America, N.A. ("BANA").  Further, as of July 1, 2011, BACHLS merged with and into BANA.  Therefore, BANA responds as successor by merger to BACHLS.

918098:1:NASHVILLE

1

clear attempt to stall a pending foreclosure sale, scheduled for the day after this lawsuit was filed, by throwing any possible theories for why foreclosure should not take place against the wall to see what sticks, without regard for relevant facts or law.

Setting aside the confusing nature of Plaintiff's disjointed Complaint, the limited claims and theories in the Complaint that are actually discernible fail as a matter of law for a variety of reasons. First, based on this meager array of facts, Plaintiff alleges a violation of the Tennessee Consumer Protection Act ("TCPA") but fails to cite any specific facts in support of such assertions. Second, Plaintiff's claims for breach of contract, "inducing a breach of contract," and violation of the covenant of good faith and fair dealing neglects to specify the nature of the breach and how the alleged breach caused damages. Further, Plaintiff does not attach the contract at issue, and, thereby, fails to comply with the Tennessee Rules of Civil Procedure. Third, Plaintiff generally avers without any support that Defendant's loan modification process is fraudulent and misleading, and pleads that Defendant made material misrepresentations to Plaintiff, but fails to satisfy the elements for fraud and fails to meet the heightened pleading requirement of Tennessee Rule of Civil Procedure 9.02. Lastly, Plaintiff fails to comply with Rule 65 of the Tennessee Rules of Civil Procedure and is clearly not entitled to injunctive relief.

Out of an abundance of caution, Defendant attempts to address all recognizable claims that can be deciphered from Plaintiff's "shotgun" Complaint. In sum, Plaintiff has fallen far short of the necessary standard to properly set forth a claim against Defendant – with the result being that Plaintiff's Complaint cannot survive a motion to dismiss.

918098:1:NASHVILLE

## FACTUAL BACKGROUND[2]

The Complaint and foreclosure relate to a parcel of residential property located at 9245 Arcadia Place, Cordova, Tennessee 38018 (the "Property"). (Compl. ¶¶ 1, 5, 8.) The gravamen of Plaintiff's Complaint appears to concern the creation of an escrow account to pay taxes and insurance for the Property, and Plaintiff's inability to secure a loan modification prior to the foreclosure of her home. (*See generally* Compl.)

Plaintiff alleges that she financed her home with an Adjustable Rate Mortgage ("ARM") through "Bank of America."[3] (Compl. ¶ 9.) Based on the allegations, it appears that Plaintiff was not required to escrow her taxes and insurance at origination. (Compl. ¶ 13.) After owning the Property for approximately five (5) years, Plaintiff's ARM increased her monthly mortgage payment. (Compl. ¶ 9.)

Subsequently, in early 2010, Plaintiff alleges that she sought a loan modification and began working with the Neighborhood Assistance Corporation Association ("NACA"). (Compl. ¶ 10.) Plaintiff further alleges that NACA initially requested that an escrow account be created and set up for property insurance and taxes. (Compl. ¶ 10.) Plaintiff insists that NACA, acting on her behalf, made several attempts to "begin" the application process for a loan modification, but "Bank of America" was unresponsive. (Compl. ¶¶ 10-11.)

Plaintiff confusingly maintains that Defendant breached Section 3 of the Deed of Trust by improperly creating an escrow account, even though Plaintiff admits that NACA requested it on her behalf. (Compl. ¶¶ 10-11, 13.) Plaintiff fails to attach any relevant documentation to her

---

[2]    The allegations in the Complaint are treated as true for the purposes of this motion only.
[3]    Plaintiff incorrectly states that the Property was financed through "Bank of America." There is no known legal entity named Bank of America.  BANA assumes that Plaintiff meant to make this assertion against it.
918098:1:NASHVILLE

3

Complaint in violation of Tenn. R. Civ. P. 10.03.[4]  On March 8, 2011, Plaintiff admits that she received a notice of the right to foreclose from Defendant Nationwide Trustee Services, Inc. (Compl. ¶ 14.)  Plaintiff does not allege that she is current on her obligations to Defendant.  (*See generally* Compl.)

Plaintiff's Complaint then appears to assert a laundry list of purported wrongful conduct with respect to Plaintiff's mortgage, the denial of her modification and subsequent foreclosure, none of which contain factual support.[5]  Specifically, Paragraph 19 of Plaintiff's Complaint concludes that Defendant continues to be "deficient" by:  (a) falsifying a notary's signature on the assignment of Plaintiff's Deed of Trust and Promissory Note, (b) failing to provide proper notice of the foreclosure as required by HAMP;[6] (c) failing to provide to Plaintiff a certified letter stating that "all possibilities for modifications had been exhausted," and that she did not qualify for any home modification programs; (d) failing to provide alternative home modification programs to Plaintiff; (e) intentionally setting up the Plaintiff "such that the costs, the fees, and the deficit accrued on the mortgage account" allowing Defendant to foreclose; (e) increasing Plaintiff's interest rate from "5.7.5%" to 10.5%; (f) failing to provide information which shows the "status on the loan with Defendants"; and (g) stating an incorrect outstanding balance.

Although Plaintiff filed this Complaint against multiple defendants, her allegations do not distinguish among the alleged wrongdoers, and Defendant is forced to speculate as to which

---

[4]      Tenn. R. Civ. P. 10.03 requires a written instrument to be attached to the pleading when the claims are founded on it.
[5]      The Complaint is notable for its omission of critical information.  The Complaint served on Defendant is incomplete, and specifically appears to omit pages 4 and 15-18.  Defendant's counsel has attempted to contact Plaintiff's counsel regarding this matter but, as of the date of this filing, has been unsuccessful.  In a good faith effort, and out of an abundance of caution, Defendant's counsel contacted the Shelby County Court Clerk's Office and requested a copy of the Complaint filed with the Court, which, upon review, also appears to omit pages 15-18. As such, Defendant has not been afforded the opportunity to specifically address any allegations contained therein.
[6]      Paragraphs 19(b) and 19(c) of Plaintiff's Complaint are duplicative.
918098:1:NASHVILLE

claims are asserted against it and which are meant to be asserted against Nationwide Trustee Services, Inc. or Wilson & Associates, PLLC.

In sum, Plaintiff alleges seven "Counts" purporting to assert causes of action under Tennessee law.   First, Plaintiff alleges Defendant violated the TCPA by failing to modify Plaintiff's loan, falsifying a notary's signature on the assignment of Plaintiff's Deed of Trust and Promissory Note, improperly creating an escrow account, and fraudulently executing a substitution of trustee document.   (Compl. ¶¶ 21-22.)   This claim does not site specific facts to support such assertions.   Second, repeatedly and without explanation, Defendant is accused of violating "Section 3" of the Deed of Trust.   However, Plaintiff's breach of contract claim neglects to specify the nature of the breach and how the alleged breach caused damages other than to baldly assert that Defendant erroneously initiated an escrow account. (Compl. ¶¶ 10-13.) Plaintiff next alleges that Defendant induced a breach of contract and violated the covenant of good faith and fair dealing by improperly creating an escrow account.   (Compl. ¶¶ 30, 36.) Plaintiff also contends that Defendant engaged in negligent and intentional misrepresentations, and promissory fraud, stating, for example, that it would assist her in obtaining a loan modification. (Compl. ¶¶ 19, 21-22, 42, 48.)

On these sparse facts, "Plaintiffs" ask the Court to enjoin "Defendants" from proceeding with the foreclosure sale.   (Compl. ¶ 55.)   However, all of these claims must be dismissed as Plaintiff fails to give Defendant notice of a plausible claim pursuant to Rule 8 and fails to state any cognizable cause of action against Defendant.

## STANDARD OF REVIEW

Rule 12.02(6) of the Tennessee Rules of Civil Procedure provides for the dismissal of a complaint when it fails to state a claim upon which relief may be granted. *Webb v. Nashville*

918098:1:NASHVILLE

*Area Habitat for Humanity, Inc.*, 2011 Tenn. LEXIS 623 at *6 (Tenn. July 21, 2011) (copy attached);[7] *see also Lanier v. Rains*, 229 S.W.3d 656, 660 (Tenn. 2007). In order to survive a motion to dismiss under Rule 12.02(6), a complaint must contain a statement of the facts showing that the plaintiff is entitled to relief. *Webb*, 2011 Tenn. LEXIS, at *5.

A motion to dismiss should be granted "when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Webb*, 2011 Tenn. LEXIS, at *8 (quoting *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002)). "To be sufficient and survive a motion to dismiss, a complaint must not be entirely devoid of factual allegations. Tennessee courts have long interpreted Tennessee Rule of Civil Procedure 8.01 to require a plaintiff to state the facts upon which a claim for relief is founded." *Webb*, 2011 Tenn. LEXIS, at *9-10 (citations and quotations omitted).

A motion to dismiss a complaint for failure to state a claim filed pursuant to Tenn. R. Civ. P. 12.02(6) "admits the truth of all of the relevant and material allegations contained in the complaint, but it asserts that the allegations fail to establish a cause of action." *Webb*, 2011 Tenn. LEXIS, at *7. (citations omitted). A court will accept as true all factual allegations in the complaint. *Id.*

Plaintiff's Complaint must be dismissed in its entirety because Plaintiff has failed to state any claim on which relief can be granted.

## LEGAL ARGUMENT

Plaintiff's Complaint fails to state a claim because it is filled with labels and conclusions and it is merely a formulaic recitation of the elements of several causes of action with insufficient factual, specific allegations. As such, Defendant cannot reasonably formulate a

---

[7]    All unpublished cases are attached hereto as collective **Exhibit A.**
918098:1:NASHVILLE

response to the pleading, and Plaintiff's Complaint should be dismissed with prejudice. In addition, each individual legal theory cited by Plaintiff is clearly erroneous or improperly pled and each is subject to dismissal as a matter of law for failure to state a cognizable claim.

## I.    PLAINTIFF'S COMPLAINT FAILS TO MEET PLEADING STANDARDS UNDER RULES 8.01 AND 12.02(6).

In sum, Plaintiff's Complaint consists of seven allegations containing bald legal conclusions and lacking any factual support whatsoever that could raise Plaintiff's right to relief above a speculative level. As a result, the Complaint must be dismissed with prejudice under Rule 12.02(6) and Rule 8.01 because Plaintiff fails to provide notice to BANA as to the claims alleged.

### A.    The Plaintiff's Complaint is a "Shotgun Style" Pleading Warranting Outright Dismissal.

Plaintiff's Complaint is comprised almost exclusively of irrelevant factual allegations and legal conclusions that do not identify any activity to form a basis for Plaintiff's claims. As a result, it is an impermissible "shotgun" pleading that must be dismissed.

The defining characteristic of a shotgun complaint is that it fails "to identify claims with sufficient clarity to enable the defendant to frame a responsive pleading." *Beckwith v. Bellsouth Telecomms., Inc.*, 145 Fed. App. 368, 371 (11th Cir. 2005). Each count of the shotgun complaint "incorporates by reference all prior allegations in the Complaint, leaving the final count an amalgamation of everything in the complaint." *Cobb v. Regions Bank*, 2010 U.S. LEXIS 49544, at *6 (W.D. Tenn. May 19, 2010) (copy attached) (internal quotations omitted); *see also Strategic Income Fund v. Spear, Leeds & Kellogg*, 305 F.3d 1293, 1295 n.9 (11th Cir. 2002) (describing a shotgun complaint as one that "contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts …

918098:1:NASHVILLE

contain irrelevant factual allegations and legal conclusions"). Such complaints "wreak havoc on the judicial system because of the resources that opposing parties and the court must waste to decipher them." *Cobb*, 2010 U.S. LEXIS 49544, at *6.

The shotgun complaint or answer, filed in the hope that discovery will produce the justification for it, is improper. *Bonner v. Billen*, No. E2005-01901-COA-R3-CV, 2007 Tenn. App. LEXIS 674, at *13 (Tenn. Ct. App. 2007) (copy attached). Shotgun complaints may be suicidal, inflicting Rule 11 sanctions. *Guthrie v. Hunter Marine Transp.*, No. 3-86-0902, 1987 U.S. Dist. Lexis 11858, at *22 (M.D. Tenn. Dec. 15, 1987) (copy attached).

Plaintiff's Complaint lacks facts and simply spouts legal theories without any support. Plaintiff hurls around random, conclusory allegations, without any attempt to include the elements of a single legally-cognizable claim. (*See generally* Compl.) Any substantive allegations that the Complaint contains are entirely conclusory. For example, Plaintiff alleges the following:

> Plaintiff entered into a mortgage contract with Defendant Bank of America and BAC Home Loan Servicing, L.P. Defendants breached that contract by improperly establishing an escrow account for Plaintiff even though Plaintiff was not delinquent in her payments as required by the contract between Plaintiff and Defendants. Defendant's breach of their own contract is the proximate cause of Plaintiff's damages. Plaintiff has suffered damages in an amount to be proven at trial.

(Compl. ¶¶ 24-27.) These vague generalizations are meaningless without specific facts to support them.

Moreover, Plaintiff refers to "Defendants" without meaningful distinction, making it impossible to determine toward which entity or entities Plaintiff is directing a given allegation. (*See generally* Compl.) Therefore, the Complaint fails to put BANA on notice of any actual claims against it. Similarly, it is difficult to understand who is a party to the lawsuit as the

918098:1:NASHVILLE

Plaintiff switches from the singular to plural and back again, using the terms "Plaintiff" and "Plaintiffs" interchangeably, despite the fact that she is the only named Plaintiff. (*Id.*) For example, the Complaint states, "The Plaintiffs pray that this court enjoin the Defendants from proceeding with the foreclosure sale, from removing them from their home until the Court has the opportunity to address the facts of this case." (Compl. ¶ 55.) These errors are the rule, rather than the exception, to the structure and presentation of Plaintiff's Complaint.

It is painfully obvious that Plaintiff did not even bother to proofread her Complaint. For example, Plaintiff alleges that "Bank of America, and all other Defendants are and continue to be (deficient [right word??]…." And also states that Defendants "had not intention of to carry out the promise." (Compl. ¶¶ 19, 51.) Further, Plaintiff alleges that Defendants breached "their duties as mentioned in paragraphs 37 and 38." (Compl. ¶ 39.) However, the Complaint omits Paragraph 37. Therefore, Defendant has not been afforded the opportunity to specifically address the allegations contained therein. Moreover, and as previously articulated, Plaintiff failed to ensure that all pages of the Complaint were attached and served on Defendant.

Under the foregoing authority, Plaintiff's Complaint is a prohibited shotgun pleading and should be dismissed on this basis as a matter of law.

**B.      The Complaint Fails to State a Short, Plain Statement of Any Claim and, Therefore, Fails to Provide Notice of a Claim to BANA.**

In addition to being a "shotgun pleading," Plaintiff's complaint must be dismissed because it fails to comply with the pleading standards set forth in Rule 8.01 and 12.02(6) generally. While the Complaint is short, it fails to contain any coherent fact-based statement of a claim against BANA and must be dismissed. In order to survive a Rule 12.02(6) motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Tenn. R. Civ. P. 8.01.

918098:1:NASHVILLE

Rule 8.01 provides that a complaint, "shall contain: (1) a short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded." *See also CitiFinancial Mortg. Co. v. Beasley*, 2007 Tenn. App. LEXIS 20, (Tenn. Ct. App. 2007) (copy attached) (discussing Rule 8.01 requirements). Further, "[m]erely reciting the elements of a cause of action or making conclusory statements that Plaintiff is entitled to relief or was harmed is not enough." *Western Express, Inc. v. Brentwood Servs.*, 2009 Tenn. App. LEXIS 707, *29-30 (Tenn. Ct. App. 2009)(copy attached)(dismissing the complaint for insufficient pleadings).

As discussed above, Plaintiff merely makes conclusory statements such as "Defendants have deceived and mislead Plaintiff." (Compl. ¶ 22.) *See Humphries v. West End Terrace, Inc.*, 795 S.W.2d 128, 132 (Tenn. Ct. App. 1990) (dismissing claim based on failure to allege specific facts related to the alleged fraudulent or deceptive act). What actions of Defendants constitute fraud is completely unclear. Defendant cannot, and should not be required to, defend against conclusory claims that are without sufficient specificity; therefore, Plaintiff's Complaint should be dismissed.

## II.    EACH OF PLAINTIFF'S INDIVIDUAL CLAIMS FAILS AS A MATTER OF LAW.

Although Plaintiff's Complaint should be dismissed for the above reasons alone, each individual legal theory contained in the Complaint is clearly erroneous or improperly pled and subject to dismissal as a matter of law for failure to state a cognizable claim. As listed in the following sections, each of Plaintiff's seven (7) "claims" fails as a matter of law.

918098:1:NASHVILLE

A.   **Plaintiff's Claim Under the TCPA Fails as a Matter of Law Because the TCPA Does Not Apply to Disputes Over the Repossession of Collateral Securing a Loan and Plaintiff Fails to Allege Sufficient Facts to State a Claim For Violation of the TCPA.**

1.   The TCPA Does Not Apply to Disputes Over the Repossession of Collateral Securing a Loan.

In Count I of the Complaint, Plaintiff alleges that Defendant violated the TCPA, arguing that Defendant's conduct was unfair and deceptive. (Compl. ¶¶ 21-22.) However, well settled Tennessee jurisprudence does not permit TCPA claims involving a dispute which arises over repossession of the collateral securing a loan. As set out more fully in section II.A.3, herein, Plaintiff improperly attempts to recast her HAMP claim as a TCPA violation, and for this reason alone, her TCPA claim should be dismissed. However, even assuming Plaintiff's Complaint could be interpreted to allege a claim under the TCPA for wrongful foreclosure, such a claim is also barred.

For the TCPA to apply, "the unfair or deceptive acts must affect trade or commerce, as defined by the Act." *Davenport v. Bates*, 2006 Tenn. App. LEXIS 790 (Tenn. Ct. App. Dec. 12, 2006) (copy attached); *See also* Tenn. Code Ann. § 47-18-103(9). "[W]hile the definition of 'trade or commerce' contained within the Tennessee Consumer Protection Act are broad, they do not extend to . . . dispute[s] which [arise] over repossession of the collateral securing [a] loan." *Pursell v. First Am. Nat'l Bank*, 937 S.W. 2d 838, 842 (Tenn. 1996); *see also Launius v. Wells Fargo Bank, N.A. and Wilson and Associates, P.L.L.C.*, 2010 U.S. Dist. LEXIS 89234 (E.D. Tenn. Aug. 27, 2010) (copy attached) (quoting *Schmidt v. Nat'l City Corp.*, 2008 U.S. Dist. LEXIS 102371, 2008 WL 5248706. (E.D. Tenn. Dec. 17, 2008)). "When a debtor defaults on a mortgage payment, and the mortgage holder forecloses upon the collateral that secured the loan (in this case, the Property), the TCPA does not apply." *Id.* at 17-18.

918098:1:NASHVILLE

11

Defendant's alleged wrongful conduct was clearly in the context of a dispute arising over foreclosure of the collateral securing the loan at issue. Plaintiff does not allege that she is current on her obligations to Defendant. (*See generally* Compl.) Consequently, Defendant initiated foreclosure proceedings. (Compl. ¶¶ 19(i), 30.) Thus, because Defendant's actions were in the context of a dispute over the collateral securing the Plaintiff's loan, the TCPA does not apply, and this claim fails as a matter of law. *See Pursel*, 937 S.W.2d at 842.

> 2.   Plaintiff Fails to Allege Sufficient Facts to State a Claim for Violation of the TCPA.

Even assuming, *arguendo*, Plaintiff's TCPA claims do not involve disputes which arises over repossession of the collateral securing a loan, Plaintiff has failed to state a claim for violations of the TCPA, Tenn. Code Ann. § 47-18-101, *et seq.*, because Plaintiff does nothing more than make conclusory statements in support of her claim. (Compl. ¶¶ 21-22.)

To recover under the TCPA, a plaintiff must allege the existence of: (1) an unfair or deceptive act or practice, (2) that causes, (3) an ascertainable loss. Tenn. Code Ann. § 47-18-109(a)(1) (2011). Plaintiff must also meet the heightened pleading requirements set forth at Tennessee Rule of Civil Procedure 9.02, which applies to claims brought under the TCPA. *Western Express, Inc.*, 2009 Tenn. App. LEXIS 707, at *29, *see also Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 276 (Tenn. Ct. App. 1999).

Here, Plaintiff makes the unsupported assertion that "Defendants, in course of advertising, soliciting, selling, promoting and their Law firm [sic], that all acted in conjunction with one another, have engaged in a courses or [sic] trade or commerce which constitutes [sic] unfair or deceptive acts or practices, and is [sic] therefore unlawful under the [TCPA]." (Compl. ¶ 21.) Plaintiff further states, in an almost indecipherable manner, that these alleged "false and misleading" practices violated specific subsections of the TCPA because Defendants allegedly

918098:1:NASHVILLE

(i) caused the likelihood of confusion or misunderstanding by failing to provide accurate and timely information to Plaintiff in obtaining a loan modification with BANA, (ii) caused the likelihood of confusion or misunderstanding by failing to provide accurate contact information and failing to respond to Plaintiff's request to obtain a loan modification, (iii) falsified a notary's signature on the assignment of Plaintiff's Deed of Trust and Promissory Note, (iv) improperly created an escrow account, and (v) fraudulently executed a substitution of trustee document. (Compl. ¶ 21.)

However, Plaintiff's allegations here fail for a number of reasons. First, it is unclear which parties these allegations are even aimed at. For example, the reference to Defendants "promoting their Law firm" is clearly out of place. Additionally, Plaintiff's claim fails to set forth any facts to support these vague and general allegations. For example, Plaintiff does not mention what inaccurate information she was provided or by whom. She does not say what conduct was untimely or what specific timetable should have been complied with. She does not say specifically when her request for a loan modification was made, how such contact was made, what was represented, and what inquiry was not responded to.

With respect to Plaintiff's confused allegations concerning her escrow, she does not attach a copy of the Deed of Trust and Promissory Note in question. She does not state the time frame during which the escrow account was supposedly created. She also does not attach a copy of the purported falsified assignment or fraudulently executed substitution of trustee document, and she does not explain how or why she believes they were falsified or fraudulently executed or how she was harmed as a result. Further, Plaintiff omits any explanation or details as to how these actions might be "unfair or deceptive" or how these actions caused Plaintiff an ascertainable loss.

918098:1:NASHVILLE

13

In addition, in attempting to describe her damages, Plaintiff also fails to meet the heightened pleading requirement of Rule 9.02.  Plaintiff alleges generally that as a result of Defendants' conduct, "Defendants have deceived and misled Plaintiff, and is [sic] therefore liable to Plaintiff for treble damages, punitive damages, and reasonable attorney's fees." (Compl. ¶ 22.)  However, Plaintiff does not allege specifically what was lost as a result of Defendants' actions.

It is simply not sufficient for Plaintiff to baldly conclude that Defendant violated the TCPA, or make conclusory statements that Plaintiff is entitled to relief or was harmed.  *See Western Express, Inc.*, 2009 Tenn. App. LEXIS 707 at *29-30 (citations omitted) ("Alleging mere conclusions, such as the board exceeded its authority, failed to follow the applicable statutes, or violated the plaintiff's legal rights, is not sufficient to state a claim for which relief can be granted.").  Therefore, Plaintiff's TCPA claims must be dismissed for failing to state a claim under TCPA.

        3.      <u>Plaintiff Fails to State a Claim for Any Violation of HAMP.</u>

Although the Complaint does not explicitly state a claim for violations of the Home Affordable Modification Program ("HAMP"), to the extent one could glean such a claim from the Complaint, such a claim also fails as a matter of law because there is no private right of

action under HAMP.[8]  Plaintiff's TCPA claims are strongly premised on Defendant's alleged

failure to modify her loan.  In support of her TCPA claim, Plaintiff specifically alleges that "she

did not receive the proper notice of the foreclosure as is required by the HAMP regulations," that

Defendant failed to provide her with notice "to the effect that all possibilities for modifications

had been exhausted, and that "she was never advised of the federal programs for which she

qualified...." (Compl. ¶¶ 19(b), 19(d), 19(e).)

However, as one court stated, "[n]owhere in the HAMP Guidelines . . . does it expressly

provide for a private right of action." *Marks v. Bank of America, N.A., et al*, 2010 U.S. Dist.

LEXIS 61489, at *16 (D. Ariz. June 22, 2010) (copy attached).  Therefore, any claim for failure

---

[8]     Many jurisdictions have addressed the issue of whether there is a private right of action under HAMP and nearly all have come to the same conclusion that there is not.  This is not an exhaustive list: *see e.g. Allen v. Citimortgage, Inc.*, 2011 U.S. Dist. LEXIS 86077 (D. Md. Aug. 4, 2011); *Webb v. Nashville Area Habitat for Humanity, Inc.*, 2011 Tenn. LEXIS 623 (Tenn. July 21, 2011); *Paine v. Wells Fargo Bank, N.A.*, 2011 U.S. Dist. LEXIS 83016 (E.D. Va. July 12, 2011); *Ogbon v. Benefit Credit Servs.*, 2011 U.S. Dist. LEXIS 74620 (S.D.N.Y. July 8, 2011); *Sherman v. Litton Loan Servicing, L.P.*, 2011 U.S. Dist. LEXIS 71756 (E.D. Va. July 1, 2011); *Brisbin v. Aurora Loan Servs., LLC*, 2011 U.S. Dist. LEXIS 46925 (D. Minn. May 2, 2011); *Nafso v. Wells Fargo Bank, N.A.*, 2011 U.S. Dist. LEXIS 44654 (E.D. Mich. April 26, 2011); *KeyBank, N.A. v. Bingo*, 2011 U.S. Dist. LEXIS 43812 (W.D. Wash. Apr. 22, 2011); *Wittenberg v. First Indep. Mortg. Co.*, 2011 U.S. Dist. LEXIS 39310 (N.D. W. Va. Apr. 11, 2011); *Bourdelais v. J.P. Morgan Chase, et al*, 2011 U.S. Dist. LEXIS 35507 (E.D. Va. April 1, 2011); *Sena v. Bank of Am. Home Loans*, 2011 U.S. Dist. LEXIS 33959 (D. Nev. Mar. 29, 2011); *Cohn v. Bank of America*, 2011 U.S. Dist. LEXIS 3076 (E.D. Cal. Jan. 12, 2011); *Ross v. State Farm Fire and Casualty Co.*, 2010 U.S. Dist. LEXIS 133995 (M.D. Tenn. Dec. 17, 2010); *Speleos v. BAC Home Loans Servicing, LP*, 755 F. Supp. 2d 304 (D.Mass. Dec. 14, 2010); *Lisier v. Citibank, N.A. (In re Wright)*, 2010 Bankr. LEXIS 4393 (Bankr. D. Md. Nov. 23, 2010); *Zoher v. Chase Home Financing*, 2010 U.S. Dist. LEXIS 109936 (S.D. Fla. Oct. 15, 2010); *Shirk v. JPMorgan Chase Bank, N.A. (In re Shirk)*, 437 B.R. 592 (Bankr. S.D. Ohio 2010); *Pennington v. PNC et al.*, 2010 U.S. Dist. LEXIS 143157 (E.D.Va. Aug. 11, 2010); *Zeller v. Aurora Loan Servs., LLC*, 2010 U.S. Dist. LEXIS 80449 (W.D. Va. Aug. 10, 2010); *Hart v. Countrywide Home Loans, Inc.*, 735 F. Supp. 2d 741, 748 (E.D. Mich. Aug. 9, 2010); *Hoffman v. Bank of Am.*, 2010 U.S. Dist. LEXIS 70455 (N.D. Cal. June 30, 2010); *Simon v. Bank of America, N.A.*, 2010 U.S. Dist. LEXIS 63480 (D. Nev. June 23, 2010); *Zendejas v. GMAC Wholesale Mortg. Corp.* 2010 U.S. Dist. LEXIS 59793 (E.D. Cal. Jun. 16, 2010); *Burtzos v. Countrywide Home Loans*, 2010 U.S. Dist. LEXIS 53509 (S.D. Cal. Jun. 1, 2010); *Benito v. Indymac Mortg.*, 2010 U.S. Dist. LEXIS 51259 (D. Nev. May 21, 2010); *Berenice Thoreau de la Salle v. America's Wholesale Lender*, 2010 U.S. Dist. LEXIS 36319 (E.D. Cal. Apr. 13, 2010); *Villa v. Wells Fargo Bank, N.A.* 2010 U.S. Dist. LEXIS 23741 (S.D. Cal. Mar. 15, 2010); *Kravich v. Wells Fargo Home Mortgage*, 2010 U.S. Dist. LEXIS 12067 (E.D. Cal. Feb. 11, 2010); *Gardner v. Am. Home Mortgage Servicing, Inc.*, 691 F.Supp.2d 1192 (E.D. Cal. 2010); *Aleem v. Bank of Am.*, 2010 U.S. Dist. LEXIS 11944 (C.D. Cal. Feb. 9, 2010); *Escobedo v. Countrywide Home Loans, Inc.*, 2009 U.S. Dist. LEXIS 117017 (S.D. Cal. Dec. 15, 2009); *Santos v. Countrywide Home Loans*, 2009 U.S. Dist. LEXIS 103453 (E.D. Cal. Nov. 5, 2009); *Oliver v. Countrywide Home Loans, Inc.*, 2009 U.S. Dist. LEXIS 94913 (E.D. Cal. Sept. 29, 2009); *Ramirez v. Litton Loan Servicing, LP*, 2009 U.S. Dist. LEXIS 52484 (D. Ariz. June 22, 2009).

15

to modify, failure to process the application effectively, or failure to follow through on any promise under the HAMP program must be dismissed.

**B.**     **Plaintiff's Contract-Based Claims Fail Because Plaintiff Fails to Attach the Contract that was Allegedly Breached and They Also Fail to Allege Sufficient Facts in Support of Such Claims.**

1.     Plaintiff's Contract-Based Claims Fail Because Plaintiff Does Not Attach the Contract at Issue, and, Thereby, Fails to Comply with the Tennessee Rules of Civil Procedure.

By failing to attach the allegedly breached contract, Plaintiff fails to establish her claims for Breach of Contract, Inducing Breach of Contract, and Violation of the Covenant of Good Faith and Fair Dealing under Tennessee law.

Tennessee Rule of Civil Procedure 10.03 requires that whenever a claim is founded upon a written instrument, a copy of that instrument shall, with certain immaterial exceptions, be attached to the pleading as an exhibit.[9]   Likewise, Local Rule 4(c) states, in pertinent part, that "[a]ll pleadings shall conform to the requirements of Rule[] … 10 …TRCP, and any pleading not so conforming may, upon motion of attorney, or by the Court *sua sponte*, be stricken from the docket."

Here, Plaintiff asserts claims for Breach of Contract, Inducing Breach of Contract, and Violation of the Covenant of Good Faith and Fair Dealing, which are all founded upon a written instrument, i.e., the Deed of Trust.  (Compl. ¶¶13, 25, 30, 36.)  Yet Plaintiff fails to attach the

---

[9]     Rule 10.03 of the Tennessee Rule of Civil Procedure states:

Whenever a claim or defense is founded upon a written instrument other than a policy of insurance, a copy of such instrument or the pertinent parts thereof shall be attached to the pleading as an exhibit unless the instrument is (1) a matter of public record in the county in which the action is commenced and its location in the record is set forth in the pleading; (2) in the possession of the adverse party and this fact is stated in the pleading; (3) inaccessible to the pleader or is of such nature that attaching the instrument would be unnecessary or impracticable and this fact is stated in the pleading, together with the reason therefor. Every exhibit so attached or referred to under (1) and (2) shall be a part of the pleading for all purposes.

918098:1:NASHVILLE

16

Deed of Trust or even just the pertinent portions thereof to her Complaint. Moreover, Plaintiff makes no effort to state whether the Deed of Trust is (1) a matter in the county in which the action is commenced and its location in the record; (2) in Defendant's possession; or (3) inaccessible to her, as required by the Rule. *See Constantin v. Univ. of Tenn.*, No. 86-7-II, 1986 Tenn. Crim. App. LEXIS 2380, at \*7-8 (Tenn. Crim. App. July 9, 1986) (copy attached) (affirming the lower court's decision to dismiss the complaint, in part, due to plaintiff's failure to attach a written contract to the complaint); *Bellsouth Advertising & Publishing Corp. v. Bonilla*, No. 01-A-01-9505-CH-00213, 1995 Tenn. App. 677, at \*10 (M.D. Tenn. Oct. 19, 1995) (copy attached) (noting that failure to attach a copy of the contract to the complaint is an appropriate subject for a responsive pleading). Thus, Plaintiff's contract-based claims must be dismissed for failure to comply with Tennessee Rule of Civil Procedure 10.03.

2.   <u>Plaintiff Fails to Allege Sufficient Facts to State a Claim for Breach of Contract.</u>

Even assuming, *arguendo*, Plaintiff complied with Tennessee Rule of Civil Procedure 10.03, Plaintiff still fails to state a claim for breach of contract. To survive a motion to dismiss, a plaintiff must allege all the elements of a breach of contract claim with supporting facts, namely, the existence of an enforceable contract, nonperformance, and damages resulting from the breach. *Am. Nat'l Prop. & Cas. Co. v. Campbell Ins., Inc.*, No. 3:08-0604, 2010 WL 1754358, at \*4 (M.D. Tenn. Apr. 30, 2010) (copy attached); *see also LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

Here, Plaintiff asserts a breach of contract claim entirely on the theory that Defendant breached the Deed of Trust by improperly establishing an escrow account to pay taxes and insurance on the Property. (Compl. ¶ 13.) Specifically, Plaintiff claims that "Section 3 of her deed of trust actually stated that if Ms. Ringold failed to pay taxes and/or insurance that the

918098:1:NASHVILLE

17

lender would then create an escrow account and pay on her behalf; however, Ms. Ringold had always paid her taxes and insurance in a timely manner and was not deficient in any respect to payment of either." (*Id.*)   This claim is wholly without merit and fails because Plaintiff conspicuously neglects to highlight the provision of the Deed of Trust that address the Lender's right to revoke a waiver to pay taxes and/or insurance at any time.  (Compl. 13. and attached **Exhibit B.**)[10]  Specifically, Section 3 of the Deed of Trust, the same covenant Plaintiff claims Defendant breached by improperly creating an escrow account, states:  "Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time."  Section 3 continues to state that "Lender may revoke the waiver as to any or all Escrow Items at any time … and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3."

As such, it is clear that Plaintiff fails to plead sufficient facts regarding, (i) exactly how Defendant failed to perform its contractual obligations, or (ii) how that alleged breach caused Plaintiff damages.  Plaintiff only alleges that "Defendant Bank of America and BAC Home Loan Servicing" breached the contract by "improperly establishing an escrow account for Plaintiff" which is the "proximate cause of Plaintiff's damages," without alleging *what* specific provision was breached, *how* Defendant failed to perform its obligations under the Deed of Trust, or *how* these violations have damaged Plaintiff. (Compl. ¶ 25.)  Further, while Plaintiff vaguely alleges that Defendant "improperly applied fees," she fails to allege the amount of fees misapplied, how the fees were misapplied, when Defendant initiated the escrow account, and what damage resulted from such alleged violations. (Compl. ¶ 30.)

---

[10]   Documents attached to a Rule 12 motion "are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999).

918098:1:NASHVILLE

In sum, Plaintiff must assert some facts to establish what contractual provisions are at issue, in which contract, and how such provisions were purportedly breached beyond general allegations of violating terms or misapplying fees. Because Plaintiff fails to assert such facts, her claim for breach of contract must be dismissed.

3.     Plaintiff Fails to Allege Sufficient Facts to State a Claim for Inducing Breach of Contract.

Similar to her breach of contract claim, Plaintiff attempts to state a claim for the procurement of a breach of contract by stating that Defendant's improper creation and application of an escrow account and improperly applied fees caused Plaintiff to breach her mortgage agreement. (Compl. ¶ 30.) However, Plaintiff's claim for procurement of a breach of contract fails because Plaintiff fails to plead sufficient facts to sustain such a claim.

Tenn. Code Ann. § 47-50-109 states:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109 (2011). For a procurement of a breach of a contract action to be sustained: 1) there must be a legal contract; 2) the wrongdoer must have knowledge of the existence of the contract; 3) there must be an intention to induce its breach; 4) the wrongdoer must have acted maliciously; 5) there must be a breach of the contract; 6) the act complained of must be the proximate cause of the breach of the contract; and 7) there must have been damages resulting from the breach of the contract. *Hanger Prosthetics & Orthotics E., Inc. v. Kitchens*, 280 S.W.3d 192, 205 (Tenn. Ct. App. 2008) (citations omitted). "Malice is a necessary element

918098:1:NASHVILLE

to an action for common law and statutory inducement to breach a contract." *Testerman v. Tragesser*, 789 S.W.2d 553, 557 (Tenn. Ct. App. 1989) (citation omitted). In addition, a third-party must induce the breach of contract. *See York v. Batson, et al.*, No. M2007-02418-COA-R3-CV, 2008 Tenn. App. LEXIS 535, at *16 (Tenn. Ct. App. 2008) (copy attached) (stating that "[i]n Tennessee, there is both a common law and statutory tort called wrongful inducement of breach of contract that allows recovery when a third party causes a breach of contract.").

Plaintiff clearly does not plead facts to meet these elements. First, as previously articulated, Plaintiff fails to clearly identify the specific contract(s) at issue or the terms that were purportedly breached. (Compl. ¶¶ 29-32.) Plaintiff merely reiterates the same poorly articulated facts in her breach of contract claim, baldly alleging that "Defendant Bank of America through its improper creation and application of an escrow account [sic] improperly applied fees [and] willfully caused Plaintiff to breach the mortgage agreement between Plaintiff and Defendant[.]" (Compl. ¶ 30.)

Second, Plaintiff fails to allege an intention to induce a breach of contract. Plaintiff merely states that Defendant "willfully caused Plaintiff to breach the mortgage agreement between Plaintiff and Defendant," with no supporting facts. (Compl. ¶ 30.) Third, Plaintiff fails to articulate an actual breach with any real specificity. Fourth, Plaintiff does not show how her damages related to the purported breach or even what those damages might be. Fourth, Plaintiff's Complaint is completely devoid of any showing of malice other than a conclusory statement. (Compl. ¶ 30.) Lastly, Defendant was a party to the contract. Indeed, it is hard to conceive why Defendant BANA would maliciously procure a breach of contract by Plaintiff from which it benefitted.

918098:1:NASHVILLE

Without establishing that there was, in fact, a breach of a valid contract, Plaintiff's claim must fail.

4.    Plaintiff's Claim for Violation of the Covenant of Good Faith and Fair Dealing Fails as it is Not an Independent Basis for Relief Under Tennessee Law.

Count IV of Plaintiff's Complaint alleges that Defendants violated the covenant of good faith and fair dealing by breaching "their duty to refrain from any action which would render performance of the contract impossible which they breached when they improperly created and applied funds to an escrow account in violation of the agreement between Plaintiff and Defendants, and other violations to be presented at trial." (Compl. ¶ 36.)

However, under Tennessee law, a breach of the implied covenant of good faith and fair dealing is not an independent basis for relief. *Weese v. Wyndham Vacations Resorts*, 2009 U.S. Dist. LEXIS 55328, at *14 (E.D. Tenn. June 30, 2009 (copy attached); *Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 945 (Tenn. Ct. App. 1989). In other words, a claim for a breach of the duty of good faith and fair dealing is just "part and parcel" of a breach of contract claim. *Weese*, 2009 U.S. Dist. LEXIS 55328, at *14. Thus, if there is no claim for a breach of an enforceable contact as between the parties, the good faith and fair dealing claim must fail as a matter of law. *Id.*

As set out more fully in section II.B.1-2, *supra*, Plaintiff fails to state sufficient facts to assert a breach of contract claim. As a result, Plaintiff's breach of the implied covenant of good faith and fair dealing fails as a matter of law.

918098:1:NASHVILLE

C.   **Plaintiff's Claims for Negligent Misrepresentation, Intentional Misrepresentation and Promissory Fraud Fail Because Plaintiff Has Not Alleged Any Facts Supporting the Alleged Misrepresentation.**

Count V and VI of Plaintiff's Complaint conclusively allege that Defendant engaged in material misrepresentations and "promise of future action" through allegations that it would assist Plaintiff in obtaining a loan modification. (Compl. ¶¶ 42, 51.)  However, Plaintiff cannot assert a negligent misrepresentation claim against Defendant for similar reasons because Defendant owes no duty outside of the contract.   In addition, Plaintiff has not made particularized allegations of fraud and does not even allege a valid framework for fraud.

1.   Plaintiff's Claim For Negligent Misrepresentation Fails as a Matter of Law.

Plaintiff fails to set forth the elements of negligent misrepresentation. (Compl. ¶¶ 41-46.) A claim for negligent misrepresentation is stated by showing:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*McBee v. Greer*, 2010 Tenn. App. LEXIS 378, *9 (Tenn. Ct. App. June 8, 2010) (copy attached).

As a threshold matter, it seems Plaintiff is attempting to hold Defendant liable for her own inability to make the loan payments that she admits she contracted to make. (Compl. ¶¶ 9, 42-45.)  Moreover, Plaintiff fails to identify any specific misrepresentations purportedly made, or provide any real explanation or clarification as to how any information specifically relates to Plaintiff's claims against Defendant. Instead, Plaintiff baldly claims that Defendant made "material representations" to Plaintiff in expressing to Plaintiff that Defendant would assist her in obtaining a loan modification. (Compl. ¶ 42.)  Plaintiff insists that Defendant had no intention

918098:1:NASHVILLE

22

of "ever allowing Plaintiff to modify her mortgage contract." (Compl. ¶ 43.) These types of generalized statements are insufficient to support any cognizable claims upon which relief can be granted. Moreover, as set out more fully in section II.C.2-3, herein, Plaintiff fails to allege that Defendant made any promises that it would modify Plaintiff's loan. Additionally, Plaintiff has not alleged a plausible case that Defendant failed to adhere to any representations because the obligations of the parties are controlled by the written agreements. Thus, Defendant had no legal obligation to modify Plaintiff's loan.

Although Plaintiff's Complaint appears to express frustration with the loan modification process, since Defendant never promised that it would modify Plaintiff's loan, and was under no obligation to do so, Plaintiff's claim for negligent misrepresentation must fail.

> 2.   Plaintiff's Claim for Intentional Misrepresentation Fails Because Plaintiff Fails to State a Representation With Particularity.

Similarly, Plaintiff claims that Defendant made a "material representation" to Plaintiff in expressing to Plaintiff that Defendant would assist her in obtaining a loan modification. (Compl. ¶ 42.) However, Plaintiff's claim fails to allege fraud with particularity.

The elements of intentional misrepresentation or fraud are: (1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, (3) an injury caused by reasonable reliance on the representation, and (4) the requirement that the misrepresentation involve a past or existing fact. *Mid-South Indus., Inc. v. Martin Mach. & Tool, Inc.*, 2010 Tenn. App. LEXIS 208, 19-20 (Tenn. Ct. App. Mar. 19, 2010) (citations omitted) (copy attached). Again, the elements of fraud must be "stated with particularity." Tenn. R. Civ. P. 9.02; *see also Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 41 (Tenn. Ct. App. 2006). Plaintiff must "allege the time, place, and content of the alleged misrepresentation on which [they] . . . relied," to support a fraud claim. *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62

918098:1:NASHVILLE

(6th Cir. 1993); *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634 (6th Cir. 2003).  "A claim of fraud is deficient if the complaint fails to state with particularity an intentional misrepresentation of a material fact." *Kincaid*, 221 S.W.3d at 41.

Plaintiff fails to allege any facts supporting a claim for intentional misrepresentation. Here, Plaintiff simply states that Defendant promised to assist her in obtaining a loan modification.  (Compl. ¶ 42.)  This bald allegation falls well short of the standard set forth by Rule 9.02.  It does not set forth the time, place, and content of the alleged misrepresentation on which she relied.

Instead, Plaintiff states, with no supporting facts regarding the time and place of the misrepresentation, that "Defendants knew at the time they expressed to Plaintiff that they would assist her they had no intention of ever allowing Plaintiff to modify her mortgage contract with Plaintiff."  (Compl. ¶ 43.)  Notably, Plaintiff conveniently fails to state when Defendants promised they would assist her with a loan modification.  In fact, Plaintiff fails to specify when those conversations took place, what was said during each conversation, and what specific misrepresentation Plaintiff relied on during those conversations to support her claim for intentional misrepresentation.

Moreover, Plaintiff asserts that Defendants misrepresented that they would assist her in obtaining a modification.  (Compl. ¶ 42.)  However, representations that are made as to future events will not suffice to make a case for fraudulent misrepresentation.  Similarly, representations about future conduct do not qualify as actionable as fraud.  *DeFord v. DeFord*, 1984 Tenn. App. LEXIS 3441, at *4 (W.D. Tenn. Nov. 6, 1984) (copy attached) (noting that fraud requires a misrepresentation of a past or present fact and fraud, as it related to a future event, cannot be grounds for fraud).  In order for actionable fraud to be based upon a promise of

918098:1:NASHVILLE

24

future conduct, it must be established that such a promise was made with the intent not to perform. *Carter v. American Republic Inc.*, No. 03A01-9102-CV-65, 1991 Tenn. App. LEXIS 580, at *19 (Tenn. Ct. App. 1991) (copy attached).   Representations relating to future performance are nothing more than "statements of intention" and, therefore, can never form a valid basis for fraud.

Without sufficiently pleading a "promise" or "representation," Plaintiff cannot show a reasonable reliance.   These unsupported allegations cannot provide the basis for their fraud claim. *See Birmingham-Jefferson County Transit Authority v. Boatright*, No. 3:09-0304, 2009 WL 2601926, at *3 (M.D. Tenn. Aug. 20, 2009) (copy attached) (dismissing fraud claim because plaintiff did not provide specifics regarding the misrepresentation, nor the date, time or circumstance of the misrepresentation).

In addition, the baldly stated misrepresentations asserted here are identical to the allegations made in support of Plaintiff's claim for negligent misrepresentation.   As shown above, Plaintiff has not alleged any facts supporting an assertion that Defendant promised that Plaintiff would receive a loan modification.

For these reasons, Plaintiff's intentional misrepresentation claim must be dismissed.

       3.    <u>Plaintiff's Claim for Promissory Fraud Fails Because Plaintiff Fails to Allege Fraud With the Necessary Particularity to Survive a Motion to Dismiss and Plaintiff's Claim is Barred by the Statute of Frauds.</u>

Plaintiff alleges that Defendant engaged in promissory fraud by making an empty promise to assist Plaintiff in obtaining a loan modification.   (Compl. ¶¶ 48-50.)   However, Plaintiff's Complaint again fails to meet the heightened pleading requirement of Tennessee Rule of Civil Procedure 9.02.

918098:1:NASHVILLE

In order to prove promissory fraud, a plaintiff must prove (1) a promise of future conduct; (2) that was material; (3) made with the intent not to perform; (4) that plaintiff reasonably relied upon; (5) to plaintiff's injury. *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978). "The statement of intent must be false and not actually held." *Id.* Further, failure to perform a promise alone is not evidence that the promisor never intended to perform. *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex. Ct. App. 1998); *see also Bryant v. Southern Energy Homes, Inc.*, 682 So. 2d 3, 5 (Ala. 1996). Fraud also requires a heightened pleading requirement. Tenn. R. Civ. P. 9.02 (2010). The elements of a fraud claim must be "stated with particularity." Tenn. R. Civ. P. 9.02; *Kincaid*, 221 S.W.3d at 41.

Plaintiff fails to satisfy the elements for promissory fraud and fails to meet the heightened pleading requirement of Tennessee Rule of Civil Procedure 9.02. Plaintiff's allegations are disjointed, incomprehensible, and do not allow Defendant the opportunity to respond. For example, in Paragraph 48(b) of the Complaint, Plaintiff alleges that Defendant:

> On numerous occasions including but not November 11, 2011, and a December 17, 2011, letter to Plaintiff stating to Plaintiff that "if you are unable to cure the default on or before January 16, 2011, BAC Home Loans Servicing, LP to prevent a foreclosure sale of your property for example a Repayment Plan ... Loan Modification ... Sale of Your Property, [or a] Deed in lieu of..."

First, Plaintiff's assertion here is incomprehensible and factually impossible. Plaintiff filed her Complaint on October 19, 2011, but interestingly alleges that Defendant made an intentional misrepresentation to Plaintiff in November 2011 and December 2011. Furthermore, Plaintiff fails to identify with any particularity the time, place, or content of any representation made by Defendant that promised her a binding loan modification agreement. (Compl. ¶ 48.)

Second, Plaintiff fails to allege a promise of future conduct and also fails to plead with any specificity how she allegedly acted in reasonable reliance. Plaintiff merely states she relied

918098:1:NASHVILLE

upon the representations made in the November 11, 2011 and December 17, 2011 letters to her detriment.  (Compl. ¶ 50.)  Notably, the statements contained in the letters, as quoted by Plaintiff, do not contain a promise of future conduct, or any promise at all. They are not even complete sentences.  These factually impossible and unsupported allegations cannot provide the basis for Plaintiff's fraud claim.

Third, Plaintiff fails to allege that Defendant made a promise without the intent to perform.  Plaintiff contends "Defendants knew, and as expressed by their subsequent actions[,] that the representations made in those letters regarding [assistance] to Plaintiff were false." (Compl. ¶ 49.)  Interestingly, Plaintiff fails to explain what is meant by Defendant's "subsequent actions."   Moreover, Plaintiff alleges that Defendant had no intention to carry out the "promise to at least assist Plaintiff in submitting the correct information." (Compl. ¶ 51.)  In fact, Plaintiff fails to allege any facts that Defendant made any such promise.  Plaintiff cannot plead that she relied on the promise of a loan modification when her own allegations fail to establish a promise.

Moreover, to the extent Plaintiff based her claim of promissory fraud on verbal misrepresentations or false statements made by Defendant, the Statute of Frauds would bar any claim in contract or tort.

The Tennessee Statute of Frauds clearly states:

> No action shall be brought against a lender or creditor upon any promise or commitment ... to alter, amend, renew, extend or otherwise modify or supplement any written promise, agreement or commitment to lend money or extend credit, unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the lender or creditor, or some other person lawfully authorized by such lender or creditor.

Tenn. Code Ann. § 29-2-101(b)(I).  To the extent Plaintiff's fraud and misrepresentation claims turn on purported verbal representations to modify her mortgage, the Statute of Frauds would bar

918098:1:NASHVILLE

proof of that agreement to support the fraud. The terms of any purported loan agreement, therefore, can only be altered by another written instrument. *See Bilyeu v. Volunteer State*, No. M2004-01040-COA-R3-CV, 2006 Tenn. App. LEXIS 241 (Tenn. Ct. App. Apr. 17, 2006) (copy attached).

For the above reasons, Plaintiff's claim for promise without intent to perform is not pled with particularity, violates the Statue of Frauds, and therefore must be dismissed.

**E.   Plaintiff's Claim for Injunctive Relief Fails Because Plaintiff Neglects to Verify Her Complaint and Fails to Meet the Required Elements of a Temporary Restraining Order.**

1.   <u>Plaintiff's Complaint is Not Verified</u>.

Count XI of Plaintiff's Complaint requests the issuance of a Temporary Restraining Order to restrain "Defendants from selling at auction the property subject to this lawsuit." (Compl. ¶ 53.)  Notably, Plaintiff conspicuously fails to comply with the Tennessee Rules of Civil Procedure by neglecting to verify her Complaint and failing to demonstrate her likelihood of success on the merits as the Rule requires.

Pursuant to Tennessee Rule of Civil Procedure Rule 65.03(1), the court may issue a Temporary Restraining Order ("TRO") if: "(A) specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party can be heard in opposition; and (B) the applicant's attorney … certifies in writing efforts made to give notice and the reasons why it should not be required."

In an apparent attempt to circumvent the aforementioned procedural requirements, Plaintiff attaches a purported "Affidavit of Mary Ringold," which is neither signed nor properly executed by the affiant. *See Smith v. Smith*, No. 01A01-9511-CH-00536, 1996 Tenn. App. LEXIS 585, at *6-7 (Tenn. Ct. App. 1996) (copy attached) (concluding that the record on appeal

918098:1:NASHVILLE

28

fails to support the trial court's issuance of the TRO because it does not contain a verified complaint or affidavit setting forth the bases for issuance of the TRO). Moreover, Plaintiff fails to provide any written proof of the attempts made to notify Defendant of the impending TRO. Therefore, Plaintiff's request to enjoin Defendant from selling the Property must fail as a matter of law.

2.      Plaintiff Fails to Meet the Required Elements of a Temporary Restraining Order.

Even assuming, *arguendo*, the court excuses Plaintiff's sloppy filing, the Property was sold on October 20, 2011, the day after Plaintiff filed her unverified Complaint and request for a TRO, and before Defendant received notice. Therefore, Plaintiff has not (and cannot) meet the required elements for a TRO. As such, Plaintiff's request for a TRO should also be denied as moot.

In deciding whether to grant a temporary injunction under Tenn. R. Civ. P. 65.04, a court weighs the following factors: "1) the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest." *Moody v. Hutchison*, 247 S.W.3d 187, 199-200 (Tenn. Ct. App. 2007).

Here, the Court should deny Plaintiff's injunction request. First, not only does Plaintiff fail to make any showing that she is likely to succeed on the merits on any of her claims, but Plaintiff has failed to state a claim upon which relief can be granted. Second, there is no "threat of irreparable harm" to Plaintiff because Tennessee provides a statutory right of redemption by which a debtor has up to two years to redeem her property following a foreclosure sale. T.C.A. §§ 66-8-101 to 102. Third, preventing the purchaser at the foreclosure sale from using the property pending this matter would result in more harm to the purchaser than to Plaintiff. *LEBS*

918098:1:NASHVILLE

29

*Partnership, Ltd. v. Northwestern Mut. Life Ins. Co.*, 1992 Tenn. App. LEXIS 124, at \*11 (Tenn. Ct. App. 1992) (copy attached) ("Northwestern's only recourse under the loan documents was to proceed against the property, and the injunctive relief sought posed a greater risk of harm [to Northwestern] than the injury perceived by the [claimant]."). Finally, the public interest would not be served by allowing injunctive relief as this is a dispute among private parties and, in any event, it is "certainly . . . in the public interest that one's debts are paid." *Sen. Hous. Alt., Inc. v. Bernard Glob. Loan Invest.*, Ltd., 2011 Tenn. App. LEXIS 346 at \*13 (Tenn. Ct. App. 2011) (copy attached). Therefore, because all of the factors weigh in favor of denying Plaintiff any injunctive relief, as well as the fact that the foreclosure sale took place on October 20, 2011, injunctive relief must be denied.

## CONCLUSION

For the reasons discussed above, Plaintiff has failed to properly allege any cause of action upon which relief can be granted. Therefore, Plaintiff's Complaint must be dismissed with prejudice.

918098:1:NASHVILLE

This is the 5th day of December 2011.     Respectfully submitted,

Donna L. Roberts (BPR No. 22249)
Paul Allen England (BPR No. 26288)
STITES & HARBISON, PLLC
401 Commerce Street
Suite 800
Nashville, TN  37219-2376
Telephone:  (615) 244-5200

*Counsel for Defendant Bank of America, N.A. and Defendant identified as Bank of America Home Loans*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by United States First Class Mail, postage prepaid, on this 5th day of December, 2011 upon:

E.A. Nichols
The Law Offices of E.A. Nichols, P.C.
8121 Walnut Run Road
Cordova, TN 38018

E.A. Nichols
198 S. Reese Avenue
Memphis, TN 38111

*Counsel for Plaintiff*

Paul Allen England

918098:1:NASHVILLE

31

# EXHIBIT A





Positive
As of: Nov 17, 2011

### PAM WEBB v. NASHVILLE AREA HABITAT FOR HUMANITY, INC.

#### No. M2009-01552-SC-R11-CV

#### SUPREME COURT OF TENNESSEE, AT NASHVILLE

*346 S.W.3d 422; 2011 Tenn. LEXIS 623; 32 I.E.R. Cas. (BNA) 1124*

**February 3, 2011, Session**
**July 21, 2011, Filed**

**PRIOR HISTORY:** [**1]
   *Tenn. R. App. P. 11* Appeal by Permission; Judgment of the Court of Appeals Affirmed; Case Remanded. Appeal by Permission from the Court of Appeals, Middle Section Circuit Court for Davidson County. No. 09C-1221. Barbara N. Haynes, Judge.
*Webb v. Nashville Area Habitat for Humanity, Inc., 2010 Tenn. App. LEXIS 273 (Tenn. Ct. App., Apr. 16, 2010)*

**DISPOSITION:**   Judgment of the Court of Appeals Affirmed; Case Remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellee employee filed a retaliatory discharge action against appellant employer under the Tennessee Public Protection Act, *Tenn. Code Ann. § 50-1-304* (2008 & Supp. 2010) and the common law. The trial court granted the employer's motion to dismiss for failure to state a claim under *Tenn. R. Civ. P. 12.02(6)*. The employee appealed. The Court of Appeals, Middle Section (Tennessee), vacated the trial court's judgment. The employer appealed.

**OVERVIEW:** The employee's amended complaint alleged that she was terminated by the employer for her complaints regarding, and her unwillingness to implement, participate in or remain silent about, discriminatory and illegal policies that the employer's management requested staff members to implement. The supreme court declined to adopt the new Twombly/Iqbal plausibility pleading standard and followed the notice pleading regime. Construing the complaint liberally, presuming all factual allegations to be true and giving the employee the benefit of all reasonable inferences, it was not apparent from the face of the amended complaint that the employee could have proven no set of facts in support of the claim that would have entitled her to relief. The amended complaint specifically referred to the statute upon which the employee was relying to state her claim, *Tenn. Code Ann. § 50-1-304*, and thus comported with *Tenn. R. Civ. P. 8.05(1)*. The amended complaint, while not a model of pleading, provided the employer with sufficient notice of the claims alleged and sufficiently pleaded a legal cause of action.

**OUTCOME:** The court affirmed the judgment.

**LexisNexis(R) Headnotes**

346 S.W.3d 422, *; 2011 Tenn. LEXIS 623, **1;
32 I.E.R. Cas. (BNA) 1124

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN1] *Tenn. R. Civ. P. 8.01* requires that a pleading for relief shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN2] See *Tenn. R. Civ. P. 8.05(1)*.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN3] When a complaint fails to comply with Tenn. R. Civ. P. 8, it is subject to dismissal by grant of a motion to dismiss for failure to state a claim upon which relief can be granted, as provided by *Tenn. R. Civ. P. 12.02(6)*. A *Rule 12.02(6)* motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. The resolution of a *Rule 12.02(6)* motion to dismiss is determined by an examination of the pleadings alone. A defendant who files a motion to dismiss admits the truth of all of the relevant and material allegations contained in the complaint, but. asserts that the allegations fail to establish a cause of action. In considering a motion to dismiss, courts must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences. A trial court should grant a motion to dismiss only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. An appellate court reviews the trial court's legal conclusions regarding the adequacy of the complaint de novo.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN4] Under Tenn. R. Civ. P. 8, Tennessee follows a liberal notice pleading standard, which recognizes that the primary purpose of pleadings is to provide notice of the issues presented to the opposing party and court.

Tennessee's notice pleading regime is firmly established and longstanding; the object and purpose of any pleading is to give notice of the nature of the wrongs and injuries complained of with reasonable certainty, and notice of the defenses that will be interposed, and to acquaint the court with the real issues to be tried.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN5] To be sufficient and survive a motion to dismiss, a complaint must not be entirely devoid of factual allegations. Tennessee courts interpret *Tenn. R. Civ. P. 8.01* to require a plaintiff to state the facts upon which a claim for relief is founded. A complaint need not contain detailed allegations of all the facts giving rise to the claim, but it must contain sufficient factual allegations to articulate a claim for relief. The facts pleaded, and the inferences reasonably drawn from these facts, must raise the pleader's right to relief beyond the speculative level. While a complaint in a tort action need not contain in minute detail the facts that give rise to the claim, it must contain direct allegations on every material point necessary to sustain a recovery on any legal theory, even though it may not be the theory suggested by the pleader, or contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial. Moreover, courts are not required to accept as true assertions that are merely legal arguments or legal conclusions couched as facts.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN6] Until 2007, the Tennessee standard on a *Tenn. R. Civ. P. 12.02(6)* motion to dismiss was generally the same as the federal standard under the similarly worded *Fed. R. Civ. P. 12(b)(6)*. Both followed the Conley formulation of the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. However, the U.S. Supreme Court announced the retirement of the Conley standard in favor of a new plausibility pleading standard. Stating a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply

346 S.W.3d 422, *; 2011 Tenn. LEXIS 623, **1;
32 I.E.R. Cas. (BNA) 1124

calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of *Fed. R. Civ. P. 8(a)(2)* that the plain statement possess enough heft to show that the pleader is entitled to relief. The plausibility standard applies in all federal civil actions.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN7] To survive a motion to dismiss in a federal civil action, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.' Two working principles underlie the decision: First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Fed. R. Civ. P. 8* marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN8] Under the Twombly/Iqbal plausibility pleading standard, a trial court presented with a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. The trial court is then tasked with determining whether the well-pleaded facts, assumed as true, plausibly give

rise to an entitlement to relief. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. If the facts pleaded do not permit the court to infer more than the mere possibility of misconduct, then the complaint is insufficient because it has alleged -- but it has not shown -- that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*.

*Governments > Courts > Judicial Precedents*
[HN9] Once the Tennessee Supreme Court has addressed an issue, its decision regarding that issue is binding on the lower courts. The Tennessee Court of Appeals has no authority to overrule or modify the Tennessee Supreme Court's opinions.

*Governments > Courts > Judicial Precedents*
*Governments > Courts > Rule Application & Interpretation*
[HN10] Although federal judicial decisions interpreting rules similar to Tennessee's own are persuasive authority for purposes of construing the Tennessee rule, they are non-binding even when the state and federal rules are identical.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN11] The Tennessee Supreme Court declines to adopt the new federal Twombly/Iqbal plausibility pleading standard and adheres to the notice pleading standard.

*Governments > Courts > Judicial Precedents*
[HN12] The doctrine of stare decisis is one of commanding importance, giving, as it does, firmness and stability to principles of law. Stability in the law allows individuals to plan their affairs and to safely judge of their legal rights.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN13] The plausibility pleading standard incorporates an evaluation and determination of likelihood of success

346 S.W.3d 422, *; 2011 Tenn. LEXIS 623, **1;
32 I.E.R. Cas. (BNA) 1124

on the merits -- a judicial weighing of the facts pleaded to see if they "plausibly" present a claim for relief -- at the earliest stage of the proceedings, before a sworn denial is even required. The new *Fed. R. Civ. P. 12(b)(6)* standard effectively reads "plausible" into the rule, as follows: failure to state a plausible claim upon which relief can be granted. This adds a determination of the likelihood of success on the merits, so that a trial judge can dismiss a claim, even where the law does provide a remedy for the conduct alleged by the plaintiff, if that judge does not believe it is plausible the claim will ultimately succeed.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN14] In Tennessee, a *Tenn. R. Civ. P. 12.02(6)* motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Governments > Courts > Rule Application & Interpretation*
[HN15] There is a strong preference embodied in the Tennessee Rules of Civil Procedure that cases stating a valid legal claim brought by Tennessee citizens be decided on their merits. The Tennessee Rules of Civil Procedure are intended to insure that cases and controversies be determined upon their merits and not upon legal technicalities or procedural niceties.

*Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions*
[HN16] The right of trial by jury shall remain inviolate. *Tenn. Const. art. I, § 6.*

*Governments > Courts > Authority to Adjudicate*
*Governments > Courts > Rule Application & Interpretation*
[HN17] As a constitutional matter, the Tennessee Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of Tennessee, and this power cannot be constitutionally exercised by any other branch of government. *Tenn. Code Ann. §§ 16-3-401, -402 (2009)*. The ordinary rule-making and amendment procedure provides for a broad

discussion and examination of the policies at issue and allows for input from the advisory commission, *Tenn. Code Ann. § 16-3-601 (2009)*, and members of the bench, bar, and general public.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN18] *Tenn. R. Civ. P. 8.01* has not been amended and still only requires (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN19] See *Tenn. Code Ann. § 50-1-304(b), (d)(1)*.

*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview*
[HN20] A claimant alleging a claim of retaliatory discharge under *Tenn. Code Ann. § 50-1-304* has the burden of proving the following four elements to prevail on his or her statutory retaliatory discharge claim: (1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in or remain silent about illegal activity; (3) the defendant employer discharged or terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview*
[HN21] A claimant alleging a claim of common law retaliatory discharge has the burden of proving the following four elements of the claim: (1) that an employment-at-will relationship existed;(2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the

346 S.W.3d 422, *; 2011 Tenn. LEXIS 623, **1;
32 I.E.R. Cas. (BNA) 1124

employee's exercise of protected rights or compliance with clear public policy.

**COUNSEL:** R. Eddie Wayland, Nashville, Tennessee, for the appellant, Nashville Area Habitat for Humanity, Inc.

James L. Harris, Nashville, Tennessee, for the appellee, Pam Webb.

Dale Conder, Jr. and Bradford D. Box, Jackson, Tennessee, for the Amicus Curiae, Tennessee Defense Lawyers Association.

Justin Gilbert, Jackson, Tennessee, William B. Ryan, Memphis, Tennessee, Jennifer B. Morton, Knoxville, Tennessee, and Wade B. Cowan, Nashville, Tennessee, for the Amicus Curiae, Tennessee Employment Lawyers Association.

Jonathan O. Harris, Nashville, Tennessee, for the Amicus Curiae, Center for Individual Freedom.

**JUDGES:** SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

**OPINION BY:** SHARON G. LEE

**OPINION**

[*424] In this action alleging retaliatory discharge, the trial court granted the defendant's motion to dismiss for failure to state a claim [**2] upon which relief can be granted pursuant to *Tennessee Rule of Civil Procedure 12.02(6)*. The Court of Appeals vacated the trial court's judgment, holding that the amended complaint sufficiently stated a cause of action for retaliatory discharge. We address the issue of the proper standard for Tennessee courts to apply in ruling on a *Rule 12.02(6)* motion to dismiss in light of the United States Supreme Court's recent decisions in *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007),* and *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).* We decline to adopt the new Twombly/Iqbal "plausibility" pleading standard and affirm the judgment of the Court of Appeals.

**OPINION**

*Background*

Pam Webb was employed by the Nashville Area Habitat for Humanity, Inc. ("Habitat") as vice president of family services, beginning her employment in August of 2007. Habitat terminated Ms. Webb's employment in February of 2009. Ms. Webb filed a complaint alleging retaliatory discharge under the Tennessee Public Protection Act ("TPPA"), *Tenn. Code Ann. § 50-1-304* (2008 & Supp. 2010), and the common law of Tennessee. After Habitat filed a motion to dismiss her complaint for failure to state a claim upon which relief [**3] can be granted pursuant to *Tennessee Rule of Civil Procedure 12.02(6)*, Ms. Webb filed an amended complaint that alleged the following:

[I]n December 2008 plaintiff filed a written complaint regarding what she had reasonable cause to believe perceived [sic] were illegal acts which had been or would be performed at the discretion of [Habitat's] management. Specifically, plaintiff was told not to allow [*425] services to be given to a person 74 years old because it would be a bad decision to loan money to someone this old. Further, Chris McCarthy, a management employee, made statements and asked staff members to implement policies that were and are discriminatory and in direct violation of the Equal Credit Opportunity Act, regulations promulgated thereunder, and the Tennessee Human Rights Act in that the policies in question involved unlawful age discrimination. The statements have been made in regard not only to age but also as to familial status, and disability, thus evidencing a course of illegal corporate conduct.

As a result of plaintiff's complaints and unwillingness to participate in or remain silent about these illegal acts, plaintiff was terminated approximately two months later on or [**4] about February 23, 2009. The reason given was "budgetary reasons." However, plaintiff would state that this reason is a pretext meant to disguise the real reason which was the fact that she complained about

346 S.W.3d 422, *425; 2011 Tenn. LEXIS 623, **4;
32 I.E.R. Cas. (BNA) 1124

illegal activities, and refused to participate in or remain silent about those activities.

Habitat responded by filing an amended 12.02(6) motion to dismiss, asserting that the amended complaint failed to state a claim upon which relief can be granted.

The trial court granted Habitat's motion and dismissed Ms. Webb's amended complaint on all of her claims. The Court of Appeals vacated the trial court's judgment, holding that the amended complaint sufficiently stated a cause of action for retaliatory discharge. We granted review to address the issue of the proper standard for Tennessee courts to apply in ruling on a *Tennessee Rule of Civil Procedure 12.02(6)* motion to dismiss a complaint for failure to state a claim upon which relief can be granted in light of the United States Supreme Court's recent decisions altering the federal standard in *Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929*, and *Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868*. In this appeal, Habitat and amici curiae Tennessee Defense Lawyers Association and The Center [**5] for Individual Freedom urge us to adopt the Twombly/Iqbal standard, which "retired" the notice pleading regime recognized in *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, and followed for fifty years, in favor of a new "plausibility" standard. For the reasons discussed below, we decline to adopt the *Twombly/Iqbal* plausibility pleading standard.

*Analysis*

*1. The Tennessee Standards – Motion to Dismiss*

[HN1] *Tennessee Rule of Civil Procedure 8.01* requires that a pleading for relief "shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks." *Rule 8.05(1)* further provides:

[HN2] Each averment of a pleading shall be simple, concise and direct. No technical forms of pleading or motions are required. Every pleading stating a claim or defense relying upon the violation of a statute shall, in a separate count or paragraph, either specifically refer to the statute or state all of the facts necessary to constitute such breach so that the other party can be duly apprised of the statutory violation charged. The substance of any ordinance or regulation relied upon for claim or defense shall be stated in a separate [**6] count or paragraph and the ordinance or regulation shall be clearly identified. The manner in which violation of any statute, ordinance or regulation is claimed shall be set forth.

[HN3] When a complaint fails to comply with Rule 8, it is subject to dismissal by grant of a motion to dismiss for failure to state a [*426] claim upon which relief can be granted, as provided by *Tennessee Rule of Civil Procedure 12.02(6)*. The standards by which our courts should assess and dispose of a *Rule 12.02(6)* motion to dismiss are well-established and have been clearly and consistently applied in Tennessee for nearly forty years, following the adoption of the Tennessee Rules of Civil Procedure in 1970.

A *Rule 12.02(6)* motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. *Highwoods Props., Inc. v. City of Memphis, 297 S.W.3d 695, 700 (Tenn. 2009); Willis v. Tenn. Dep't of Corr., 113 S.W.3d 706, 710 (Tenn. 2003); Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 986 S.W.2d 550, 554 (Tenn. 1999); Sanders v. Vinson, 558 S.W.2d 838, 840 (Tenn. 1977)*. The resolution of a 12.02(6) motion to dismiss is determined by an examination [**7] of the pleadings alone. *Leggett v. Duke Energy Corp., 308 S.W.3d 843, 851 (Tenn. 2010); Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 696 (Tenn. 2002); Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc., 878 S.W.2d 934, 938 (Tenn. 1994); Cornpropst v. Sloan, 528 S.W.2d 188, 190 (Tenn. 1975)* (overruled on other grounds by *McClung v. Delta Square Ltd. P'ship, 937 S.W.2d 891, 899-900 (Tenn. 1996))*. A defendant who files a motion to dismiss "'admits the truth of all of the relevant and material allegations contained in the complaint, but . . . asserts that the allegations fail to establish a cause of action.'" *Brown v. Tenn. Title Loans, Inc., 328 S.W.3d 850, 854 (Tenn. 2010)* (quoting *Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 516 (Tenn. 2005)); see Edwards v. Allen, 216 S.W.3d 278, 284 (Tenn. 2007); White v. Revco Disc. Drug Ctrs., Inc., 33 S.W.3d 713, 718 (Tenn. 2000); Holloway v. Putnam Cnty., 534 S.W.2d 292, 296 (Tenn. 1976)*.

In considering a motion to dismiss, courts "'must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.'" *Tigg v. Pirelli Tire Corp.,* 232 S.W.3d 28, 31-32 (Tenn. 2007) [**8] (quoting *Trau-Med,* 71 S.W.3d at 696); see *Leach v. Taylor,* 124 S.W.3d 87, 92-93 (Tenn. 2004); *Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 716 (Tenn. 1997); *Bellar v. Baptist Hosp., Inc.,* 559 S.W.2d 788, 790 (Tenn. 1978); see also *City of Brentwood v. Metro. Bd. of Zoning Appeals,* 149 S.W.3d 49, 54 (Tenn. Ct. App. 2004) (holding that courts "must construe the complaint liberally in favor of the plaintiff by . . . giving the plaintiff the benefit of all the inferences that can be reasonably drawn from the pleaded facts"). A trial court should grant a motion to dismiss "only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Crews v. Buckman Labs. Int'l, Inc.,* 78 S.W.3d 852, 857 (Tenn. 2002); see *Lanier v. Rains,* 229 S.W.3d 656, 660 (Tenn. 2007); *Doe v. Sundquist,* 2 S.W.3d 919, 922 (Tenn. 1999); *Pemberton v. Am. Distilled Spirits Co.,* 664 S.W.2d 690, 691 (Tenn. 1984); *Fuerst v. Methodist Hosp. S.,* 566 S.W.2d 847, 848 (Tenn. 1978); *Ladd v. Roane Hosiery, Inc.,* 556 S.W.2d 758, 759-60 (Tenn. 1977). We review the trial court's legal conclusions regarding the adequacy of the complaint de novo. *Brown,* 328 S.W.3d at 855; [**9] *Stein,* 945 S.W.2d at 716.

[HN4] Under Tennessee Rule of Civil Procedure 8, Tennessee follows a liberal notice pleading standard, see *Leach,* 124 S.W.3d at 92-93, which recognizes that the primary purpose of pleadings is to provide notice of the issues presented to the opposing party and court. *Abshure v. Methodist Healthcare-Memphis Hosps.,* 325 S.W.3d 98, 103 (Tenn. 2010); see also Robert [*427] Banks, Jr. & June F. Entman, Tennessee Civil Procedure § 5-4(a) (3d ed. 2009) ("The essential function of the pleadings is simply to give notice of a claim or defense. History, as Professors Wright and Miller point out, has shown that the pleadings cannot successfully do more.") (footnotes omitted). Our state's notice pleading regime is firmly established and longstanding; this Court recognized well before the Tennessee Rules of Civil Procedure were adopted that "[t]he object and purpose of any pleading is to give notice of the nature of the wrongs and injuries complained of with reasonable certainty, and notice of the defenses that will be interposed, and to acquaint the court with the real issues to be tried." *Hammett v. Vogue, Inc.,* 179 Tenn. 284, 165 S.W.2d 577, 579 (Tenn. 1942).

[HN5] To be sufficient and survive a motion [**10] to dismiss, a complaint must not be entirely devoid of factual allegations. Tennessee courts have long interpreted *Tennessee Rule of Civil Procedure 8.01* to require a plaintiff to state "the facts upon which a claim for relief is founded." *Smith v. Lincoln Brass Works, Inc.,* 712 S.W.2d 470, 471 (Tenn. 1986) (quoting *W & O Constr. Co. v. City of Smithville,* 557 S.W.2d 920, 922 (Tenn. 1977)). A complaint "need not contain detailed allegations of all the facts giving rise to the claim," but it "must contain sufficient factual allegations to articulate a claim for relief." *Abshure,* 325 S.W.3d at 103-04. "The facts pleaded, and the inferences reasonably drawn from these facts, must raise the pleader's right to relief beyond the speculative level." *Id.* at 104. Thus, as we observed in *Leach,*

"While a complaint in a tort action need not contain in minute detail the facts that give rise to the claim, *it must contain direct allegations on every material point necessary to sustain a recovery on any legal theory, even though it may not be the theory suggested ... by the pleader, or contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced* [**11] *at trial.*"

124 S.W.3d at 92 (quoting *Donaldson v. Donaldson,* 557 S.W.2d 60, 61 (Tenn. 1977)) (alteration in original); accord *Givens v. Mullikin ex rel. Estate of McElwaney,* 75 S.W.3d 383, 399 (Tenn. 2002). Moreover, courts are not required to accept as true assertions that are merely legal arguments or "legal conclusions" couched as facts. *Riggs v. Burson,* 941 S.W.2d 44, 47-48 (Tenn. 1997).

## 2. The Federal Standard — Twombly and Iqbal

[HN6] Until 2007, the Tennessee standard on a *Rule 12.02(6)* motion to dismiss was generally the same as the federal standard under the similarly worded *Federal Rule of Civil Procedure 12(b)(6).* Both followed the Conley formulation of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46. This Court adopted the Conley standard in *Ladd,* 556 S.W.2d at 759-60, and we have routinely applied it many times since *Ladd* was

346 S.W.3d 422, *427; 2011 Tenn. LEXIS 623, **11;
32 I.E.R. Cas. (BNA) 1124

decided in 1977.[1]

    1    See, e.g., *Leggett, 308 S.W.3d at 851; Highwoods Props., 297 S.W.3d at 700; Lanier, 229 S.W.3d at 660; Leach, 124 S.W.3d at 92; Willis, 113 S.W.3d at 710;* [**12] *Crews, 78 S.W.3d at 855; Givens, 75 S.W.3d at 391; Trau-Med, 71 S.W.3d at 696; White, 33 S.W.3d at 718; Doe, 2 S.W.3d at 922; Bell ex rel. Snyder. 986 S.W.2d at 554; Stein, 945 S.W.2d at 716; Cook ex rel. Uithoven, 878 S.W.2d at 938; Smith. 712 S.W.2d at 471; Pemberton, 664 S.W.2d at 691; Fuerst, 566 S.W.2d at 848; Bellar, 559 S.W.2d at 790.*

In Twombly, the Supreme Court announced the "retirement" of the Conley standard in favor of a new "plausibility" [*428] pleading standard. *550 U.S. at 563.* The Twombly plaintiffs alleged that major telecommunications providers violated the Sherman Antitrust Act, *15 U.S.C. § 1*, by engaging in parallel conduct unfavorable to competition and by agreeing to refrain from competing with one another. *550 U.S. at 550-51.* The Court observed that the allegation of parallel conduct was factually ambiguous, stating that "[t]he inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id. at 554.* The Court held that in an antitrust action, [**13] "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice," and that allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id. at 556-57.*

The Twombly Court stated the following in formulating its new plausibility pleading standard:

    we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal

agreement. . .

    The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of *Rule 8(a)(2)* that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further [**14] circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.

*Id. at 556, 557* (alteration in original).

    The Twombly formulation of the plausibility standard left open many questions about the state of federal pleading practice.[2] The Supreme Court answered some of these questions two years later in *Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868.* The Court made it clear in Iqbal that the Twombly plausibility standard applies in all federal civil actions.[3] *Id. at 1953.* The Court elaborated on its plausibility pleading standard formulation as follows:

    [*429] [HN7] To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short [**15] of the line between possibility and plausibility of 'entitlement to relief.'"

*Id. at 1949* (citations omitted) (quoting *Twombly, 550*

346 S.W.3d 422, *429; 2011 Tenn. LEXIS 623, **15;
32 I.E.R. Cas. (BNA) 1124

*U.S. at 556-57, 570).* The Court observed "[t]wo working principles" underlying the Twombly decision:

First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.

*Id. at 1949-50* (citations omitted).

2   See, e.g., Joseph A. Seiner, The Trouble With *Twombly*: A Proposed Pleading Standard for Employment Discrimination Cases, *2009 U. Ill. L. Rev. 1011, 1038 (2009)* (hereinafter "Seiner, The Trouble With *Twombly*") ("Despite the fact that Twombly is a very recent decision, it has already generated significant confusion and conflicting decisions in the appellate courts."); Z. W. [**16] Julius Chen, Note, Following the Leader: *Twombly*, Pleading Standards, and Procedural Uniformity, *108 Colum. L. Rev. 1431,1431 (2008)* ("This new [Twombly] paradigm has confounded the legal community since its inception.").

3   The language employed by the Court in Twombly left open the possibility that the Court intended to limit the application of the plausibility standard to the antitrust setting. *Twombly, 550 U.S. at 553* ("We granted certiorari to address the proper standard for pleading an antitrust conspiracy . . . ."); *id. at 554-55* ("This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act.").

Thus, [HN8] under the Twombly/Iqbal plausibility pleading standard, a trial court presented with a *Rule 12(b)(6)* motion to dismiss "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id. at 1950.* The trial court is then tasked with

determining whether the well-pleaded facts, assumed as true, "plausibly give rise to an entitlement to relief." Id. The Iqbal court advised that "[d]etermining whether a complaint states a plausible claim for relief [**17] will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. If the facts pleaded "do not permit the court to infer more than the mere possibility of misconduct," then the complaint is insufficient because it "has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Id. (alteration in original) (quoting *Fed. R. Civ. P. 8(a)(2)).*

The Tennessee Court of Appeals has cited Twombly and/or Iqbal in eight opinions[4] since the Supreme Court decided Twombly, and on one occasion has purported to "recognize [Twombly's] applicability" in Tennessee. *Hermosa Holdings, 2009 Tenn. App. LEXIS 282, 2009 WL 711125, at *3.* However, in *Morris v. Grusin,* the Court of Appeals, urged by the defendants to adopt the [*430] Twombly/Iqbal standard, correctly stated that

[HN9] [o]nce the Tennessee Supreme Court has addressed an issue, its decision regarding that issue is binding on the lower courts. The Court of Appeals has no authority to overrule or modify [the] Supreme Court's opinions. Accordingly, we are not at liberty to adopt the more liberal [Twombly/Iqbal] standard for dismissing complaints for failure to state a claim urged by Defendants.

*2009 Tenn. App. LEXIS 874, 2009 WL 4931324, at *4* [**18] (first alteration in original) (citations and internal quotation marks omitted); see also *Brukardt, 2009 Tenn. App. LEXIS 269, 2009 WL 426237, at *7* (stating that "this Court is not in a position to adopt the stricter Twombly standard").

4   See *Deja Vu of Nashville, Inc. v. Metro. Gov't, 311 S.W.3d 913, 918-19 (Tenn. Ct. App. 2009);* State ex rel. Watson v. Waters, No. E2009-01753-COA-R3-CV, *2010 Tenn. App. LEXIS 535, 2010 WL 3294109, at *4 (Tenn. Ct. App. Aug. 20, 2010);* Jackson v. Metro. Gov't, No. M2009-01970-COA-R3-CV, *2010 Tenn. App. LEXIS 379, 2010 WL 2287639, at *3 (Tenn. Ct. App. June 7, 2010);* Morris v. Grusin, No. W2009-00033-COA-R3-CV, *2009 Tenn. App.*

346 S.W.3d 422, *430; 2011 Tenn. LEXIS 623, **18;
32 I.E.R. Cas. (BNA) 1124

*LEXIS 874, 2009 WL 4931324, at \*3 (Tenn. Ct. App. Dec. 22, 2009); Steele v. Ritz, No. W2008-02125-COA-R3-CV, 2009 Tenn. App. LEXIS 843, 2009 WL 4825183, at \*2 n.3 (Tenn. Ct. App. Dec. 16, 2009); W. Express, Inc. v. Brentwood Servs., Inc., No. M2008-02227-COA-R3-CV, 2009 Tenn. App. LEXIS 707, 2009 WL 3448747, at \*9 (Tenn. Ct. App. Oct. 26, 2009); Hermosa Holdings, Inc. v. Mid-Tenn. Bone & Joint Clinic, P.C., No. M2008-00597-COA-R3-CV, 2009 Tenn. App. LEXIS 282, 2009 WL 711125, at \*3 (Tenn. Ct. App. Mar. 16, 2009); Ind. State Dist. Council of Laborers v. Brukardt, No. M2007-02271-COA-R3-CV, 2009 Tenn. App. LEXIS 269, 2009 WL 426237, at \*7 (Tenn. Ct. App. Feb. 19,2009).*

This case squarely presents the question of whether Tennessee should adopt [**19] the federal Twombly/Iqbal plausibility pleading standard. [HN10] Although federal judicial decisions "interpreting rules similar to our own are persuasive authority for purposes of construing the Tennessee rule," they "are non-binding even when the state and federal rules are identical." *Harris v. Chem, 33 S.W.3d 741, 745 n.2 (Tenn. 2000);* see also *Bowman v. Henard, 547 S.W.2d 527, 530 (Tenn. 1977).* [HN11] We decline to adopt the new plausibility standard and adhere, for the following reasons, to the notice pleading standard and the principles discussed in section 1 above that have long governed Tennessee pleading practice.

First, the Twombly and Iqbal decisions reflect a significant and substantial departure from the United States Supreme Court's prior interpretations of *Fed. R. Civ. P. 8* and the seventy-year history of a liberal notice pleading standard as envisioned by the Federal Rules of Civil Procedure and recognized in Conley. The Washington Supreme Court, in a recent decision rejecting the federal plausibility standard, described it as "a drastic change in court procedure." *McCurry v. Chevy Chase Bank, FSB, 169 Wn.2d 96, 233 P.3d 861, 863 (Wash. 2010)* (en banc). Despite the Court's insistence in a Twombly [**20] footnote that "we do not apply any 'heightened' pleading standard," *550 U.S. at 569 n.14,* academic commentators have been in general agreement that Twombly/Iqbal affected a major change in pleading practice and jurisprudence. See, e.g., Thomas P. Gressette, Jr., The Heightened Pleading Standard of *Bell*

*Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal: A New Phase in American Legal History Begins, 58 Drake L. Rev. 401, 420 (2010)* ("Twombly stands for the most remarkable shift in pleadings requirements since the implementation of Conley's highly liberal construction of the already generous Rule 8."); Arthur R. Miller, From *Conley* to *Twombly* to *Iqbal: A Double Play on the Federal Rules of Civil Procedure, 60 Duke L.J. 1, 15-16 (2010)* (hereinafter "Miller, A Double Play") ("Recognizing the importance of Twombly and Iqbal, most -- but not all -- observers believe these two cases represent a major departure from the Court's established pleading jurisprudence . . . .") (footnotes omitted); Alexander A. Reinert, The Costs of Heightened Pleading, *86 Ind. L.J. 119, 122 (2011)* ("[T]here is close to a consensus among academic observers that the Iqbal/Twombly pleading standard marks a sharp break [**21] with the past") (footnote omitted); A. Benjamin Spencer, Plausibility Pleading, *49 B.C. L. Rev. 431, 431-32 (2008)* ("In a startling move by the U.S. Supreme Court, the seventy-year-old liberal pleading standard of *[Rule] 8(a)(2)* has been decidedly tightened (if not discarded) in favor of a stricter standard requiring the pleading of facts painting a 'plausible' picture of liability."). Notably, the Court in Iqbal did not mention the concept of "notice" in its discussion and formulation of the plausibility [*431] standard, nor did the Court cite any pre-Twombly decision in that discussion.

The result of this change has been a loss of clarity, stability, and predictability in federal pleadings practice. See Kevin M. Clermont & Stephen C. Yeazell, Inventing Tests, Destabilizing Systems, *95 Iowa L. Rev. 821,832 (2010)* ("The two cases profoundly changed the law of pleading by adopting a procedural mechanism without precedent in the law. No prior model exists to help us understand how to test factual sufficiency now."); Miller, A Double Play, *60 Duke L.J. at 2,* 21-22 ("Twombly and Iqbal have destabilized both the pleading and the motion-to-dismiss practices as they have been known for over sixty [**22] years. . . . Most significantly, the decisions have unmoored our long-held understanding that the motion to dismiss simply tests a pleading's notice-giving and substantive-law sufficiency."); Seiner, The Trouble With *Twombly, 2009 U. Ill. L. Rev. at 1038* (observing that Twombly "has already generated significant confusion and conflicting decisions in the appellate courts").[5]

---

5   See also Kevin M. Clermont, Three Myths

346 S.W.3d 422, *431; 2011 Tenn. LEXIS 623, **22;
32 I.E.R. Cas. (BNA) 1124

About *Twombly-Iqbal*, 45 *Wake Forest L. Rev.* 1337, 1338 (2010) (noting "the three destabilizing attributes of Twombly and Iqbal: their doctrine is thoroughly novel, quite uncertain, and shakily resting on a foundation laid by a faulty legal process"). A number of scholarly commentators, however, have either supported the pleading changes arising from Twombly and Iqbal or questioned whether the decisions are being misconstrued by detractors. See, e.g., Victor E. Schwartz & Christopher E. Appel, Rational Pleading in the Modern World of Civil Litigation: The Lessons and Public Policy Benefits of *Twombly* and *Iqbal*, 33 *Harv. J.L. & Pub. Pol'y* 1107, 1110 (2010); Bradley Scott Shannon, I Have Federal Pleading All Figured Out, 61 *Case W. Res. L. Rev.* 453, 455-56 (2010); Douglas G. [**23] Smith, The Evolution of a New Pleading Standard: *Ashcroft v. Iqbal*, 88 *Or. L. Rev.* 1053, 1057-58 (2009).

If this Court were to follow the Supreme Court's lead in Twombly/Iqbal and "reinterpret" Tennessee Rule of Procedure 8 to mandate the new plausibility standard, it would similarly require the substantial alteration or abandonment of pleading principles that have been stable and predictable for forty years in Tennessee. *See Colby v. Umbrella, Inc.*, 184 Vt. 1, 955 A.2d 1082, 1086-87 n.1 (Vt. 2008) (Whether Twombly "creates a new and heightened pleading standard . . . and it is arguable in light of conflicting interpretations of Twombly, . . . we have relied on the Conley standard for over twenty years, and are in no way bound by federal jurisprudence in interpreting our state pleading rules . . . and are unpersuaded . . . that we should now abandon it for a heightened standard."); *McCurry*, 233 P.3d at 864 (finding no "basis to fundamentally alter our interpretation of *[Washington Superior Court Civil Rule] 12(b)(6)* that has been in effect for nearly 50 years").[6] In making this determination we are mindful of [HN12] the doctrine of stare decisis, which is "'one of commanding importance, giving, as it [**24] does, firmness and stability to principles of law.' Stability in the law allows individuals to plan their affairs and to 'safely judge of their legal rights.'" *In re Estate of McFarland*, 167 S.W.3d 299, 306 (Tenn. 2005) (quoting *J.T. Fargason Co. v. Ball*, 128 Tenn. 137, 159 S.W. 221, 222 (Tenn. 1913)).

6   But see also *Doe v. Bd. of Regents of Univ. Of Neb.*, 280 Neb. 492, 788 N.W.2d 264, 274-78

(Neb. 2010) (adopting the Twombly/Iqbal standard); *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879, 890 (Mass. 2008) (adopting the Twombly standard in a pre-Iqbal decision), *Sisney v. Best Inc.*, 2008 SD 70, 754 N.W.2d 804, 807-09 (S.D. 2008) (adopting the Twombly standard in a pre-Iqbal decision).

Second, [HN13] the plausibility pleading standard incorporates an evaluation and determination of likelihood of success on the merits – a judicial weighing of the facts [*432] pleaded to see if they "plausibly" present a claim for relief -- at the earliest stage of the proceedings, before a sworn denial is even required. As the Washington Supreme Court observed,

> [t]he new *Fed. R. Civ. P. 12(b)(6)* standard effectively reads "plausible" into the rule, as follows: "failure to state a [plausible] claim upon which relief can be granted." This adds a determination of [**25] the likelihood of success on the merits, so that a trial judge can dismiss a claim, even where the law does provide a remedy for the conduct alleged by the plaintiff, if that judge does not believe it is plausible the claim will ultimately succeed.

*McCurry*, 233 P.3d at 863; see also Miller, A Double Play, 60 *Duke L.J* at 17-18, 30 ("[T]he center of gravity of federal litigation has been shifted forward in time and the Court has accorded the *Rule 12(b)(6)* motion to dismiss potentially life-or-death significance for the pleader of an affirmative claim. . . . In other words, a trial-like scrutiny of the merits is being shifted to an extremely early point in the pretrial phase.").

This fact-weighing and merits-based determination aspect of the *Twombly /Iqbal* standard is at odds with the well-established principle [HN14] in Tennessee that a *Rule 12.02(6)* motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. *Highwoods Props.*, 297 S.W.3d at 700; *Willis*, 113 S.W.3d at 710; *Bell ex rel. Snyder*, 986 S.W.2d at 554; *Sanders*, 558 S.W.2d at 840. It also conflicts with [HN15] the strong preference embodied in the Tennessee Rules of Civil Procedure that [**26] cases stating a valid legal claim brought by Tennessee citizens be decided on their merits. *Jones v.*

346 S.W.3d 422, *432; 2011 Tenn. LEXIS 623, **26;
32 I.E.R. Cas. (BNA) 1124

*Prof'l Motorcycle Escort Serv., L.L.C, 193 S.W.3d 564, 572 (Tenn. 2006)* ("The Tennessee Rules of Civil Procedure are intended 'to insure that cases and controversies are determined upon their merits and not upon legal technicalities or procedural niceties.'") (quoting *Karash v. Pigott, 530 S.W.2d 775, 777 (Tenn. 1975)*); see also *Patton v. Dixon, 105 Tenn. 97, 58 S.W. 299, 301 (Tenn. 1900)*. Furthermore, the Twombly/Iqbal standard requiring the trial court to scrutinize and weigh the well-pleaded facts to determine if they present a plausible claim, and allowing the court to dismiss the case at the pleading stage if it determines, in light of its "judicial experience and common sense," *Iqbal, 129 S. Ct. at 1950*, that the claim is not plausible, raises potential concerns implicating the Tennessee constitutional mandate that [HN16] "the right of trial by jury shall remain inviolate." *Tenn. Const. art. I, § 6.*[7]

> 7   See also Kenneth S. Klein, *Ashcroft v. Iqbal Crashes Rule 8 Pleading Standards on to Unconstitutional Shores, 88 Neb. L. Rev. 261, 262, 287 (2009)* ("The collision between *Iqbal* and the *Seventh Amendment,* [**27] simply stated, is that under the historical test it is unconstitutional to give a judge the power to weigh the factual heft of a complaint at the outset of a civil case and to dismiss it as insufficient. . . . There can be no debate that this is not a mere incident of technical procedure -- this is a weighing of evidence, pre-discovery, with the potential consequence of dismissal of potentially meritorious litigation.").

Third, the tests formulated by *Twombly* and *Iqbal* in attempting to guide courts that must now determine the plausibility of a claim on the pleading alone are problematic. Under the first prong of Iqbal's prescribed analysis, a court may discard and not assume the truth of allegations that the court determines are merely "labels and conclusions," *129 S. Ct. at 1949*, "naked assertions devoid of further factual enhancement," id., or "mere conclusory statements." Id. (quoting *Twombly, 550 U.S. at 555, 557*) (internal quotation marks and brackets omitted). In many instances, however, the distinction between whether an allegation is a [*433] "fact" or a "conclusion" is fine, blurry, and hard to detect. One leading civil procedure commentator has observed that

> [t]he fact-legal conclusion [**28] dichotomy presented by Twombly's first

step is shadowy at best. Worse, the categories are likely to generate motion practice unrelated to the merits. Moreover, it is precisely what the drafters of the original Rules intentionally rejected as counterproductive and sought to eliminate by substituting "short and plain" and "claim for relief" for any reference to the troublesome code categories of "facts," "conclusions," "evidence," and "cause of action."

Miller, A Double Play, *60 Duke L. J. at 24.* Professor Miller, arguing that the fact/conclusion dichotomy and the plausibility standard "has granted virtually unbridled discretion to district court judges," *id. at 22*, further observed that

> [t]he conclusion category is being applied quite expansively, embracing allegations that one reasonably might classify as factual and therefore potentially jury triable, including the key allegations in Iqbal itself. It is now fairly common for federal courts to channel words used in Iqbal and characterize allegations as merely "formulaic," "conclusory," "speculative," "cryptic," "generalized," or "bare." By transforming arguably factual allegations into legal conclusions and refusing to draw favorable [**29] inferences from them -- thereby ignoring portions of the complaint -- judges are both failing to construe the complaint in favor of the pleader as prior *Rule 12(b)(6)* doctrine required and performing functions previously thought more appropriate for the factfinder. And they are doing so based only on the complaint.

*Id. at 24-25* (footnotes omitted). The difficulty presented by the elevated status of the fact/conclusion dichotomy formulated by Twombly/Iqbal is seen in an examination of the *Iqbal* decision itself. In Iqbal, the five-justice majority rejected as "conclusions" not requiring the assumption of truth the following allegations in Iqbal's complaint: (1) that the "petitioners 'knew of, condoned, and willfully and maliciously agreed to subject'" respondent Iqbal "to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 63 of 177   PageID 71

Page 13

346 S.W.3d 422, *433; 2011 Tenn. LEXIS 623, **29;
32 I.E.R. Cas. (BNA) 1124

penological interest'"; (2) that petitioner "Ashcroft was the 'principal architect' of this invidious policy"; and (3) that petitioner "Mueller was 'instrumental' in adopting and executing it." *129 S. Ct. at 1951* (alteration in original). The four-justice dissent, written by Justice [**30] Souter (Twombly's author), viewed these allegations quite differently, namely, as "factual assertions" entitled to a presumption of truth:

> The complaint thus alleges, at a bare minimum, that Ashcroft and Mueller knew of and condoned the discriminatory policy their subordinates carried out. Actually, the complaint goes further in alleging that Ashcroft and Muller affirmatively acted to create the discriminatory detention policy. If these factual allegations are true, Ashcroft and Mueller were, at the very least, aware of the discriminatory policy being implemented and deliberately indifferent to it.
>
>  . . . .
>
> The majority says that these are "bare assertions" that, "much like the pleading of conspiracy in Twombly, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and therefore are "not entitled to be assumed true." The fallacy of the majority's position, however, lies in looking at the relevant assertions in isolation. The complaint contains specific allegations that, in the aftermath of the September [*434] 11 attacks, the Chief of the FBI's International Terrorism Operations Section and the Assistant Special Agent in Charge for the [**31] FBI's New York Field Office implemented a policy that discriminated against Arab Muslim men, including Iqbal, solely on account of their race, religion, or national origin. Viewed in light of these subsidiary allegations, *the allegations singled out by the majority as "conclusory" are no such thing.*

*Id. at 1959, 1959-61* (Souter, J., dissenting) (emphasis added) (citations omitted). The dissent concluded that "the majority's holding that the statements it selects are

conclusory cannot be squared with its treatment of certain other allegations in the complaint as nonconclusory." *Id. at 1961.*

The differing viewpoints of the Iqbal majority and dissent illustrate a fundamental problem with the fact/conclusion dichotomy: many, if not most, allegations can be fairly described as at least having a "conclusory" aspect. The problem is generally avoided by adhering to the principles that are already well established in Tennessee for ruling on a motion to dismiss. The texts of *Federal Rule of Civil Procedure 8* and *Tennessee Rule of Civil Procedure 8.01* indicate that the drafters of the rules also aspired to avoid this problem: the rules do not include terms such as "fact," "conclusion," or "cause [**32] of action."

This is not to say that there is absolutely no place for drawing an analytical distinction between factual assertions and legal conclusions, however; as noted, we stated in Riggs that "the legal conclusions set forth in a complaint are not required to be taken as true." *941 S.W.2d at 48* (citing *Dobbs v. Guenther, 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992)*). Riggs, however, involved an unusual "allegation" that was quintessentially a legal conclusion, or perhaps more accurately, a legal argument couched as a factual assertion -- that a statute was unconstitutional. Id. We reached the obvious conclusion that "[t]he plaintiffs' allegations that the statute violated due process and equal protection under the United States and Tennessee Constitutions and suspended general law in violation of the Tennessee Constitution were legal conclusions that should not have been taken as true." Id. Our review of Tennessee motion-to-dismiss jurisprudence as outlined in section 1 above confirms the observation of Professors Banks and Entman that the fact/conclusion dichotomy has rarely been invoked in Tennessee. Tennessee Civil Procedure, § 5-4(c).

Fourth, a number of commentators and observers [**33] have noted the possibility that the Twombly/Iqbal standard requiring a demonstration of plausibility at the pre-discovery phase of the case results in the disproportionate dismissal of certain types of potentially meritorious claims that require discovery to be proven, including actions for violations of civil rights, employment discrimination, antitrust, and conspiracy. This "information asymmetry" problem has been described as follows:

346 S.W.3d 422, *434; 2011 Tenn. LEXIS 623, **33;
32 I.E.R. Cas. (BNA) 1124

It is uncertain how plaintiffs with potentially meritorious claims are expected to plead with factual sufficiency without the benefit of some discovery, especially when they are limited in terms of time or money, or have no access to important information that often is in the possession of the defendant, especially when the defendant denies access.

. . . .

This problem of information asymmetry . . . presents itself in many litigation contexts. It is prevalent in actions challenging the conduct of large institutions -- for example, antitrust and securities cases -- when the necessary information relating to issues such as fraud, [*435] conspiracy, price-fixing, and corporate governance can be found only in the defendant's files and computers. The problem is exacerbated [**34] in multiple-defendant situations in which access to information is critical to indicating the alleged wrongdoing in order to focus on the alleged wrongdoer.

The same is true of questions like intent and malice. A similar asymmetry exists in other important litigation contexts such as actions against governmental entities. Particularly affected are civil rights and employment-discrimination cases, in which issues of motivation, state of mind, and insidious practices are hidden by agents and employees or are buried deep within an entity's records. Discrimination in hiring, promotion, or employee discipline depends on comparative data drawn from the employer's records that simply are inaccessible absent discovery.

Miller, A Double Play, *60 Duke L.J. at 43, 45-46* (footnotes omitted). As a result,

[u]nder plausibility pleading, one has no confidence that a plaintiff's dismissed claim was frivolous or nonmeritorious because it permits the dismissal of

complaints that assert wrongdoing, but merely offer supporting factual allegations consistent with -- rather than factually suggestive of -- liability. Thus, although discovery might reveal facts that prove liability, that opportunity is preemptively [**35] foreclosed and the investigation for supportive facts that the rules contemplate never occurs.

Spencer, Plausibility Pleading, *49 B.C. L. Rev. at 481* (footnote omitted); see also Goutam U. Jois, *Pearson, Iqbal,* and Procedural Judicial Activism, *37 Fla. St. U. L. Rev. 901, 903 (2010)* (arguing that *Iqbal* and *Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009),* "will work a disservice to our nation's promise of permitting victims of civil rights violations to achieve redress through civil litigation"); Ramzi Kassem, Implausible Realities: *Iqbal's* Retrenchment of Majority Group Skepticism Towards Discrimination Claims, *114 Penn St. L. Rev. 1443, 1446 (2010)* (arguing that "[d]iscrimination claims are particularly vulnerable to an unfavorable application of dispositive judicial discretion at the threshold stage"); Elizabeth M. Schneider, The Changing Shape of Federal Civil Pretrial Practice: The Disparate Impact on Civil Rights and Employment Discrimination Cases, *158 U. Pa. L. Rev. 517, 519 (2010)* ("[T]he greatest impact of this change in the landscape of federal pretrial practice is the dismissal of civil rights and employment discrimination cases from federal courts in disproportionate numbers."). [**36] Early academic empirical studies following Twombly and Iqbal have tended to confirm the concerns regarding a possible disproportionate impact on civil rights and employment discrimination cases. See Patricia W. Hatamyar, The Tao of Pleading: Do *Twombly* and *Iqbal* Matter Empirically?, *59 Am. U. L. Rev. 553, 556-57 (2010)*; Seiner, The Trouble With *Twombly, 2009 U. Ill. L. Rev. at 1026-38*; Kendall W. Hannon, Note, Much Ado About *Twombly*? A Study on the Impact of *Bell Atlantic Corp. v. Twombly* on 12(b)(6) Motions, *83 Notre Dame L. Rev. 1811, 1836-38 (2008)*. Thus, although it may still be too soon to fully gauge the impact of the new plausibility standard, it is at least arguable that it has operated to deny access to justice in the federal courts to possibly meritorious claimants for civil rights violations and employment discrimination.

Fifth, neither Habitat nor amici curiae in the present case have presented evidence showing that the policy

346 S.W.3d 422, *435; 2011 Tenn. LEXIS 623, **36;
32 I.E.R. Cas. (BNA) 1124

concerns cited by the Court in Twombly and Iqbal are present in Tennessee to the extent they exist in the federal judicial system, much less that they warrant "such a drastic change in court procedure," McCurry, [*436] 233 P.3d at 863, as the defendant asks [**37] us to affect here. The Washington Supreme Court made a similar observation in McCurry in stating:

> The Supreme Court's plausibility standard is predicated on policy determinations specific to the federal trial courts. The Twombly Court concluded: federal trial courts are incapable of adequately preventing discovery abuses, weak claims cannot be effectively weeded out early in the discovery process, and this makes discovery expensive and encourages defendants to settle "largely groundless" claims. See 550 U.S. at 557-58, 559, 127 S. Ct. 1955. Neither party has shown these policy determinations hold sufficiently true in the Washington trial courts to warrant such a drastic change in court procedure.

> Nor has either party here addressed countervailing policy considerations. For example, do current discovery expenses justify plaintiffs' loss of access to that discovery and general access to the courts, particularly in cases where evidence is almost exclusively in the possession of defendants? Could runaway discovery expenses be addressed by better means -- perhaps involving more court oversight of the discovery process or a change in the discovery rules?

Id.

The policy concerns cited by the Court [**38] in Twombly -- the threat of expensive and/or abusive discovery practices leading to the settlement of "even anemic cases," 550 U.S. at 559, -- should not be lightly dismissed. However, it is clear that such a broad and sweeping change in the procedural landscape as has been discussed here should come by operation of the normal rule-making process, not by judicial fiat in the limited context of a single case.[8] [HN17] As a constitutional matter, this Court "has the inherent power to promulgate

rules governing the practice and procedure of the courts of this state," and "this power cannot be constitutionally exercised by any other branch of government." State v. Mallard, 40 S.W.3d 473, 481 (Tenn. 2001); see also Tenn. Code Ann. §§ 16-3-401 to -402 (2009). The ordinary rule-making and amendment procedure provides for a broader discussion and examination of the policies at issue and allows for input from the advisory commission, see Tenn. Code Ann. § 16-3-601 (2009), and members of the bench, bar, and general public. The Supreme Courts in several of our sister states have reached the same conclusion. Cullen v. Auto-Owners Ins. Co., 218 Ariz. 417, 189 P.3d 344, 347 (Ariz. 2008) (en banc) (holding that "Arizona has [**39] not revised the language or interpretation of Rule 8 in light of Twombly" and that any change must come through the Arizona rule-making process); McCurry, 233 P.3d at 864 ("The appropriate [*437] forum for revising the Washington rules is the rule-making process."); see also Roth v. DeFeliceCare, Inc., 226 W. Va. 214, 700 S.E.2d 183, 197 (W. Va. 2010) (Benjamin, J., dissenting) (stating that it is "preferable that we consider [the adoption of a heightened pleading standard] in the reflection of rule-making rather than in the vacuum of an individual case before us on appeal").[9]

8  Moreover, one study of empirical data and the judicial decisions following Twombly and Iqbal concludes that the "fundamental assumption" of the Court in formulating the new plausibility pleading standard, that "notice pleading lets in too many meritless cases, and heightened pleading will keep them out," is unsupported by the evidence. Reinert, The Costs of Heightened Pleading, 86 Ind. L.J. at 119-20. Professor Reinert's study concludes that

> [t]here is, however, no empirical basis supporting the assumption that heightened pleading standards -- either the plausibility standard ushered in by Iqbal and Twombly or the closely related "fact [**40] pleading" standard that has always lurked as a competitor to notice pleading -- are more efficient filters than Conley's notice pleading standard. . . . The data reported here suggest that the common wisdom among supporters of heightened pleading

346 S.W.3d 422, *437; 2011 Tenn. LEXIS 623, **40;
32 I.E.R. Cas. (BNA) 1124

along the lines of Iqbal and Twombly cannot be supported empirically. Rules that subject thin pleadings to greater scrutiny and dismissal do not do a better job than notice pleading of filtering out meritless claims.

*Id. at 125, 126.*

9   See also Paul D. Carrington, Politics and Civil Procedure Rulemaking: Reflections on Experience, *60 Duke L.J. 597, 648-57 (2010).*

In summary, it must be remembered that we are addressing the standard in assessing the sufficiency of a single document filed at the very beginning of a case -- the complaint. Our motion-to-dismiss jurisprudence reflects the principle that this stage of the proceedings is particularly ill-suited for an evaluation of the likelihood of success on the merits or of the weight of the facts pleaded, or as a docket-clearing mechanism. [HN18] *Rule 8.01* has not been amended and still only requires "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand [**41] for judgment for the relief the pleader seeks." We decline to reinterpret *Rule 8* to require a pleader to demonstrate "plausibility" and continue to adhere to the well established standards set forth in section 1 of this opinion.

Applying these standards to Ms. Webb's amended complaint in the present case, we affirm the Court of Appeals' holding that it states a cause of action for retaliatory discharge under the TPPA and Tennessee common law. The TPPA, *Tennessee Code Annotated section 50-1-304,* creates a cause of action for retaliatory discharge by providing that:

[HN19] (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.

. . . .

(d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

*Tenn. Code Ann. § 50-1-304.*[10] [HN20] A claimant has the burden of proving the following four elements to prevail on his or her statutory retaliatory discharge claim:

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about illegal [**42] activity;

[*438] (3) the defendant employer discharged or terminated the plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Sykes v. Chattanooga Hous. Auth., ___ S.W.3d ___, ___, No. E2008-00525-SC-R11-CV, 343 S.W.3d 18, 2011 Tenn. LEXIS 604, 2011 WL 2517145, *6 (Tenn. June 24, 2011);* see also *Voss v. Shelter Mut. Ins. Co., 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997).*

10   But see 2011 Tenn. Pub. Acts 461 (amending *Tennessee Code Annotated section 50-1-304* and enacting *Tennessee Code Annotated section 50-1-701)* (effective on and applicable to causes of action accruing on or after June 10, 2011).

[HN21] A claimant alleging a claim of common law retaliatory discharge has the burden of proving the following four elements of the claim:

(1) that an employment-at-will relationship existed;

(2) that the employee was discharged;

(3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

(4) that a substantial factor in the [**43] employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Kinsler v. Berkline, LLC, 320 S.W.3d 796, 800 (Tenn.*

346 S.W.3d 422, *438; 2011 Tenn. LEXIS 623, **43;
32 I.E.R. Cas. (BNA) 1124

2010); accord *Gossett v. Tractor Supply Co., Inc., 320 S.W.3d 777, 781 (Tenn. 2010)* (citing *Crews v. Buckman Labs. Int'l, 78 S.W.3d 852, 862 (Tenn. 2002)*).

Ms. Webb's amended complaint alleges that she was an employee of Habitat who was terminated for her complaints regarding, and unwillingness to implement, participate in or remain silent about, discriminatory and illegal policies that Habitat's management requested staff members to implement. Construing "'the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences,'" *Tigg, 232 S.W.3d at 31-32* (quoting *Trau-Med, 71 S.W.3d at 696*), it is not apparent from the face of the amended complaint that Ms. Webb "can prove no set of facts in support of the claim that would entitle [her] to relief." *Crews, 78 S.W.3d at 857*. The amended complaint specifically refers to the statute upon which

Ms. Webb is relying to state her claim, *Tenn. Code Ann. § 50-1-304*, and thus comports with *Rule 8.05(1)*. [**44] The amended complaint, while not a model of pleading, provides Habitat with sufficient notice of the claims she is alleging and sufficiently pleads a legal cause of action.

*Conclusion*

The judgment of the Court of Appeals is affirmed, and the case is remanded to the Circuit Court for Davidson County for further action as may be necessary, consistent with this opinion. Costs on appeal are assessed to the appellant, Nashville Area Habitat for Humanity, Inc., and its surety, for which execution may issue if necessary.

SHARON G. LEE, JUSTICE



1 of 1 DOCUMENT



Cited
As of: Dec 05, 2011

**JERRY W. COBB, individually and on behalf of the Qualico Steel 401(k) Plan and its participants, Plaintiffs, v. REGIONS BANK d/b/a REGIONS MORGAN KEEGAN TRUST; QUALICO STEEL CO., INC.; and MORGAN KEEGAN & CO., INC., Defendants.**

No. 09-2806

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION

*2010 U.S. Dist. LEXIS 49544*

May 19, 2010, Decided
May 19, 2010, Filed

**COUNSEL:** [*1] For Jerry W. Cobb, individually and on behalf of the Qualico Steel 401(k) plan on behalf of all others who were participants in the Qualico Steel 401(k) plan, Plaintiff: Charles M Thompson, LAW OFFICE OF CHARLES M. THOMPSON, Birmingham, AL; James Harold Anderson, BEERS ANDERSON JACKSON PATTY & FAWAL, PC, Montgomery, AL.

For Regions Bank, doing business as Regions Morgan Keegan Trust, Defendant: Jeffrey A. Lee, PRO HAC VICE, MAYNARD COOPER & GALE, PC, Birmingham, AL; William B. Wahlheim, Jr., MAYNARD COOPER & GALE, PC, AmSouth/ Harbert Plaza, Birmingham, AL.

For Qualico Steel Co., Inc., Defendant: Albert Loring Vreeland, II, LEHR MIDDLEBROOKS & VREELAND, PC, Birmingham, AL; Michael L. Thompson, LEHR MIDDLEBROOK & VREELAND, PC, Birmingham, AL.

For Morgan Keegan & Company, Inc., Defendant: Anna M. Grizzle, BASS BERRY & SIMS PLC, AmSouth Center, Nashville, TN; Matthew M. Curley, BASS BERRY & SIMS PLC, Nashville, TN; W. Brantley Phillips, Jr., BASS BERRY & SIMS PLC- Nashville, Nashville, TN.

**JUDGES:** SAMUEL H. MAYS, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SAMUEL H. MAYS, JR.

**OPINION**

**ORDER GRANTING DEFENDANT QUALICO STEEL CO., INC.'S MOTION FOR A MORE DEFINITE STATEMENT**

Before the Court is Defendant Qualico Steel Co.,

[*2] Inc.'s ("Qualico") August 31, 2009, Motion for a More Definite Statement pursuant to *Federal Rule of Civil Procedure 12(e)*. (*See* Dkt. No. 37, Exh. 9.) Plaintiff Jerry W. Cobb responded in opposition on October 5, 2009, and Qualico filed its reply on October 13, 2009. (*See* Dkt. No. 37, Exhs. 46, 49.) For the following reasons, Qualico's Motion is GRANTED.

Plaintiff originally filed suit under the Employee Retirement Security Act of 1974 ("ERISA"), *29 U.S.C. §§ 1109, 1132*, in the Middle District of Alabama, alleging that Defendants Regions Morgan Keegan Trust ("Regions"), Qualico, and Morgan Keegan & Company ("Morgan Keegan") had violated the statutory fiduciary duties they owed to the beneficiaries of the Qualico Employee 401(k) Plan (the "Plan"). (Compl. P 6.) The Plan was a "defined contribution plan" into which Qualico employees made elective contributions that Qualico matched. (*Id.* PP 24-25.) Regions served as the Plan's trustee, and Morgan Keegan was the Plan's "exclusive investment advisor." (*Id.* PP 19, 23.)

Through the Plan, employees had "the option of purchasing one or more variations of investments for [their] retirement investment portfolio[s]." (*Id.* P 5.) [*3] Two of the funds in which employees could choose to invest were the Regions Morgan Keegan Select Intermediate Bond Fund and the Regions Morgan Keegan Select High Income Bond Fund (the "Funds"). Plaintiff alleges that the Funds violated their published investment restrictions by investing more than fifty percent of their assets in mortgage-backed securities. (*Id.* P 50.) The Funds were restricted from investing more than twenty-five percent of their assets in any one industry. (*Id.*) Plaintiff also alleges that Defendants failed to inform Plan participants that the Funds had violated their investment restrictions and that the mortgage-backed securities composing the majority of the Funds' investments were highly illiquid because of the limited market for them. (*Id.* PP 52-53.) This made the Funds inappropriate investments for an employee 401(k) plan and exposed the Funds to much greater than average risk. (*Id.* P 39.) When the credit crisis began in late 2007, the Funds' share price collapsed as the value of their underlying mortgage-backed securities dropped. Plaintiff alleges that the Funds suffered "far greater adverse effect[s]" than their peer funds. (*Id.* P 54.) On December 2, 2009, [*4] the United States Judicial Panel on Multidistrict Litigation transferred Plaintiff's suit from Alabama to the Western District of Tennessee, where this Court is hearing all litigation related to the collapse of the Funds. (*See* Transfer Order, Dkt. No. 37, Exh. 52); *see also In re Regions Morgan Keegan Sec., Derivative, and ERISA Litig., 598 F. Supp. 2d 1379, 1382 (J.P.M.L. 2009)* (original order transferring related Morgan Keegan cases to the Western District of Tennessee and establishing Morgan Keegan MDL).

Qualico's Motion seeks an order requiring Plaintiff to file a more detailed complaint, delineating the specific claims he has against each named Defendant. Qualico argues that Plaintiff's current Complaint refers generically to "Defendants" without "designating which allegations are made against each particular defendant." (Defendant Qualico's Motion for a More Definite Statement P 5.) ("Def's Mot.") The Motion also asserts that Plaintiff's Complaint is a cut-and-paste job, comprised of sections lifted from other complaints against Defendants that are inapplicable to the present suit. (*Id.* P 4.) Qualico argues that, absent a more specific Complaint, it cannot know the claims to which [*5] it must respond. (*Id.* P 7.)

*Federal Rule of Civil Procedure 12* states that:

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

*Fed. R. Civ. P. 12(e)*. Whether to grant a *Rule 12(e)* Motion is within the sound discretion of the Court. *Babb v. Bridgestone/Firestone, 861 F. Supp. 50, 52 (M.D. Tenn. 1993)*; *Fleming v. Michigan, No. 2:09-cv-11795, 2010 U.S. Dist. LEXIS 22790, at \*27 (E.D. Mich. Feb. 23, 2010)*. However, a motion for a more definite statement is not intended as a substitute for the discovery process. *Wheeler v. United States Postal Serv., 120 F.R.D. 487, 488 (M.D. Pa. 1987)*.

2010 U.S. Dist. LEXIS 49544, *5

Plaintiff's Complaint contains four counts alleging that "Defendants" violated the duties of prudence and loyalty (Compl. PP [*6] 81-88), failed to provide complete and accurate information to the Plan's beneficiaries (id. PP 89-99), improperly acted while under a conflict of interest (id. PP 100-05) and failed to monitor the other fiduciaries. (Id. PP 106-115.) Each count of the Complaint incorporates by reference all prior allegations in the Complaint, leaving the final count "an amalgamation of everything in the complaint." Byrne v. Nezhat, 261 F.3d 1075, 1128 (11th Cir. 2001); (see Compl. PP 81, 89, 100, 106.) Plaintiff's Complaint, therefore, is a clear example of a "shotgun complaint." Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1279 (11th Cir. 2006) ("Shotgun pleadings are those that incorporate every antecedent allegation by reference into each subsequent claim for relief." (citation omitted)); see also Byrne, 261 F.3d at 1130 (noting that such complaints can "wreak havoc on the judicial system" because of the resources that opposing parties and the court must waste to decipher them).

Qualico is correct that Plaintiff's Complaint fails, in parts, to specify the parties against which it makes allegations. Although the first three counts note that their allegations apply to all named Defendants, [*7] count four provides no hint about the party or parties against which it is directed. (Compare Compl. at 26, 28, 31 (noting that the counts apply to "all Defendants"), with Compl. at 32 (containing no indication about the Defendant or Defendants implicated).) Count four alleges that certain Defendants failed to monitor or properly oversee the Plan, (see, e.g., id. P 111), but contains no proper name of any Defendant. Indeed, it refers to non-existent defendants, i.e., the "Director Defendants." (Id. P 109(f).) Plaintiff has not sued any individual directors. Count four also refers to "The Company," a term the Complaint does not define. (Id.) Because each of the three named Defendants is a legal entity, it could apply to any one of them.

The Complaint's first three counts also lack specificity. Plaintiff never uses the name of an actual Defendant. (See id. PP 81-105.) Instead, Plaintiff refers to "Defendants" and leaves it to those unspecified Defendants to determine which paragraphs of the Complaint might refer to them. Although not as unclear as count four, the first three counts are indefinite about the allegations Qualico must answer. Cf. Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) [*8] (per curiam) (remanding for repleading where "[t]he complaint [was] replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged").

Rule 12(e) exists to rectify complaints that are unintelligible or vague. See Fed. R. Civ. P. 12(e); Cox v. Maine Maritime Acad., 122 F.R.D. 115, 116 (D. Me. 1988). As currently pled, count four fails to notify Qualico of what, if any, specific wrongs Plaintiff alleges against it. Therefore, Qualico's Motion for a More Definite Statement is GRANTED. Plaintiff is ORDERED to submit an amended complaint within 30 days. See Fed. R. Civ. P. 12(e) (noting that the Court may set a deadline of not less than fourteen days to comply with an order to replead). Plaintiff should replead count four in its entirety, noting the Defendant or Defendants to which specific allegations apply and removing all references to non-existent or undefined defendants. Where appropriate, Plaintiff should also revise and edit the Complaint's first three counts to include the proper names of the "Defendants" against which Plaintiff alleges culpable conduct and the specific conduct alleged.

So ordered this 19th day [*9] of May, 2010.

/s/ Samuel H. Mays, Jr.

SAMUEL H. MAYS, JR.

UNITED STATES DISTRICT JUDGE





Positive
As of: Dec 05, 2011

**JERRY BONNER and JERRY BONNER, ADMINISTRATOR AD LITEM FOR
GALE BONNER, v. ANDREW BILLEN and RISK ENTERPRISE
MANAGEMENT LIMITED, INC., on behalf of BELK DEPARTMENT STORE OF
CHATTANOOGA, TN, INC.**

No. E2005-01901-COA-R3-CV

COURT OF APPEALS OF TENNESSEE, AT KNOXVILLE

*2007 Tenn. App. LEXIS 674*

**August 13, 2007, Session
November 5, 2007, Filed**

**PRIOR HISTORY:** [*1]
*Tenn. R. App. P.3* Appeal as of Right; Judgment of the Circuit Court Affirmed. Direct Appeal from the Circuit Court for Hamilton County, Division IV. No. 97 CV 1376. Hon. W. Neil Thomas, III., Circuit Judge.

**DISPOSITION:** Judgment of the Circuit Court Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant claimant and appellee driver challenged the judgment of the Circuit Court for Hamilton County, Division IV, Tennessee, awarding the claimant damages for personal injuries sustained in an automobile accident, and awarding appellee employer's workers' compensation insurer a lien against the judgment entered on behalf of the claimant.

**OVERVIEW:** The automobile accident occurred during the course and scope of the claimant's employment. A jury awarded the claimant $ 40,000 in damages against the driver and $ 500 for property damage. The verdict form stated that $ 36,500 was awarded for medical care/services and $ 3,000 for loss of earning capacity. The appellate court ruled that the driver's argument that the action against him should be barred due to the statute of limitations failed, because the claimant complied with *Tenn. Code Ann. § 56-7-1206.* Since the driver's policy limits were less than the claimant's, he was uninsured and the uninsured motorist (UM) statute applied. If service was timely made upon the UM carrier, and service was attempted but returned "not found" against the other motorist, the case could proceed with the UM carrier as defendant. Also, the trial court did not abuse its discretion in failing to sanction the workers' compensation insurer and its attorneys. The attorneys for the workers' compensation insurer gave a reasonable explanation for their actions in filing the motion seeking to disqualify the driver's attorney.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(R) Headnotes**

*Insurance Law > Motor Vehicle Insurance > Coverage > Underinsured Motorists > General Overview*
*Insurance Law > Motor Vehicle Insurance > Coverage > Uninsured Motorists > General Overview*
[HN1] Pursuant to the wording of the uninsured statute, it is clear that underinsured is considered the same as uninsured for the purposes of the statute. *Tenn. Code Ann. § 56-7-1202(a)* expressly defines an uninsured motor vehicle as one that is underinsured, i.e. one for which the sum of the limits of liability available to the insured under all valid and collectible insurance policies, bonds, and securities applicable to the bodily injury, death, or damage to property is less than the applicable limits of uninsured motorist coverage provided to the insured under the policy against which the claim is made.

*Insurance Law > Motor Vehicle Insurance > Coverage > Uninsured Motorists > General Overview*
[HN2] Application of *Tenn. Code Ann. § 56-7-1206(d)* establishes that if service is timely made upon the uninsured carrier, and service is attempted but returned "not found" against the other motorist, the case can proceed with the uninsured carrier as defendant.

*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
*Insurance Law > Motor Vehicle Insurance > Coverage > Uninsured Motorists > General Overview*
[HN3] *Tenn. Code Ann. § 56-7-1206(e)* provides: In the event the uninsured motorist's whereabouts is discovered during the pendency of the proceedings, an alias process may issue against the uninsured motorist. In such a case, the uninsured motorist shall be allowed a reasonable time within which to plead to the original process and then the case may proceed against uninsured motorist as if he was served with process in the first instance. *Tenn. Code Ann. § 56-7-1206* supersedes Tenn. R. Civ. P. 3 in this situation.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN4] If every improper statement that creep into lawsuits were prejudicial or had the effect of such

prejudicial injury to the person being tried that it could not be corrected by a proper admonition from the trial judge, there would be few trials that could ever be conducted to an end. Jurors are intelligent persons, and when properly instructed at the proper time when things like this come about, the court does not think that such is prejudicial.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Evidence > Procedural Considerations > Rulings on Evidence*
[HN5] Trial courts are given wide discretion regarding admissibility of evidence, and the appellate court will not interfere with their judgment, absent a clear abuse of discretion.

*Civil Procedure > Judgments > General Overview*
[HN6] It is the duty of the court in construing verdicts to give them the most favorable interpretation and to give effect to the intention of the jurors if that intention be permissible under the law and ascertainable from the phraseology of the verdict. If after an examination of the terms of the verdict the court is able to place a construction thereon that will uphold it, it is incumbent upon the court to do so.

*Civil Procedure > Sanctions > General Overview*
[HN7] The test to be applied in deciding whether an attorney's conduct is sanctionable, is one of objective reasonableness under all the circumstances, and the reasonableness of the attorney's belief must be assessed in light of the circumstances existing at the time the document in question is signed. The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what is reasonable to believe at the time of signing.

*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN8] An attorney must read every paper before signing it. He must make a reasonable pre-filing investigation of the facts. He must research the law, unless he is certain he knows it. The law as applied to the facts must reasonably warrant the legal positions and steps he takes. If existing law does not warrant these positions, a plausible argument for the extension of the law to the

2007 Tenn. App. LEXIS 674, *1

facts of the case is required. It must be demonstrated, as the basis of pre-filing investigation and research, that there is a reasonable basis to name each defendant named, and to support each claim asserted. The shotgun complaint or answer, filed in the hope that discovery will produce the justification for it, is improper.

*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN9] The adequacy of an attorney's investigation, research and legal analysis will be evaluated by the court under an objective standard, namely, whether the attorney acted as a reasonably competent attorney admitted to practice. Except as to improper purpose, subjective good faith is not a defense to *Fed. R. Civ. P. 11* sanctions. A pure heart but an empty head is of no avail. An attorney must not have an improper purpose, such as harassment or intimidation, in naming any defendant, asserting any legal position or taking any legal step. If an attorney violates *Fed. R. Civ. P. 11* the imposition of some sanction is mandatory, although the nature and extent of the sanction is discretionary with the trial court.

*Civil Procedure > Sanctions > Baseless Filings > General Overview*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN10] Whether an attorney has made sufficient inquiries in light of the circumstances is a factual determination. The issues involved in determining whether an attorney has violated *Fed. R. Civ. P. 11* likewise involve fact-intensive, close calls. For this reason, appellate courts review *Fed. R. Civ. P. 11* under the abuse of discretion and deferential standard.

*Workers' Compensation & SSDI > Third Party Actions > Subrogation*
[HN11] *Tenn. Code Ann. § 50-6-112(c)(1)* provides for a recovery lien when an employee recovers against a third party, and when the employer's liability for workers' compensation has been fully or partially paid and discharged.

**COUNSEL:** Kathryn R. Leiderman, Jasper, Tennessee, for appellant, Jerry Bonner.

Scott A. Rhodes, Brentwood, Tennessee, for appellee, Andrew Billen.

Jeffrey L. Cleary, Chattanooga, Tennessee, for appellee, Risk Enterprise Management Limited, Inc.

**JUDGES:** HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

**OPINION BY:** HERSCHEL PICKENS FRANKS

**OPINION**

In this action for damages for personal injuries sustained in an automobile accident, plaintiff obtained a Judgment against defendant driver, an underinsured motorist, and the intervener who had paid plaintiff's workers compensation benefits, was awarded a lien against the Judgment entered on behalf of the plaintiff. On appeal, we affirm the Judgment of the Trial Court.

**OPINION**

**Background**

Jerry Bonner brought this action against Andrew Billen, alleging the parties were involved in an automobile accident, that plaintiff was injured at the fault of Billen, and [*2] for damages for personal injury and property damage. The original summons to Billen was returned with a notation that Billen could not be found, and had moved from that address, and CUNA, plaintiff's UM carrier, Answered, stating that Bonner had a UM policy with them, with limits of $ 100,000 per person and $ 300,000 per occurrence.

An alias summons was issued to Billen, which was returned marked "refused" and/or "unclaimed". Subsequently, on January 7, 2001, service was obtained on Billen at his residence, and Billen then filed an Answer, and denied the accident could have caused injury to plaintiff.

Risk Enterprise Management Limited, Inc., ("REM") on behalf of Belk Department Store, was allowed to intervene and asserted its subrogation rights. REM stated that it was the third-party administrator of workers' compensation risk for Belk Department Stores of Chattanooga, and that Belk was plaintiff's employer at the time of the accident, which occurred during the course and scope of plaintiff's employment. REM stated that it had paid benefits to plaintiff under the workers'

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 76 of 177   PageID 84

Page 4
2007 Tenn. App. LEXIS 674, *2

compensation laws for his injuries from the accident, and sought to recover any benefits it had paid from any damages [*3] that plaintiff recovered in this action.

Plaintiff's discovery revealed that Billen was insured by Direct Insurance at the time of the accident, with limits of liability on his policy of $ 25,000/$ 50,000.

Billen filed a Motion to Dismiss which was treated as a Summary Judgment, and responding, the Court determined that Billen had insurance limits of $ 25,000/$ 50,000, and that plaintiff's UM coverage was $ 100,000/300,000. The Court concluded that since Billen was underinsured, plaintiff could rely on the provisions of *Tenn. Code Ann. § 56-7-1206(e)* regarding service of process, and then denied Billen's motion. On February 16, 2004, the Court ordered Billen to comply with discovery within 30 days. The plaintiff subsequently filed a Third Motion to Compel and/or for Contempt and/or for Default Judgment, asserting that Billen had still not responded to discovery. The Court then entered an Order giving Billen 30 more days to respond, stating that if he did not, his Answer would be stricken and a default judgment would be entered.

Billen sought an extraordinary appeal on the issue, but his application was denied. The Trial Court then entered an Order finding that the defendant had failed [*4] to comply with discovery, and ordering that he be declared in default, and the case set for hearing on damages.

Plaintiff filed an Exhibit List and Witness List, and Billen responded with a Motion asserting that plaintiff should be prohibited from presenting the testimony of Ken Johnson and Donna Poole, who were listed, because plaintiff failed to name them in his interrogatory responses or his deposition. Billen admitted that plaintiff had attempted to supplement his interrogatory responses on the same date the witness list was filed.

A jury trial was held, and the Court entered a Judgment on the verdict, awarding plaintiff $ 40,000 in damages against Billen, and $ 500.00 for property damage. The Verdict form stated that $ 36,500.00 was awarded for "medical care/services", and $ 3,000 for loss of earning capacity.

REM then filed a Motion asserting the subrogation, and that in a Final Decree entered in the underlying workers' compensation action filed by the plaintiff against Belk, Belk was given a subrogation interest of $ 53,011.86 against "any recovery of the employee from any third parties liable to the employee for the expenses for the injuries alleged herein."

Billen filed a Motion [*5] for Judgment Notwithstanding the Verdict or, alternatively, Motion for New Trial, asserting that the Court erred in denying his Motion for Summary Judgment based on the statute of limitations, and that the court erred in allowing Ken Johnson to testify. Further, that the court erred in denying Billen's motion for a mistrial after plaintiff stated in his testimony about Billen having been in jail. Billen also deposited funds of $ 25,500 with the Court in partial satisfaction of the judgment.

The Trial Court entered an Order Allowing Lien Against Judgment, and imposed a lien against plaintiff's recovery in the amount of $ 53,011.86, in favor of REM. After ruling on several motions, the Court entered Judgment and appeals by Billen and the plaintiff ensued.

**Issues on Appeal**

1. Did the Trial Court err in overruling Billen's Motion for Summary Judgment based upon plaintiff's failure to comply with *Tenn. R. Civ. P. 3?*

2. Did the Trial Court err in denying Billen's Motion for New Trial on August 29, 2005, after the Court overruled Billen's motion for a mistrial, allowed a key witness to testify in violation of local rules, and upheld a verdict which is inconsistent?

3. Did the Trial Court err [*6] in denying Billen's motion for sanctions against REM and its attorneys?

4. If this Court finds in Billen's favor on issues 1 or 2, did the Trial Court err in awarding discretionary costs to Bonner and REM?

5. Would REM be entitled to a subrogation lien against that portion of Bonner's judgment that represents future medical expenses?

**Discussion**

Billen argues that he should never have had to defend this action, because plaintiff did not comply with the requirements of *Tenn. R. Civ. P. 3* by having process reissued in a timely fashion. He argues that *Tenn. Code Ann. § 56-7-1206* does not change this result, because it

2007 Tenn. App. LEXIS 674, *6

is part of the uninsured motorist statute, and he was not an uninsured motorist.

[HN1] Pursuant to the wording of the UM statute, it is clear that underinsured is considered the same as uninsured for the purposes of the statute. *Tenn. Code Ann. § 56-7-1202(a)* expressly defines an uninsured motor vehicle as one that is underinsured, i.e. one for "which the sum of the limits of liability available to the insured under all valid and collectible insurance policies, bonds, and securities applicable to the bodily injury, death, or damage to property is less than the applicable limits of uninsured [*7] motorist coverage provided to the insured under the policy against which the claim is made."

In this case, since Billen's policy limits were less than plaintiff's, he is uninsured and the UM statutes apply. [HN2] Application of *Tenn. Code Ann. § 56-7-1206(d)* establishes that since service was timely made upon the UM carrier, and service was attempted but returned "not found" against the other motorist, the case can proceed with the UM carrier as defendant. *Tenn. Code Ann. § 56-7-1206(e)* provides:

> [HN3] In the event the uninsured motorist's whereabouts is discovered during the pendency of the proceedings, an alias process may issue against the uninsured motorist. In such a case, the uninsured motorist shall be allowed a reasonable time within which to plead to the original process and then the case may proceed against uninsured motorist as if he was served with process in the first instance.

In this regard, *see Lady v. Kregger, 747 S.W.2d 342 (Tenn. Ct. App. 1987)*. This case held that *T.C.A. § 56-7-1206* superseded *T.R.C.P. 3* in this situation. *Id.* Billen's argument that the action against him should be barred due to the statute of limitations fails, because plaintiff complied with *T.C.A. § 56-7-1206*.

Finally, [*8] Billen argues that underinsured is not the same as uninsured, and relies on the cases of *Estate of Kirk v. Lowe, 70 S.W.3d 77 (Tenn. Ct. App. 2001), Carr v. Borchers, 815 S.W.2d 528 (Tenn. Ct. App. 1991), Carlton v. Davis, 2003 Tenn. App. LEXIS 302, 2003 WL 1923825 (Tenn. Ct. App. Apr. 24, 2003)*, and *Lasher v.*

*Robertson, 1994 Tenn. App. LEXIS 604, 1994 WL 579972 (Tenn. Ct. App. Oct. 24, 1994)*. However, none of these cases is applicable to the issue before us. In *Kirk*, the uninsured v. underinsured issue was never addressed, and in *Carr* and *Davis*, the defendants were explicitly found by the court to be "fully" insured, such that the UM statute would not apply. Finally, in *Lasher*, the Court ruled that plaintiff could not rely on *Tenn. Code Ann. § 56-7-1206* because the UM carrier had not been properly served, as required by that statute. These cases are inapposite to the ruling herein.

Billen also argues that the Trial Court erred in failing to grant his motion for new trial, because the Court denied his motion for a mistrial after Bonner made a statement from the stand that he thought Billen had been in jail.

During cross-examination, Bonner was asked about the length of time the lawsuit had been pending, and he stated that it had been hard [*9] to serve Billen, because he understood Billen had spent some time in jail. Responding to an objection, the Trial Court gave a curative instruction to the jury, telling them that any reference made to Billen having been incarcerated was hearsay, that there was no proof of it, and that they should disregard it. The Trial Court's ruling was correct. *See, Willis v. Settle, 162 S.W.3d 169, 188-189 (Tenn. Ct. App. 2004)*. [HN4] "If every statement of this type that creep into lawsuits were prejudicial or had the effect of such prejudicial injury to the person being tried that it could not be corrected by a proper admonition from the trial judge, there would be few trials that could ever be conducted to an end. Jurors are intelligent persons, and, when properly instructed at the proper time when things like this come about, we do not think that such is prejudicial." *Brown v. State, 220 Tenn. 709, 423 S.W.2d 493, 496 (Tenn. 1968)*. The Trial Court did not abuse its discretion in denying Billen's motion for a new trial, after giving a proper curative instruction.

Next, Billen argues that the Trial Court erred in refusing to exclude Ken Johnson as a witness, on the ground that Johnson's [*10] identity was not disclosed (despite prior discovery) until six days before trial, and that the local rule requires witnesses to be disclosed ten days before trial. Bonner's response is that while Johnson was not identified by name until six days before trial, he had listed in the discovery responses that other "Belk

store employees" had information about the case, and that Johnson is a Belk store employee and Bonner's co-worker. Bonner also points out that he supplemented his discovery responses as soon as he found out that Johnson was a fact witness, and that Billen was given the opportunity to depose Johnson prior to trial, but declined to do so. Further, Billen was offered a continuance to give him the opportunity to investigate this witness, but he declined.

The Local Rules relied upon by Billen, state that the judge has the discretion to suspend the same in the interest of justice. Moreover, [HN5] trial courts are given wide discretion regarding admissibility of evidence, and we will not interfere with their judgment, absent a clear abuse of discretion. *Tire Shredders, Inc. v. ERM, 15 S.W.3d 849 (Tenn. Ct. App. 1999).* This issue is without merit.

Further, Billen argues the Trial Court [*11] erred in upholding the jury's verdict because it is "inconsistent and cannot be rationally explained". He argues that the jury found that plaintiff suffered no injury, yet still awarded damages for medical expenses.

A review of the jury form demonstrates otherwise. The jury clearly found that defendant was at fault and caused damage to plaintiff, and then the jury was asked to award damages based on various categories, including medical expenses, property damage, permanent impairment, and personal injury. The jury made an award of damages for medical expenses, property damage, and loss of earning capacity. Thus, the jury found that plaintiff suffered injury, and simply awarded damages based on the provided categories that they deemed appropriate.

As we have held:

[HN6] It is the duty of the court in construing verdicts to give them the most favorable interpretation and to give effect to the intention of the jurors if that intention be permissible under the law and ascertainable from the phraseology of the verdict. If after an examination of the terms of the verdict the court is able to place a construction thereon that will uphold it, it is incumbent upon the court to do so.

*Templeton v. Quarles, 52 Tenn. App. 419, 374 S.W.2d 654, 660 (Tenn. Ct. App. 1963).* [*12] In this case, the jury's verdict is not so unintelligible or inconsistent as to show "caprice or whim on the part of the jury" or disregard for the court's instructions. *See Hogan v. Doyle, 768 S.W.2d 259 (Tenn. Ct. App. 1988).* This issue is without merit.

Finally, Billen argues the Trial Court abused its discretion in failing to sanction REM and its attorneys for the "factually and legally frivolous motion" seeking to disqualify Billen's counsel.

Our Supreme Court has explained the proper Rule 11 analysis as follows:

[HN7] The test to be applied in deciding whether an attorney's conduct is sanctionable, is one of objective reasonableness under all the circumstances, and the reasonableness of the attorney's belief must be assessed in light of the circumstances existing at the time the document in question was signed. The Advisory Committee notes to the federal version of *Rule 11* state that "[t]he Court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time [of signing]." One of the clearest and most succinct explanations of the principles associated with a proper Rule 11 analysis was set forth in *Whittington v. Ohio River Co., 115 F.R.D. 201, 209 (E.D.Ky.1987)*:

1. [*13] [HN8] An attorney must READ every paper before signing it.

2. He must make a reasonable pre-filing investigation of the FACTS.

3. He must research the LAW, unless he is certain he knows it.

4. The law as applied to the facts must REASONABLY WARRANT the legal positions and steps he takes. If existing law does not warrant these positions, a plausible argument for the extension of the law to the facts of the case is required.

5. It must be demonstrated, as the basis of pre-filing investigation and research, that there is a REASONABLE BASIS to name each defendant named, and to support each claim asserted. The shotgun complaint or answer, filed in the hope that discovery will produce the justification for it, is improper.

6. [HN9] The adequacy of an attorney's investigation, research and legal analysis will be evaluated by the court under an OBJECTIVE STANDARD, namely, whether the attorney acted as a reasonably competent attorney admitted to ... practice. Except as to improper purpose, subjective good faith is not a defense to Rule 11 sanctions. A pure heart but an empty head is of no avail.

* * * * * *

8. An attorney must not have an IMPROPER PURPOSE, such as harassment or intimidation, in naming any defendant, [*14] asserting any legal position or taking any legal step.

9. If an attorney violates Rule 11 the imposition of some sanction is MANDATORY, although the nature and extent of the sanction is discretionary with the [trial] court.

*Andrews v. Bible, 812 S.W.2d 284, 288 (Tenn. 1991)*(citations omitted).

As the above reflects, "[w]hether [HN10] an attorney has made sufficient inquiries in light of the circumstances is a factual determination. 'The issues involved in determining whether an attorney has violated *Rule 11* likewise involve 'fact-intensive, close calls'.' For this reason, appellate courts review Rule 11 under the 'abuse of discretion' and 'deferential' standard. *Krug v. Krug, 838 S.W.2d 197, 205 (Tenn. Ct. App. 1992)*(citations omitted). In this case, we are unable to say the Trial Court abused its discretion in refusing to award sanctions, given the facts and circumstances surrounding this litigation. REM's attorneys gave a reasonable explanation for their actions in filing the motion, and we conclude this issue is without merit.

Bonner has also appealed, and raises the issue of whether REM is entitled to a subrogation lien against that portion of Bonner's judgment that represents future medical [*15] expenses. He argues that it would be improper to allow REM to recover the amount it paid him in a lump sum settlement of the workers' compensation action by getting funds earmarked for "future medical expenses" that were awarded in the third party action. REM's response is that the Final Decree in the workers' compensation action provided that REM would have a lien against "any" recovery Bonner might obtain in his third party action, and did not exempt out amounts awarded for future medical expenses.

The Trial Court found that Bonner agreed in the settlement (that was incorporated into the Final Decree) that REM would have a lien against "any recovery of the employee from any third parties liable to the employee for the expenses for the injuries alleged herein." This provision was not only agreed to by Bonner, but also received the sanction of the Court. Bonner has not directed this Court to any provision of the workers compensation statute that would prohibit such an agreement. In fact, [HN11] *Tenn. Code Ann. § 50-6-112(c)(1)* provides for such a lien, when an employee recovers against a third party, and when the employer's liability for workers' comp has been "fully or partially paid and [*16] discharged", as in this case.

The cases relied upon by Bonner deal with credit for an employer's future liability and are distinguishable from this case because the employer has already paid the full amount of its liability, and there is no "credit" for "future liability" involved, as any future liability was foreclosed by Bonner and REM in their settlement. Thus, there is no issue regarding credits or finality of judgments as was present in those cases. *See Hickman v. Continental Baking Co., 143 S.W.3d 72 (Tenn. 2004); Graves v. Cocke County, 24 S.W.3d 285 (Tenn. 2000)*. REM has already paid the full amount of workers compensation benefits to plaintiff, and has the statutory right, as well as the contractual right based upon the parties' settlement, to seek to recover those amounts from any recovery plaintiff gets from a third party regarding his injuries. Plaintiff's argument that he will be, in effect, getting "no recovery" for his future medical expenses is disingenuous, since plaintiff knew he would have future medical expenses when he entered into the settlement with REM, and thus part of that settlement amount was to compensate plaintiff for the same. Plaintiff also argues that [*17]

2007 Tenn. App. LEXIS 674, *17

REM is getting a "double credit" by recovering the amount he received from a third party to pay his future medicals, and also by being relieved of its obligation pursuant to the settlement to pay future medicals, but this argument ignores the fact that REM compensated plaintiff for his agreement to release REM from any liability for future medicals. Thus, if REM was not allowed to recover the amount it has already paid, plaintiff, plaintiff would in effect enjoy a "double"

recovery, which the workers' compensation statutes do not permit. *See Tenn. Code Ann. § 50-6-112* and *Graves.*

For the foregoing reasons we affirm the Judgment of the Trial Court and remand, with the cost of the appeal assessed to Andrew Billen.

HERSCHEL PICKENS FRANKS, P.J.





Cited
As of: Dec 05, 2011

BALFOUR GUTHRIE, INC. v. HUNTER MARINE TRANSPORT, INC. and
SCNO Barge Lines, Inc.

No. 3-86-0902

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
TENNESSEE, NASHVILLE DIVISION

*118 F.R.D. 66; 1987 U.S. Dist. LEXIS 11858; 9 Fed. R. Serv. 3d (Callaghan) 1256*

December 15, 1987, Decided

CASE SUMMARY:

**PROCEDURAL POSTURE:** Defendant carrier moved for sanctions against plaintiff purchaser under *Federal Rule of Civil Procedure 11* in the purchaser's action against the carrier for breach of contract, breach of bailment, and negligence, which the purchaser alleged had damaged coils that the purchaser had contracted with the carrier to deliver and which were held by a storage warehouse during the shipping process.

**OVERVIEW:** The carrier claimed that the purchaser filed its complaint although the purchaser's attorney's pre-filing inquiry disclosed facts that exculpated the carrier and that the attorney for the purchaser had failed to examine their shipping documents before responding to the carrier's motion for summary judgment. The court determined that through the attorney for the purchaser had discovered from experts that the coils were not damaged while in the carrier's possession, but had rusted while stored in the warehouse facility after the carrier had delivered the coils. The court determined that it was within its discretion to impose sanctions pursuant to

*Federal Rule of Civil Procedure 11* against the purchaser and its attorney, because the attorney had failed to make a reasonable inquiry into the validity of the purchaser's claim before signing and filing its complaint. The court further determined that pursuant to *Rule 11* the court had the authority to impose sanctions upon the purchaser and its attorney for the frivolous response to the carrier's motion for summary judgment after the purchaser refused to voluntarily dismiss its complaint against the carrier.

**OUTCOME:** The court granted the carrier's motion for sanctions and ordered that the carrier was awarded costs and attorney's fees from both the purchaser and its attorneys, in an amount determined by a magistrate as being reasonable under the guidelines related in the court's opinion.

**LexisNexis(R) Headnotes**

*Civil Procedure > Parties > Self-Representation > Pleading Standards*

118 F.R.D. 66, *; 1987 U.S. Dist. LEXIS 11858, **;
9 Fed. R. Serv. 3d (Callaghan) 1256

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN1] Before signing pleadings, motions, or papers described by *Federal Rule of Civil Procedure 11*, an attorney or pro se litigant must be satisfied after reasonable inquiry that the document signed is well grounded in fact, that it is warranted by existing law or a good faith belief in changing the law, and that it is not interposed for any improper purpose.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN2] See *Federal Rule of Civil Procedure 11* (as amended 1983).

*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
*Civil Procedure > Pretrial Matters > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN3] *Federal Rules of Civil Procedure 7(b)(3)* makes explicit the application of *Federal Rules of Civil Procedure 11* to motions as well as pleadings.

*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > General Overview*
*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN4] *Federal Rule of Civil Procedure 11* (as amended 1983) applies not just to pleadings, but to pleadings, motions, and papers signed by an attorney or pro se litigant.

*Civil Procedure > Parties > Self-Representation > Sanctions*
*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN5] Although *Federal Rule of Civil Procedure 11* (as amended 1983) mandates sanctions for violations, the severity of the sanction is within the trial court's discretion. Sanctions may be imposed against an attorney, a client, or both attorney and client. Sanctions may be imposed against a pro se litigant.

*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN6] The signer's experience or inexperience will not revoke a sanction mandated by *Federal Rule of Civil Procedure 11* (as amended 1983), but may affect the severity of the penalty.

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
*Torts > Negligence > Standards of Care > Appropriate Standard > Objectivity*
[HN7] *Federal Rule of Civil Procedure 11* (as amended 1983) incorporates an objective standard of reasonableness into the evaluation of attorney conduct. The standard is one of reasonableness under the circumstances. A greater range of circumstances will trigger its violation. Attorney conduct is evaluated in light of what a competent attorney would reasonably have believed at the time the pleading, motion, or paper was filed.

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN8] *Federal Rule of Civil Procedure 11* (as amended 1983) tests the actions of a signing attorney by a standard of objective reasonableness under the circumstances.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
*Civil Procedure > Parties > Self-Representation > Sanctions*
*Civil Procedure > Counsel > General Overview*
[HN9] *Federal Rule of Civil Procedure 11* applies to pleadings, motions, or papers signed by an attorney or a pro se litigant. An attorney who does not sign one of these documents cannot be sanctioned under *Rule 11*.

*Civil Procedure > Counsel > General Overview*

118 F.R.D. 66, *; 1987 U.S. Dist. LEXIS 11858, **;
9 Fed. R. Serv. 3d (Callaghan) 1256

*Civil Procedure > Sanctions > Baseless Filings > General Overview*

[HN10] There are three critical components to *Federal Rule of Civil Procedure 11*. Measuring the conduct of counsel that is subject to sanctions by an objective standard of reasonableness under the circumstances, a court must impose sanctions if reasonable inquiry discloses that the pleading, motion, or paper is (1) not well grounded in fact; or (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; or (3) interposed for any improper purpose, such as harassment or delay.

*Civil Procedure > Sanctions > Baseless Filings > General Overview*

[HN11] Factual errors in a complaint need not result in sanctions under *Federal Rule of Civil Procedure 11*.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
*Civil Procedure > Parties > Self-Representation > Sanctions*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*

[HN12] When there is neither factual nor legal support for a claim, it may be construed as frivolous.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
*Contracts Law > Negotiable Instruments > Enforcement > Joint & Several Instruments*

[HN13] If a pleading, motion, or paper certified by an attorney's or pro se litigant's signature fails the three part test of *Federal Rule of Civil Procedure 11*, sanctions must be imposed.

*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*

[HN14] A court is expected to avoid using the wisdom of hindsight and tests the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion

or paper was filed. *Federal Rule of Civil Procedure 11*. In considering the nature and severity of the sanctions to be imposed, the court takes account of the attorney or party's actual or presumed knowledge when the pleading or other paper was signed.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*

[HN15] The continuing duty issue under *Federal Rules of Civil Procedure 11* only arises when a once worthy claim is later discovered to be meritless.

*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*

[HN16] See *Federal Rule of Civil Procedure 41(a)(1)*.

*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*

[HN17] A pending motion for summary judgment will not preclude dismissal if the parties agree to the dismissal.

*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*

[HN18] Even if a voluntary dismissal occurs, it does not prevent a court from imposing sanctions under *Federal Rule of Civil Procedure 11*.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*

[HN19] A response to a motion for summary judgment that is made without reasonable inquiry into the facts on which the motion is based violates *Federal Rule of Civil Procedure 11*.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Civil Procedure > Sanctions > Baseless Filings >*

118 F.R.D. 66, *; 1987 U.S. Dist. LEXIS 11858, **;
9 Fed. R. Serv. 3d (Callaghan) 1256

*General Overview*

[HN20] To award an opposing party the reasonable expenses it incurs because of the improper filing of the pleading, motion, or other paper a court must find that the actions for which fees are sought were reasonably necessary to defend against the motions. A reasonableness inquiry necessarily requires a determination as to what extent plaintiff's expenses and fees could have been avoided and were self-imposed. When counsel is called upon to defend against its adversary's unreasonable motion practices, he must mitigate damages by correlating his response, in terms of hours and funds expended, to the merit of the claims. The mitigation requirement prevents a party from misusing sanctions under Federal Rule of Civil Procedure 11in order to benefit from the errors of opposing counsel. The district court is therefore required to balance carefully these competing interests in determining the amount of sanctions.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*

[HN21] *Federal Rule of Civil Procedure 11* expressly provides that an award of the opposing party's reasonable expenses, including a reasonable attorney's fee, is only one possible sanction. A district court, moreover, is given wide discretion in deciding the nature and extent of sanctions to impose.

**COUNSEL:** [**1] Allan B. Thorp of Price, Criss & Thorp and C. Dewey Branstetter, Jr., for Plaintiff.

John S. Sandberg, Gary D. McConnell of Shepherd, Sandberg & Phoenix and E. Clifton Knowles of Bass, Berry & Sims, for SCNO Barge Lines, Inc.

John W. Wagster of Hollins, Wagster & Yarbrough, for Hunter Marine Transport.

**JUDGES:** Thomas A. Wiseman, Jr., Chief United States District Judge.

**OPINION BY:** WISEMAN

**OPINION**

[*67] MEMORANDUM

THOMAS A. WISEMAN, JR., CHIEF JUDGE.

In this case, the defendant SCNO Barge Lines has moved for sanctions against the plaintiff Balfour Guthrie under *Federal Rule of Civil Procedure 11*. [HN1] Before signing pleadings, motions, or papers described by *Rule 11*, an attorney or pro se litigant must be satisfied after reasonable inquiry that the document signed is well grounded in fact, that it is warranted by existing law or a good faith belief in changing the law, and that it is not interposed for any improper purpose. [1] SCNO claims that Balfour Guthrie filed a complaint alleging that SCNO damaged 109 steel coils owned by the plaintiff during shipment, although the plaintiff's pre-filing inquiry disclosed facts that only exculpated SCNO. SCNO also contends that Balfour Guthrie's response to [*68] SCNO's motion for summary judgment is sanctionable because the plaintiff's attorneys [**2] allegedly failed to examine the shipment contract and bill of lading before fashioning their arguments.

[1] *See Fed. R. Civ. P. 11.*

I.

In August of 1984, Balfour Guthrie, owner of 109 steel coils, contracted with SCNO Barge Lines to deliver the coils to Hunter Marine, a storage warehouse in Nashville. [2] When rust was discovered on the coils, Balfour Guthrie filed a complaint against SCNO and Hunter Marine for breach of contract, breach of bailment, and negligence. The complaint, filed on October 21, 1986, alleges that the damage to the coils must have occurred either during transport by SCNO or during storage by Hunter Marine.

[2] Complaint, *Balfour Guthrie, Inc. v. Hunter Marine Transport* (No. 3-86-0902) (filed Oct. 21, 1986).

Balfour Guthrie's insurance surveyor, K. W. Diers, investigated the cause of damage in the spring of 1985. After examination of both the Hunter Marine warehouse records and the coils, Diers concluded that the rusting had occurred after condensation had formed on the coils at the warehouse. [3] One year later, in preparation for litigation, Balfour Guthrie's counsel hired a marine surveyor, Captain Zane, to discover when and how the coils had rusted. [**3] Zane studied Diers' reports and

118 F.R.D. 66, *68; 1987 U.S. Dist. LEXIS 11858, **3;
9 Fed. R. Serv. 3d (Callaghan) 1256

agreed with Diers' conclusion that the rust formed on the coils while they were stored in Hunter Marine's warehouse. [4] Unbeknownst to plaintiff's [*69] counsel, Captain Zane was also employed by SCNO at the time he gave his opinion assigning full liability to Hunter Marine.

3   *See* Affidavit of Captain C. Zane [hereinafter "Zane Affidavit"], Exhibits Z-76 to Z-80. In an April 16, 1985 letter by Diers to Balfour Guthrie, Diers reported that he made one inspection of the coils at Hunter Marine's warehouse and a more detailed examination of six coils selected at random and transported to Nashville Steel Corporation. All six coils showed evidence of rust. Testing revealed that there was no seawater in the cans in which the coils were stored. Diers said that the coils were in the warehouse from September 12, 1984 until at least April of 1985. Diers observed that coils from the lot shipped out in November of 1984 were not reported by Hunter Marine or by the customer who received them to have been damaged in any way. Accordingly, Diers concluded that the rust was caused by sweating or condensation that resulted some time after the coils were stored at Hunter Marine. *Id.*

Diers traced some of the coils to S & G Metals Company in Kansas City and issued a very similar report to Balfour Guthrie on May 20, 1985. The results of both examinations are summarized in a July 3, 1985 letter to Balfour Guthrie. That letter assigns responsibility for the rusting to Hunter Marine. *See* Zane Affidavit, Exhibits Z-82 to Z-85 and Z-73 to Z-74.

[**4]

4   Zane Affidavit, Exhibits Z-9 to Z-24. In Zane's affidavit, Zane explains that he first concluded that Hunter Marine was responsible for the damage after review of Diers' report in the summer of 1986. Zane told plaintiff's attorney of this opinion orally around August 8, 1986. In October, approximately two months after the complaint had been filed, Zane reemphasized his position in his recommendations to plaintiff's counsel, urging the use of climatological data to strengthen the case against Hunter Marine. Relevant portions of Zane's December 26, 1986 letter read as follows:

From the case file you sent me,

continuity of transit is well established, verifying loss was sustained a considerable time after the coils were in care/custody storage of Hunter Marine.

The fact that some coils were delivered from the overall lot storage without damage claim [sic] should reasonably indicate that the remaining subsequent damaged coils were the result of inadequate protection against weather elements while in storage. In essence, while the coils may have been in covered warehouse storage, there apparently was no protection against severe temperature changes.

In my opinion the key documents would be the climatological data from the weather bureau closest to the warehouse facilities. This should establish an official record of the ambient frezze [sic] thaw conditions condusive [sic] to moisture/rusting accruals.

The report of Diers and Associates, Inc. dated April 16, 1985 concludes with opinion, "Damages appear to have resulted from the time cargo was stored in warehouse, because reportedly, no loss was was [sic] reported against coils which were shipped out shipped out [sic] of warehouse in November, 1984."

I can concur with the opinion .

. . .

It is suggested you review your existing case file for documents relating to Hunter marine [sic] and then request any documents relative to in/out warehouse receipts for the purpose of establishing if any exceptions

118 F.R.D. 66, *69; 1987 U.S. Dist. LEXIS 11858, **4;
9 Fed. R. Serv. 3d (Callaghan) 1256

were made by Hunter Marine.

It is also suggested that you request warehouse activity and/or payroll records concerning the handling cost of coils. There may be a possibility that coils may have been re-handled while in warehouse storage for space accomodations [sic] or the like. If such is the case, the relative weight bearing forces of the coil rounds would change enhancing moisture ingress between the coil windings. In that some coils were shipped out in November 1984 there is a probability that some coils rehandling occured [sic]. And if some coils were rehandled during freeze periods, or shortly before or after, in warehouse, this would compound the likelyhood [sic] of moisture accruals between windings.

A paramount factor in the interrogatory discover [sic] would be the questions and answers relative to temperatue [sic] controls, if any, in the warehouse.

Further, discover if the warehouse is constructed so as to provide a wind force barrier to inhibit strong circulation of air in the warehouse which usually accompany [sic] frigid temperatures. A strong circulation of frigid air could create a 'flash type freeze' of any moisture between windings which in turn would prlong [sic] thaw and aggravate rusting exposure.

Based on known facts and factors it is reasonable to conclude that damages to coils occured [sic] while in care and custody of Hunter Marine, and that Hunter Marine did not have reasonable storage facilities or did not

exercise reasonable prcautions [sic] for cargo protection.

Zane Affidavit, Exhibits Z-9 to Z-10.

[**5] At the time the complaint was filed, Balfour Guthrie's counsel believed that both experts' opinions supported a claim against Hunter Marine. [5] Before naming SCNO, however, the plaintiff's attorneys specifically discussed with their client whether there were sufficient facts to justify the complaint under *Fed. R. Civ. P. 11.* [6] Although Diers and Zane agreed that the rust formed at the warehouse, Balfour Guthrie made a claim against SCNO. An affidavit of the plaintiff's attorney gave three reasons for filing suit against SCNO: (1) Hunter Marine continued to disclaim fault; (2) Balfour Guthrie employees had no personal knowledge of how the coils were handled; and (3) neither Diers nor Zane had personal knowledge of how the coils were handled. [7]

> [5]   Affidavit of Allan B. Thorp in Opposition to SCNO's Motion of Sanctions [hereinafter "Thorp Affidavit"] at 2.
> [6]   *Id.*
> [7]   *Id.*

After SCNO had been named in the October 21, 1986 complaint, Captain Zane told Balfour Guthrie's counsel that he worked for SCNO and would not testify against the company. [8] Counsel's response was to urge Zane to remain an expert in the case against Hunter Marine and to assure Zane that he would [**6] not be required to testify against SCNO. [9] Despite these assurances, in March of 1987 Zane gave his entire file on the case to his SCNO superiors, who relayed them to SCNO's counsel. [10] At this time, SCNO learned that Balfour Guthrie may have believed as early as the spring of 1985, the date of Diers' report and one and a half years before the complaint was filed, that SCNO was not responsible for the damage to the coils.

> [8]   Zane Affidavit, Exhibit Z-6; Thorp Affidavit at 3-4.
> [9]   Thorp Affidavit at 3-4.
> [10]   *Id.* at 4-6; Exhibit 6 (letter from plaintiff's attorney to Zane, Apr. 8, 1987).

On April 6, 1987, SCNO's attorneys told Balfour Guthrie that SCNO suspected a *Rule 11* violation and demanded a voluntary dismissal with prejudice under *Fed. R. Civ. P. 41.* [11] Balfour Guthrie countered on April

118 F.R.D. 66, *69; 1987 U.S. Dist. LEXIS 11858, **6;
9 Fed. R. Serv. 3d (Callaghan) 1256

16 by offering a voluntary dismissal without prejudice if SCNO would withdraw its pending motion for summary judgment and cooperate in the case against Hunter Marine. [12] SCNO refused and moved for sanctions on July 31.

>    11   Motion for Sanctions at 5. This conversation was confirmed by letter on May 13, 1987. Thorp Affidavit at 6-8; Exhibit 8 (letter from SCNO counsel to plaintiff's attorney, May 13, 1987).

[**7]

>    12   Motion for Sanctions at 5.

SCNO's motion argues that Balfour Guthrie made the reasonable pre-filing inquiry required under *Rule 11* and that the result of that inquiry should have led Balfour Guthrie not to file suit against SCNO. [13] [*70] In response, Balfour Guthrie's counsel claims that he had a good faith basis in fact and law for filing against SCNO and that the claim was not made for any improper purpose. Balfour Guthrie also argues that it was unable to dismiss its claims against SCNO in view of SCNO's outstanding motion for summary judgment. [14]

>    13   As support, SCNO cited attachments to the Zane affidavit and the plaintiff's answers to Hunter Marine's interrogatories, in which Balfour Guthrie said the coils left SCNO in good condition. Answers to these interrogatories, submitted by plaintiff's counsel to Hunter Marine on May 15, 1987, show that the opinion Balfour Guthrie held before filing the complaint against SCNO remained unchanged after subsequent discovery. These answers have been neither sworn nor notarized.

>    2. State all facts and information upon which you allege in your cmplaint [sic] that the coils were delivered to SCNO in New Orleans in good and undamaged condition.

>    Answer   to   Interrogatory Number 2:

>    The SCNO Bill of Lading; the fact that there were no exceptions taken to the coils when they were delivered by SCNO to Hunter Marine; and, the fact that some of the coils had been delivered to

customers and were undamaged.

* * *

>    8. State all facts and information upon which you allege in your complaint that SCNO delivered the coils to Hunter Marine in a good and undamaged condition.

>    Answer   to   Interrogatory Number 8:

>    The Bill of Lading of SCNO; the fact that Hunter Marine made no exceptions to the condition of the coils; and, the fact some of the coils had been delivered to customers who made no claim as to the condition.

>    9. State all facts and information upon which you allege in your complaint that SCNO delivered the coils to Hunter Marine in a damaged condition.

>    Answer   to   Interrogatory Number 9:

>    The Plaintiff has no knowledge except for information which the Defendant Hunter Marine has concerning the condition of the coils when delivered by SCNO to Hunter Marine.

* * *

>    19. State all facts and information upon which you allege in your complaint that defendant is guilty of breach of contract and/or breach of bailment.

>    Answer   to   Interrogatory Number 19:

>    Discovery is continuing. However, the coils were delivered

Page 8

118 F.R.D. 66, *70; 1987 U.S. Dist. LEXIS 11858, **7;
9 Fed. R. Serv. 3d (Callaghan) 1256

to Hunter Marine in a good condition and were redelivered damaged. Hunter Marine did not exercise proper temperature control to warehouse the coils without damage.

*See* Notice of Filing Document, *Balfour Guthrie, Inc. v. Hunter Marine Transport* (No. 3-86-0902) (filed Aug. 5, 1987) (interrogatories and answers are attached).

[**8]

14   Plaintiff's Memorandum Opposing SCNO's Motion for Sanctions at 2-3, 9-10; Supplemental Memorandum Opposing Motion for Sanctions at 2-3.

In March of 1987, SCNO filed a motion for summary judgment against Balfour Guthrie. This motion, submitted before Captain Zane's disclosures to SCNO, argued that Balfour Guthrie's complaint was filed after the time period permitted in a notice-to-sue provision incorporated into the shipping contract through the bill of lading. 15 Balfour Guthrie's perfunctory response to the motion for summary judgment argued that the terms of the bill of lading, which contained the limitations period, were never incorporated into the contract and were not signed by the plaintiff or its agents. 16 Hence, Balfour Guthrie [*71] asserted that the contractual limitation never came into being.

15   SCNO's Motion for Summary Judgment. The straight bill of lading required that SCNO receive written notice of any claims for damage to the shipment within nine months of delivery, and that suits arising from these claims be instituted within two years and one day from the date of SCNO's receipt of the written notice. *d.* at 2. According to SCNO, the bill of lading was issued pursuant to the transportation contract between SCNO and Balfour Guthrie's agent, Houston Stevedores. The transportation contract was said to incorporate the bill of lading in its entirety. Both the bill of lading and accompanying Freight Schedule 800, referenced in the transportation contract between plaintiff's agent and SCNO, contain the limitations period. *See* Reply of SCNO Barge Lines, Inc. to Plaintiff's Response to SCNO's Motion for Summary Judgment and attachments.

[**9]

16   Plaintiff's Response to Motion for Summary Judgment by SCNO Barge Lines, Inc. The response is reprinted in its entirety.

PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT BY SCNO BARGE LINES, INC.

The defendant, SCNO Barge Lines, Inc., has filed a Motion for Summary Judgment alleging that the plaintiff's claim is time-barred because neither notice of the claim to the defendant nor the filing of suit occurred within the limitations periods stated on the back of the bill of lading. (Exhibit A to Affidavit of Gerald Weinmann, Vice President of SCNO Barge Lines, Inc.)

The defendant is not entitled to summary judgment on this issue because the limitations periods relied on did not become part of the contract of the parties. "A stamp or notice on the back of a bill of lading does not constitute a part of the contract or vary its obligations unless it receives the assent of the shipper or is incorporated by reference on the face of the bill, . . . ." *70 AmJur2d Shipping, § 736.* The front side of the bill of lading exhibited to the Weinmann Affidavit does not incorporate by reference the terms and conditions on the back side, nor is the bill signed by Balfour Guthrie, Inc. or its agent.

Therefore, the plaintiff requests that the defendant's Motion for Summary Judgment be denied.

[**10]   This Court granted SCNO's motion in August 1987. 17 The Court observed that, plaintiff's objection notwithstanding, the terms of the limitations period on the face of the bill were expressly incorporated

118 F.R.D. 66, *71; 1987 U.S. Dist. LEXIS 11858, **10;
9 Fed. R. Serv. 3d (Callaghan) 1256

in the transportation contract in Freight Schedule 800 and that Balfour Guthrie had actual notice of that contract. Further, the Court noted that the face of the bill incorporated the transportation contract. Finally, the Court also determined that the notice-to-sue provision was a common commercial practice and that limitations periods of much shorter duration had been upheld as reasonable.

> 17 Memorandum and Order, *Balfour Guthrie, Inc. v. Hunter Marine Transport* (No. 3-86-0902) (August 6, 1987).

SCNO's motion for sanctions argues that Balfour Guthrie's response to the motion for summary judgment is sanctionable because it showed that plaintiff's counsel had not closely examined the contract produced to them. 18 Balfour Guthrie responds that the documents produced did not show that the parties ever contracted for a notice-to-sue provision. Balfour Guthrie adds that "a good faith dispute as to whether the statute of limitations has run can be no basis to support a *Rule* [**11] *11* motion." 19

> 18 Motion for Sanctions at 4; Memorandum in Support of Motion for Sanctions at 7.
> 19 Plaintiff's Memorandum Opposing SCNO's Motion for Sanctions at 3-7.

II.

*The Original Rule 11*

*Rule 11*, adopted into the Federal Rules of Civil Procedure in 1938, tried to promote the responsible practice of law but offered neither guidance in defining appropriate conduct nor flexibility in punishing breaches of it. The 1938 Rule reads as follows:

> Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one

witness sustained by corroborating circumstances is abolished. *The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground* [**12] *to support it; and that it is not interposed for delay.* If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted. (Emphasis added).

*Rule 11* once required "good ground" to support a pleading and banned any pleading interposed for delay. If a violation occurred, sanctions were not mandated by the Rule; but if the court did impose sanctions, only one choice was permitted by the Rule -- to strike the pleading entirely. Because the Rule relied on a subjective good faith standard to detect violations and allowed only one harsh penalty for violators, courts rarely enforced *Rule 11*. See Nelken, *Sanctions Under Amended Federal Rule 11 -- Some "Chilling" Problems in the Struggle Between Compensation and Punishment*, 74 Georgetown L.Rev. 1313, 1314-17 (1986) [hereinafter "Nelken"]. An attorney's genuine belief in the validity of the pleadings was usually sufficient protection [**13] from sanctions Under *Rule 11. See*, [*72] *e.g., Nemeroff v. Abelson*, 620 F.2d 339, 350 *(2d Cir. 1980)* (because action not without foundation, no subjective bad faith sufficient to warrant sanctions).

*Changes in Rule 11: The 1983 Amendment*

The new *Rule 11*, amended in 1983, took shape because of frustrations with both the strictures of the old Rule and the explosion of litigation in the federal courts. An increased desire to let federal courts manage their dockets and the urge to discourage unfounded filings were also contributing factors. *Rule 11* was one in a series of several amended rules designed to make lawyers more accountable for their actions, increase judicial management of cases, improve the discovery process, and encourage use of sanctions where appropriate. 20 *Federal Rule of Civil Procedure 11* now reads as follows:

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 91 of 177   PageID 99

Page 10

118 F.R.D. 66, *72; 1987 U.S. Dist. LEXIS 11858, **13;
9 Fed. R. Serv. 3d (Callaghan) 1256

[HN2] Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address. Except when otherwise specifically provided by rule or statute, [**14] pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. *The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.* If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay [**15] to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee. (Emphasis added).

20   Nelken at 1317. In her article on *Rule 11*, Nelken describes the 1983 amendments to

*Federal Rules of Civil Procedure 7, 11, 16,* and *26* as an "integrated package" promoting judicial management. These rules

> focus on the pretrial process and attempt to remedy the perceived inefficiencies and abuses of the system by increasing judicial oversight of litigation and by diminishing the incentives for certain kinds of litigation behavior through sanctions provisions. [HN3] *Rule 7(b)(3)* makes explicit the application of *Rule 11* to motions as well as pleadings. *Rule 16*, which expands the role of pretrial conferences, is a "blueprint for management," and rule 26 puts the judge in the driver's seat with respect to the scope of discovery. *Rule 11* is a general provision that supplements the case management tools prescribed in *rules 16 and 26.*

*Id.*

[HN4] *Rule 11* now applies not just to pleadings, but to pleadings, motions, and papers signed by an attorney or pro se litigant. [HN5] Although the amended Rule mandates sanctions [**16] for violations, the severity of the sanction is within the trial court's discretion. *Fed. R. Civ. P. 11*, Notes of Advisory Committee. Sanctions may be imposed against an attorney, a client, or both attorney and client. Sanctions may be imposed against a pro se litigant. *See Kurkowski v. Volcker, 819 F.2d 201 (8th Cir. 1987); Doyle v. United States, 817 F.2d 1235 (5th Cir. 1987).* [HN6] The signer's experience or inexperience will not revoke a sanction mandated by *Rule 11* but may affect the severity of the penalty. *Compare Unioil, Inc. v. E.F. Hutton & Co., 809 F.2d 548, 557-559 (9th Cir. 1987)* (sanctions of $ 294,141.10 upheld in part because attorney was experienced [*73] and firm specialized in complex business litigation) *with Brown v. Nationwide Mut. Ins. Co., 805 F.2d 1242, 1244 (5th Cir. 1986)* (trial court had reduced sanctions to $ 1,000 because it considered counsel sufficiently humiliated by a first time offense).

Perhaps the most important difference in [HN7] the amended Rule is that it incorporates an objective standard

118 F.R.D. 66, *73; 1987 U.S. Dist. LEXIS 11858, **16;
9 Fed. R. Serv. 3d (Callaghan) 1256

of reasonableness into the evaluation of attorney conduct. The standard is one of reasonableness under the circumstances. This standard is more stringent than [**17] the original good faith formula and thus it is expected that a greater range of circumstances will trigger its violation. *Fed. R. Civ. P. 11*, Notes of Advisory Committee (citations omitted). Attorney conduct is evaluated in light of what a competent attorney would reasonably have believed at the time the pleading, motion, or paper was filed. *Id.*

Courts often say that the subjective standard of good faith no longer applies in *Rule 11* cases. *See Greenberg v. Sala, 822 F.2d 882 (9th Cir. 1987)* (before 1983, *Rule 11* was interpreted to require subjective bad faith by a signing attorney . . . . but [HN8] amended *Rule 11* tests the actions of a signing attorney by a standard of objective reasonableness under the circumstances). *See also INVST Financial Group v. Chem-Nuclear Systems, 815 F.2d 391, 401 (6th Cir. 1987), cert. denied, Garratt v. INVST Financial Group, Inc., 484 U.S. 927, 108 S. Ct. 291, 98 L. Ed. 2d 251 (1987), citing Albright v. Upjohn Co., 788 F.2d 1217, 1221 (6th Cir. 1986); Robinson v. National Cash Register Co., 808 F.2d 1119, 1127 (5th Cir. 1987); Zaldivar v. City of Los Angeles, 780 F.2d 823, 829 (9th Cir. 1986); Whittington v. Ohio River Co., 115 F.R.D. 201, 208 (E.D. Ky. 1987).* [**18] Some writers believe that amended *Rule 11* modifies the good faith formula of the original Rule by restricting it to two areas: in the attorney's belief about arguments for the extension, modification, or reversal of existing law and in the prohibition against filing documents for an improper purpose. *See Whittington, 115 F.R.D. at 208, n.23;* Nelken at 1320. One commentator observes that the new Rule adds an objective layer to the subjective core of traditionally sanctionable bad faith conduct. *Id.*

*Requirements of Rule 11*

[HN9] *Rule 11* applies to pleadings, motions, or papers signed by an attorney or a pro se litigant. An attorney who does not sign one of these documents cannot be sanctioned under *Rule 11. See In re Ruben, 825 F.2d 977 (6th Cir. 1987).* Limiting sanctions to the person who signed makes sense in light of the certification rationale for the Rule and avoids the need for extra discovery to find out who prepared the document. *See Robinson v. National Cash Register, 808 F.2d at 1129.* [21]

21    In *Robinson,* the Fifth Circuit observed that a

signing attorney may be subject to sanctions even if the attorney is an associate signing at the direction of a partner or a local attorney signing for out-of-state counsel. The court warned attorneys to be selective about the documents they sign. *See id. at 1128-1129.* The Ninth Circuit disagrees under some circumstances. *See Unioil, Inc. v. E.F. Hutton & Co., 809 F.2d 548, 558 (9th Cir. 1987), citing* Schwarzer, *Sanctions Under the New Rule 11 -- A Closer Look,* 104 F.R.D. 181 (1985).

[**19] [HN10] There are three critical components to *Rule 11*. Measuring the conduct of counsel that is subject to sanctions by an objective standard of reasonableness under the circumstances, a court must impose sanctions if reasonable inquiry discloses that the pleading, motion, or paper is

(1) not well grounded in fact; or

(2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; or

(3) interposed for any improper purpose, such as harassment or delay.

*Knop v. Johnson, 667 F. Supp. 512, 516 (W.D. Mich. 1987), citing Westmoreland v. CBS, Inc., 248 U.S. App. D.C. 255, 770 F.2d 1168, 1174 (D.C. Cir. 1985);* Fed. R. Civ. P. 11.

In *Albright v. Upjohn Co., 788 F.2d 1217 (6th Cir. 1986),* the Sixth Circuit discussed what constitutes reasonable inquiry sufficient to show that a complaint is well grounded in fact. The court upheld *Rule 11* sanctions against a plaintiff who sued a drug manufacturer solely because it had [*74] been a defendant in similar suits and because her medical records were illegible and incomplete. The plaintiff, who had sued several different manufacturers, was using discovery to determine whether her claims against Upjohn had any [**20] merit. *Cf. Southern Leasing Partners v. McMullan, 801 F.2d 783, 786 (5th Cir. 1986)* (counsel filed complaint hoping discovery would uncover facts to support its claims); *Whittington v. Ohio River Co., 115 F.R.D. at 206* (a claim must not be asserted in the mere hope that discovery will turn up something against the defendant). The Sixth Circuit sanctioned Albright's action because

Page 12

118 F.R.D. 66, *74; 1987 U.S. Dist. LEXIS 11858, **20;
9 Fed. R. Serv. 3d (Callaghan) 1256

she asserted her claim against Upjohn with knowledge that she had no factual basis for it. *Albright v. Upjohn Co., 788 F.2d at 1221, n.7. Cf. INVST Financial Group v. Chem-Nuclear Systems, 815 F.2d at 402* (motion for recusal not well grounded in fact when Judge had made no comments showing personal bias against the defendants).

[HN11] Factual errors in a complaint need not result in *Rule 11* sanctions. In a recent case, the Ninth Circuit denied sanctions imposed against a attorney who had put in over 100 hours of pre-filing research because neither clear legal authority nor the litigant's own admission erased the factual underpinning of the litigant's pleading. *Greenberg v. Sala, 822 F.2d at 889 (9th Cir. 1987)*. By contrast, minimal pre-filing research that consists primarily of conversations [**21] with a client is not enough to show that a complaint is well grounded in fact. *See Southern Leasing Partners v. McMullan, 801 F.2d 783 (5th Cir. 1986)*. However, extended research alone will not redeem a claim that is without legal or factual merit. *Knop v. Johnson, 667 F. Supp. at 516*.

Determining what constitutes reasonable inquiry sufficient to show that the pleading, motion or paper is well grounded in existing law or in a good faith belief in changing the law seems more difficult. In *Whittington v. Ohio River Co.*, the Eastern District of Kentucky observed that a competent attorney must do enough research to know what the existing law in the case is. *115 F.R.D. at 207-208*. Hence, if a controlling case is fatal to a claim and a reasonably competent attorney would have found it, the claim is not well grounded in law. *Id. See INVST Financial Group v. Chem-Nuclear Systems, 815 F.2d at 403* (cursory review of *Fed. R. Civ. P. 12* would have shown the motion to dismiss was improper); *Robinson v. National Cash Register Co., 808 F.2d at 1131* (law of res judicata clearly barred the claim); *Southern Leasing Partners v. McMullan, 801 F.2d at 788-789* (argument that res [**22] judicata not applicable to case mere rhetoric that misstates the law). Shotgun complaints may be suicidal, inflicting *Rule 11* sanctions. *See Thomas v. Capital Security Services, 812 F.2d 984, 986 (5th Cir. 1987); Southern Leasing Partners, 801 F.2d at 787; Whittington, 115 F.R.D. at 207*. If the area of law is considered complex and uncertain, however, *Rule 11* sanctions are rarely granted under this provision. *See Vatican Shrimp Co. v. Solis, 820 F.2d 674, 681 (5th Cir. 1987)*.

Deciding what are reasonable inquiries into fact and law requires the court to balance the legitimate concerns about shotgun pleadings and frivolous filings against several factors: the Rule's own admonition not to stifle attorneys' creativity and enthusiasm, the general intent of the Federal Rules to replace technical code pleading with more liberal pleading rules, and the need for change and growth in the law itself. *See Fed. R. Civ. P. 11*, Notes of Advisory Committee. *See generally* Note, *Plausible Pleadings: Developing Standards for Rule 11 Sanctions, 100 Harv. L. Rev. 630 (1987)*.

*Rule 11* labels harassment and delay as improper purposes, and the Advisory Committee Notes observe [**23] that the litigation process may be abused for other purposes as well. [HN12] When there is neither factual nor legal support for a claim, it may be construed as frivolous. *See Kurkowski v. Volcker, 819 F.2d at 204* (farmers' pro se complaint against lenders sanctionable when filed in face of previous dismissals involving the same parties under the same legal theories); *INVST Financial Group v. Chem-Nuclear Systems, 815 F.2d at 402-403 [*75]* (motion for recusal without basis in fact or law); *Brown v. Nationwide Mut. Ins. Co., 805 F.2d at 1244-1245* (neither legal nor factual merit in plaintiff's claim against insurance company for failure to settle fast enough). The Ninth Circuit observes that harassment must do more than bother, annoy or vex the complaining party. *Zaldivar v. City of Los Angeles, 780 F.2d at 832*. Hence, successive complaints based upon propositions of law previously rejected may constitute harassment. *Id*. Similarly, a blizzard of poorly prepared but potentially dispositive motions submitted shortly before trial may be construed as harassment. *Knop v. Johnson, 667 F. Supp. at 519-520*. A motion filed to delay a hearing has been filed for an improper purpose. *[**24] INVST Financial Group, 815 F.2d at 402*. By contrast, political motives for filing a lawsuit that is well grounded in fact and law have been held not to be improper. *Zaldivar, 780 F.2d at 834*. These cases reveal two patterns. Either the document is so devoid of factual and legal merit that any purpose for which it has been filed must be improper, or the document has been filed for some purpose other than the orderly resolution of disputes through litigation.

*Beyond Rule 11: Continuing Duty*

[HN13] If a pleading, motion, or paper certified by an attorney's or pro se litigant's signature fails the three part test of *Rule 11*, sanctions must be imposed. *Fed. R.*

*Civ. P. 11.* The Advisory Committee's Notes emphasize that the signer's compliance is to be judged by what was reasonable to have been believed at the time the document was filed.

Some courts have asked whether the duty imposed by *Rule 11* at the time of filing continues throughout the litigation. They speculate about whether the attorney who files in compliance with *Rule 11* and thereafter learns that the document is not well grounded in law or fact must take further action. When the document in question is a complaint, the issue [**25] arises whether a voluntary dismissal under *Federal Rule of Civil Procedure 41* is required.

Circuit courts are split as to whether *Rule 11* imposes a continuing duty. The Fifth Circuit invokes the doctrine as a sensible extension of the rule. *See Thomas v. Capital Security Services, 812 F.2d at 988; Robinson v. National Cash Register, 808 F.2d at 1127; Southern Leasing Partners v. McMullan, 801 F.2d at 788.* By contrast, the Second Circuit opposes the continuing duty doctrine because it is viewed as undercutting the language of the Rule and the intent of the drafters. *See Oliveri v. Thompson, 803 F.2d 1265, 1274 (2d Cir. 1986); Stiefvater Real Estate, Inc. v. Hinsdale, 812 F.2d 805, 809 (2d Cir. 1987).*

The Sixth Circuit's position on continuing duty is unclear. In dicta, the court has suggested that a plaintiff whose claim lacked merit at the outset should have dismissed it.

> Albright asserted her claim for liability against Upjohn with the knowledge that she had no factual basis for the claim and continued to assert it long after it would have been reasonable to have dismissed it.

*Albright v. Upjohn Co., 788 F.2d at 1221, n.7. Albright* turned on the plaintiff's [**26] failure to make a reasonable prefiling inquiry. The Court determined that the claim violated *Rule 11* at the time of filing. Because the continuing duty issue only arises in the context of a reasonable filing that later becomes unreasonable, it is uncertain what position this Circuit would adopt on the issue.

Interestingly, several circuits have imposed sanctions for *Rule 11* violations even after voluntary dismissal under *Fed. R. Civ. P. 41. See Greenberg v. Sala, 822*

*F.2d 882 (9th Cir. 1987); Kurkowski v. Volcker, 819 F.2d 201 (8th Cir. 1987); Szabo Food Service, Inc. v. Canteen Corp., 823 F.2d 1073,* (No. 86-3093), (7th Cir. June 29, 1987).

III.

SCNO's motion for sanctions against Balfour Guthrie raises two questions: whether the original complaint was filed in violation of *Rule 11* and whether Balfour Guthrie's response to SCNO's motion for summary judgment also violated the Rule.

[*76] *The Complaint*

Balfour Guthrie's complaint, signed by attorney Allan Thorp and filed on October 21, 1986, is clearly a pleading that falls within the bounds of *Rule 11.* The plaintiff conducted a reasonable pre-filing investigation by hiring two different experts to discover what had caused the steel [**27] coils to rust.

Plaintiff's compliance with the Rule ends at this point, however. The reasonable inquiry, based on first hand examination of the coils and the warehouse records, disclosed facts that only exculpated SCNO. Diers inspected the coils both at Hunter Marine and at another warehouse to which they had been transported for the purpose of further testing. Tests on six coils selected at random revealed gradations of rust on the coils in the *absence* of seawater, an element one might expect to be present had the coils been improperly handled by SCNO. Review of Hunter Marine's own records confirmed this analysis. Coils from Balfour Guthrie's lot were delivered to a customer in November of 1984, two months after SCNO had delivered them to the warehouse. Neither Hunter Marine nor the customer who received the coils reported any damage to them.

Captain Zane agreed with this analysis before the complaint was filed; afterwards, he suggested discovery of climatological data as a means of fixing damage *exclusively* on Hunter Marine. With hindsight, Captain Zane's credibility is questionable: as an SCNO employee who refused to testify against his employer, Zane could have been expected [**28] to point the finger at the only remaining defendant in the lawsuit, Hunter Marine. Yet, the Advisory Committee's Notes to *Rule 11* caution against hindsight judgments and urge the Court to consider what it would have been reasonable for Balfour Guthrie's counsel to believe about SCNO's potential

118 F.R.D. 66, *76; 1987 U.S. Dist. LEXIS 11858, **28;
9 Fed. R. Serv. 3d (Callaghan) 1256

liability when the complaint was filed. 22 Counsel for the plaintiff says that he did not know Captain Zane worked for SCNO until well after the filing. 23 Hence, plaintiff's counsel had no reason to doubt Zane's opinion of Diers' study. In addition, Zane's credibility is irrelevant to the force of Dier's analysis, available to plaintiff's counsel for over a year before the lawsuit began.

>   22   [HN14] The Court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion or paper was filed. *Fed. R. Civ. P. 11*. Notes of Advisory Committee. In considering the nature and severity of the sanctions to be imposed, the court should take account of the attorney or party's actual or presumed knowledge when the pleading or other paper was signed. *Id. See INVST Financial Group v. Chem-Nuclear Systems, 815 F.2d 391, 401 (6th Cir. 1987).*

[**29]

>   23   Thorp Affidavit at 3.

Balfour Guthrie's justifications for filing suit against SCNO in light of these factual findings are weak at best. Hunter Marine's protestations of innocence are insufficient to make the complaint well-grounded in fact when every factual finding pointed to Hunter Marine as the culprit. Indeed, Hunter Marine could scarcely have been expected to say anything else. The issue is not whether the other defendant's belief in SCNO's liability was reasonable, but whether Balfour Guthrie's belief was reasonable. It was not.

The plaintiff's argument that neither its experts nor employees had first hand knowledge of how the coils were handled is not persuasive. At least one of the plaintiff's experts, Mr. Diers, had personal knowledge of the condition of the coils at the warehouse, because he examined them there. The plaintiff hired experts presumably because plaintiff was willing to rely on opinions based not on direct observation of the coils' storage and transport but on tests made thereafter. In short, Balfour Guthrie made reasonable inquiry through its two experts but lacked any basis in fact to support its claim against SCNO at the time of filing.

This conclusion [**30] is strengthened by three pieces of evidence showing that months after the complaint was filed, plaintiff's counsel continued to believe that there was no basis in fact for the suit against

SCNO. In December of 1986, Captain Zane confirmed in writing his initial position that [*77] the rusting of the coils was attributable solely to Hunter Marine. In May of 1987, Balfour Guthrie's answers to Hunter Marine's interrogatories showed the plaintiff's belief that the coils had been delivered by SCNO to the warehouse in good condition. Most importantly, in the spring of 1987, up to seven months after the complaint was filed, Balfour Guthrie's counsel admitted that it had no evidence to support a claim against SCNO.

>   By the time this request [by SCNO to dismiss under *Fed. R. Civ. P. 41*] had been made, discovery had been taken, all of which indicated the coils had been delivered to Hunter in a good and undamaged condition. 24

>   24   Plaintiff's Supplemental Memorandum Opposing Motion for Sanctions at 2.

Because the Court finds that Balfour Guthrie's original complaint against SCNO lacked any basis in fact when filed, there is no need to reach [HN15] the continuing duty issue, which only arises when a [**31] once worthy claim is later discovered to be meritless. Balfour Guthrie resembles the plaintiff in *Albright,* who knew that the claim was not well grounded in fact and continued to assert the claim long after it would have been reasonable to dismiss it. *Albright v. Upjohn Co., 788 F.2d at 1221, n.7.*

The plaintiff asserts that because the damage must have occurred either during shipment or storage, the claims against SCNO can defeat *Rule 11* sanctions under a theory of alternate liability. The plaintiff in *Albright,* who sued several drug manufacturers on theories of concert of action and alternate liability, made a similar argument. The Sixth Circuit observed

>   the basis of [Upjohn's] *Rule 11* motion was that Albright failed to reasonably investigate the *facts,* not that Albright failed to conduct a reasonable inquiry into the *law.* Whether or not Albright's assertion of joint enterprise liability was warranted by a good faith argument of existing law is not determinative of the question of whether she made reasonable

118 F.R.D. 66, *77; 1987 U.S. Dist. LEXIS 11858, **31;
9 Fed. R. Serv. 3d (Callaghan) 1256

prefiling inquiry into the facts to satisfy the affirmative duty imposed by *Rule 11*.

*Id. at 1221, n.5.* In the case before this Court, Balfour Guthrie's [**32] prefiling inquiry made the claim against SCNO unreasonable. The existence of alternate liability theory does not change that result. Lawsuits do not exist in a theoretical vacuum — they require real disputes between real parties. That under different facts the law would have provided a theory of recovery does not change this result.

There is also evidence in the record that Balfour Guthrie filed suit against SCNO for improper purposes: to "fish" for some evidence of SCNO's liability and to compel SCNO to cooperate in the case against Hunter Marine. The plaintiff makes much of SCNO's refusal to withdraw its motion for summary judgment after SCNO asked Balfour Guthrie to dismiss the claim. Balfour Guthrie argues that SCNO's pending motion prevented voluntary dismissal. *Federal Rule of Civil Procedure 41(a)(1)* reads as follows:

*Rule 41.* **Dismissal of Actions**

(a) **[HN16]** **Voluntary Dismissal: Effect Thereof.**

(1) **By Plaintiff; by Stipulation.** Subject to the provisions of Rule 23(e), of Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse [**33] party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.

The language of the rule makes clear that [HN17] a

pending motion for summary judgment will not preclude dismissal if the parties agree to the dismissal. In this case, the parties could not agree because Balfour Guthrie refused to dismiss the complaint [*78] with prejudice. The plaintiff sought to use a groundless complaint to prompt SCNO's aid in the suit against Hunter Marine, and at the same time wanted to leave open the possibility of a later suit against SCNO on the merits. When Balfour Guthrie's counsel had admitted that there was no real basis in fact for the SCNO claim, such machinations constitute an improper purpose.

To some extent, the uproar created by the parties over voluntary dismissal [**34] is a tempest in a teacup. The parties neither agreed to dismissal nor did one party move the Court to dismiss. [HN18] Even if voluntary dismissal had occurred, this would not prevent this Court from imposing sanctions under *Rule 11*.

The Court finds that Balfour Guthrie made a reasonable prefiling inquiry into the facts of the case. That inquiry disclosed that a claim against SCNO was without merit. Further discovery failed to uncover any evidence to refute the initial findings that exculpated SCNO. The Court finds that Balfour Guthrie's claim against SCNO was not well grounded in fact. The Court also finds that Balfour Guthrie filed the claim for improper purposes.

*The Response to SCNO's Motion for Summary Judgment*

Examined in light of other circumstances, Balfour Guthrie's abbreviated response to SCNO's motion for summary judgment also reveals the plaintiff's failure to make a reasonable inquiry into the facts of the case. Balfour Guthrie argued that the parties never agreed to a limitations period in the contract because the front of the bill of lading did not incorporate the terms on the back of the bill and because the bill was not signed by Balfour Guthrie or its agents.

In response [**35] to the motion for sanctions, plaintiff's attorney makes two arguments: (1) that a good faith belief that a limitations period has not run defeats a *Rule 11* motion; and (2) that Balfour Guthrie did not produce to its counsel either the Transportation Contract or the Freight Schedule. Without these documents the cross-references to the limitations period presumably would be impossible to ascertain.

Clearly, the issue before the Court is not whether the

118 F.R.D. 66, *78; 1987 U.S. Dist. LEXIS 11858, **35;
9 Fed. R. Serv. 3d (Callaghan) 1256

attorney's response was filed in good faith. Instead, the issue is whether the attorney, after reasonable pre-filing inquiry, had a sufficient basis in fact and law for the filing and lacked an improper purpose. The Court concludes that the attorney failed to make a reasonable pre-filing investigation of the relevant documents. SCNO alleges that it actually produced all of the contractual documents to plaintiff's counsel before the response was made. [25] Even if SCNO had not done this, it should have been a relatively simple matter for Balfour Guthrie's counsel to contact its client and retrieve all the documentation necessary, including the names of its agents.

25   Memorandum in Support of Motion for Sanctions at 7.

Careful review [**36] of the bill of lading, the transportation contract, and the Freight Schedule show that plaintiff's arguments in the response to the motion were without factual support. In this Court's Memorandum Opinion on SCNO's motion for summary judgment, the Court observed that the face of the bill incorporates the transportation contract between SCNO and Houston Stevedores, plaintiff's agent, in language specifying that it is "subject to the contract in effect on date of issue of this original Bill of Lading." The Court observed:

> Plaintiff further contends that it lacked notice of the notice-to-sue provision because the terms on the reverse side of the bill of lading are not expressly incorporated by reference on the face of the bill. As SCNO has pointed out, however, the notice provision is part of its Freight Schedule 800, which is expressly referred to in the transportation contract, of which plaintiff had actual notice before the carriage ever began when its agent Mr. Milam signed it on July 27, 1984. Exhibit C to SCNO's Reply Memorandum. Memorandum and Order.

[*79] *Balfour Guthrie, Inc. v. Hunter Marine Transport* (No. 1-86-0902), August 6, 1987 at 4, n.4. This Court is not sanctioning [**37] plaintiff's attorney because he responded to a motion and lost on the merits. Rather, the Court is imposing sanctions because the response shows an insufficient basis in facts available to Balfour

Guthrie's counsel.

There is another reason why sanctions are appropriate. SCNO need never have moved for summary judgment if the complaint had not been filed. *Rule 11* applies not just to complaints, but to pleadings, motions, and papers. *Fed. R. Civ. P. 11.* [HN19] A response to a motion for summary judgment that is made without reasonable inquiry into the facts on which the motion is based violates *Rule 11.* For the same reason that sanctions are justified on the complaint, sanctions are warranted on the response.

IV.

In *Knop v. Johnson, 667 F. Supp. at 521,* the Eastern District of Michigan cited the Sixth Circuit's decision in *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc., 815 F.2d 391, 404 (6th Cir. 1987)* and explained how [HN20] to award an opposing party the reasonable expenses it incurs because of the improper filing of the pleading, motion, or other paper.

> In order to award the fees sought by plaintiff's counsel . . . ., the court must find that the actions for which fees are sought were reasonably necessary [**38] to defend against the motions. A reasonableness inquiry necessarily requires a determination as to what extent plaintiff's expenses and fees could have been avoided and were self-imposed. When counsel is called upon to defend against its adversary's unreasonable motion practices, he must mitigate damages by correlating his response, in terms of hours and funds expended, to the merit of the claims. The mitigation requirement prevents a party from misusing *rule 11* sanctions in order to benefit from the errors of opposing counsel. The district court is therefore required to balance carefully these competing interests in determining the amount of sanctions. *Id. at 404* (footnote and citations omitted).

[HN21] *Rule 11* expressly provides, of course, that an award of the opposing party's reasonable expenses, including a

118 F.R.D. 66, *79; 1987 U.S. Dist. LEXIS 11858, **38;
9 Fed. R. Serv. 3d (Callaghan) 1256

reasonable attorney's fee, is only one possible sanction. A district court, moreover, is given wide discretion "in deciding the nature and extent of sanctions to impose." *Knop, 667 F. Supp. at 522.*

This Court orders that the plaintiff Balfour Guthrie and its counsel be sanctioned for filing the initial complaint against SCNO. Plaintiff's counsel will also be sanctioned [**39] for the response to SCNO's motion for summary judgment. SCNO may present proof of costs and attorney's fees to the Magistrate. Those costs and fees determined to be reasonable under the guidelines explained by the Sixth Circuit in the *INVST* case will be

awarded to SCNO.

**ORDER**

For the reasons stated in the Court's memorandum opinion, the defendant's motion for sanctions is granted. The defendant SCNO will be awarded costs and attorney's fees from both the plaintiff Balfour Guthrie, Inc. and from the plaintiff's attorneys, Price, Criss & Thorp, in an amount determined by the Magistrate to be reasonable under the guidelines imposed by the Sixth Circuit in *INVST Financial Group v. Chem-Nuclear Systems, 815 F.2d 391, 404 (6th Cir. 1987).*

 

Positive
As of: Dec 05, 2011

## CITIFINANCIAL MORTGAGE COMPANY, INC. v. AUGUSTUS BEASLEY, ET AL.

### No. W2006-00386-COA-R3-CV

### COURT OF APPEALS OF TENNESSEE, AT JACKSON

### 2007 Tenn. App. LEXIS 20

### October 26, 2006, Session
### January 11, 2007, Filed

**PRIOR HISTORY:** [*1] *Tenn. R. App. P. 3* Appeal as of Right; Judgment of the Circuit Court Reversed; and Remanded. Direct Appeal from the Circuit Court for Tipton County. No. 6086. Joe H. Walker, III, Judge.

**DISPOSITION:** Judgment of the Circuit Court Reversed; and Remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The Circuit Court for Tipton County, Tennessee, denied appellant homeowners' request to appeal an adverse unlawful detainer judgment to the circuit court and to set aside the foreclosure of their residence. The circuit court denied the homeowners' petition for writs of certiorari and supersedeas and granted appellee mortgage company summary judgment. The homeowners appealed.

**OVERVIEW:** The homeowners argued that the circuit court did not properly consider their amended petition for writs of certiorari and supersedeas. The appellate court determined that, considered as a motion, the amended petition was properly before the trial court. An analysis of the petition as a pleading yielded the same result. The homeowners complied with the statutory requirements of posting bond and filing for writs of certiorari and supersedeas within 30 days of the unlawful detainer judgment. As petitioners who complied with the statute in seeking de novo review in circuit court, the homeowners had to have made a prima facie showing of merit in their petition to retry the detainer action. The appellate court believed that the homeowners stated a valid defense because the mortgage company would have lacked authority to sell the property at foreclosure. This type of contract breach would be sufficient to prevent the passage of good title and, thus, the emergence of the landlord/tenant relationship. In the absence of this relationship, the mortgage company would not have been in constructive possession of the property so as to maintain an unlawful detainer action.

**OUTCOME:** The judgment was reversed and remanded for the issuance of writs of certiorari and supersedeas and for further proceedings.

**LexisNexis(R) Headnotes**

original motion.

*Civil Procedure > Judgments > Entry of Judgments > Stays Pending Appeals > Supersedeas Bonds*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*
[HN1] See *Tenn. Code Ann. § 29-18-129.*

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] The appellate court reviews questions of pure law de novo with no presumption of correctness for the ruling of the trial court below.

*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN3] The Tennessee Rules of Civil Procedure govern appeals taken from general sessions courts to circuit courts, Tenn. R. Civ. P. 1. According to the Rules, filings addressing the court may take one of two forms: pleadings or motions, Tenn. R. Civ. P. 7. A pleading that sets forth a claim for relief must include a short and plain statement of the claim showing the pleader is entitled to relief and a demand for relief, Tenn. R. Civ. P. 8.01. The Rules limit the types of pleadings allowed and distinguish them from motions, Tenn. R. Civ. P. 7. A motion, on the other hand, is an application to the court for an order that must be in writing (unless made during a hearing or trial), state its grounds with sufficient particularity, and identify the relief or order requested, Tenn. R. Civ. P. 7.02.

*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
[HN4] As contemplated by the Tennessee Rules of Civil Procedure, a motion is not a pleading.

*Civil Procedure > Pleading & Practice > Motion Practice > General Overview*
[HN5] No provision in the Tennessee Rules of Civil Procedure addresses the amendment of motions. In general, Tennessee courts will allow for a motion's amendment so long as there has been no ruling on the

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN6] Tenn. R. Civ. P. 15.01 provides that a party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served. If the pleading at issue is the type to which no response is permitted, then the rules provide a fifteen (15) day window for amendment as of right, so long as no trial date has been set.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
[HN7] The appropriate pre-answer procedure for testing the legal sufficiency of a complaint is filing a motion to dismiss for failure to state a claim. Moreover, whether a party files a motion to dismiss or a motion for summary judgment, it still must comply with the particularity requirements set forth in Tenn. R. Civ. P. 7.

*Civil Procedure > Judgments > Entry of Judgments > Stays Pending Appeals > Supersedeas Bonds*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*
[HN8] An unsuccessful defendant in a forcible entry and detainer (FED) action has ten (10) days following the general sessions judgment to file for appellate review in circuit court, *Tenn. Code Ann. § 29-18-128 (2000)*. Although the defendant can appeal as of right, the plaintiff may regain possession of the premises by posting bond for twice the amount of one year's rent, *Tenn. Code Ann. § 29-18-130(b)(1) (2000)*. Alternatively, if the unsuccessful defendant desires to retain possession of the property throughout the litigation, he or she may petition the court for writs of certiorari and supersedeas, which, if issued, will stay the writ of possession and allow for review in circuit court. To succeed in a petition for writs of certiorari and supersedeas, the defendant/petitioner must file within thirty (30) days following the judgment, sufficiently set forth merits and post bond to cover costs, damages, and the value of the rent during litigation, *Tenn. Code Ann. § 29-18-129*

(2000). When the petitioner meets these more stringent standards, the court must issue the writs.

*Civil Procedure > Judgments > Entry of Judgments > Stays Pending Appeals > Supersedeas Bonds*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*

[HN9] Although certiorari and supersedeas offer an alternative to the unsuccessful forcible entry and detainer (FED) defendant, the remedy by this alternative is different from, but not a substitute for, the remedy by appeal. The authorities unequivocally state that, in FED actions, certiorari is not a substitute for appeal. Instead, when coupled with the writ of supersedeas, certiorari provides an alternative remedy distinct from that offered by the appeal as of right. Certiorari and supersedeas allow the defendant to retain possession of the property, whereas appeal leaves the defendant vulnerable to the writ of possession. Although a petitioner for writs of certiorari and supersedeas enjoys more time to file than does an appellant, he or she must post bond sufficient to cover the costs of appeal, damages, and rent during litigation, as well as bear the risk of the petition's denial, *Tenn. Code Ann. § 29-18-129* (2000).

*Civil Procedure > Judgments > Entry of Judgments > Stays Pending Appeals > Supersedeas Bonds*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*

[HN10] The requirements for sustaining a petition for writs of certiorari and supersedeas following forcible entry and detainer (FED) actions differ from those following other cases. The general standard requires the petitioner to show good reason for not taking an appeal, whereas the standard applicable in cases of FED judgments does not. Both standards, however, require a showing of sufficient merits. Thus, when an unsuccessful FED defendant posts bond and files for writs of certiorari and supersedeas within thirty days of the judgment, he or she need only state sufficient merits in the petition to obtain review in circuit court.

*Civil Procedure > Judgments > Entry of Judgments > Stays Pending Appeals > Supersedeas Bonds*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*

[HN11] Certain circumstances will require the forcible entry and detainer petitioner to show good cause for not taking an appeal. First, if the petitioner files after the expiration of the statutory thirty (30) day period, he or she must make the more demanding showing required under the general standard. Similarly, if the petitioner files only for a writ of certiorari without also petitioning for a writ of supersedeas, he or she must meet the higher standard by justifying the failure to appeal.

*Civil Procedure > Judgments > Entry of Judgments > Stays Pending Appeals > Supersedeas Bonds*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*

[HN12] Merits sufficient to sustain a petition for writs of certiorari and supersedeas are allegations which, if true, would constitute a meritorious defense. The language of *Tenn. Code Ann. § 29-18-129* does not require the petitioner to prove the allegations by a preponderance of the evidence or to the level of detail expected at trial. Rather, the petitioner's prima facie showing of merit will suffice for the issuance of the writs.

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*

[HN13] Since 1821, Tennessee has recognized a right to bring a cause of action for a writ of possession when a lessee remains on the leased property after the lease has been terminated. *Tenn. Code Ann. § 29-18-101* provides that no person shall enter upon any lands, tenements, or other possessions, and detain or hold the same, but where entry is given by law, and then only in a peaceable manner. The legislative intent behind the creation of forcible entry and detainer (FED) actions was to provide a streamlined, inexpensive, summary procedure to determine the rights to possession of land, in contrast to the old formal common law ejectment action. FED proceedings also serve the function of preventing

violence and breaches of the peace that result from the inherent friction caused by repossessing property through self-help. To avoid these conflicts, the party seeking to repossess the land must do so with the aid of a writ of possession issued by the court.

*Real Property Law > Financing > Mortgages & Other Security Instruments > Foreclosures > General Overview*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*
[HN14] In contrast to suits in ejectment, which resolve issues of title and the resulting right to possession, forcible entry and detainer actions concern only the right to possession. In these summary proceedings, the estate, or merits of the title, shall not be inquired into, *Tenn. Code Ann. § 29-18-119(c)* (2000). At first glance, it would seem that wrongful foreclosure, being tantamount to an assertion of title, could not constitute a defense in this action. Where title bears directly upon the right of possession, however, a party may legitimately interpose the issue. For example, a court may inquire into title when a claimant has fraudulently represented his title to another and induced him to lease the property.

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*
[HN15] Forcible entry and detainer actions cannot be resolved in favor of a claimant when title, if bearing directly on his immediate right to possession, is questionable.

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Forcible Entry & Detainer*
[HN16] Unlawful detainer occurs where the defendant enters by contract, either as tenant or as assignee of a tenant, willfully and without force, holds over the possession from the landlord or the assignee of the remainder or reversion, *Tenn. Code Ann. § 29-18-104* (2000). Thus, a landlord/tenant relationship, established by contract, is the baseline requirement for maintaining an unlawful detainer action. If the trust deed establishes a landlord/tenant relationship between the mortgagor and foreclosure sale purchaser, then a constructive entry on the part of the purchaser attaches upon the passing of

title; this constructive entry provides the basis for maintaining the unlawful detainer action. Under the facts of this unlawful detainer action, the right to immediate possession requires (1) the plaintiff's (constructive) possession and (2) the plaintiff's subsequent loss of possession by the defendant's act of unlawful detainer.

*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN17] In general, Tennessee law has required the trustee's strict compliance with the advertisement and notice terms as provided in the deed of trust. The consequences of a foreclosing trustee's failure to comply with foreclosure terms depend upon the source of the requirement. Specifically, if the terms are sufficiently clear and originate in the deed of trust, the law demands strict compliance for the conveyance to be valid. In contrast, where a foreclosing trustee proceeds according to statutory requirements, the law in Tennessee is not so exacting. The failure of a trustee to comply with statutory requirements does not render the sale at foreclosure void or even voidable.

*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN18] The parties can vary the terms of foreclosure by contract, and where a deed of trust provision varies from the statutory requirements, that term will generally supersede the statutory requirement, *Tenn. Code Ann. § 35-5-101(d)* (2001 & Supp. 2006). When the purchaser at the foreclosure sale has drafted the deed of trust controlling the sale, and where the deed of trust waives and conveys the makers' equity of redemption for the benefit of the purchaser, the instrument must be strictly construed, and the terms thereof must be followed strictly by the trustee, in order to deprive the makers of their title by means of a sale thereunder. For example, a trustee must comply with terms such as notice of time and place of sale, as well as personal notice of sale, if provided for in the deed of trust.

*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN19] When, by the terms of the deed, the trustee is required before making sale to give notice to the bargainor of the time and place of sale, the giving of such notice is in the nature of a condition precedent, and, if not complied with, the sale is unauthorized and void and will

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 104 of 177   PageID 112

Page 5
2007 Tenn. App. LEXIS 20, *1

communicate no title to the purchaser. And if the requirement be that personal notice shall be given, the trustee cannot substitute notice by advertisement in a newspaper, or at some public place or places, because not within the scope of his authority and also because such a departure on the part of the trustee might be made to defeat the very object of the requirement by enabling him to sell the property without the knowledge of the party making the deed.

**COUNSEL:** Sheila L. Robinson-Beasley, Memphis, Tennessee, for the appellants, Augustus Beasley and Sheila Robinson-Beasley.

Jason S. Mangrum and Katherine Kellogg Kuhn, Nashville, Tennessee, for the appellee, CitiFinancial Mortgage Company, Inc.

**JUDGES:** DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

**OPINION BY:** DAVID R. FARMER

**OPINION**

Appellants Augustus and Sheila Beasley (the Beasleys) seek to challenge the denial of their request to appeal an adverse unlawful detainer judgment to circuit court and to set aside the foreclosure of their residence. Specifically, the Beasleys appeal the trial court's grant of summary judgment to CitiFinancial Mortgage, Inc. (Citi) and denial of their petition for writs of certiorari and supersedeas, filed after the deadline for appealing the judgment as of right. The court denied the petition on the grounds that it did not set forth sufficient [*2] merits for removal to circuit court for a trial *de novo*. In the petition for writs of certiorari and supersedeas, the Beasleys advanced as grounds for review the insufficiency of funds for filing a timely appeal and premature foreclosure on their residence in violation of the deed of trust. On appeal, they contend these allegations constituted sufficient merits as required by *Tennessee Code Annotated Section 29-18-129*. We reverse and remand.

**OPINION**

The Appellants, Augustus and Sheila Beasley (Mr. Beasley, Ms. Beasley, or the Beasleys), defaulted on a loan secured by their residence and received notice of default from CitiFinancial Mortgage Company, Inc.

(Citi), holder of the deed of trust and loan, by facsimile dated July 29, 2004. The facsimile correspondence, "per requested," included the amount required to cure the default and indicated that the reinstatement figures would be "good to [August 12, 2004]." The Beasleys did not cure the default, and the foreclosure sale occurred on August 13, 2004, at the Shelby County courthouse. Citi purchased the residence for $ 248,606.73.

The Beasleys refused to vacate the residence. Citi obtained a [*3] detainer warrant on August 24, 2004, which was posted at the Beasleys' residence on the third attempt at service. A copy was then mailed to the Beasleys.

At the General Sessions detainer hearing on September 27, 2004, Citi obtained a judgment for possession. The Beasleys concede in their memorandum opposing summary judgment that they did not appear at the detainer hearing. Nor did they appeal the General Sessions judgment. Instead, slightly less than a month later, they filed a petition for writs of certiorari and supersedeas pursuant to *Tennessee Code Annotated Section 29-18-129* [1] on October 21, 2004, in Shelby County Circuit Court. In the petition, the Beasleys alleged that they did not have the funds available to post the bond for a timely appeal and that they were unaware of Citi's intent to repossess the home until October 20, 2004, the evening before filing their petition.

1   *Tennessee Code Annotated Section 29-18-129* provides that

[HN1] [t]he proceedings in such action may, within thirty (30) days after the rendition of judgment, be removed to the circuit court by writs of certiorari and supersedeas, which it shall be the duty of the judge to grant, upon petition, if merits are sufficiently set forth, and to require from the applicant a bond, with security sufficient to cover all costs and damages; and, if the defendant below be the applicant, then the bond and security shall be of sufficient amount to cover, besides costs and damages, the value of the rent of the premises during the litigation.

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 105 of 177   PageID 113

Page 6
2007 Tenn. App. LEXIS 20, *3

*Tenn. Code Ann. § 29-18-129* (2000).

[*4]   In January 2005, Citi filed a motion for summary judgment in response to the Beasleys' petition and appended a Statement of Material Facts Not in Dispute. In the statement, Citi recited the relevant facts supporting the judgment in the detainer action, yet omitted the relevant facts, if any, pertaining to the Beasleys' petition. Nowhere in its filings does Citi mention the date of notice of default. On February 25, 2005, a hearing on the matter occurred in Shelby County Circuit Court before Judge Rita Stotts, who announced that she would recuse herself in the matter. The same day, the Beasleys filed a motion for leave to amend the original petition, a proposed amended petition setting forth the facts pertinent to the wrongful foreclosure allegation, a statement of material facts in dispute, and a "Responsive Opposition to Plaintiff's Motion for Summary Judgment."

On August 8, 2005, upon motion by Citi and by agreement of the parties, venue for the hearing changed to Tipton County. The Tipton County Circuit Court conducted the summary judgment hearing on January 12, 2006. The Statement of Evidence or Proceedings filed by the Beasleys indicates that they argued the issue of wrongful [*5] foreclosure before the court on January 12, 2006. The record also reveals that the Beasleys re-filed all previous filings, including the proposed amended petition, in Tipton County on the next day, even though the transfer of venue occurred after the filings had been submitted to the court in Shelby County. They also provided, "as promised," a Memorandum of Law with attachments, another copy of the proposed amended petition, and case law in support of their argument, directly to the judge by letter dated January 12, 2006. In its order of January 26, 2006, the court found that the Beasleys had not stated sufficient merits in the petition and accordingly granted summary judgment to Citi. The order referenced the fact of foreclosure, the detainer action, the Beasleys' refusal to vacate, the filing of the petition, and the insufficient allegations therein. Although based "upon the entire record," the order did not reference the amended petition or the Beasleys' motion for leave to amend the petition.

On appeal, the Beasleys restate their contentions of insufficient funds for a timely appeal and of wrongful foreclosure. The Beasleys contend that, had Citi adhered

to the terms of the deed [*6] of trust by exercising the power of sale no sooner than thirty (30) days after tendering notice of default, they could have cured the default and reinstated the loan.

## Issues Presented and Standard of Review

On appeal, the Beasleys raise the issue, as we perceive it, of whether the trial court erred in dismissing their petition for writs of certiorari and supersedeas on the grounds of insufficient merits. Citi, on the other hand, restates the issue as whether the trial court erred in granting Citi's motion for summary judgment. Because the trial court granted summary judgment in the absence of disputed material facts, the parties on appeal present only questions of law. [HN2] We review questions of pure law *de novo* with no presumption of correctness for the ruling of the trial court below. *Inmon v. Hadley, 2006 Tenn. App. LEXIS 581, 2006 WL 2507188, at *5 (Tenn. Ct. App. 2006)* (citing *Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 35 (Tenn. 1996))*.

The resolution of this case requires us to answer three questions: first, whether the trial court properly considered the Beasleys' amended petition; second, what a petitioner for writs of certiorari and supersedeas must show [*7] to obtain review of an unlawful detainer judgment; and third, whether wrongful foreclosure is a meritorious defense to an unlawful detainer action.

## Whether the Trial Court Properly Considered the Amended Petition

We now address the threshold issue of whether the trial court properly considered the Beasleys' amended petition. Resolution of this issue proves determinative because the original petition lacked sufficient merits [2] to support a trial *de novo*, whereas the amendment added wrongful foreclosure, a potentially meritorious defense. We conclude, on procedural grounds, that the amended petition was properly before the trial court.

> 2   The only allegation in the original petition that might satisfy the sufficient merit requirement is lack of notice of Citi's intent to repossess the property. The language of the petition leaves open the question of whether the Beasleys alleged lack of notice of the detainer hearing or of Citi's imminent execution of the writ of possession. Vague and indefinite allegations cannot sustain a petition for writs of certiorari and supersedeas

following forcible entry and detainer actions. *Pritchard v. Dixie Greyhound Lines, 183 Tenn. 408, 192 S.W.2d 845, 847 (Tenn. 1946).* We find the Beasleys' allegation of lack of notice to be equivocal at best and insufficient to satisfy the requirement.

[*8] [HN3] The Tennessee Rules of Civil Procedure govern appeals taken from general sessions courts to circuit courts. *Tenn. R. Civ. P. 1.* According to the Rules, filings addressing the court may take one of two forms: pleadings or motions. *See* Tenn. R. Civ. P. 7. A pleading that sets forth a claim for relief must include a "short and plain statement of the claim showing the pleader is entitled to relief" and a demand for relief. *Tenn. R. Civ. P. 8.01.* The Rules limit the types of pleadings allowed and distinguish them from motions. *See* Tenn. R. Civ. P. 7 (limiting pleadings to the complaint, answer, reply to counterclaim, answer to cross-claim, third-party complaint, and third-party answer, and treating motions and other papers in a separate rule). A motion, on the other hand, is "an application to the court for an order" that must be in writing (unless made during a hearing or trial), state its grounds with sufficient particularity, and identify the relief or order requested. *Tenn. R. Civ. P. 7.02.*

[HN4] As contemplated by the Tennessee Rules of Civil Procedure, a motion is not a pleading. Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 5.1(a), at 5-7 (2d ed. 2004) [*9] ("Rule 7 provides separate treatment for pleadings and for motions and other papers . . . it is important not to read the term 'pleading' as encompassing a motion."); *id.* § 5.1(e), at 5-11 ("*Rule 7.02(1)* requires that any application to the court should be in the form of a motion. Technically, therefore, neither letters to the court, 'petitions,' nor other forms of requests other than by motion are proper."). Although reasonable persons might differ as to whether this type of petition is a motion or a pleading, we need not make this esoteric distinction here. The petition, whether treated as a pleading or a motion, should have been amended.

[HN5] No provision in the Tennessee Rules of Civil Procedure addresses the amendment of motions. Banks & Entman, *supra,* § 5.1(e), at 5-14. In general, Tennessee courts will allow for a motion's amendment so long as there has been no ruling on the original motion. *Id.* at 5-15. In this case, the court had obviously not ruled on

the petition (construed as the original motion). Moreover, the record on appeal reveals that the proposed amendment was in the possession of Citi for almost one year before the hearing, was filed with the Shelby County [*10] Circuit Court Clerk prior to the transfer of venue, and was argued at the hearing. [3] Indeed, the Beasleys' statement of evidence indicates that the court heard argument on and considered the issues pertaining to foreclosure, yet, as apparent from the ruling, found them unpersuasive. Nothing in the record suggests that Citi ever objected to or contested the contents of the Beasleys' statement of evidence, so we accept it as an accurate account of the proceedings in the trial court. Accordingly, considered as a motion, the amended petition was properly before the trial court.

> 3   Although the Tennessee Rules of Civil Procedure do not address the amendment of motions, they do contain safeguards for the benefit of non-movants. For example, the particularity and writing requirements for motions serve to notify the adverse party of the pendency of and grounds for the motion. Banks & Entman, *supra,* at 5-11, 5-13. The facts of this case provide further support for amendment because Citi was on notice of the motion and its contents well before the hearing. Thus, amending the motion/petition would not violate the safeguarding of fairness through notice as provided by the Rules.

[*11] Likewise, an analysis of the petition as a pleading yields the same result. Although the Beasleys moved for leave to amend the petition, they could have amended it as of right in any event because Citi never filed an answer. [HN6] *Tennessee Rule of Civil Procedure 15.01* provides that "[a] party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served." *Tenn. R. Civ. P. 15.01.* If the pleading at issue is the type to which no response is permitted, then the rules provide a fifteen (15) day window for amendment as of right, so long as no trial date has been set. *See Tenn. R. Civ. P. 15.01.* Nothing in the Rules forbids an answer in response to a petition for writs of certiorari and supersedeas in this circumstance.

The record indicates that Citi filed a motion for summary judgment but never filed an answer. Thus, because a motion is not a pleading, Citi never filed a responsive pleading so as to foreclose the Beasleys'

opportunity to amend the petition as of right. [4] As proponents of a complaint under the Rules, the Beasleys could have amended the petition as of right in any event. Either procedural approach arrives at the same conclusion [*12] that the petition was, for all intents and purposes, properly amended.

 4 We note that [HN7] the "appropriate pre-answer procedure for testing the legal sufficiency of a complaint" is filing a motion to dismiss for failure to state a claim. *Banks & Entman, supra* § 5.6(g), at 5-109. Moreover, whether a party files a motion to dismiss or a motion for summary judgment, it still must comply with the particularity requirements set forth in Rule 7 of the Tennessee Rules of Civil Procedure. In its motion for summary judgment, Citi identifies no grounds in support of its motion and instead conclusively asserts that it is entitled to judgment as a matter of law. In its statement of facts not in dispute, it does, however, enumerate the underlying facts of the foreclosure and detainer action. Taken together, these filings seem to place the merits of the detainer action back into question, rather than to challenge the sufficiency of the Beasleys' petition. Nevertheless, because the gravamen of this action is whether the Beasleys can retry the detainer action, we will proceed by considering the sole question of whether the Beasleys stated sufficient merits in their petition.

## [*13] The Required Showing for Sustaining a Petition for Writs of Certiorari and Supersedeas Following an Unlawful Detainer Action

The parties in this appeal dispute the standard for prevailing on a petition for writs of certiorari and supersedeas. The Beasleys cite various standards yet fail to identify which one applies to their case. They argue that the problem of insufficient funds sufficiently explains a petitioner's reason for not appealing; that a petition need not state merits or an excuse for failing to appeal; and that allegations constituting a meritorious defense satisfy the sufficient merits requirement. Citi, on the other hand, contends that a petitioner must show a substantial reason for not appealing as well as allegations that, if true, would constitute a meritorious defense. The proper standard under Tennessee law lies in the middle of this spectrum.

[HN8] An unsuccessful defendant in a forcible entry and detainer (FED) action has ten (10) days following the general sessions judgment to file for appellate review in circuit court. *Tenn. Code Ann. § 29-18-128 (2000).* Although the defendant can appeal as of right, the plaintiff [5] may regain [*14] possession of the premises by posting bond for twice the amount of one year's rent. *Tenn. Code Ann. § 29-18-130(b)(1) (2000).* Alternatively, 6 if the unsuccessful defendant desires to retain possession of the property throughout the litigation, he or she may petition the court for writs of certiorari and supersedeas, which, if issued, will stay the writ of possession and allow for review in circuit court. *Nashville Hous. Auth. v. Kinnard, 186 Tenn. 33, 207 S.W.2d 1019, 1020 (1949); see Tenn. Code Ann. § 29-18-129 (2000).* To succeed in a petition for writs of certiorari and supersedeas, the defendant/petitioner must file within thirty (30) days following the judgment, sufficiently set forth merits, and post bond to cover costs, damages, and the value of the rent during litigation. *Tenn. Code Ann. § 29-18-129 (2000).* When the petitioner meets these more stringent standards, the court must issue the writs. *Id.*

 5 *Section 29-18-130(b)(2)* alters these requirements in cases where the landlord brings an FED action in response to the lessee's failure to pay rent. *See Tenn. Code Ann. § 29-18-130 (b)(2) (2000).*

[*15]

 6 [HN9] Although certiorari and supersedeas offer an alternative to the unsuccessful FED defendant, we emphasize that the remedy by this alternative is different from, but not a substitute for, the remedy by appeal. The authorities unequivocally state that, in FED actions, certiorari is not a substitute for appeal. *See, e.g., Ammons v. Coker, 124 Tenn. 676, 139 S.W. 732, 733 (Tenn. 1911)*(noting that the petitioner could have obtained the same remedy by certiorari as by appeal only by showing good reason for failing to appeal; opining that she could have obtained a different remedy by using the certiorari and supersedeas together as provided by the statutes; and holding that the petitioner could not use certiorari alone as a substitute for appeal). Instead, when coupled with the writ of supersedeas, certiorari provides an alternative remedy distinct from that offered by the appeal as of right. *Bell v. Smith, 185 Tenn. 11, 202 S.W.2d 654, 656 (Tenn.*

*1947)*; *Ammons, 139 S.W. at 733* ("[I]f the defendant desires to retain possession . . ., he has his remedy by certiorari and supersedeas. If he is willing to surrender possession pending the litigation . . ., he has his remedy by appeal.); *Robertson v. Penn. Mut. Life Ins. Co., 22 Tenn. App. 387, 123 S.W.2d 848, 850 (Tenn. Ct. App. 1938)* (noting that Tennessee statutes provide "two alternative remedies," one of which is "by appeal, and the other . . . by certiorari and supersedeas"). Certiorari and supersedeas allow the defendant to retain possession of the property, whereas appeal leaves the defendant vulnerable to the writ of possession. Although a petitioner for writs of certiorari and supersedeas enjoys more time to file than does an appellant, he or she must post bond sufficient to cover the costs of appeal, damages, *and* rent during litigation, as well as bear the risk of the petition's denial. *See Tenn. Code Ann. § 29-18-129 (2000)*.

[*16] [HN10] The requirements for sustaining a petition for writs of certiorari and supersedeas following FED actions differ from those following other cases. *Elliott v. Lawless, 53 Tenn. 123 (Tenn. 1871)*. The general standard requires the petitioner to show good reason for not taking an appeal, whereas the standard applicable in cases of FED judgments [7] does not. *Elliott, 53 Tenn. at 126*. Both standards, however, require a showing of sufficient merits. *Id.* Thus, when an unsuccessful FED defendant posts bond and files for writs of certiorari and supersedeas within thirty days of the judgment, he or she need only state sufficient merits in the petition to obtain review in circuit court. *See Ammons v. Coker, 124 Tenn. 676, 139 S.W. 732, 733 (Tenn. 1911); Rogers v. Wheaton, 88 Tenn. 665, 13 S.W. 689, 689 (Tenn. 1890); Elliott, 53 Tenn. at 126*.

[7] [HN11] Certain circumstances will require the FED petitioner to show good cause for not taking an appeal. First, if the petitioner files after the expiration of the statutory thirty (30) day period, he or she must make the more demanding showing required under the general standard. *Rogers, 139 S.W. at 689*. Similarly, if the petitioner files *only* for a writ of certiorari without also petitioning for a writ of supersedeas, he or she must meet the higher standard by justifying the failure to appeal. *Ammons, 139 S.W. at 733*.

[*17] [HN12] Merits sufficient to sustain a petition for writs of certiorari and supersedeas are allegations which, if true, would constitute a meritorious defense. *S. Servs., Inc. v. Brewington, No. 86-42-II, 1986 Tenn. App. LEXIS 3040, 1986 WL 6062, at *3 (Tenn. Ct. App. May 29, 1986); Investors Diversified Prop. Mgmt., Inc. v. Wright, 1985 Tenn. App. LEXIS 2947, at *11-*12 (Tenn. Ct. App. 1985); see Elliott v. Lawless, 53 Tenn. at 126-27*. The language of the statute does not require the petitioner to prove the allegations by a preponderance of the evidence or to the level of detail expected at trial. *S. Servs., 1986 Tenn. App. LEXIS 3040, 1986 WL 6062, at *3*. Rather, the petitioner's prima facie showing of merit will suffice for the issuance of the writs. *Id.*

The Beasleys complied with the statutory requirements of posting bond and filing for writs of certiorari and supersedeas within thirty (30) days of the unlawful detainer judgment. As petitioners who complied with the statute in seeking *de novo* review in circuit court, the Beasleys must have made a prima facie showing of merit in their petition to retry the detainer action. We now address whether, in the Beasleys' case, the allegation [*18] of wrongful foreclosure constitutes a meritorious defense to the unlawful detainer action. If it does, then the Beasleys are entitled to their writs.

**Whether Wrongful Foreclosure is a Valid Defense to an Unlawful Detainer Action**

[HN13] Since 1821, Tennessee has recognized "a right to bring a cause of action for a writ of possession when a lessee remains on the leased property after the lease has been terminated." *Cain P'ship v. Pioneer Inv. Servs. Co., 914 S.W.2d 452, 456 (Tenn.1996)*. Section 29-18-101 of the Tennessee Code provides that "[n]o person shall enter upon any lands, tenements, or other possessions, and detain or hold the same, but where entry is given by law, and then only in a peaceable manner." *Tenn. Code Ann. § 29-18-101 (2000)*. The legislative intent behind the creation of FED actions was to provide a streamlined, inexpensive, summary procedure to determine the rights to possession of land, in contrast to the old formal common law ejectment action. *Newport Hous. Auth. v. Ballard, 839 S.W.2d 86, 89 (Tenn. 1992)*. FED proceedings also serve the function of preventing violence [*19] and breaches of the peace that result from the inherent friction caused by repossessing property through self-help. *Childress v. Black, 17 Tenn. 317, 320 (1836); 35A Am.Jur.2d Forcible Entry and Detainer § 6*

(2006). To avoid these conflicts, the party seeking to repossess the land must do so with the aid of a writ of possession issued by the court. *Hayes v. Schweikart's Upholstering Co.*, 55 Tenn. App. 442, 402 S.W.2d 472, 484 (1965).

[HN14] In contrast to suits in ejectment, which resolve issues of title and the resulting right to possession, FED actions concern only the right to possession. *Newport Hous. Auth.*, 839 S.W.2d at 89. In these summary proceedings, "the estate, or merits of the title, shall not be inquired into." *Tenn. Code Ann. § 29-18-119(c)* (2000). At first glance, it would seem that wrongful foreclosure, being tantamount to an assertion of title, could not constitute a defense in this action. Where title bears directly upon the right of possession, however, a party may legitimately interpose the issue. *Allison v. Casey*, 63 Tenn. 587 (Tenn. 1874) [*20] (allowing evidence of title as proof of right to control and rent out property); *Philips v. Sampson*, 39 Tenn. 429 (Tenn. 1859); *Settle v. Settle*, 29 Tenn. 504 (Tenn. 1850). For example, a court may inquire into title when a claimant has fraudulently represented his title to another and induced him to lease the property. *Philips*, 39 Tenn. at 429.

Additionally, [HN15] FED actions cannot be resolved in favor of a claimant when title, if bearing directly on his immediate right to possession, is questionable. *See Elliott v. Lawless*, 53 Tenn. 123 (Tenn. 1871); 35A Am.Jur.2d Forcible Entry & Detainer § 50 (2006) ("[I]f the issue of title is germane to the issue of who has the present right of possession, questions of title may be raised . . . . However, such an issue may result in the case being removed from the summary proceedings contemplated by a forcible entry and detainer action, or the claimant may be required to establish his or her superior title prior to bringing the summary proceeding." (footnotes omitted)). In *Elliott v. Lawless*, the plaintiff in a detainer [*21] action appealed an adverse judgment following a retrial of the summary proceeding below. *Id. at 124-25.* He specifically appealed the denial of his motion to dismiss the defendant's petition for certiorari and supersedeas, as well as the judgment entered for defendant after the retrial. *Id.* The Tennessee Supreme Court held that the trial court properly denied the plaintiff's motion to dismiss the petition because the defendant had stated sufficient merits; moreover, there was no evidence that the defendant had forcibly taken possession of the property from the plaintiff or that he

unlawfully detained it. *Id. at 129-30.* Rather, the proof tended to show that the defendant had either taken possession from one who claimed title through adverse possession or had entered when no other person was in actual possession of the property. *Id. at 130.* Because forcible entry and detainer actions do not resolve issues of title, the plaintiff had apparently sued for possession under the wrong theory. *Id. at 129.* Assuming the defendant took possession of vacant property or from a third party claiming title through adverse possession, [*22] the Tennessee Supreme Court noted that the plaintiff should have brought a suit in ejectment to attempt to regain possession. *Id.* The distinguishing feature between ejectment and unlawful detainer is the appearance of an issue regarding legal title of the plaintiff. *Metro. Life Ins. Co. v. Moore*, 167 Tenn. 620, 72 S.W.2d 1050, 1051 (1934).

Here, we consider a detainer action brought against the maker of a deed of trust who, after default and foreclosure, refused to surrender possession of the property. Under these facts, one seeking to regain possession by way of the summary FED proceeding must rely on the action of unlawful detainer. [8] [HN16] Unlawful detainer occurs "where the defendant enters by contract, either as tenant or as assignee of a tenant, . . . willfully and without force, holds over the possession from the landlord, or the assignee of the remainder or reversion." *Tenn. Code Ann. § 29-18-104* (2000). Thus, a landlord/tenant relationship, established by contract, is the baseline requirement for maintaining an unlawful detainer action. If the trust deed establishes a landlord/tenant relationship between the mortgagor and foreclosure [*23] sale purchaser, then a constructive entry on the part of the purchaser attaches upon the passing of title; this constructive entry provides the basis for maintaining the unlawful detainer action. *Metro. Life Ins. Co.*, 72 S.W.2d at 1051; *Griffith v. Brackman*, 97 Tenn. 387, 37 S.W. 273, 274 (1896). Under the facts of this unlawful detainer action, the right to immediate possession requires (1) the plaintiff's (constructive) possession and (2) the plaintiff's subsequent loss of possession by the defendant's act of unlawful detainer. *Accord Foster v. Hill*, 510 S.W.2d 520, 522 (Tenn. Ct. App. 1973).

[8]  Although FED proceedings are considered one type of action, the Tennessee Code identifies separate bases for the recovery of real property by summary proceeding: forcible entry and detainer,

*Tenn. Code Ann. § 29-18-102* (2000), forcible detainer, *Tenn. Code Ann. § 29-18-103* (2000), and unlawful detainer, *Tenn. Code Ann. § 29-18-104* (2000).

[*24] Even though the right to immediate possession does not generally hinge on title to the property, in the unique case of foreclosures conducted under a power of sale, however, the landlord/tenant relationship may not arise when the trustee has exercised the power of sale in violation of the deed of trust. If, according to the Beasleys' allegations, Citi's wrongful foreclosure resulted in the passage of void title and failed to place it in constructive possession of the property, then it could not maintain an unlawful detainer action. It follows that the Beasleys would have stated a meritorious defense and should have secured writs of certiorari and supersedeas.

We first consult the terms of the deed of trust to determine the effect of the trustee's timing of foreclosure. The deed of trust executed by the Beasleys provides, in pertinent part, as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this security instrument but not prior to acceleration under paragraph 17 (unless applicable law provides otherwise). *The notice shall specify: (a) the default; (b) the action* [*25] *required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums*

*secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law.* Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21 including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Trustee shall give notice of sale by public advertisement in the county in which the Property is located for the [*26] time and in the manner provided by applicable law, and Lender or Trustee shall mail a copy of the notice of sale to Borrower in the manner provided in paragraph 14. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and under the terms designated in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty expressed or implied . . . . *If the Property is sold pursuant to this paragraph 21, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant at will of the purchaser and hereby agrees to pay the purchaser the reasonable rental value of the Property after sale.*

Since the original filing of their amended petition in February of 2005, the Beasleys have asserted that they received "notice" of default and acceleration on July 29, 2004. The facsimile is the only evidence of notice submitted by the Beasleys, [*27] and Citi has neither disputed the characterization of the facsimile as the "notice" required under these terms, nor has it provided documentation to show other correspondence between the parties. For the purposes of evaluating the Beasleys'

2007 Tenn. App. LEXIS 20, *27

petition, then, we consider the facsimile to support the Beasleys' prima facie case of wrongful foreclosure. It appears on its face that the undisputed date of the foreclosure sale was within the thirty (30) day curative period and that the sale violated the terms of the trust deed. Whether or not the facsimile was in fact the only "notice" provided by Citi under the terms of the contract and whether Citi in fact foreclosed in violation of the trust deed, however, are matters for trial.

[HN17] In general, Tennessee law has required the trustee's strict compliance with the advertisement and notice terms as provided in the deed of trust. *See, e.g., Henderson v. Galloway, 27 Tenn. 692, 695-96 (Tenn. 1848).* The consequences of a foreclosing trustee's failure to comply with foreclosure terms depend upon the source of the requirement. Specifically, if the terms are sufficiently clear and originate in the deed of trust, the law demands strict [*28] compliance for the conveyance to be valid. *Progressive Bldg. & Loan Ass'n v. McIntyre, 169 Tenn. 491, 89 S.W.2d 336, 336 (Tenn. 1936).* In contrast, where a foreclosing trustee proceeds according to statutory requirements, the law in Tennessee is not so exacting. *See Tenn. Code Ann. §§ 35-5-101-35-5-116* (2001 & Supp. 2006) (addressing non-judicial sales pertaining to the foreclosure of deeds of trust). The failure of a trustee to comply with statutory requirements does not render the sale at foreclosure void or even voidable. *See Tenn. Code Ann. § 35-5-106* (2001 & Supp. 2006) (sale without advertisement is not void); *Doty v. Fed. Land Bank of Louisville, 169 Tenn. 496, 89 S.W.2d 337 (Tenn. 1936); Williams v. Williams, 25 Tenn. App. 290, 156 S.W.2d 363, 369 (Tenn. Ct. App. 1941).*

But [HN18] the parties can vary the terms of foreclosure by contract, and where a deed of trust provision varies from the statutory requirements, that term will generally supersede the statutory requirement. *See Tenn. Code Ann. § 35-5-101(d)* (2001 [*29] & Supp. 2006)("Nothing in this section shall be construed as applying to any notice published in accordance with any contract entered into heretofore, and expressed in a mortgage, deed of trust or other legal instruments."); *McIntyre, 89 S.W.2d at 336* (holding a foreclosure sale to be void, and purchaser's title invalid, where trustee sold property after twenty-two days of advertisement, rather than the twenty-eight days required by the deed of trust); *Potts v. Coffman, 146 Tenn. 282, 240 S.W. 783, 784 (Tenn. 1922).* If the trustee breaches the controlling terms, the foreclosure sale may be set aside. *McIntyre, 89*

*S.W.2d at 337; In re: Kitts, 274 B.R. 491, 494 (Bankr. E.D. Tenn. 2002)* (setting aside a foreclosure sale in light of the trustee's violation of the deed of trust default notice provisions). When the purchaser at the foreclosure sale has drafted the deed of trust controlling the sale, and where the deed of trust waives and conveys the makers' equity of redemption for the benefit of the purchaser, the instrument "must be strictly construed, and the terms thereof must be followed strictly by the trustee, in [*30] order to deprive the makers of their title by means of a sale thereunder." *McIntyre, 89 S.W.2d at 336.* For example, a trustee must comply with terms such as notice of time and place of sale, as well as personal notice of sale, if provided for in the deed of trust.

> [HN19] When, by the terms of the deed, the trustee is required before making sale to give notice to the bargainor of the time and place of sale, the giving of such notice is in the nature of a condition precedent, and, if not complied with, the sale is unauthorized and void and will communicate no title to the purchaser. And if the requirement be that personal notice shall be given, the trustee cannot substitute notice by advertisement in a newspaper, or at some public place or places, because not within the scope of his authority and also because such a departure on the part of the trustee might be made to defeat the very object of the requirement by enabling him to sell the property without the knowledge of the party making the deed.

*Henderson v. Galloway, 27 Tenn. 692, 695-96 (Tenn. 1848).*

According to the terms of the deed of trust executed by the Beasleys, the Lender may invoke the power [*31] of sale only after the expiration of the thirty (30) day period. Moreover, only when the sale occurs "pursuant to . . . paragraph 21" and the Borrower refuses to surrender possession does a landlord/tenant relationship arise between the Borrower and purchaser. Assuming the Beasleys' allegations to be true and construing these terms strictly, we believe the Beasleys have stated a valid defense because Citi would have lacked authority to sell the property at foreclosure. This type of contract breach would be sufficient to prevent the passage of good title

and, thus, the emergence of the landlord/tenant relationship. In the absence of this relationship, Citi would not have been in constructive possession of the property so as to maintain an unlawful detainer action.

## Conclusion

In this case, the Beasleys seek to retry the unlawful detainer action in circuit court by way of writs of certiorari and supersedeas. To prevail in petitioning for the writs, the Beasleys must have set forth sufficient merits, or a prima facie, meritorious defense. We hold that the Beasleys are entitled to writs of certiorari and supersedeas because, in addition to complying with the statutory bond and [*32] timeliness requirements, they stated a prima facie case of wrongful foreclosure, which, in this particular circumstance, is a valid defense. An allegation of wrongful foreclosure constitutes merits sufficient to sustain a petition for review pursuant to *Tennessee Code Annotated Section 29-18-129* where the trustee has conducted the foreclosure sale before

expiration of the curative period clearly set forth in the deed of trust; where the contractual curative period supersedes the statutory requirements for non-judicial foreclosure sales; where the terms of the deed of trust give rise to the power of sale only after the expiration of the curative period; where the breach of this term would invalidate the conveyance at the foreclosure sale; and, therefore, where the purchaser would acquire no title and could not establish the right to immediate possession of the premises in an unlawful detainer action.

For the foregoing reasons, we reverse the judgment of the trial court below and remand for the issuance of writs of certiorari and supersedeas and for further proceedings consistent with this opinion. The costs of this appeal are taxed to CitiFinancial Mortgage [*33] Company, Inc., for which execution may issue if necessary.

DAVID R. FARMER, JUDGE





Positive
As of: Nov 17, 2011

WESTERN EXPRESS, INC. v. BRENTWOOD SERVICES, INC. ET AL.

No. M2008-02227-COA-R3-CV

COURT OF APPEALS OF TENNESSEE, AT NASHVILLE

*2009 Tenn. App. LEXIS 707*

April 14, 2009, Session
October 26, 2009, Filed

**PRIOR HISTORY:** [*1]
  *Tenn. R. App. P. 3* Appeal as of Right; Judgment of the Chancery Court Affirmed. Appeal from the Chancery Court for Davidson County. No. 07-1040-III. Ellen Hobbs Lyle, Chancellor.

**DISPOSITION:**    Judgment of the Chancery Court Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation, which was one of 29 members of a workers' compensation self-insurance group trust established pursuant to *Tenn. Code Ann. § 50-6-405(c)*, appealed the dismissal for failure to state a claim upon which relief could be granted pursuant to *Tenn. R. Civ. P. 12.02(6)* by the Chancery Court for Davidson County, Tennessee, of its suit against defendant former administrator of the liquidated self-insurance group trust.

**OVERVIEW:** The trust was liquidated in a separate liquidation proceeding wherein the Commissioner of the Department of Commerce and Insurance served as the liquidator. A settlement entered into between the liquidator and the trust, which resolved all claims common to the members of the trust, was approved by the Chancery Court and entered in the liquidation action. The corporation presented two issues on appeal: the trial court erred in considering the settlement agreement from the trust liquidation action and the trial court erred in dismissing its complaint for failure to state a claim upon which relief could be granted. The settlement agreement from the liquidation action, which the corporation referenced in the complaint, was properly considered as it was a public record of which the trial court could take judicial notice. The trial court properly dismissed the complaint as the corporation did not allege anything other than a common injury held by the trust. The failure to adequately supervise, failure to perform fiduciary duties, breach of contract, and negligence claims were common to the members of the trust.

**OUTCOME:** The judgment of the trial court was affirmed, and the matter was remanded with costs of appeal assessed against the corporation.

**LexisNexis(R) Headnotes**

Case 2:12-cv-02344-JPM-dkv    Document 1-2    Filed 05/02/12    Page 115 of 177    PageID 123

Page 2
2009 Tenn. App. LEXIS 707, *1

*Insurance Law > Business Insurance > Self-Insurance > General Overview*
*Workers' Compensation & SSDI > General Overview*
[HN1] Under *Tenn. Code Ann. § 50-6-405(c)* and the applicable Department of Commerce and Insurance regulations, a group of ten or more employers in the same trade are permitted to form a pool to self-insure all members collectively against workers' compensation claims.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN2] The failure to state a claim upon which relief can be granted is determined by an examination of the complaint alone.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN3] In the context of *Tenn. R. Civ. P. 12.02(6)* motion to dismiss for failure to state a claim upon which relief could be granted, numerous cases have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN4] The purpose of a *Tenn. R. Civ. P. 12.02(6)* motion to dismiss is to determine whether the pleadings state a claim upon which relief can be granted. A Rule 12 motion only challenges the legal sufficiency of the complaint. It does not challenge the strength of the plaintiff's proof. In reviewing a motion to dismiss, an appellate court must liberally construe the complaint, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences. Thus, a complaint should not be dismissed for failure to state a claim unless it appears that the plaintiff can prove no set of facts in support of his or her claim that would warrant relief. Making such a determination is a question of law. Review of a trial court's determinations on issues of law is de novo, with no presumption of correctness.

*Insurance Law > Industry Regulation > Insurer Insolvency > Liquidations & Rehabilitations*
[HN5] *Tenn. Code Ann. § 56-9-310* provides the liquidator with the authority to (8) Collect all debts and moneys due and claims belonging to the insurer, wherever located, and for this purpose to: (A) Institute timely action in other jurisdictions, in order to forestall garnishment and attachment proceedings against such debts; (B) Do such other acts as are necessary or expedient to collect, conserve or protect its assets or property, including the power to sell, compound, compromise or assign debts for purposes of collection upon such terms and conditions as the liquidator deems best; and (C) Pursue any creditor's remedies available to enforce the liquidator's claims. (14) Continue to prosecute and institute in the name of the insurer, or in the liquidator's own name, any and all suits and other legal proceedings, in this state or elsewhere, and abandon the prosecution of claims the liquidator deems unprofitable to pursue further. If the insurer is dissolved under *Tenn. Code Ann. § 56-9-309*, the liquidator shall have the power to apply to any court in this state or elsewhere for leave to substitute the liquidator for the insurer as plaintiff; (15) Prosecute any action which may exist in behalf of the creditors, members, policyholders or shareholders of the insurer against any officer of the insurer, or any other person; *Tenn. Code Ann. § 56-9-310(a)(8)(A)-(C), (14)-(15) (2004)*.

*Insurance Law > Industry Regulation > Insurer Insolvency > Liquidations & Rehabilitations*
[HN6] See *Tenn. Code Ann. § 56-9-307(a)*.

*Insurance Law > Industry Regulation > Insurer Insolvency > Liquidations & Rehabilitations*
[HN7] The liquidator is vested with the power to pursue claims against the company's officers, and prosecute and institute all claims in the insurer's name that the liquidator deems necessary. *Tenn. Code Ann. § 56-9-307(a), 310*.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN8] *Tenn. R. Civ. P. 9.02* states that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. A plaintiff must allege the following elements to assert a common law fraud claim: (1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's

2009 Tenn. App. LEXIS 707, *1

falsity, (3) an injury caused by reasonable reliance on the representation and (4) the requirement] that the misrepresentation involve a past or existing fact. A claim of fraud is deficient if the complaint fails to state with particularity an intentional misrepresentation of a material fact. To pass the particularity test, the actors should be identified and the substance of each allegation should be pled.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*

[HN9] A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*

[HN10] The necessary elements to establish a cause of action based upon negligent misrepresentation are One who, in the course of his business, profession, or employment, or during a transaction in which he had a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon such information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Statements of opinion or intention are not actionable, nor, is puffing or other sales talk.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > State Regulation*

[HN11] *Tenn. Code Ann. § 47-18-104(b)(7)* provides it is a violation to represent that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another, and *§ 47-18-104(b)(27)* provides that it is a violation to engage in any other act or practice which is deceptive to the consumer or to any other person.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*

[HN12] Merely reciting the elements of a cause of action or making conclusory statements that a plaintiff is entitled to relief or was harmed is not enough.

COUNSEL: Isham B. Bradley, Nashville, Tennessee, for the appellant, Western Express, Inc.

Tara L. Swafford and Wendee Hilderbrand, Nashville, Tennessee, for the appellees, Brentwood Services, Inc. and Brentwood Services Administrators, Inc.

JUDGES: FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

OPINION BY: FRANK G. CLEMENT, JR.

OPINION

Western Express, which was one of twenty-nine members of a workers' compensation self-insurance group trust established pursuant to *Tenn. Code Ann. § 50-6-405(c)*, appeals the dismissal of its civil action against the former administrator of the now liquidated self-insurance group trust, Brentwood Services, Inc. Plaintiff's claims were dismissed pursuant to *Tenn. R. Civ. P. 12.02(6)* for failure to state a claim upon which relief may be granted. The Trust was liquidated in a separate liquidation proceeding wherein the Commissioner of the Department of Commerce and Insurance served as the [*2] Liquidator. A settlement entered into between the Liquidator and Brentwood, which resolved all claims common to the members of the Trust, was approved by the Chancery Court and entered in the liquidation action. Following the settlement of the liquidation action, Plaintiff filed this civil action against Brentwood to assert claims Plaintiff believed to be personal or unique to Plaintiff and which were not barred by the Liquidator's settlement with Brentwood. Thereafter, Brentwood filed a *Tenn. R. Civ P. 12.02(6)* motion to dismiss for failure to state a claim upon which relief could be granted, contending that the claims asserted by Plaintiff were not personal or unique to Plaintiff, but common to all members of the trust, and that all such claims had been resolved in the liquidation action; alternatively, Brentwood asserted that any claims that were unique to Plaintiff were not sufficiently pled and, thus, should be dismissed. The trial court granted Brentwood's motion, dismissing all claims based upon the reasoning submitted by Brentwood. We affirm.

OPINION

This action arises from the operation and

Case 2:12-cv-02344-JPM-dkv    Document 1-2    Filed 05/02/12    Page 117 of 177    PageID 125

Page 4
2009 Tenn. App. LEXIS 707, *2

court-assisted liquidation of a workers' compensation self-insurance group trust established [*3] and regulated pursuant to *Tenn. Code Ann. § 50-6-405(c)*. [HN1] Under the statute and the applicable Department of Commerce and Insurance regulations, a group of ten or more employers in the same trade are permitted to form a pool to self-insure all members collectively against workers' compensation claims.

In compliance with the statute, Western Express, Inc. ("Plaintiff") and twenty-eight other trucking companies pooled together to establish the Tennessee Trucking Association Self Insurance Group Trust ("Trust"). Brentwood Services, Inc. and Brentwood Services Administrators, Inc. (collectively, "Brentwood") provided certain administrative services to the Trust pursuant to a contract with the Trust. Brentwood did not have individual contracts with any of the Trust members.

In December 2002, a Department of Commerce and Insurance examiner issued a report identifying deficiencies in the administration of the Trust. Over a year later, the Commissioner of the Department of Commerce and Insurance used the Examiner's Report as a basis for filing a petition in Davidson County Chancery Court seeking to liquidate the Trust under *Tenn. Code Ann. § 56-9-101, et seq.* The chancellor granted the petition [*4] to liquidate the Trust and appointed the Commissioner to serve as the Liquidator. The Liquidator was granted all the rights and authority set forth in *Tenn. Code Ann. § 56-9-301, et seq.* Among the rights and authority granted to the Liquidator, by court order and statute, was the assumption of any causes of action belonging to the Trust and the authority to prosecute or settle legal claims belonging to the Trust or its members. Also pursuant to the statute, the court's order expressly enjoined and prohibited Trust members from bringing their own suits against the Trust or initiating any other legal actions that might interfere with the Liquidation case or the Trust's rights and assets.

During the liquidation case, the Liquidator pursued certain claims against Brentwood arising out of Brentwood's contract to provide administrative services to the Trust. Brentwood countered with its own claims against the Trust. Ultimately, the Liquidator and Brentwood entered into a court-approved settlement agreement. Under the terms of the settlement agreement, the Liquidator released all claims against Brentwood in exchange for a $ 215,000 settlement payment.

Six months after approving the settlement [*5] agreement, the Chancellor addressed third-party claims filed against Brentwood by the trustees of the Trust. Two of the issues presented were whether any third-party claims against the Trust fell outside of the authority of the Liquidator and the scope of the settlement agreement between the Liquidator and Brentwood. The Chancellor found that "Tennessee law does not vest a liquidator with the authority to settle personal claims, and it accords individual claimants the right to pursue these purely personal causes of action," and, therefore, the Chancellor determined that claims which were personal or unique to a member of the Trust could be pursued by that member, but claims which were common to all members of the Trust were within the exclusive authority of the Liquidator and could not be separately pursued by individual members of the Trust.

Plaintiff filed this action in the Williamson County Chancery Court in August 2006 to pursue its separate and unique claims against Brentwood. Shortly thereafter, the parties agreed to transfer this action to the Davidson County Chancery Court which had presided over the liquidation proceeding. Brentwood filed its Answer to the Complaint on September [*6] 21, 2007. Thereafter, Brentwood filed its *Tenn. R. Civ. P. 12.02(6)* motion to dismiss wherein Brentwood contended, *inter alia*, that Plaintiff's claims were not personal or unique to Plaintiff but rather claims held in common by the Trust and its members. The chancery court entered an order, *sua sponte*, allowing Plaintiff to amend its complaint to "provide more detailed factual allegations concerning its fraud claim and more detailed factual allegations concerning how its alleged cause of action and damages are personal to it and are not claims and damages common to the trust." Plaintiff filed an Amended Complaint on June 20, 2008. Three days later, Brentwood filed a renewed Motion to Dismiss.

On August 15, 2008, the chancery court entered an order dismissing all but three of Plaintiff's claims. In the same order, the court requested additional briefing on the three remaining claims, fraud, misrepresentation, and negligence, before ruling on those claims. After the parties submitted additional briefs, the court entered a handwritten order, adopting the "reasoning and authorities of [Brentwood's] July 23, 2008 Supplemental Memorandum of Law and their August 15, 2008 Supplemental Memorandum," [*7] and dismissing Plaintiff's Amended Complaint "in its entirety." This

appeal followed.

Plaintiff presents two issues on appeal. First, Plaintiff contends that the trial court erred in considering the Settlement Agreement from the Trust Liquidation action. Second, Plaintiff contends the trial court erred in dismissing its complaint for failure to state a claim upon which relief could be granted. We will address each issue in turn.

## ANALYSIS

### SETTLEMENT AGREEMENT

The trial court dismissed the Complaint upon a *Tenn. R. Civ. P. 12.02(6)* motion to dismiss for failure to state a claim upon which relief could be granted. [HN2] The failure to state a claim upon which relief can be granted is determined by an examination of the complaint *alone*. *Wolcotts Fin. Servs. Inc. v. McReynolds, 807 S.W.2d 708, 710 (Tenn. Ct. App. 1990)* (emphasis added). Plaintiff argues on appeal that the Settlement Agreement entered into by the Liquidator and Brentwood should not have been considered in a *Rule 12.02(6)* motion to dismiss for failure to state a claim. Specifically, Plaintiff objects to the Settlement Agreement because "it was not part of the pleadings and it was not an Order entered by the Chancery Court in a related [*8] case." Thus, Plaintiff argues the matter should have been converted into a Rule 56 motion for summary judgment.

As this court recently explained in *Indiana State District Council of Laborers v. Brukardt*, there are exceptions to this rule:

There are exceptions to the above rule, and the appellee contends that these exceptions apply here. The exceptions are reflected as follows:

[HN3] Numerous cases, as the note below reflects, have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint

whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.

Wright and Miller, *Federal Practice and Procedure, Civil* § 1357, p. 376 (3d ed.2004). The above, as noted, is reflected in numerous court decisions and is well recognized. *See, e.g., Wyser-Pratte Management Inc. v. Telxon Corp., 413 F.3d 553, 560 (6th Cir.2005)* ("In addition to allegations in the complaint, the court may also consider other materials that are integral to the complaint, are [*9] public records, or are otherwise appropriate for taking judicial notice"); *Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir.2000)* (court may consider SEC disclosure documents without converting motion to dismiss to summary judgment).

*Ind. State Dist. Council of Laborers v. Brukardt, No. M2007-02271-COA-R3-CV, 2009 Tenn. App. LEXIS 269, 2009 WL 426237, at *8 (Tenn. Ct. App. Feb. 19, 2009)* (perm. app. denied Aug. 24, 2009).

Based on the exception to the rule above, we find that the Settlement Agreement was properly considered as it is a public record of which the court could take judicial notice. As part of the record in the liquidation action, which Plaintiff references in his Complaint, the trial court did not err by considering the Settlement Agreement when deciding whether to dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted.

### RULE 12.02 MOTION TO DISMISS

[HN4] The purpose of a *Tenn. R. Civ. P. 12.02(6)* motion to dismiss is to determine whether the pleadings state a claim upon which relief can be granted. A Rule 12 motion only challenges the legal sufficiency of the complaint. It does not challenge the strength of the plaintiff's proof. *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 986 S.W.2d 550, 554 (Tenn. 1999).* [*10] In reviewing a motion to dismiss, we must liberally construe the complaint,

presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences. *See Pursell v. First American National Bank, 937 S.W.2d 838, 840 (Tenn. 1996); see also Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 696-97 (Tenn. 2002).* Thus, a complaint should not be dismissed for. failure to state a claim *unless* it appears that the plaintiff can prove no set of facts in support of his or her claim that would warrant relief. *See Doe v. Sundquist, 2 S.W.3d 919, 922 (Tenn. 1999); Fuerst v. Methodist Hospital South, 566 S.W.2d 847, 848 (Tenn. 1978)* (emphasis added). Making such a determination is a question of law. Our review of a trial court's determinations on issues of law is de novo, with no presumption of correctness. *Frye v. Blue Ridge Neuroscience Center, P.C., 70 S.W.3d 710, 713 (Tenn. 2002); Bowden v. Ward, 27 S.W.3d 913, 916 (Tenn. 2000); Gamevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997).*

In this case, the trial court dismissed all of Plaintiff's claims adopting the reasoning of Brentwood Services in its July 23, 2008 Supplemental Memorandum of Law and [*11] its August 15, 2008 Supplemental Memorandum. The crux of Brentwood Services' argument in its motion to dismiss was that the claims asserted by Plaintiff were common claims that the Liquidator asserted on behalf of the Trust, and not "personal" claims. Thus, it contends Plaintiff was barred from bringing these claims in a subsequent action by both case law and the order of the trial court. Plaintiff, however, contends that the causes of action pled in its complaint assert personal actions with injuries unique to it, and thus, the trial court erred in dismissing its claims.

COMMON CLAIMS

The claims asserted by Plaintiff arise from the actions of Brentwood Services in its administration of the Trust. Following the liquidation of the Trust, in which the Commissioner served as the Liquidator, an action was filed against Brentwood Services by the Liquidator on behalf of the members of the Trust. The Liquidator brought these actions based upon the statutory authority granted [HN5] by *Tenn. Code Ann. § 56-9-310* which provides the liquidator with the authority to:

(8) Collect all debts and moneys due and claims belonging to the insurer, wherever located, and for this purpose to:

(A) Institute timely [*12] action in other jurisdictions, in order to forestall garnishment and attachment proceedings against such debts;

(B) Do such other acts as are necessary or expedient to collect, conserve or protect its assets or property, including the power to sell, compound, compromise or assign debts for purposes of collection upon such terms and conditions as the liquidator deems best; and

(C) Pursue any creditor's remedies available to enforce the liquidator's claims;

. . . .

(14) *Continue to prosecute and institute in the name of the insurer, or in the liquidator's own name, any and all suits and other legal proceedings,* in this state or elsewhere, and abandon the prosecution of claims the liquidator deems unprofitable to pursue further. If the insurer is dissolved under § 56-9-309, the liquidator shall have the power to apply to any court in this state or elsewhere for leave to substitute the liquidator for the insurer as plaintiff;

(15) *Prosecute any action which may exist in behalf of the creditors, members, policyholders or shareholders of the insurer against any officer of the insurer, or any other person;*

*Tenn. Code Ann. § 56-9-310(a)(8)(A)-(C), (14)-(15) (2004)* (emphasis added). [1]

1  While both [*13] parties cite to the 2008 version of the statute, the Commissioner was

appointed as Liquidator in February 2004, and, therefore, we find that the 2004 statute is the applicable provision.

Thus, according to the provisions of the statute, the Liquidator has the sole authority to assert claims on behalf of the Trust.[HN6] *See Tenn. Code Ann. § 56-9-307(a)* ("The liquidator shall be vested by operation of law with the title to all of the property, contracts *and rights of action. . . .*") (emphasis added).

Neither party has cited, and we have not found, any Tennessee cases directly on point concerning the preclusive effect of a settlement by a liquidator that prosecuted claims on behalf of members of an insurance trust such as this, or on the right of an individual member to commence and maintain claims that are common to the members of the Trust. Brentwood Services, however, cited several cases that were relied upon by the trial court, and which we find persuasive, that support the trial court's determination that Plaintiff is barred from asserting claims against Brentwood Services that were common to the membership of the Trust.

*In the Matter of the Liquidation of American Mutual Liability Insurance Company, 417 Mass. 724, 632 N.E.2d 1209 (Mass. 1994),* [*14] the Supreme Judicial Court of Massachusetts addressed the question of whether the Commissioner of Insurance appointed as receiver of an insolvent insurance company had the exclusive authority to assert and settle the claims of the insurance company. In the case, the Commissioner had been appointed pursuant to the governing statutes as receiver with the authority to take possession and control of the insurance company, American Mutual, which had become insolvent. *Id.* at 1210. Following an investigation into the reasons for American Mutual's insolvency, the Commissioner determined potential claims existed against the former certified accountant and auditor of American Mutual, and began negotiations to settle the claims. *Id.* at 1211. A proposed settlement agreement was reached between the parties in which the former accountant would pay a settlement amount in exchange for the release from liability on all claims "'that she, acting either as Commissioner of Insurance or as Permanent Receiver on behalf of [American Mutual] or on behalf of [American Mutual] policyholders, claimants, and other creditors (including, without limitation, guaranty funds and insurance insolvency funds) has had, [*15] may now, or hereafter can, shall or may have.'" *Id.*

Following a motion for the court to approve the settlement agreement, several State insurance guaranty funds and associations sought to intervene in the action in order to assert separate claims against the accountant, to conduct discovery, and to object to the settlement. *Id.* The motion to intervene was denied pending the response of a full court response on several questions, one of which was the scope of the authority of the Commissioner to assert claims on for the insolvent insurer. *Id.*

The Massachusetts court first looked to the statutes under which the Commissioner's authority as receiver stemmed. *Id.* at 1212. These statutes, which are similar to Tennessee's, provided:

> The receiver's authority emanates principally from *G. L. c. 175, §§ 6* and *180C* (1992 ed.). *Section 6* authorizes the receiver appointed for an insolvent insurer "to take possession of all the property and effects of the company, to settle its affairs, and to distribute its assets, subject to such rules and orders as the court may prescribe." *Section 180C* provides that, after entry of a liquidation order and "subject to the approval of the court, [the receiver] may [*16] sell or otherwise dispose of the real and personal property, or any part thereof, and sell or compromise all choses in action, of the company." In conformity with these statutes, there was entered in the county court an order of liquidation which directed the receiver, "to liquidate [American Mutual] as provided in and subject to [*G. L. c. 175, § 180C*], to take possession of, with the authority to transfer and control, the property, records, accounts, and effects of [American Mutual], to settle the affairs and distribute the assets of [American Mutual] subject to such rules and orders as the Court or some Justice hereof may prescribe."

*Id.* The court then held that the Commissioner as receiver had the exclusive authority to assert and settle claims against the accountant, such as those that the accountant had provided negligent services causing American Mutual to become insolvent. *Id.* The court reasoned that the pertinent statute conferred upon the receiver "broad

authority to 'settle its affairs,'" and the statute expressly allowed the receiver "to 'compromise *all* choses in action.'" *Id.* The court noted that an alternate result would "undermine the reasonably specific and broad language" [*17] of the statute and "create a potential morass of lawsuits involving the receiver, and potentially up to fifty funds, in which many seek to assert, as a representative of American Mutual, the latter's claims against [the accountant] for alleged negligent services." *Id. at 1213.*

The court further determined, however, that the receiver's sole authority to assert claims was only in regards to "common claims":

"The weight of authority makes it clear that a statutory receiver, such as the [receiver] here, may prosecute claims on behalf of creditors and policyholders of the insolvent [insurance] company in order to preserve its estate assets, but may not maintain a suit in such a representative capacity if it is strictly personal in nature, that is, if the cause of action belongs clearly to the individual creditor or policyholder." *Matter of the Liquidation of Integrity Ins. Co.,* 240 N.J. Super. 480, 491, 573 A.2d 928 (App. Div. 1990). See *Corcoran v. Frank B. Hall & Co., supra* at 177 (receiver has authority to prosecute claims on behalf of creditors); *Foster v. Peat Marwick Main & Co., supra* at 151-155 (insurance commissioner, as rehabilitator of insolvent insurer, had authority to assert [*18] claim against insurer's auditor on behalf of insurer, all policyholders and insurers, creditors, and interested parties alleging malpractice, breach of contract, and misrepresentation).

*Id.* The court then looked to the Texas case of *Cotten v. Republic Nat'l Bank,* 395 S.W.2d 930 (Tex. Civ. App. 1965), for guidance in the distinction between common claims and personal claims. *Id.* In *Cotten,* the court "held that a receiver could sue to recover assets for an insolvent insurer on behalf of creditors and policyholders, but could not maintain a suit as the representative of a policyholder or creditor who claimed that he or she had been induced by fraud to invest in the insurer." *American Mutual,* 632 N.E.2d at 1213. In so finding, the court in *Cotten* explained:

Certainly a receiver for an insolvent insurance corporation . . . has a right to maintain a suit which is necessary to preserve the corporation's assets and to recover assets of which the corporation has been wrongfully deprived through fraud. In such a suit the receiver may be said to sue as the representative of the corporation and its creditors, stockholders and policyholders, for they have an interest in the corporation's assets and [*19] upon liquidation they are entitled to a proper distribution of the assets.

But some actions for fraud are by their nature personal to each creditor, or each stockholder, or each policyholder, and the receiver may not then maintain a suit in his representative capacity for their joint benefit. In such case each claimant and he alone may bring and maintain the suit himself, for the action is personal, separate and several, not joint, and extends no further than the individual loss of each particular creditor who sues. For example, one who proves that he relied on false representations as to the corporation's financial condition and was thereby induced to extend credit to the corporation, or to purchase stock in it, or to take out an insurance policy with it, must in his own name maintain a separate suit for his damages against the person who uttered the fraudulent representations. The aggrieved party and he alone may maintain the suit.

*Cotten,* 395 S.W.2d at 941. The Massachusetts court then noted that while it had not been asked to rule on what constituted a valid personal claim, it appeared that the claim asserting the accountant's negligent auditing practices was a common claim. *American Mutual,* 632 N.E.2d at 1214 n.7.

Another [*20] case cited by both Brentwood Services and Plaintiff provides further guidance in the inquiry regarding what constitutes a common claim. In *Boedeker v. Rogers,* the Ohio Court of Appeals addressed the issue of whether the Ohio statute which authorized the Superintendent of Insurance to assume responsibility

over a liquidated insurer's affairs also authorized the Superintendent to be substituted as a plaintiff in an action by shareholders of the insurer who were asserting both derivative claims on behalf of the corporation and individual claims on behalf of shareholders. *Boedeker, 140 Ohio App. 3d 11, 746 N.E.2d 625, 628 (Ohio Ct. App. 2000).* Under Ohio's statutory scheme, the Superintendent, acting as liquidator, was authorized to "prosecute any and all claims and other legal proceedings of the insurer." *Id.* The court found this included the derivative claims asserted by the shareholders on behalf of the corporation, because these actions were "asserted on behalf of the corporation to right an alleged wrong done to the corporation." *Id. at 635.* The court found that this conclusion supported the purpose of the statute:

> The obvious intent of such a statutory scheme is to give the liquidator the sole authority [*21] to prosecute or abandon all legal rights of action that inure to the benefit of the insurer, including legal claims of the insurer's creditors, members, policyholders or shareholders who look to the insurer for satisfaction. *See Four Star Insurance Agency, Inc. v. Hawaiian Electric Industries, Inc. (1999), 89 Haw. 427, 974 P.2d 1017; Corcoran v. Frank B. Hall & Co., Inc. (1989), 149 A.D.2d 165, 545 N.Y.S.2d 278.* Concentrating this authority in the hands of a liquidator serves to reduce the potential that a multiplicity of actions by claimants having antagonistic interests will deplete the insurer's assets before the insurer's obligations are fairly extinguished.
>
> By necessity, the interests that shareholders or other interested parties may seek to protect will be limited to the interests they possess. The interests the Superintendent must represent, however, go beyond those of the immediately affected principals and include the interests of insurers, claimants, creditors, and the public generally. *R.C. 3903.02(D).* While the interests represented by shareholders and the interests represented by the Superintendent may be in harmony at times, their interests may become dissonant at other [*22] times. *So that the*

> *liquidation process does not degenerate into cacophony and disarray, there can be only one conductor.*

*Id. at 636* (emphasis added). The court stated, however, that the individual claims were different because a direct claim is "personal, separate, and distinct from that otherwise suffered in common by the corporation and its other shareholders." *Id. at 637.*

Tennessee's statutory scheme for dissolution of an insolvent insurer is similar to that of the states discussed in the opinions above, i.e., Massachusetts, Texas, and Ohio. In each of these states, and Tennessee, [HN7] the liquidator is vested with the power to pursue claims against the company's officers, and prosecute and institute all claims in the insurer's name that the liquidator deems necessary. *See Tenn. Code Ann. § 56-9-307(a), 310.* Thus, we concur with the reasoning adopted by the trial court that the only claims which Plaintiff could pursue were claims not in common with those that were pursued or could have been pursued by the Liquidator. We find that Plaintiff has not alleged anything other than a common injury held by the Trust. Plaintiff had no individual contractual relationship with Brentwood Services [*23] from which to assert an individual breach of contractual relationship claim, and, while Plaintiff may contend that it was a third party beneficiary of the contract between the Trust and Brentwood Services, any injury incurred from a breach of the administrative services contract would be in common with the Trust, and, thus a common claim. This is equally true of Plaintiff's claims for failure to adequately supervise and failure to perform fiduciary duties owed to the Trust.

We, therefore, affirm the trial court's conclusion that Plaintiff failed to state a claim for which relief could be granted for Brentwood Services' alleged failure to adequately supervise, failure to perform fiduciary duties, breach of contract, and negligence, as each and all of these claims are common to the members of the Trust. Accordingly, we affirm the dismissal of the above claims. We will now consider the individual claims asserted by Plaintiff.

INDIVIDUAL CLAIMS

While many of the claims asserted by Plaintiff were "common" claims that were in the sole discretion of the Liquidator, and thus, were properly dismissed, some claims asserted by Plaintiff involved claims that were

unique to Plaintiff or "personal" [*24] in nature.

Plaintiff contends on appeal that it properly asserted claims that were personal to Plaintiff and, thus, the trial court erred in dismissing these claims. Brentwood Services contends, however, that even if Plaintiff is entitled to assert these claims, Plaintiff failed to properly plead them; thus, the "personal claims" were properly dismissed.

## FRAUD AND MISREPRESENTATION

We agree that claims for fraud and misrepresentation could constitute claims that are personal in nature, and, thus could be asserted by Plaintiff. However, we find that these claims were not properly pled.[HN8] *Tenn. R. Civ. P. 9.02* states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

A plaintiff must allege the following elements to assert a common law fraud claim: "(1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, . . . (3) an injury caused by reasonable reliance on the representation [and (4) the requirement] that the misrepresentation involve a past or existing fact. . . ." *Dobbs v. Guenther, 846 S.W.2d 270, 274 (Tenn. Ct. App.1992).* "A claim of fraud is deficient if the [*25] complaint fails to state with particularity an intentional misrepresentation of a material fact." *Hermosa Holdings, Inc. v. Mid-Tennessee Bone & Joint Clinic, P.C., No. M2008-00597-COA-R3-CV, 2009 Tenn. App. LEXIS 282, 2009 WL 711125, at *10 (Tenn. Ct. App. Mar. 16, 2009)* (citing *Dobbs, 846 S.W.2d at 274*). "To pass the particularity test, the actors should be identified and the substance of each allegation should be pled." *Id.* (citing *Strategic Capital Res., Inc. v. Dylan Tire Indus., LLC, 102 S.W.3d 603, 611 (Tenn. Ct. App. 2002)*).

We find that Plaintiff has not met this burden. The only allegations of fraud by Plaintiff are that Brentwood Services held "secret meetings" to conceal its failure to perform and failure to supervise, and that Brentwood Services' disregard of the "laws of the State of Tennessee, and the rules and regulations of the Department of Commerce and Insurance" was fraudulent. We find that these assertions are too vague to fulfill the pleading requirements imposed by *Tenn. R. Civ. P. 9.02*, and, thus the trial court properly dismissed Plaintiff's claims for fraud under *Tenn. R. Civ. P. 12.02(6). See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.*

*Ed. 2d 929 (2007)* ([HN9] "[A] plaintiff's obligation to provide [*26] the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do).

For its misrepresentation claim, Plaintiff states that Western Services made representations that the Trust was in compliance, that Plaintiff relied on these representations when entering into the Trust and forgoing alternative opportunities for insurance, and that based upon these false representations Plaintiff incurred damages. [HN10] The necessary elements to establish a cause of action based upon negligent misrepresentation are:[2]

> One who, in the course of his business, profession, or employment, or during a transaction in which he had a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon such information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*McElroy v. Boise Cascade Corp., 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982)* (citing *Jasper Aviation, Inc. v. McCollum Aviation, Inc., 497 S.W.2d 240 (Tenn.1972); Merriman v. Smith, 599 S.W.2d 548 (Tenn. Ct. App.1979);* [*27] *Hunt v. Walker, 483 S.W.2d 732 (Tenn. 1971)*). "Statements of opinion or intention are not actionable," nor, is "puffing or other sales talk." *Id.* (citing *Sunderhaus v. Perel & Lowenstein, 215 Tenn. 619, 388 S.W.2d 140 (1965)*). We find that Plaintiff also failed to state a claim for which relief can be granted on its misrepresentation claim. Plaintiff does not allege who made the misrepresentations or when the misrepresentations were made, thereby failing to allege the required elements that a person in the course of his business supplied false information. Plaintiff's allegation is simply too vague to set forth a misrepresentation claim, and, therefore, we affirm the chancery court's dismissal of the claim under *Tenn. R. Civ. P. 12.02(6)*.

[2]    Plaintiff does not specify whether it is asserting a claim for intentional misrepresentation or negligent misrepresentation. For purposes of

this appeal, we shall evaluate the claim as one of negligent misrepresentation due to the fact a claim for intentional misrepresentation would fail to satisfy the pleading requirement of specificity, as was the case with Plaintiff's claim of fraud.

## TENNESSEE CONSUMER PROTECTION ACT

We also find that Plaintiff [*28] has failed to state a claim upon which relief can be granted for violations of the Tennessee Consumer Protection Act, *Tenn. Code Ann. § 47-18-101, et seq.* One purpose of the Act is "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." *Tenn. Code Ann. § 47-18-102(2); see also ATS Southeast, Inc. v. Carrier Corp., 18 S.W.3d 626 (Tenn. 2000).*

Plaintiff asserts that Brentwood Services violated the Act based upon its misrepresentations and "active participation in the marketing maneuvers." Plaintiff asserts that these actions violated[HN11] *§ 47-18-104(b)(7)*, which provides it is a violation to represent that "goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another," and *§ 47-18-104(b)(27)*, which provides that it is a violation to engage "in any other act or practice which is deceptive to the consumer or to any other person." To the extent that Plaintiff asserts that Brentwood Services engaged in actions to conceal its improper administration, this would fall under the common [*29] claims discussed previously, as that would be an injury to the Trust as a whole and held commonly by other members of the Trust. To the extent that Plaintiff would be able to assert a claim for misrepresentations specifically targeted at Plaintiff, we find that Plaintiff has not properly pled this cause of action, despite being allowed an opportunity to amend its complaint by the trial court. Instead, Plaintiff does little more than make conclusory legal statements,

as opposed to facts upon which to base its claim. This is not enough to state a claim upon which relief can be granted. First, we note that Plaintiff must also meet the pleading requirements set forth at *Tenn. R. Civ. P. 9.02*, which apply to claims brought under the Tennessee Consumer Protection Act. *See Harvey v. Ford Motor Credit Co., 8 S.W.3d 273, 276 (Tenn. Ct. App. 1999).* Plaintiff's vague assertions do not meet this standard, nor, do they meet the less stringent standards under *Tenn. R. Civ. P. 8.01*. [HN12] Merely reciting the elements of a cause of action or making conclusory statements that Plaintiff is entitled to relief or was harmed is not enough. *See Twombly, 550 U.S. at 555; see also Polite v. Metropolitan Development and Housing Agency, No. M2007-02472-COA-R3-CV, 2008 Tenn. App. LEXIS 501, 2008 WL 3982915, at *3 (Tenn. Ct. App. Aug. 26, 2008)* [*30] ("Alleging mere conclusions, such as the board exceeded its authority, failed to follow the applicable statutes, or violated the plaintiff's legal rights, is not sufficient to state a claim for which relief can be granted."). Therefore, we find that the trial court properly dismissed Plaintiff's TCPA claim.

## COMPENSATORY AND PUNITIVE DAMAGES

Plaintiff also asserts that it is entitled to compensatory damages for the amount of the Liquidator's assessments against Plaintiff in the liquidation proceedings, and that it is entitled to compensatory and punitive damages based on the claims asserted in this action. Plaintiff's claims for damages have been rendered moot by our decision in this case as the claims for damages cannot stand alone.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Plaintiff/Appellant Western Express, Inc.

FRANK G. CLEMENT, JR., JUDGE





Positive
As of: Dec 05, 2011

### MICHAEL DAVENPORT v. RICK BATES d/b/a RB AUTO SALES

### No. M2005-02052-COA-R3-CV

### COURT OF APPEALS OF TENNESSEE, AT NASHVILLE

*2006 Tenn. App. LEXIS 790; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542*

**July 13, 2006, Session**
**December 12, 2006, Filed**

**PRIOR HISTORY:** [*1] *Tenn. R. App. P. 3*; Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified. Direct Appeal from the Circuit Court for Davidson County. No. 04C-2924. Walter Kurtz, Judge.

**DISPOSITION:** Judgment of the Circuit Court Affirmed as Modified.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a case involving the repossession of two vehicles, appellant seller appealed the judgment of the Circuit Court for Davidson County (Tennessee) that found, inter alia, that he wrongfully repossessed appellee buyer's car and that valued the amount of the deficiency owed on a truck. The buyer cross appealed the directed verdict on his Tennessee Consumer Protection Act claim.

**OVERVIEW:** The seller argued, inter alia, that the finding of wrongful repossession of the car was erroneous. The court of appeals disagreed. The evidence supported a finding that the seller had waived his right to insist on prompt payment, the buyer had relied on that course of conduct, and the seller took no action to retract his waiver of the original terms. At the very least, reasonable minds could differ as to whether the seller waived his right to repossess for late payments. It was undisputed that the seller accepted the buyer's late payments and did not charge late fees to the buyer's account for the first three years of the contract. The buyer was current on his monthly payments through the end of 2003, but he had not paid any late fees. He also did not maintain insurance on the car, but the seller had never before declared him in default on that basis. There was ample evidence in the record to support a finding that the buyer was relying on the seller's pattern of accepting his payments late. Therefore, the evidence supported a finding that the seller had waived his right to repossess for late payments.

**OUTCOME:** The trial court's $ 7,777 award of the statutory penalty provided in consumer transactions was vacated. The two awards were offset for a total award of $ 3,547 to be awarded to the buyer. The judgment was otherwise affirmed.

**LexisNexis(R) Headnotes**

2006 Tenn. App. LEXIS 790, *1; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN1] An appellate court will set aside a jury's findings of fact only if there is no material evidence to support the verdict. Tenn. R. App. P. 13(d). When addressing whether there is material evidence to support a verdict, an appellate court shall: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all countervailing evidence. Appellate courts do not reweigh the evidence, nor do they decide where the preponderance of the evidence lies. If there is any material evidence to support the verdict, it must be affirmed, or else the parties would be deprived of their constitutional right to a trial by jury.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] An appellate court reviews a trial court's conclusions of law under a de novo standard upon the record with no presumption of correctness for the trial court's conclusions.

*Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts*
*Civil Procedure > Appeals > Standards of Review > General Overview*
[HN3] In ruling on a motion for directed verdict, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. A motion for directed verdict should be granted only if, after assessing the evidence according to the foregoing standards, the court determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. On review of a trial court's ruling on a motion for directed verdict, an appellate court does not reweigh the evidence. Instead, the appellate court also must take the strongest legitimate view of the evidence in favor of the non-movant, indulging in all reasonable inferences in his favor, and disregarding any evidence to the contrary. The motion should have been granted only if there is no material evidence in the record that would support a verdict under the theories that were advanced.

*Contracts Law > Contract Conditions & Provisions > Waivers > Notice*
*Contracts Law > Contract Interpretation > Parol Evidence > Course of Dealing*
*Contracts Law > Debtor & Creditor Relations*
[HN4] It is settled law in Tennessee that as a result of a course of dealing between parties, the holder of an indebtedness may be deemed to have waived the right to accelerate without giving prior notice to the debtor of his intention to do so.

*Contracts Law > Contract Conditions & Provisions > Waivers > Acceptance of Late Payment*
*Contracts Law > Contract Interpretation > Parol Evidence > Course of Dealing*
[HN5] A secured party may be deemed to have waived its right to insist on prompt payment if it has established a course of accepting late payments. In order for the "waiver" reasoning to apply, an accepted course of conduct or dealing must have been established by the parties, and also, the debtor must have relied on that course of conduct in his further dealings.

*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > Disposition of Collateral*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > Notice of Sale*
[HN6] A secured party that disposes of collateral must send a reasonable authenticated notification of disposition to the debtor. *Tenn. Code Ann. § 47-9-611(b)* (2001). The timeliness, content, and form of the notice are addressed by *Tenn. Code Ann. §§ 47-9-612 - 47-9-613* (2001). The provision for notice prior to a sale is intended to afford the debtor a reasonable opportunity to avoid the sale altogether by redeeming the collateral, or in case of sale, to see that the collateral brings a fair price.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Civil Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Testimony > Credibility > General Overview*
[HN7] Reconciling conflicting testimony between the parties and evaluating witnesses' credibility are responsibilities for the jury. An appellate court does not have the same opportunity to observe witnesses, and the

2006 Tenn. App. LEXIS 790, *1; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

appellate court will not reevaluate their credibility. Rather, the appellate court accords great weight to the jury's verdict.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Application & Construction > Definitions > Collateral > Goods > Consumer Goods*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > Disposition of Collateral*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > Notice of Sale*
[HN8] When a secured party fails to comply with the statutory notice requirements, the debtor may recover damages for its loss. *Tenn. Code Ann. § 47-9-625* (2001). However, if the collateral is "consumer goods," the debtor is entitled to recover a minimum statutory penalty without regard to his actual loss or his ability to prove that he has been damaged at all. The consumer debtor may recover an amount not less than 10% of the cash price plus the time-price differential. *§ 47-9-625(c)(2)*.

*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > Disposition of Collateral*
[HN9] Application of the terms in *Tenn. Code Ann. § 47-9-625* (2001) depends on whether the debtor received credit from the seller or a third-party financer. If the seller himself extended credit to the buyer, the formula including the time-price differential plus ten percent of the cash price is used. "Time-price differential" is defined as a figure representing the difference between the current cash price of an item and the total cost of purchasing it on credit.

*Civil Procedure > Appeals > Standards of Review > Fact & Law Issues*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Application & Construction > Definitions > Collateral > Goods > Consumer Goods*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Application & Construction > Definitions > Collateral > Goods > Equipment*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession >*

*Disposition of Collateral*
[HN10] In the context of the disposition of collateral, the determination of whether secured property is equipment or consumer goods is a question of law and the trial judge will select which calculation is applicable.

*Commercial Law (UCC) > Secured Transactions (Article 9) > Application & Construction > Definitions > Collateral > Goods > Consumer Goods*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > Disposition of Collateral*
[HN11] In secured transactions, collateral is defined by its type of primary use in the hands of the debtor. "Consumer goods" are defined as goods that are used or bought for use primarily for personal, family, or household purposes. *Tenn. Code Ann. § 47-9-102(a)(23)* (2001). The fact that an item is personally used does not mean it is for "personal use."

*Commercial Law (UCC) > Secured Transactions (Article 9) > Application & Construction > Definitions > Collateral > Goods > Consumer Goods*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > Disposition of Collateral*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN12] When a debtor would benefit if collateral constitutes "consumer goods," the debtor has the burden of proving the nature of the collateral. In borderline cases of classifying collateral, the principal use of the property is determinative.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > General Overview*
[HN13] A creditor who wrongfully repossesses property may be held liable for conversion damages. When the converter is a secured party, the measure of damages is the value of the vehicle at the time of the wrongful repossession, less the amount owing thereon.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*

2006 Tenn. App. LEXIS 790, *1; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

*Civil Procedure > Remedies > Damages > General Overview*
*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN14] The amount of damages rests in the sound discretion of the jury, and when approved by the trial judge, the award will not be disturbed on appeal unless a violation of discretion by the jury is shown. A jury's damage verdict need not be reviewed for mathematical precision or certainty. When there is substantial evidence in the record, and reasonable inferences may be drawn from that evidence, mathematical certainty is not required.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
[HN15] See *Tenn. Code Ann. § 47-18-104(a)* (2005).

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
[HN16] Under the Tennessee Consumer Protection Act, *Tenn. Code Ann. § 47-18-101 et seq.*, "trade" or "commerce" is defined as the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated. *Tenn. Code Ann. § 47-18-103(11)* (2001).

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > General Overview*
[HN17] The definitions of "trade or commerce" in the Tennessee Consumer Protection Act, *Tenn. Code Ann. § 47-18-101 et seq.*, do not extend to a dispute arising over repossession of collateral securing a loan.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Commercial Law (UCC) > Secured Transactions (Article 9) > Default > Foreclosure & Repossession > General Overview*
[HN18] The Tennessee Consumer Protection Act, *Tenn. Code Ann. § 47-18-101 et seq.*, does not cover repossessions. Repossessions do not affect the

advertising, offering for sale, lease, rental, or distribution of any goods, services, or property. *Tenn. Code Ann. § 47-18-103(11)* (2001).

**COUNSEL:** Thomas J. Drake, Jr., Nashville, TN, for Appellant.

Kirk L. Clements, Goodlettsville, TN, for Appellee.

**JUDGES:** ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

**OPINION BY:** ALAN E. HIGHERS

**OPINION**

    This case involves the repossession of two vehicles - a car and a truck. The buyer sued the seller claiming that he had repossessed the vehicles in violation of the sales contracts and violated the Tennessee Consumer Protection Act, and he sought punitive damages. The seller counterclaimed that the buyer had first breached their contract by making late payments. The trial court directed a verdict in the seller's favor on the Consumer Protection Act claim and the request for punitive damages. The court also directed a verdict for the seller on the issue of wrongful repossession of the truck because the buyer had told the seller to take the truck. A jury found that the car was [*2] wrongfully repossessed because the seller had routinely accepted the buyer's late payments, and he had thereby waived his right to repossess for late payments. The jury also found that, after repossession, the seller had not provided written notice to the buyer before he resold the vehicles. As a result, the trial court ordered the seller to pay a statutory penalty to buyer which is available in "consumer goods" transactions. The court also awarded damages to the buyer for the wrongful repossession of the car. After the jury determined the fair market value of the car when it was repossessed, the trial court awarded the buyer damages for the difference in the car's value and the amount the buyer still owed. The sale of the truck did not produce enough money to cover what the buyer had owed on it. The jury determined the deficiency existing on the truck to be awarded to the seller. The trial court incorporated all these damage awards into a final award to the buyer. On appeal, the seller contends that he did not wrongfully repossess the car because the sales contract specifically provided that he could waive any

Case 2:12-cv-02344-JPM-dkv  Document 1-2  Filed 05/02/12  Page 130 of 177  PageID 138

Page 5

2006 Tenn. App. LEXIS 790, *2; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

default without impairing his right to declare a subsequent default. Also, [*3] he argues that the evidence does not support the jury's finding that he did not send the required notices before he sold the vehicles. In addition, he claims that the evidence does not support a finding that the car was bought in a "consumer goods" transaction because the buyer testified that he used it in his business. He also challenges the jury's valuation of the fair market value of the car and the deficiency owed on the truck. The buyer claims that the trial court erred in directing a verdict on his Tennessee Consumer Protection Act claim. For the following reasons, the trial court's judgment is affirmed as modified.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

On May 1, 2000, Michael Davenport ("Buyer" or "Appellee") purchased a 1995 Chevrolet Corvette from Rick Bates d/b/a RB Auto Sales ("Seller" or "Appellant"). The Corvette was purchased pursuant to a written contract which provided that Buyer would make monthly payments to Seller, and Seller would retain a security interest in the vehicle. The payments were to be made over a five year period with an annual percentage rate of 11.45%. The total purchase price of the vehicle, with interest, was $ 30,402.93. Payments [*4] were to be made on the first day of the month, and if any payment was more than two days late, Buyer would incur a late charge of $ 10.00 per day. The contract also provided, in pertinent part, that:

> If any installment of this note is not paid when due, the entire amount unpaid shall be due and payable at the election of the holder hereof, without notice. All parties hereto . . . hereby waive demand, notice and protest.

> . . .

> Upon default, all sums secured hereby shall immediately become due and payable at Seller's option without notice to Buyer, and Seller may proceed to enforce payment of same and to exercise any or all rights and remedies provided by the Uniform Commercial Code or other applicable law. . . .

Seller may waive any default before or after the same has been declared without impairing his right to declare a subsequent default hereunder, this right being a continuing one.

The contract also stated that Buyer was to purchase comprehensive insurance on the vehicle and furnish evidence of the policy to Seller within ten days. The contract was signed by both parties and dated May 1, 2000.

Buyer is a self-employed landscaper, and he testified that the Corvette [*5] was used in his landscaping business. Though he obviously did not use it to haul materials, he explained that he "went and looked at jobs in it, went and collected money in it, and went and done proposals in it, things like that." One of his landscaping employees was paid to keep the car clean. Buyer also attempted to insure the Corvette under a commercial insurance policy, but for unknown reasons, the policy was never issued. He provided documentation of his commercial insurance application to Seller.

On April 1, 2003, Buyer purchased another vehicle, a 1997 Chevrolet Silverado "dually," from Seller. This truck was used in Buyer's landscaping business to carry materials. Buyer signed another contract with provisions identical to those mentioned above, except that payments were to be made over a period of four years with a 10% annual percentage rate. The total price to be paid for the truck, including interest, was $ 18,029.50.

Over the course of three and a half years, Buyer made several late payments and some partial payments to Seller. Buyer testified that he was often "tight on money" because of the nature of his work, but Seller would work with him on his payment schedule. Buyer [*6] stated that he never paid any late charges and was never asked to pay late fees by Seller. According to Buyer, there was never any problem with his making payments late. Seller, on the other hand, claimed that he told Buyer from the beginning that he had to make payments on time. Seller testified that he would tell Buyer about applicable late fees, and Buyer would simply state that he refused to pay them. Seller claimed that he pleaded with Buyer on numerous occasions to "do right" and make his payments. However, Seller admitted that no late fees were actually charged to Buyer's account until November of 2003. [1]

1 At some point, the parties had a disagreement

2006 Tenn. App. LEXIS 790, *6; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

about landscaping work that Buyer had done at Seller's home. The argument appears to have affected their other dealings, and the situation involving the vehicles progressively worsened.

On January 1, 2004, Buyer called Seller to say that he would be unable to make his January payments on time. Buyer was current on his payments through December of 2003, [*7] but he had made no payments toward accrued late fees. He also maintained no insurance on either vehicle. According to Buyer, he informed Seller that he would be in to make the payments on the following Friday, which was January 9th, and Seller did not appear to have any problem with that arrangement. Seller, on the other hand, testified that Buyer called and said not to call him about that month's payment because he had not been working. He claims Buyer only said that he would get there when he could. At that point, according to Seller, he informed Buyer that "it [was] over," and would no longer tolerate the late payments and was sending someone to repossess the car.

The Corvette was repossessed on January 6, 2004. Buyer claims he knew nothing about Seller's plans to repossess until he got home and the car was gone. Seller testified that when his agent attempted to repossess the car, it would not even start. The car had to be towed back to the lot, where Seller discovered further repairs that were necessary before the car could be resold. Buyer called Seller and demanded to know the full "payoff" amount he was required to pay in order to get the car back. According to Buyer, Seller [*8] replied that he was unsure of the amount and would have to check with the bank which had financed the loan. Seller asked Buyer about the truck payment, and Buyer responded that he intended to pay the current payments owing on it as well. At some point, Buyer went to Seller's car lot to discuss the vehicles. At that time, Buyer did not present any money to pay off the car or to make a payment on the truck, but he claims that he could have borrowed funds from a friend if he had known the actual amount needed. He secretly taped the parties' conversation, and the cassette tape was entered as an exhibit in the trial court and played for the jury. When Seller again mentioned the dually during that conversation, Buyer responded, "you can repo that dually any day you want to repo it." With the help of the Sumner County Sheriff's Department, Seller eventually located and repossessed the truck, which had been wrecked. 2

2  Buyer testified that around the end of 2003 or the first of 2004, he was unloading the truck on a hill and inadvertently failed to properly shift the vehicle into park. As a result, the truck rolled down the hill resulting in damage. Buyer took the truck to a repair shop for a preliminary estimate of the cost to repair the damages. An estimate of $ 6,585.99 was provided on January 9, 2004. Seller claimed that Buyer had admitted wrecking the truck on a curve one night. Seller also testified that the truck appeared to have been "stripped," as it was missing the tailgate, the battery, and a mirror, in addition to its other damages, which included a cracked windshield and one whole side of the truck being smashed in.

[*9] Seller subsequently resold both vehicles, receiving $ 12,500 from a wholesaler for the Corvette and $ 8,000 for the truck. At trial, conflicting evidence was presented regarding whether Seller notified Buyer of these sales. Buyer claims he never received notice of either sale, nor did he receive an explanation of whether a deficiency or surplus remained after the sale. Seller testified that it was his policy to send a letter of notice to a customer ten days prior to a sale of the customer's repossessed vehicle. He also acknowledged his policy of providing notice of any surplus or deficiency existing upon sale. Seller claimed that he complied with these policies in dealing with Buyer. According to his testimony, he sent the appropriate letters to Buyer's home address, but the letters were returned to him. When asked about the current location of these notices, Seller stated that he had provided the originals to Buyer's former attorney, and Seller had no copies. However, upon re-examination, Seller acknowledged his inconsistent deposition testimony, in which he had stated that no notice was given to Buyer prior to the sale.

Buyer had made payments on the Corvette over the course of [*10] three and a half years totaling approximately $ 22,700.00, leaving a balance of $ 7,624.61 owing at the time of repossession according to the balance shown on his last payment receipt. Prior to the sale, Seller performed repairs on the car in the amount of $ 847.00. Seller then resold the Corvette for about $ 12,500.00 wholesale. It is undisputed that Seller retained money from the sale beyond what he was owed on the car, and Buyer never received that "surplus."

Buyer had paid on the truck for approximately eight

months and still owed approximately $ 13,380.60 at the time of its repossession according to his last receipt. In addition, Seller incurred about $ 1,500.00 in repairing the vehicle Seller received $ 8,000.00 from the sale of the truck. This left an estimated deficiency of about $ 6967.00, according to Seller's figures. However, the parties disputed whether the amount Buyer still owed should be reduced to reflect the amount of interest that was charged for the original four-year loan. Buyer argued that because the vehicle was repossessed early, he should not be required to pay the full interest charge.

Buyer first brought suit against Seller in the Metropolitan General Sessions [*11] Court of Davidson County by obtaining issuance of a civil warrant on February 24, 2004. Seller filed a counterclaim against Buyer on May 3, 2004. However, both claims were dismissed at trial on September 29, 2004. Buyer filed an appeal bond on October 5, 2004, and subsequently requested a jury trial.

Buyer filed an amended complaint in the Circuit Court for Davidson County on January 11, 2005, alleging that Seller repossessed the vehicles in violation of the sales contracts, violated the Tennessee Consumer Protection Act, and engaged in intentional and outrageous conduct entitling Buyer to punitive damages. [3] Buyer's request for relief included: compensatory damages; costs, interest, and attorney's fees; discretionary costs; punitive damages; treble damages; and statutory damages pursuant to *Tenn. Code Ann. § 47-9-625*, which provides remedies to a buyer if a secured party fails to comply with proper procedures upon a buyer's default. [4]

[3]   Although Buyer's complaint alleged that Seller "fail[ed] to act in a commercially reasonable manner as required by *T.C.A. § 47-9-607*," his counsel stated at trial that he was not raising an issue of whether the *sale* after repossession was commercially reasonable. Instead, Buyer contended that the repossession of the vehicle itself was not commercially reasonable.

[*12]

[4]   A second amended complaint was filed on January 20, 2005. The parties agreed that Buyer could amend his original amended complaint because it appears that the previous complaint misstated Seller's name in its factual allegations. Therefore, a second amended complaint was filed, amending the factual allegations but alleging the

same grounds for the complaint.

Seller's answer stated various defenses. Relevant to this appeal, he claimed that Buyer had breached the parties' contracts by failing to make payments. Additionally, Seller included a counterclaim for payment of the balance owing under the two contracts.

Buyer's answer to Seller's countercomplaint asserted that Seller was barred from recovery under the doctrine of equitable estoppel because he frequently allowed Buyer to make late payments without consequence. Also, Buyer claimed that Seller could not recover because he failed to comply with the proper procedures for repossession under Tennessee law. He also cited other defenses which are not relevant to this appeal.

At trial, which was held April 19-20, 2005, Buyer testified about [*13] the parties' transactions. In addition, he presented the testimony of another local car dealer regarding the value of the vehicles and testimony about the Corvette's condition from Buyer's girlfriend and one of Buyer's landscaping employees. The jury subsequently heard testimony from Seller, two of Seller's employees, and a local auto mechanic who repaired the Corvette after repossession. Seller moved for and was granted a directed verdict on the causes of action for outrageous conduct and punitive damages, violation of the Tennessee Consumer Protection Act, and wrongful repossession of the truck. The court found that Buyer had voluntarily surrendered the truck by basically telling Seller to go get it.

The trial court charged the jury and submitted five interrogatories to be answered, as follows, in pertinent part:

A. Statutory Damages

1. Did [Seller] notify [Buyer] by mail at his last known address that the Corvette would be sold at a certain time and place prior to the resale of the repossessed Corvette?

2. Did [Seller] notify [Buyer] by mail at his last known address that the pickN-up truck would be sold at a certain time and place prior to the resale of the [*14] repossessed truck?

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 133 of 177   PageID 141

Page 8

2006 Tenn. App. LEXIS 790, *14; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

B. Wrongful Repossession

3. Did [Seller] waive the right to repossess the Corvette for late payment? (If you answered "Yes" to this Question, please proceed to Question 4.)

4. What was the fair market value of the Corvette in January 2004?

C. Counterclaim for Deficiency

5. The defendant-counterclaimant is entitled to recover the deficiency owed on the pickup truck. You are to determine that amount by determining the amount still owed at the time of repossession plus the cost of repossession, plus the cost of repair, less the amount for which it was sold.

The jury found that Seller had not provided notice to Buyer before the sale of either vehicle. The jury also concluded that Seller had waived the right to repossess the Corvette for late payment. The jury determined that the fair market value of the Corvette at the time of repossession was $ 17,500, and the deficiency on the pick-up truck was valued at $ 6,328.14.

On May 6, 2005, the trial court entered an order based on the jury's factual findings. Buyer was awarded $ 7,777 statutory damages for Seller's failure to provide proper notice of the sale of the Corvette and $ 4,385 [*15] statutory damages for Seller's failure to provide proper notice of the sale of the truck. These statutory damages were calculated pursuant to *Tenn. Code Ann. § 47-9-625(c)(2)* for "consumer goods" collateral. In addition, Buyer was awarded $ 9,875.39 for the "surplus" existing after the sale of the Corvette. The court took the jury's deficiency figure of $ 6,328.14 that Buyer still owed on the truck and subtracted a $ 4,500 "surplus" that Seller had received from the sale of the Corvette beyond the amount Buyer still owed. This left an award of $ 1,828.14 to Seller, which was offset against the awards to Buyer. The award totaled $ 20,209.25 to be paid by Seller, plus court costs.

On June 3, 2005, Seller filed a motion to alter or amend the judgment, or in the alternative, to grant a new trial. Relevant to this appeal, Seller contended that the issue of waiver of the right to repossess should not have

been submitted to the jury because the contract specifically provided that Seller could waive any default without impairing his right to declare a subsequent default. He also challenged the jury's determination of the Corvette's fair market value, which was [*16] used to determine the damage award for wrongful repossession, and he challenged the jury's calculation of the deficiency remaining on the truck.

In addition, Seller argued that the weight of the evidence did not support the jury's finding that he had failed to provide notice prior to the sale of the vehicles, and therefore, no statutory damages were appropriate. Alternatively, Seller challenged the court's award and calculation of statutory damages. The court had calculated those damages according to the statute's provision for "consumer goods" transactions. Buyer had testified that both the car and the truck were used in his landscaping business. Seller also claimed that the present "consumer-goods" calculation of damages had been improperly determined with regard to the amount of the credit service charge to be included. He finally claimed that the weight of the evidence did not support the total award of $ 20,209.25.

Buyer subsequently filed a motion to alter or amend, requesting attorney's fees pursuant to the Tennessee Consumer Protection Act and prejudgment interest. He also moved for discretionary costs pursuant to Tenn. R. Civ. P. 54.

On July 25, 2005, the trial court entered [*17] an order on the parties' post-trial motions. Seller's motion for a new trial was denied, and his motion to alter or amend the judgment was denied in part and granted in part. The court withdrew the $ 4,385 statutory damages for consumer collateral in regard to the truck, which reduced the total judgment against Seller to $ 15,824.25. Buyer's motion requesting attorney's fees pursuant to the Tennessee Consumer Protection Act was denied, but his motion for discretionary costs was granted. Seller was ordered to pay $ 1200 discretionary costs to Buyer. Seller timely filed his appeal to this Court on August 22, 2005.

II. ISSUES PRESENTED

Appellant presents the following issues, as we perceive them, for review:

1. Whether the trial court erred in ruling that a factual issue existed as to whether

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 134 of 177   PageID 142

Page 9

2006 Tenn. App. LEXIS 790, *17; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

Seller could waive the right to repossess the Corvette for late payment, where the contract specifically said no rights were waived;

2. Whether there is any material evidence to support the jury's finding that Seller did not give notice of the sales;

3. Whether the transaction involving the 1995 Chevrolet Corvette was a commercial transaction;

4. Whether the trial court erred in [*18] granting statutory damages based on the entire finance charge to be paid, where the proper measure is the amount of finance charge which had been paid;

5. Whether the damage for wrongful repossession of the Corvette was the difference between the sale price, $ 12,500, and the balance owed, $ 7,624;

6. Whether the deficiency on the truck was $ 6,967.38 rather than $ 6,328.14 as determined by the jury.

Additionally, Appellee presents the following issue for review:

7. Whether the trial court properly directed a verdict on Buyer's Tennessee Consumer Protection Act claim.

For the following reasons, the decision of the circuit court is affirmed as modified.

### III. STANDARD OF REVIEW

[HN1] This Court will set aside a jury's findings of fact only if there is no material evidence to support the verdict. *Tenn. R. App. P. 13(d).* "When addressing whether there is material evidence to support a verdict, an appellate court shall: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] [*19] evidence." *Whaley v. Perkins, 197 S.W.3d 665, 671 (Tenn. 2006)* (citing *Crabtree Masonry Co., Inc. v. C & R Constr., Inc., 575 S.W.2d 4, 5 (Tenn. 1978); Black v. Quinn, 646*

*S.W.2d 437, 439-40 (Tenn. Ct. App. 1982)).* Appellate courts do not reweigh the evidence, nor do we decide where the preponderance of the evidence lies. *Crabtree, 575 S.W.2d at 5.* If there is any material evidence to support the verdict, it must be affirmed, or else the parties would be deprived of their constitutional right to a trial by jury. *Id.*

[HN2] We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness for the trial court's conclusions. *Union Carbide Corp. v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993)* (citing *Estate of Adkins v. White Consol. Indus., Inc., 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).*

### IV. DISCUSSION

#### A. Wrongful Repossession

According to Seller, the trial court erred in denying his motion for a directed verdict on the issue of wrongful repossession of the Corvette. Seller contends that no factual [*20] issue existed regarding his right to repossess upon late payment, and, therefore, the trial court erred in allowing the jury to determine whether Seller had waived his right to repossess. The parties' contract stated that "Seller may waive any default before or after the same has been declared without impairing his right to declare a subsequent default . . . ."

[HN3] In ruling on a motion for directed verdict, "the court must take the strongest legitimate view of the evidence in favor of the non-moving party." *Conatser v. Clarksville Coca-Cola Bottling Co., 920 S.W.2d 646, 647 (Tenn. 1995).* "In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence." *Id.* A motion for directed verdict should be granted only if, after assessing the evidence according to the foregoing standards, the court determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. *Id.* (citing *Eaton v. McLain, 891 S.W.2d 587, 590 (Tenn.1994)).*

On review of a trial court's ruling on a motion for directed verdict, [*21] an appellate court does not reweigh the evidence. *Conatser, 920 S.W.2d at 647,* (citing *Williams v. Brown, 860 S.W.2d 854, 857 (Tenn.1993)).* Instead, we also must "take the strongest legitimate view of the evidence in favor of the

[non-movant], indulging in all reasonable inferences in his favor, and disregarding any evidence to the contrary." *Id.* The motion should have been granted only if there is no material evidence in the record that would support a verdict under the theories that were advanced. *Id.*

The issue then, for this Court, is whether the record contains any material evidence supporting Buyer's cause of action for wrongful repossession. It is undisputed that Seller did accept Buyer's late payments and did not charge late fees to Buyer's account for the first three years of the contract. Buyer was current on his monthly payments through the end of 2003, but he had not paid any late fees. He also did not maintain insurance on the car, but Seller had never before declared him in default on this basis. When Buyer called Seller on January 1, 2004, to inform Seller that he would not be able to make his January payment [*22] on time, Seller repossessed the vehicle. Buyer claims that Seller had waived his right to repossess the vehicle for late payments by establishing a course of accepting his payments late. Seller argues that the contract does not allow such a waiver of the right to repossess for late payments.

The Tennessee Supreme Court has addressed the waiver issue in a case involving a real estate foreclosure. *Lively v. Drake, 629 S.W.2d 900 (Tenn. 1982).* In *Lively,* the Court affirmed a trial court's decision to enjoin a mortgagee from foreclosing on a deed of trust. *Id. at 904.* The mortgagee had accepted irregular payments over a period of two years, and the mortgagors had become five months behind in scheduled payments. *Id. at 903.* The mortgagee finally decided to accelerate the maturity of the note and to commence foreclosure. *Id.* However, he did not communicate with the mortgagors prior to declaring a default. *Id. at 902.* The Court noted [HN4] it was settled law in Tennessee that "as a result of a course of dealing between parties, the holder of an indebtedness may be deemed to have waived the [*23] right to accelerate without giving prior notice to the debtor of his intention to do so." [5] *Id. at 903.* The Court then concluded that:

> the course of dealing between the parties over a period of almost two years was such that appellants had been led to believe that irregular payments would be accepted without acceleration. Under those circumstances appellee should not be permitted to foreclose on the note

without first calling attention of appellants to the fact that he was insisting upon the original terms, and that no further irregular payments would be accepted.

*Id. at 904.* Although *Lively* involved a real estate foreclosure, the Court's reasoning has also been applied in wrongful repossession cases. *See Crowe v. First Am. Nat'l Bank,* No. W2001-00800-COA-R3-CV, 2001 Tenn. App. LEXIS 950, at *10 (Tenn. Ct. App. W.S. Dec. 10, 2001). [HN5] A secured party may also be deemed to have waived its right to insist on prompt payment if it has established a course of accepting late payments. Robert M. Lloyd, *Wrongful Repossession in Tennessee,* 65 Tenn. L. Rev. 761, 764 (1998).

> 5   When a secured party has accepted payments late, but then wishes to declare a default upon further late payments, he may send the debtor a "strict compliance" letter to demand compliance with the original terms of the agreement. Robert M. Lloyd, *Wrongful Repossession in Tennessee, 65 Tenn. L. Rev. 761, 765 (1998).* This informs the debtor that even though late payments may have been accepted on previous occasions, the secured party will proceed to repossess the collateral if further payments are untimely. *Id.* The secured party's waiver of the original terms is thereby retracted. *Id.* In this case, no such letter was sent to Buyer to demand strict compliance with the monthly deadline.

[*24]  In order for *Lively*'s "waiver" reasoning to apply to these facts, an accepted course of conduct or dealing must have been established by the parties, and also, the debtor must have relied on that course of conduct in his further dealings. *Jerles v. Phillips,* No. M2005-1494-COA-R3-CV, 2006 Tenn. App. LEXIS 558, at *12 (Tenn. Ct. App. W.S. at Nashville Aug. 22, 2006); *Dacus v. Weaver,* Shelby Equity No. 29, 1988 Tenn. App. LEXIS 867, 1988 WL 138918 at *2 (Tenn. Ct. App. W.S. Dec. 28, 1988). In this case, there is material evidence in the record to support a finding that the parties had established a course of dealing in which late payments were routinely accepted. Regarding the debtor's reliance, we have previously refused to apply *Lively* in situations in which a debtor stops making payments altogether, as opposed to making irregular payments. *See Jerles, 2006 Tenn. App. LEXIS 558, at *12 ; Dacus, 1988 Tenn. App. LEXIS 867, 1988 WL 138918 at *2.* In other words, "it

2006 Tenn. App. LEXIS 790, *24; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

cannot reasonably be said that [a debtor] relied on [a creditor's] acceptance of late payments when making no payment at all." *Dacus, 1988 Tenn. App. LEXIS 867, 1988 WL 138918 at *2.* In this case, however, Buyer had not stopped making payments [*25] altogether. In fact, he was current on his payments up through the previous month. He merely called on the day his next payment was due to say he would be late. This is a case of "irregular payment," like *Lively*, rather than a case of "nonpayment." There is ample evidence in the record to support a finding that Buyer was relying on Seller's pattern of accepting his payments late. Therefore, the evidence supports a finding that Seller had waived his right to repossess for late payments.

Seller contends that, despite the fact that he had accepted Buyer's irregular payments, the clause in their contract providing that he could still declare a subsequent default controls, and he could still proceed to repossess the vehicle upon further late payment. Secured parties often include "antiwaiver" or "non-waiver" clauses in their original agreements, stating that the failure of the secured party to exercise its remedies on one default will not waive the right to exercise rights on subsequent defaults. *Lloyd, supra, at 767.* The contract in the case at bar included this type of "non-waiver" clause. (Exhibit 1). Courts in other jurisdictions have refused to give effect to these clauses, [*26] finding that the secured party's conduct created an estoppel, or the secured party waived the non-waiver clause, or that non-waiver clauses are invalid and against public policy. *Id.* (mentioning *In re Bagley, 6 B.R. 387, 390 (Bankr. N.D. Ga. 1980); Montgomery Enter., Inc. v. Atlantic Nat'l Bank, 338 So. 2d. 1078, 1081 (Fla. Dist. Ct. App. 1976); Pierce v. Leasing Int'l, Inc., 142 Ga. App. 371, 235 S.E.2d 752, 754 (Ga. Ct. App. 1972); Cobb v. Midwest Recovery Bureau Co., 295 N.W.2d 232, 237 (Minn. 1980); Westinghouse Credit Corp. v. Shelton, 645 F.2d 869, 874 (10th Cir. (Okla.) 1981); Smith v. General Fin. Corp., 243 Ga. 500, 255 S.E.2d 14, 15 (Ga. 1979); Battista v. Savings Bank, 67 Md. App. 257, 507 A.2d 203 (Md. Ct. Spec. App. 1986)).* Tennessee has a statute addressing these clauses, which states:

(c) If any such security agreement, note, deed of trust, or other contract contains a provision to the effect that no waiver of any terms or provisions thereof shall be valid *unless such waiver is in writing,* no court shall give effect to any such waiver

[*27] *unless it is in writing.*

*Tenn. Code Ann. § 47-50-112 (2001) (emphasis added).* However, the statute does not address the effect of general non-waiver clauses which completely prohibit any type of waiver.

There is no indication in *Lively* of whether the contract at issue contained a non-waiver clause. *629 S.W.2d 900, 901-904.* However, we have previously found that a bank waived its right to repossess for late payment even though a non-waiver clause was included in the parties' contract. In *Crowe v. First Am. Nat'l Bank,* No. W2001-00800-COA-R3-CV, 2001 Tenn. App. LEXIS 950, at *10 (Tenn. Ct. App. W.S. Dec. 10, 2001), a case analogous to the one before us, the parties' contract provided that:

The Creditor can delay or refrain from enforcing any of its rights under this contract without losing them. For example, the Creditor can extend the time for making some payments without extending others. Any change in terms of this contract must be in writing and signed by the Creditor.

2001 Tenn. App. LEXIS 950, at *4 . The course of dealing between the parties during a period of over three years was such that the debtor had been led to believe [*28] that the bank would accept late payments without considering him in default. 2001 Tenn. App. LEXIS 950, at*10. The bank had never refused the debtor's late payments before, and it had not notified the debtor that future late payments would not be accepted. *Id.* Also, debtor had never properly insured the truck as required by their contract, but the bank had never placed him in default. *Id.* When the debtor was late on another payment, the bank proceeded to repossess his truck. *Id.* The creditor moved for a directed verdict on the issue of wrongful repossession, but we concluded that the trial court had correctly overruled the motion. *Id.* The bank had waived its right to declare a default for late payments, and it had not taken any action to retract its waiver.

In his brief, Seller cites two cases in which the Tennessee Court of Appeals had determined there was no waiver of creditors' rights to declare a default. *Spectra Plastics, Inc. v. Nashoba Bank, 15 S.W.3d 832, 842*

2006 Tenn. App. LEXIS 790, *28; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

*(Tenn. Ct. App. 1999); Vantage Fin. Corp. v. McNiel, No. M2002-00047-COA-R3-CV, 2003 Tenn. App. LEXIS 2, at *5 (Tenn. Ct. App. M.S. Jan. 7, 2003).* However, we find the two cases [*29] are distinguishable to the case at bar. In *Spectra,* the court refused to find a waiver of contract rights when the contract specifically provided that its terms could not be modified except in writing. *15 S.W.3d at 842.* The court reasoned that the "no oral modification" clause should be enforced according to *Tenn. Code Ann. § 47-50-112(c) (2001),* which we have previously discussed. *Id.* The contract at issue in this case does not contain a "no oral modification" clause. (Exhibit 1). It contains a general non-waiver clause which is not addressed by *Tenn. Code Ann. § 47-50-112(c) (2001).*

In the other case Seller mentions, *Vantage,* the debtor had not made any payments for over a year. *2003 Tenn. App. LEXIS 2, at *6* . His promissory note was assigned to another creditor, who made a demand for payment. *Id.* The debtor still did not pay. *Id.* The court stated that a course of conduct of accepting late payments "does not excuse [the debtor's] failure to make *any* payments . . . when [the creditor] made demand for payment." *2003 Tenn. App. LEXIS 2, at *6* (emphasis added). The court's reasoning was similar to that [*30] employed in *Jerles, 2006 Tenn. App. LEXIS 558, at *12* , and *Dacus, 1988 Tenn. App. LEXIS 867, 1988 WL 138918. at *2.* Although a pattern of accepting late payments may prevent the creditor from immediately repossessing a vehicle upon a further late payment, the pattern of paying late does not justify a debtor's complete refusal to make any payment. In this case, Buyer did not refuse to pay altogether, and Seller made no demand for payment. Seller repossessed the Corvette when Buyer called to say he would be late. Therefore, this case is not analogous to either of the cases cited by Seller.

In sum, we find sufficient material evidence in the record to support Buyer's claim for wrongful repossession of the Corvette. The evidence supports a finding that Seller had waived his right to insist on prompt payment, Buyer had relied on that course of conduct, and Seller took no action to retract his waiver of the original terms. At the very least, reasonable minds could differ as to whether Seller waived his right to repossess for late payments. Therefore, the trial court properly denied his motion for a directed verdict.

### B. Notice prior to Sales

[HN6] A secured party that disposes of collateral

must [*31] send a reasonable authenticated notification of disposition to the debtor. *Tenn. Code Ann. § 47-9-611(b)* (2001). The timeliness, content, and form of the notice are addressed by *Tenn. Code Ann. § 47-9-612 - 613* (2001). The provision for notice prior to a sale is intended to afford the debtor a reasonable opportunity to avoid the sale altogether by redeeming the collateral, or in case of sale, to see that the collateral brings a fair price. *R & J of Tenn., Inc. v. Blankenship-Melton Real Estate, Inc., 166 S.W.3d 195, 203 (Tenn. Ct. App. 2004).* On appeal, Seller asserts that there is no material evidence to support the jury's finding that Seller did not give notice of the sales. Seller testified that it was his policy to send a notice letter to a customer ten days prior to the sale of their repossessed vehicle. He claimed that he sent the appropriate letters to Buyer, but the letters were returned because Buyer would not accept his mail. [6] He did not produce copies of any such letters because he allegedly sent the originals to Buyer's former attorney.

> 6   When addressing this issue in his brief, Seller also refers to the testimony of one of his employees, who stated that he had called Buyer on numerous occasions to inform him of late fees he had incurred. Seller also states that he personally told Buyer to make payments on time or else he would be charged late fees. However, this evidence does not appear to be relevant to the issue of whether Seller provided the required notice *following repossession before disposition of the collateral* in accordance with *Tenn. Code Ann. § 47-9-611-613.*

[*32] Buyer claimed he never received notice of either sale. Upon re-examination of Seller, Buyer's counsel introduced deposition testimony in which Seller admitted he had never provided notice of the sales to Buyer. Seller then explained that he was told not to contact Buyer directly, but only to communicate through their attorneys. He stated that a notice letter was sent to Buyer's attorney, and it was refused by both the attorney and Buyer. Still, no copy of any notice letter was produced.

Given the testimony in the case at bar, material evidence existed to support the jury's finding that Seller did not send the required notices. [HN7] Reconciling conflicting testimony between the parties and evaluating witnesses' credibility are responsibilities for the jury. *Sasser v. Averitt Exp., Inc., 839 S.W.2d 422, 427 (Tenn.*

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 138 of 177   PageID 146

Page 13

2006 Tenn. App. LEXIS 790, *32; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

*Ct. App. 1992).* This Court does not have the same opportunity to observe witnesses, and we will not reevaluate their credibility. *Id.* Rather, we accord great weight to the jury's verdict. *Id.* Buyer's testimony, along with the inconsistent testimony of Seller, constituted sufficient evidentiary support for the jury's conclusion that no [*33] notices were sent.

### C. Damages

#### 1. Consumer or Commercial Transaction

[HN8] When a secured party fails to comply with the statutory notice requirements, the debtor may recover damages for its loss. *Tenn. Code Ann. § 47-9-625* (2001). However, if the collateral is "consumer goods," the debtor is entitled to recover a minimum statutory penalty without regard to his actual loss or his ability to prove that he has been damaged at all. *Davenport v. Chrysler Credit Corp., 818 S.W.2d 23, 31 (Tenn. Ct. App. 1991).* The consumer debtor may recover an amount not less than 10% of the cash price plus the time-price differential. [7] *Tenn. Code Ann. § 47-9-625(c)(2).*

7    *Tenn. Code Ann. § 47-9-625(c)(2)* (2001) actually reads:

> if the collateral is consumer goods, a person that was a debtor or a secondary obligor at the time a secured party failed to comply with this part may recover for that failure in any event an amount not less than the credit service charge plus ten percent (10%) of the principal amount of the obligation or the time-price differential plus ten percent (10%) of the cash price.

The section does not define the terms "credit service charge," "time-price differential," and "cash price." According to the comments following the text, the construction and application of the terms are left to the court. *Tenn. Code Ann. § 47-9-625* official comment 4. However, "[c]ase law and scholarly commentary reveal that [HN9] application depends on whether the debtor received credit from the seller or a third-party financer." Timothy R. Zinnecker, *The Default Provisions of Revised Article 9 of the*

*Uniform Commercial Code: Part II, 54 Bus. Law. 1737, 1804 (1999).* If the seller himself extended credit to the buyer, as in this case, then we use the formula including the time-price differential plus ten percent of the cash price. *Id.* "Time-price differential" is defined by Black's Law Dictionary as: "[a] figure representing the difference between the current cash price of an item and the total cost of purchasing it on credit." *Black's Law Dictionary* (8th ed. 2004).

[*34] The trial court awarded statutory damages to Buyer for Seller's failure to notify him of the sales pursuant to *Tenn. Code Ann. § 47-9-625(c)(2)* (2001) for "consumer goods" collateral . (Vol.I, p.84). Initially, the award included $ 7,777 regarding the sale of the Corvette and $ 4,385 regarding the truck. On Seller's motion to alter or amend, the trial court withdrew the award for the truck, apparently concluding that it was not a "consumer goods" transaction. The court did not alter the $ 7,777 statutory damage award regarding the Corvette.

On appeal, Seller argues that the trial court erred in calculating damages for a "consumer goods" transaction because Buyer himself testified that he used the Corvette in his landscaping business. As previously discussed, the trial court submitted to the jury the issue of whether notice was properly given. However, the court did not submit an interrogatory asking whether the transaction was consumer or commercial in nature. Although the parties did not challenge the manner in which the trial court proceeded on this issue, we must address it in order to ascertain the correct standard of our review. In secured transactions [*35] cases, there has been a divergence of opinion as to whether the classification of collateral is a question of law or a question of fact. *See McFarland v. Brier, 850 A.2d 965, 976 (R.I. 2004); First Nat'l Bank in Grand Prairie v. Lone Star Life Ins. Co., 524 S.W.2d 525, 533 (Tex. Civ. App. 1975); Matter of Newman, 993 F.2d 90, 93 (5th Cir. (Tex.) 1993)* ("Classification of collateral under the UCC is a question of law"). *But see Morgan County Feeders, Inc. v. McCormick, 836 P.2d 1051, 1053 (Colo. App. 1992); Zeagler v. Custom Auto, Inc., 880 F.2d 1284, 1286 (11th Cir. (Ala.) 1989)* (concluding that in borderline cases involving whether good is "consumer good," determination is best made by trier of fact). Although there appear to be no reported cases from Tennessee courts addressing this issue, and the parties have not cited any, the "Tennessee Pattern Jury Instructions" provide some guidance. The Pattern

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 139 of 177   PageID 147

Page 14

2006 Tenn. App. LEXIS 790, *35; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

Jury Instruction regarding "Wrongful Sale After Repossession" sets out the two alternative damage calculations for commercial and consumer transactions. 8 Tenn. Practice: [*36] *Tenn. Pattern Jury Instructions - Civil § 14.71* (6th ed. 2006). The Instruction is followed by a "Use Note," which provides: [HN10] "[t]he determination of whether the secured property is equipment or consumer goods is a question of law and the trial judge will select" which calculation is applicable. *Id.* In this case, the trial judge's actions were in accordance with the Pattern Jury Instructions. Although we recognize that the Pattern Jury Instructions are meant to be an aid and are not mandatory authority, *See Cortazzo v. Blackburn 912 S.W.2d 735, 740 (Tenn. Ct. App. 1995)*, we find that the trial judge proceeded properly in treating the issue as a question of law and selecting which damage calculation applied to this collateral.

We will next consider the trial judge's conclusion that the Corvette transaction involved "consumer goods." If the Corvette is considered "consumer goods," Buyer is entitled to the sizeable statutory penalty. As previously noted, we review a trial court's conclusions of law under a de novo standard upon the record with no presumption of correctness for the trial court's conclusions. *Union Carbide Corp. v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993)* [*37] (citation omitted).

[HN11] In secured transactions, collateral is defined by its type of primary use in the hands of the debtor. *Walker v. Assoc. Commercial Corp., 673 S.W.2d 517, 522 (Tenn. Ct. App. 1983)*. "Consumer goods" are defined as "goods that are used or bought for use primarily for personal, family, or household purposes." *Tenn. Code Ann. § 47-9-102(a)(23)* (2001). "Of course, broadly speaking, every buyer is a 'consumer.'" *Int'l Harvester Credit Corp. v. Hill, 496 F. Supp. 329, 333-34 (M.D.Tenn. 1979)*. However, the fact that an item is personally used does not mean it was for "personal use." *Id. at 334*.

At trial, various witnesses gave lengthy testimony about the value of the Corvette and its condition. However, the testimony as to Buyer's *use* of the Corvette was fairly limited. The following exchange took place between Buyer and his counsel:

Q. Just tell me what you did with the Corvette once you purchased the Corvette.

A. I bought it and used it in my landscaping business.

Q. Okay. What - explain that to us.

A. Well, of course, I didn't haul dirt in it, it was a Corvette. [*38] I went and looked at jobs in it, went and collected money in it, and went and done proposals in it, things like that.

Buyer also stated that one of his landscaping employees was paid to keep the car clean. In addition, when questioned about his failure to insure the vehicles as required by the contract, Buyer stated that he had attempted to have the Corvette and the dually put on one commercial insurance policy. He also provided documentation to Seller of his application for a commercial insurance policy. For some time, Seller was under the impression that the commercial policy covered the vehicles.

Buyer now contends that his testimony, along with that of his witnesses, demonstrates that the Corvette was a collector's item, and thus, inherently for personal use. He refers to his testimony that he kept the Corvette in excellent condition and had it cleaned on a regular basis. He also notes that he referred to the car as his "baby" and said he loved the car. Also, he testified that he kept the car in a garage and did not drive it in the rain. According to Buyer, this is "conclusive proof" that the vehicle was purchased for personal use. We disagree.

In searching the extensive [*39] transcript of the testimony in this case, we are unable to locate a single reference to an occasion of Buyer driving the car for personal or family use. To the contrary, all of Buyer's testimony relates to his use of the car in his business. [HN12] When a debtor would benefit if the collateral constituted "consumer goods," the debtor has the burden of proving the nature of the collateral. 10 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 9-507:77 (3rd ed. 1999) (citing *Wilmington Trust Co. v. Conner, 415 A.2d 773, 781 (Del. 1980)*; *Bundrick v. First Nat'l Bank, 570 S.W.2d 12, (Tex. Civ. App. 1978))*. In borderline cases of classifying collateral, the principal use of the property is determinative. *In re Frazier, 16 B.R. 674, 680 (Bankr.M.D.Tenn. 1981)*. Buyer simply did not produce any evidence that the vehicle was "used or bought for use primarily for personal, family, or household purposes." *Tenn. Code Ann. § 47-9-102(a)(23)*

2006 Tenn. App. LEXIS 790, *39; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

(2001).

Buyer, on appeal, cites two cases in support of his argument that the Corvette was a "consumer good." First, he notes that just because a vehicle is used for [*40] a particular purpose does not necessarily place the vehicle in that particular category, and he cites *Int'l Harvester Credit Corp. v. Hill, 496 F. Supp. 329, 333-34 (M.D.Tenn. 1979)*. We agree with Buyer's statement. We must consider the "primary use" of the collateral in the hands of the debtor. *Walker, 673 S.W.2d at 522*. In *Int'l Harvester*, the collateral at issue was a tractor. *496 F. Supp. at 333*. The court classified it as equipment, stating that just because an item is personally used does not mean it was for "personal use" under the statute. *Id. at 334*. The court also said, "[i]t is the actual use to which the equipment is put and not the occupational status of the owner which is determinative." *Id. at 333*. In this case, just because Buyer is a landscaper does not mean he could not use the Corvette for commercial purposes. Buyer himself acknowledged the peculiarity of his using the Corvette in his landscaping business. He explained, "of course, I didn't haul dirt in it, it was a Corvette. I went and looked at jobs in it, went and collected money in it, and went [*41] and done proposals in it, things like that." He hauled dirt and materials in the dually. His testimony demonstrates that he had a need for another vehicle in which he could easily travel to potential job sites and interact with customers, and he used the Corvette for those purposes.

Buyer also discusses *Mallicoat v. Volunteer Fin. & Loan Corp., 57 Tenn. App. 106, 415 S.W.2d 347 (Tenn. Ct. App. 1966)*, in which the court briefly discussed the classification of collateral. The court stated:

> There is no proof that [the buyer] was in a business requiring the use of an automobile. He testified he bought it to use in going to and from his place of employment. It is clearly not 'equipment', 'farm products' or 'inventory' as defined by *T.C.A. § 47-9-109*. We, therefore, hold that it falls within the category of 'consumer goods' as defined by the same Section of the Act.

*Id. at 349-50*. Buyer now asserts that he used the Corvette in precisely the same way - to travel to and from his employment. He argues that he was not in a business

to need a Corvette. However, as we have already discussed, Buyer's testimony revealed [*42] that he used the Corvette for various commercial reasons. In our opinion, Buyer's occupation would qualify as a business requiring the use of an automobile. He did not merely drive to and from an office everyday with no occasion to use the car for business reasons. Although he may not have needed a Corvette, specifically, he needed some type of vehicle and chose to purchase a Corvette. If Buyer had used another truck or a less expensive car and testified that he used it for these same commercial purposes, the vehicle would clearly not be classified as a consumer good. We will not accept Buyer's argument on appeal that the Corvette is "inherently" a collector's item, and therefore for personal use, when the evidence he presented at trial does not support that conclusion.

In sum, we conclude that the evidence presented in this case does not support a finding that the Corvette was purchased in a "consumer goods" transaction. Therefore, the statutory penalty available in consumer transactions was awarded in error. We vacate the trial court's award of $ 7,777 to Buyer regarding the Corvette. We find it unnecessary to address the issue Seller presented regarding the trial court's alleged [*43] error in calculating the award.

## 2. Surplus Following Sale of the Corvette

The trial judge awarded damages to Buyer for Seller's wrongful repossession of the Corvette. The damage award allowed Buyer to recover his equity in the collateral. The judge calculated the award as the reasonable value of the collateral at the time of the wrongful repossession less the amount of debt owed on the car ($ 17,500 value - $ 7,624.61 owed = $ 9,875.39 surplus). The jury had determined the fair market value of the Corvette was $ 17,500. Seller argues on appeal that the jury's determination of the value of the car was not supported by the evidence. The judge determined the amount owed from the balance shown on Buyer's last payment receipt. [8] He then calculated the surplus of $ 9,875.39 and awarded that amount to Buyer.

> 8   As previously discussed, the parties disputed whether the receipts displayed the true amount owed on the vehicles because the figures included the entire interest charge. However, on appeal, neither party challenged the trial court's use of this figure in his calculation of the surplus for the car.

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 141 of 177   PageID 149

Page 16

2006 Tenn. App. LEXIS 790, *43; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

[*44] However, the judge also reduced Seller's deficiency award by offsetting it with a $ 4,500 "surplus." Although the final order does not explain the court's calculations, the judge discussed the damage awards after the jury returned its answers to the interrogatories. The court stated, "[o]n the counterclaim, I award [Seller] $ 6,328.14, *but I set off $ 4,500 to that, which is a surplus on the Corvette,* whatever that figure is. [W]hich is only going to be around, off the top of my head, $ 1,800" awarded to Seller. (Emphasis added). So, in sum, the court awarded Buyer a $ 9,875.39 surplus in addition to the $ 4,500 surplus it credited against Seller's deficiency award. It appears that the $ 4,500 surplus figure came from Seller's testimony that, after the sale of the Corvette, he had retained approximately $ 4,500 "surplus" beyond what he was owed ($ 12,500 sale price - approx. $ 7,900 owed = approx. $ 4500).

First, we address Seller's argument that the jury's valuation of the Corvette's fair market value was not supported by the testimony at trial. Seller had contended that the fair market value equaled the wholesale price he received, $ 12,500.

As previously noted, this [*45] Court will set aside a jury's findings of fact only if there is no material evidence to support the verdict. *Tenn. R. App. P. 13(d).* We will take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all that tends to support it, allow all reasonable inferences to sustain the verdict, and discard all to the contrary. *Crabtree, 575 S.W.2d at 5.* We will not reweigh the evidence, nor will we decide where the preponderance of the evidence lies. *Id.*

Having examined the record, we conclude that the jury's determination of the car's fair market value is supported by material evidence. At trial, a local car salesman testified that, in his opinion, the Corvette was worth around $ 16,000 to $ 18,000 at the time of repossession. He stated that he had been in the car business for approximately twenty years, he regularly saw Corvettes sold at auction, and he saw the Corvette at issue after it was repossessed. Although Seller claimed that the Corvette was in poor condition when repossessed, Buyer and his girlfriend testified that it was in excellent condition. Buyer also stated his own opinion that the Corvette was valued [*46] between $ 16,000 and $ 18,000. This evidence, if believed by the jury, would support a finding that the Corvette's fair market value was

$ 17,500 at the time of repossession. Therefore, the trial judge properly included this figure in his damage calculation.

Next, we will address the proper formula for calculating damages for wrongful repossession. [9] Seller claims in his brief that the correct measure of damages is the difference between the "sale price" and the balance still owed on the car ($ 12,500 sale price - $ 7,624.61 amount owed = $ 4,875.39 surplus). [10] It is not clear from Seller's argument whether he is again stating that the $ 12,500 sales price should have established the fair market value of the vehicle, or whether he claims that a different formula should have been used in calculating damages. We find it necessary to address the proper measure of damages because of the various calculations used by the parties and the trial court. Again, we note that the trial court's conclusions of law are reviewed *de novo* with no presumption of correctness. *Union Carbide Corp., 854 S.W.2d at 91.*

[9]   It is important to note that Buyer did not challenge the commercial reasonableness of the *sale* following repossession. When a sale following repossession is determined to be commercially unreasonable, the proper measure of damages is "the excess of the fair market value at the time of repossession over *the greater of* the disposition sale price of the collateral *or* the indebtedness due on the collateral." *Walker v. Assoc. Commercial Corp., 673 S.W.2d 517, 523 (Tenn. Ct. App. 1983)* (emphasis added); *See also* 8 Tenn. Practice: *Tenn. Pattern Jury Instructions - Civil § 14.71* comment (6th ed. 2006) (stating that the above mentioned measure of damages applies when the secured party fails to conduct a commercially reasonable sale, regardless of whether the repossession itself was wrongful).

[*47]

[10]   Seller also states in his brief that the trial court had calculated damages of $ 5,000 by subtracting the sale price from the fair market value ($ 17,500 value - $ 12,500 sale price = $ 5000 surplus). This appears to be a misstatement of the facts as we can find no such award in the record, and Seller does not cite to the record when mentioning the award. As previously noted, the court actually calculated the surplus damage award by subtracting the amount owed from the value of the car ($ 17,500 value - $ 7,624.61 owed

2006 Tenn. App. LEXIS 790, *47; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

= $ 9,875.39 surplus). The judge also credited a "surplus" to Buyer by subtracting the amount owed from the actual sales price, ($ 12,500 sale price - approx. $ 7,900 owed = approx. $ 4500). Neither of these calculations corresponds to the formula Seller claims the court used.

[HN13] A creditor who wrongfully repossesses property may be held liable for conversion damages. *See Harris Truck & Trailer Sales v. Foote, 58 Tenn. App. 710, 719, 436 S.W.2d 460, 464 (Tenn. Ct. App.1968); 68A Am. Jur. 2d Secured Transactions § 583* [*48] (2d ed. 2006); Robert M. Lloyd, *Wrongful Repossession in Tennessee, 65 Tenn. L. Rev. 761, 789 (1998).* When the converter is a secured party, the measure of damages is the value of the vehicle at the time of the wrongful repossession, less the amount owing thereon. *Harris, 58 Tenn. App. at 719, 436 S.W.2d at 464; Lloyd, supra, at 790.* This method of calculation gives Buyer the benefit of receiving the fair market value of the car rather than the price Seller received from selling it wholesale. Before trial, the judge acknowledged that this measure of damages was applicable to this case. The first surplus award to Buyer was calculated using this formula ($ 17,500 value - $ 7,624.61 owed = $ 9,875.39 surplus). We conclude that this was the proper measure of damages to be awarded to Buyer for wrongful repossession. However, the $ 4,500 "surplus" should not have been additionally credited on Buyer's behalf. In effect, Buyer was awarded damages based on what Seller *did* receive from the sale beyond what he was owed and also what Seller *could have* received from the sale beyond what he was owed. The only "surplus" that should have been awarded [*49] to Buyer was the $ 9,875.39 based on the value of the vehicle at the time of repossession, less the amount owing thereon. This award properly compensated Buyer for his equity in the car at the time of the wrongful repossession.

### 3. Deficiency Following Sale of the Dually

Seller also challenges the jury's valuation of the deficiency remaining on the truck. The jury was asked to determine the deficiency as: the amount still owed at the time of repossession, plus the cost of repossession, plus the cost of repairs, less the amount for which the truck was sold. The jury returned the interrogatory with a figure of $ 6,328.14 with no explanation of its calculations. Seller argues that the jury's figure is not supported by the weight of the evidence and the correct

amount should be $ 6,967.38.

Buyer explains the jury's lower figure as taking into account the parties' dispute as to the amount Buyer still owed at the time of repossession. According to Buyer, the jury could have agreed that the amount he owed was less than Seller had claimed. When Buyer made his last payment on the dually, his payment receipt showed a remaining balance of $ 13,380.60 on the loan. At trial, Seller testified [*50] that the "payoff" amount owed should equal the balance shown on that receipt. Buyer, on the other hand, claimed that the payoff amount should be lower than what was shown on the receipts because the vehicles were repossessed early. He argued that he should not be required to pay the extra interest if he did not pay on the vehicle for the entire life of the loan. Buyer's counsel later questioned Seller on whether the entire finance charge had been included in Seller's figures. He introduced Seller's deposition testimony in which Seller had stated that the amount listed on the receipts did include the finance charge.

Again, if there is any material evidence to support the jury's decision, we must affirm the judgment. *Tenn. R. App. P. 13(d).* [HN14] The amount of damages rests in the sound discretion of the jury, and when approved by the trial judge, the award will not be disturbed on appeal unless a violation of discretion by the jury is shown. *Sholodge Franchise Systems, Inc. v. McKibbon Bros., Inc., 919 S.W.2d 36, 42-43 (Tenn. Ct. App. 1995)* (citing *Southern R.R. Co. v. Deakins, 107 Tenn. 522, 64 S.W. 477 (1901); Ellis v. White Freightliner Corp., 603 S.W.2d 125 (Tenn.1980);* [*51] *D.M. Rose & Co. v. Snyder, 185 Tenn. 499, 206 S.W.2d 897 (1947); Strother v. Lane, 554 S.W.2d 631 (Tenn. Ct. App. 1976)).* A jury's damage verdict need not be reviewed for mathematical precision or certainty. *Hunter v. Ura, 163 S.W.3d 686, 705 (Tenn. 2005).* When there is substantial evidence in the record, and reasonable inferences may be drawn from that evidence, mathematical certainty is not required. *Cummins v. Brodie, 667 S.W.2d 759, 765 (Tenn. Ct. App. 1983).*

In our view, the jury's valuation of the deficiency is supported by material evidence and within the reasonable range of damages supported by the record. In weighing the evidence and assessing the witnesses' credibility, the jury could have determined that Buyer did not still owe the full amount claimed by Seller. Alternatively, the jury could have decided that all of the repairs Seller had

2006 Tenn. App. LEXIS 790, *51; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

performed following the repossession were not truly necessary. Either way, the jury's damage award was not grossly disproportionate to the amount claimed by Seller so that we would consider it an abuse of the jury's discretion. Although it is unclear what precise [*52] amounts were used in the jury's calculation, as we have noted, we need not review the award for mathematical certainty.

**4. Total Damages**

Because we have vacated the consumer penalty award and modified the surplus award to Buyer, we will explain the correct amount of total damages to be awarded. [11] There is sufficient proof in the record to enable us to calculate the damages. Thus, we need not require the parties or the trial court to go to the time and expense of doing so on remand. When the trial court issued its final order and awarded damages, the court listed the jury's findings and its awards as follows, in pertinent part:

   . . . the jury found that by the preponderance of the evidence as follows:

   1. [Seller] failed to provide written notice of the sale of the 1997 Chevrolet Silverado pick up truck to [Buyer].

   2. [Seller] failed to provide written notice of the sale of the 1995 Chevrolet Corvette to [Buyer].

   3. [Seller] wrongfully repossessed the 1995 Chevrolet Corvette;

   4. The 1995 Chevrolet Corvette had the fair market value of seventeen thousand and five hundred dollars ($ 17,500) at the time of the repossession;

   5. The deficiency on the 1997 [*53] Chevrolet Silverado pick up truck is six thousand three hundred and twenty-eight dollars and fourteen cents ($ 6,328.14).

   Wherefore, it appearing to the Court the said verdict of the jury is appropriate and was unanimous;

   It is therefore, ordered, adjudged and decreed that a judgment is hereby awarded

and entered in favor of [Buyer] against [Seller] in the amounts as follows:

   1. $ 7,777 for statutory damages pursuant to *T.C.A.* § *47-9-625* for failure to provide proper notice of the sale of the 1995 Chevrolet Corvette;

   2. $ 4,385 for statutory damages pursuant to *T.C.A.* § *47-9-625* for failure to provide proper notice of the sale of the 1997 Chevrolet Silverado pick up truck;

   3. *$ 9,875.39 for the surplus* on the 1995 Chevrolet Corvette;

   4. Less *$ 1,828.14 for the deficiency* on the 1997 Chevrolet Silverado pick up truck *minus the surplus* [of $ 4500] on the Chevrolet Corvette.

───────────

11    Seller claims that the total amount of damages should be calculated by taking the surplus he owes to Buyer and subtracting the deficiency that Buyer owes him.

[*54] All in an amount equal to twenty thousand and two hundred and nine dollars and twenty-five cents ($ 20,209.25). (emphasis added). On Seller's motion to alter or amend, the trial court withdrew the $ 4,385 consumer penalty for selling the truck without notice. We have vacated the consumer penalty of $ 7,777 for sale of the car. We affirm the $ 9,875.39 surplus award to Buyer representing damages for wrongful repossession of the car. However, the full amount of the deficiency owed to Seller, $ 6,328.14, should be awarded to him without the offset for an additional surplus.

The surplus and deficiency awards are affirmed as modified. In sum, we conclude that the remaining award of $ 9,875.39 to Buyer should be offset against the deficiency award of $ 6,328.14 to Seller, with a total award remaining to Buyer of $ 3,547.25.

***D. The Tennessee Consumer Protection Act***

On appeal, Buyer claims that the trial court erred in directing a verdict on his claim for violation of the Tennessee Consumer Protection Act, *Tenn. Code Ann.* § *47-18-101, et seq.* The Act provides that [HN15]

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 144 of 177   PageID 152

Page 19

2006 Tenn. App. LEXIS 790, *54; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

"[u]nfair or deceptive acts or practices affecting the conduct of any trade or [*55] commerce constitute unlawful acts or practices . . . ." *Tenn. Code Ann. § 47-18-104(a)* (2005). So in order for the Act to apply, the unfair or deceptive acts must affect trade or commerce, as defined by the Act. In *Pursell v. First Am. Nat'l Bank, 937 S.W.2d 838, 842 (Tenn. 1996)*, the Supreme Court of Tennessee concluded that our Consumer Protection Act .did not apply to a bank's actions with regard to repossession of collateral. In the Court's opinion, the bank's actions during repossession did not affect the conduct of any "trade or commerce." *Id. at 839*. However, Buyer argues that this case is distinguishable from *Pursell* because it involves a repossession arising from a buyer-seller relationship rather than by a third-party creditor such as a bank.

[HN16] Under the Act, "trade" or "commerce" is defined as the "advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated." *Tenn. Code Ann. § 47-18-103(11)* (2001). Buyer argues [*56] that, in essence, the transaction at issue here involves a sale, and the repossession only makes up part of Seller's deceptive actions. He states that, in short, Seller sold Buyer a vehicle, "accepted payments of over $ 22,000 over a three and a half year period, [and] stole it from him via wrongful repossession . . . ." He compares his situation to one in which a seller sells a vehicle outright and then steals it back after some time. He also cites certain statutory language requiring a liberal construction of the Act to provide a means of "maintaining ethical standards of dealing . . . to the end that good faith dealings between buyers and sellers *at all levels of commerce* be had in this state." *Tenn. Code Ann. § 47-18-102(4)* (2001) (emphasis added).

In *Pursell*, the Court acknowledged the provisions of the Act which require a liberal construction to protect against unfair or deceptive acts or practices. *937 S.W.2d at 841*. However, the Court concluded that the parameters of the Act do not extend to every action of every business in the state. *Id.* The Court further noted, "[t]hough the definitions of 'trade or commerce' [*57] contained within the Tennessee Consumer Protection Act are broad, they do not extend to this dispute, which arose over repossession of the collateral securing the loan." *Id. at 842*. The repossession did not affect the "advertising, offering for sale, lease or rental, or distribution of any

goods, services, or property . . . ." *Id. at 841*. The Court proceeded to confine its holding to the facts and circumstances of that case and did not generally exempt all banking activities from the coverage of the Act. *Id. at 842*.

The case at bar is analogous to *Pursell*, and we decline the opportunity to extend the coverage of the Consumer Protection Act to this repossession. In *Pursell*, the debtor argued that, in effect, every action of an entity engaged in business affects trade or commerce, and, if unfair or deceptive, gives rise to a claim under the Act. *Id. at 841*. The Court acknowledged that other banking activities may affect trade or commerce and was careful to point out that it was not exempting those activities from the coverage of the Act. *Id. at 842*. However, by [*58] considering the natural and ordinary meaning of the language of the Act, the Court concluded that [HN17] the definitions of "trade or commerce" did not extend to a dispute arising over repossession of collateral securing a loan. *Id.* Likewise, we conclude that a plain reading of the definition of "trade" or "commerce" does not extend to this situation involving repossession. The acts complained of do not affect the advertising, offering for sale, lease, rental, or distribution of any goods, services, or property as described in *Tenn. Code Ann. § 47-18-103(11)* (2001). Although other activities in Seller's business may affect trade or commerce, the Act does not then automatically apply to any other actions taken, even if unfair or deceptive.

Only a few states have allowed recovery under state consumer protection acts for wrongful repossessions. Robert M. Lloyd, *Wrongful Repossession in Tennessee, 65 Tenn. L. Rev. 761, 797 (1998)* (mentioning *Entriken v. Motor Coach Fed. Credit Union, 256 Mont. 85, 845 P.2d 93, 98 (Mont. 1992); Sherwood v. Bellevue Dodge, Inc., 35 Wn. App. 741, 669 P.2d 1258, 1263-64 (Wash. Ct. App. 1983),* [*59] modified, *676 P.2d 557 (Wash. Ct. App. 1984))*. It has been suggested that the drafters of our Consumer Protection Act may have intentionally exempted repossessions from the coverage of the Act. *Id. at 798*. It is possible they believed that repossessors are entitled to use deceptive practices that would be unlawful under the Act in other contexts. *Id.* For example, after default, a secured party may take possession of collateral without judicial process if he can do so without a breach of the peace. *Tenn. Code Ann. § 47-9-609* (2001). The secured party is not required to give prior notice to the debtor before repossessing the collateral, unless their

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 145 of 177   PageID 153

Page 20

2006 Tenn. App. LEXIS 790, *59; 61 U.C.C. Rep. Serv. 2d (Callaghan) 542

contract provides otherwise, because doing so would allow an unscrupulous debtor to hide or dispose of collateral and avoid rightful repossession by a secured party. 11 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* [Rev] § 9-609:5 (3rd ed. 1999). Although he cannot use or threaten violence or force entry into closed premises, *Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23, 29-30 (Tenn. Ct. App. 1991), if the secured party [*60] takes property from a driveway or open area, even though he is technically trespassing, it will not generally, by itself, constitute a breach of the peace. Anderson, *supra*, [Rev] § 9-609:6. However, some may perceive this type of action by a repossessor as "deceptive" or "unfair."

Although the term "deceptive act or practice" is not defined by the Act, a non-exclusive, illustrative list of deceptive acts or practices affecting trade or commerce is provided. *Tenn. Code Ann. § 47-18-104(b) (1)-(40)* (2005). Three more specific illustrations of deceptive acts affecting trade or commerce were added during the most recent legislative session. *See* 2006 Tenn. Pub. Ch. 628; 2006 Tenn. Pub. Ch. 671; 2006 Tenn. Pub. Ch. 746. None of the specific examples listed deal with repossessions. If, after *Pursell*, the General Assembly wished to clarify or express its intention that the Tennessee Consumer Protection Act would cover repossessions, it surely would have responded with a specific illustration addressing repossessions.

The self-help procedures provided in repossession situations are the product of a careful balancing of the interests of secured [*61] parties and debtors. *Davenport*, 818 S.W.2d at 30. "On one hand, secured creditors have a legitimate interest in obtaining possession of collateral without resorting to expensive and sometimes cumbersome judicial procedures. On the other hand, debtors have a legitimate interest in being free from unwarranted invasions of their property and privacy interests." *Id.* (citing *Riley State Bank v. Spillman*, 242 Kan. 696, 750 P.2d 1024, 1029 (Kan. 1988); *General Elec. Credit Corp. v. Timbrook*, 170 W. Va. 143, 291 S.E.2d 383, 385 (W.Va. 1982); *Salisbury Livestock Co. v. Colo. Cent. Credit Union*, 793 P.2d 470,

475 (Wyo. 1990)). From our reading of [HN18] the Consumer Protection Act, it does not cover repossessions. Repossessions do not affect the "advertising, offering for sale, lease, rental, or distribution of any goods, services, or property." *Tenn. Code Ann. § 47-18-103(11)* (2001). We do not wish to upset the balancing of the interests of secured creditors and debtors which the legislature has achieved. Therefore, we will not extend the Tennessee Consumer Protection Act to cover repossessions [*62] without a clear expression of our legislature's intention to cover these transactions.

## V. CONCLUSION

For the aforementioned reasons, we conclude that the trial court properly overruled Seller's motion for a directed verdict on the issue of wrongful repossession of the Corvette, and we find material evidence in the record to support the jury's finding that no notices were sent prior to sale of the vehicles. Regarding damages, we find no evidence in the record to support a finding that the transaction at issue involved "consumer goods," and therefore we vacate the trial court's $ 7,777 award of the statutory penalty provided in consumer transactions. We do find evidence supporting the jury's valuation of the fair market value of the Corvette, and we affirm the trial court's award of $ 9,875.39 to Buyer for the surplus. We also find material evidence to support the jury's finding that $ 6,328.14 existed as a deficiency owed on the truck, and that full amount should have been awarded to Seller. In sum, we will offset the two awards for a total award of $ 3,547.25 to be awarded to Buyer, plus the discretionary costs he was awarded below which the parties have not appealed. The judgment [*63] of the circuit court is affirmed as modified.

Cost of this appeal are taxed one-half to Appellant, Rick Bates d/b/a RB Auto Sales, and his surety, and one-half to Appellee, Michael Davenport, for which execution may issue if necessary.

ALAN E. HIGHERS, JUDGE





Positive
As of: Dec 05, 2011

**MICHAEL R. LAUNIUS, Plaintiff, v. WELLS FARGO BANK, N.A. and WILSON & ASSOCIATES, P.L.L.C., Defendants.**

No. 3:09-CV-501

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

*2010 U.S. Dist. LEXIS 89234*

August 27, 2010, Filed

COUNSEL: [*1] For Michael R Launius, Plaintiff: Jack W Piper, Jr, O'Connor, Petty, Child, & Piper, Knoxville, TN.

For Wells Fargo Bank, National Association, Defendant: Kenny L. Saffles, LEAD ATTORNEY, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC (Knox), Knoxville, TN.

For Wilson and Associates, PLLC, Defendant: Jason S Mangrum, LEAD ATTORNEY, Wilson & Associates, PLLC (Brentwood), Creekside Crossing III, Brentwood, TN.

JUDGES: Thomas W. Phillips, United States District Judge.

OPINION BY: Thomas W. Phillips

OPINION

MEMORANDUM AND ORDER

This matter is before the Court on defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Dismiss [Doc. 6]. Pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, Wells Fargo moves to dismiss this lawsuit. [Id.].

This case is based upon the foreclosure of real property located in Sevierville, Tennessee. Plaintiff has sued Wells Fargo, the bank which foreclosed upon the property after Plaintiff defaulted on his mortgage payments. Plaintiff has also sued Wilson & Associates, P.L.L.C. ("Wilson & Associates"), the law firm which conducted the foreclosure sale. Plaintiff has sued the defendants for the following: (1) a claim for intentional infliction of emotional distress; (2) a [*2] claim under the Tennessee Consumer Protection Act; *T.C.A. §§ 47-18-102, et seq*; (3) a claim for promissory estoppel; and (4) a claim for intentional misrepresentation.

There are two issues before the Court. First, does the Statute of Frauds bar Plaintiff's claims? Second, if the claims are not barred, has Plaintiff pled sufficient facts to survive a 12(b)(6) motion?

For the following reasons, Wells Fargo's Motion to Dismiss [Doc. 6] is **GRANTED IN PART AND DENIED IN PART**. While the Statute of Frauds does not bar Plaintiff's claims, he has failed to plead sufficient facts to survive a 12(b)(6) motion. Accordingly, Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

## I. BACKGROUND

As a preliminary matter, the Court notes that it has jurisdiction pursuant to *28 U.S.C. § 1332*. Because jurisdiction "is predicated on the diversity of parties, we are obligated to apply state law in resolving the substantive issues presented." *Rutherford v. Columbia Gas, 575 F.3d 616, 623 (6th Cir. 2009)* (citing *Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*). Tennessee law therefore governs the substantive issues in this case.

The following facts are taken mostly from Plaintiff's complaint. In March 1996, Plaintiff [*3] purchased real property located at 1875 Blue Tick Way in Sevierville, Tennessee (hereafter, the "Property"). In order to finance the purchase, Plaintiff obtained a loan in the amount of $240,000.00 (hereafter, the "Loan" from RGMG, Inc. ("RGMC"). Plaintiff executed a Promissory Note and Deed of Trust which gave RGMC a security interest in the Property.

Later on, Wells Fargo became the successor in interest and assignee of RGMG. This gave Wells Fargo a security interest in the Property. To service the Loan, Wells Fargo used America's Servicing Company ("ASC"), a division of Wells Fargo.

In 2009, Plaintiff became delinquent on his Loan payments. The Deed of Trust provided that Plaintiff's debt could be accelerated if he fell behind in his payments. As a result, Wells Fargo began to initiate foreclosure proceedings on the Property. The Deed of Trust also provided that the mortgage holder (Wells Fargo, after it became the successor in interest to RGMG) could foreclose upon the Property if Plaintiff defaulted on his Loan payments.

From April 21, 2009 through July 14, 2009 (the foreclosure date), Plaintiff and his father called ASC representatives in an attempt to modify the Loan agreement. [*4] These modifications are known as "work-out plans." On April 21, 2009, Plaintiff spoke over the phone with a Wells Fargo representative about his financial condition. Plaintiff also authorized his father, Donald D. Launius, to speak with ASC representatives about the Loan.

Weeks later, Plaintiff received a letter from ASC dated June 2, 2009, indicating that his request for modification was denied. [Plaintiff's Complaint, Doc. 1 at 4]. However, the letter stated that "there might be alternative options available," and that he could "be reconsidered for work out options" by calling the phone number listed in the letter. [Id.]. After receiving this letter, Plaintiff spoke with ASC representatives over the phone about "work out plans." On June 10, 2009, an ASC representative told Plaintiff that he would be reconsidered for a "work-out plan."

Following these phone calls, Plaintiff received a letter dated June 12, 2009, from the law firm of Wilson & Associates stating that Plaintiff owed $231,249.72. The letter stated that the debt was due immediately, and that Wilson & Associates would be initiating foreclosure proceedings on the Property.

On June 18, 2009, Plaintiff's father called ASC representatives [*5] to discuss a "work-out plan." An ASC representative told him that she could delay the foreclosure, but that she could not stop it. Following this phone call, Plaintiff received a letter dated June 17, 2009, from Wilson & Associates specifying the date of the foreclosure sale.

On July 6, 2009, Plaintiff's father again called ASC representatives to discuss a "work-out plan." During that phone call, an ASC representative told him that "she would delay the foreclosure, in fact, she was doing so at that time," and that "the foreclosure would not occur until after a negotiator had been in contact by phone to discuss a work-out plan." [Id. at 7].

On July 13, 2009, Plaintiff received a letter from ASC (dated July 7, 2009) that provided a phone number for Plaintiff to call "if you [Plaintiff] would like to be considered for work-out options." [Id. at 8]. On July 14, 2009, the Property was foreclosed upon. Wilson & Associates conducted the foreclosure sale, and Wells Fargo purchased the Property for $234,996.31.

## II. STANDARD OF REVIEW

In ruling upon motions to dismiss under *Rule*

2010 U.S. Dist. LEXIS 89234, *5

12(b)(6) of the Federal Rules of Civil Procedure, a court must "construe the complaint in the light most favorable to [*6] the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." DIRECTV, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007). The court, however, "need not accept as true legal conclusions or unwarranted factual inferences." Id. (quoting Gregory v. Shelby County, 220 F.3d 433, 446 (6th Cir. 2000)). To survive a motion to dismiss, the "[f]actual allegations contained in [the] complaint must 'raise a right to relief above the speculative level.'" Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)). This "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 127 S. Ct. at 1974).

## III. ANALYSIS

### A. The Statute of Frauds Does Not Bar Plaintiff's Claims

Wells Fargo argues that "the statute of frauds bars all of Plaintiff's claims because all of his claims are predicated on the enforceability of the alleged oral promise . . ." [Wells Fargo's Memorandum of Law in Support of its Motion to Dismiss, Doc. 7 at 7]. Defendant cites to T.C.A. § 29-2-101(b)(1) [*7] for support. That statute provides:

No action shall be brought against a lender or creditor upon any promise or commitment . . . to alter, amend, renew, extend or otherwise modify or supplement any written promise, agreement or commitment to lend money or extend credit, unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the lender or creditor, or some other person lawfully authorized by such lender or creditor.

T.C.A. § 29-2-101(b)(1). Wells Fargo argues that the Statute of Frauds bars Plaintiff's claims because: (1) Plaintiff's claims are an attempt to modify a written agreement-- that is, the Loan agreement; (2) Plaintiff is

attempting to modify the written agreement through the use of oral statements; and (3) the written agreement may only be modified in writing. [See Wells Fargo's Memorandum of Law in Support of its Motion to Dismiss, Doc. 7 at 5-8]. Wells Fargo cites to Bilyeu v. Volunteer State, but its reliance upon that case is misplaced. 2006 Tenn. App. LEXIS 241, 2006 WL 1005130 (Tenn. Ct. App. Apr. 17, 2006).

In Bilyeu, the plaintiff filed suit against a bank in chancery court. Id. The plaintiff argued that a [*8] bank officer made an oral promise to modify a loan agreement. Id. The plaintiff wanted to enjoin the bank from foreclosing upon his property, based upon the oral statements made by the bank officer. Id. The bank moved for judgment on the pleadings, arguing that the plaintiff's claims violated the Statute of Frauds, T.C.A. § 29-2-101(b)(1). Id. The trial court granted the motion and the Tennessee Court of Appeals affirmed. Id.

The present case is distinguishable from Bilyeu. The plaintiff in Bilyeu sought to modify a written agreement (the loan agreement) through the use of oral statements. 2006 Tenn. App. LEXIS 241, [WL] at *2. In fact, the plaintiff argued that the written agreement was actually modified by the oral statements. Id. The plaintiff did not sue the bank for other damages, but merely sought to avoid foreclosure upon the property. Id. The plaintiff's entire action was an attempt to modify a written agreement through the use of oral statements. Id.

In the present case, Plaintiff has sued Wells Fargo under four different theories: (1) a claim for intentional infliction of emotional distress; (2) a claim under the Tennessee Consumer Protection Act, T.C.A. §§ 47-18-102, et seq; (3) a claim for promissory [*9] estoppel; and (4) a claim for intentional misrepresentation. Wells Fargo argues that "[t]he statute of frauds bars all of Plaintiff's claims because all of his claims are predicated on the enforceability of the alleged oral promise to delay the foreclosure." [Wells Fargo's Memorandum of Law in Support of its Motion to Dismiss, Doc. 7 at 7]. This is a mischaracterization of Plaintiff's claims. In fact, none of Plaintiff's claims are based upon the enforceability of the oral statements. While the Loan agreement-- that is, the Deed of Trust and Promissory Note-- falls within the Statute of Frauds[1], Plaintiff is not seeking to modify the Loan agreement. The Statute of Frauds only bars claims that attempt to modify a written agreement through oral statements. As

evidenced by Plaintiff's "prayer for relief," he is not seeking to modify the Loan agreement:

> Wherefore, Plaintiff demands judgment against the defendants, jointly and severally, in an amount which is proven to compensate Plaintiff for the loss of value of the property sustained by the wrongful foreclosure and for the damages which flow from that loss, including but not limited to all recoverable compensatory damages . . .

[Plaintiff's [*10] Complaint, Doc. 1 at 11-12]. Unlike the plaintiff in *Bilyeu*, Plaintiff does not request that the Court modify the Loan agreement. Unlike the plaintiff in *Bilyeu*, Plaintiff does not seek to enjoin Wells Fargo from foreclosing upon the property. Rather, Plaintiff is seeking compensatory and punitive damages for the foreclosure that has already occurred. Plaintiff does not argue that the Loan agreement-- the written agreement covered by the Statute of Frauds--was modified by oral statements. Rather, Plaintiff argues that he relied upon misrepresentations made by ASC representatives. Plaintiff does not argue that those misrepresentations actually modified the Loan agreement. None of Plaintiff's actions are predicated on the enforceability of the oral statements.

> 1  The Loan agreement falls within the Statute of Frauds because it is a "written promise, agreement or commitment to lend money or extend credit." *T.C.A. § 29-2-101(b)(1). See Bilyeu v. Volunteer State Bank, 2006 Tenn. App. LEXIS 241, 2006 WL 1005130, at *2 (Tenn. Ct. App. Apr. 17, 2006)* ("Both the promissory note and Mr. Bilyeu's personal guaranty fall within the scope of the statute of frauds.") (citing *In re Estate of Dickerson, 600 S.W.2d 714, 716-17 (Tenn. 1980)).

As [*11] courts in Tennessee recognize, the Statute of Frauds applies "only in suits for the breach or enforcement of a contract and are thus inapplicable to tort claims." *In re Estate of Nelson, 2007 Tenn. App. LEXIS 147, 2007 WL 851265, at *16 (Tenn. Ct. App. 2007).* Plaintiff has filed tort claims against Wells Fargo, including claims for intentional infliction of emotional distress and intentional misrepresentation [2]. Plaintiff has

also filed a claim under the Tennessee Consumer Protection Act. This claim is based upon the alleged deceptive or unfair practices of Wells Fargo-- not the enforceability of oral statements. Accordingly, Wells Fargo's Motion to Dismiss [Doc. 6] is **DENIED IN PART**, whereby the Court finds that **Plaintiff's claims are not barred by the Statute of Frauds.**

> 2  See *Osceola Inv. v. Union Planters Nat'l Bank of Memphis, 1990 Tenn. App. LEXIS 36, 1990 WL 4338, at *2 (Tenn. Ct. App. Jan. 25, 1990)* (recognizing the "tort of negligent misrepresentation," and thus by extension, the tort of intentional misrepresentation).

**B. Plaintiff's Claims Are Dismissed Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure**

**1. Intentional Infliction of Emotional Distress**

Plaintiff has sued the Defendants for the "tort of outrageous conduct." [*12] [Plaintiff's Complaint, Doc. 1 at 11]. In Tennessee, the tort of intentional infliction of emotional distress is synonymous with the tort of outrageous conduct. *See Lyons v. Farmers Ins. Exch., 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000)* ("Intentional infliction of emotional stress and outrageous conduct are simply different names for the same cause of action . . .").

To establish a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must show that a defendant's conduct was "(1) intentional or reckless; (2) so outrageous that it cannot be tolerated in a civilized society; and (3) the cause of serious mental injury to the plaintiff." *Bain v. Wells, 936 S.W.2d 618, 623 (Tenn. 1997).* In determining whether conduct is "outrageous," courts are instructed to follow the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been [*13] so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as

atrocious and utterly intolerable in a civilized community.

*Restatement (Second) of Torts, Section 46, Comment d.* Under this high standard, "mere insults, indignities, threats, annoyances, petty oppression or other trivialities" are not recognized as "outrageous." *Bain, 936 S.W.2d at 622.*

In addition, the mental injury must be "so severe that no reasonable person would be expected to endure it." *Arnett v. Domino's Pizza I, L.L.C., 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003).* Physical manifestations of emotional distress—though not required to sustain a claim--may serve as proof of serious injury. *Miller v. Willbanks, 8 S.W.3d 607, 615 (Tenn. 1999).* "Moreover, evidence that a plaintiff has suffered from nightmares, insomnia, and depression or has sought psychiatric treatment may support a claim of serious mental injury." *Id.* The intensity and duration of the mental distress "are also factors that may be considered in determining the severity of the injury." *Id.*

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to plead [*14] sufficient facts to support an IIED claim. First, Plaintiff has failed to identify any conduct that is "so outrageous that it is not tolerated by civilized society." *Lyons, 26 S.W.3d at 893.* Second, Plaintiff does not allege that he suffered serious mental injury. Because Plaintiff does not allege that he suffered serious mental injury, he has failed to establish an essential element. *See Arnett, 124 S.W.3d at 540.* Accordingly, Plaintiff's claim for intentional infliction of emotional distress is **DISMISSED WITH PREJUDICE.**

**2. Tennessee Consumer Protection Act**

The Tennessee Consumer Protection Act ("TCPA") is designed to "[t]o protect consumers . . . from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." *T.C.A. § 47-18-102(2).* For the Act to apply, "the unfair or deceptive acts must affect trade or commerce, as defined by the Act." *Davenport v. Bates, 2006 Tenn. App. LEXIS 790, 2006 WL 3627875, at *17 (Tenn. Ct. App. Dec. 12, 2006).* The terms "trade" and "commerce" are defined as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles,

commodities, [*15] or things wherever situated." *T.C.A. § 47-18-103(9).*

Plaintiff does not fall within the ambit of the TCPA. Courts in Tennessee have held that the Act does not apply to a bank's repossession of collateral that was used to secure a loan. *See Pursell v. First Am. Nat'l Bank, 937 S.W.2d 838, 842 (Tenn. 1996).* In Pursell, the Tennessee Supreme Court held that the TCPA did not apply to a bank's repossession of collateral because it did not affect "trade or commerce." *Id. at 839.* In that case, the plaintiff sued a bank and repossession company under the TCPA. Id. The plaintiff had borrowed money from the bank to purchase a truck. *Id. at 839.* As part of the loan agreement, the bank was given a security interest in the truck. Id. In other words, the truck served as collateral to secure the loan. Id. Two years later, the plaintiff became delinquent on his loan payments. Id. The bank then repossessed the truck. Id.

The plaintiff filed suit under the TCPA, arguing that bank representatives made deceptive statements. *Id. at 840.* The bank moved to dismiss the TCPA claim, and the lower courts granted the motion. The Tennessee Supreme Court affirmed dismissal, recognizing that "[t]hough the definitions [*16] of 'trade or commerce' contained within the Tennessee Consumer Protection Act are broad, they do not extend to this dispute, *which arose over repossession of the collateral securing the loan*." *Id. at 842* (emphasis added). While the TCPA is a broad statute, "[t]he parameters of the Act, however, do not extend to every action of every business in the State." *Id. at 841.*

Since Pursell, courts have declined to extend the TCPA to repossession actions. As one court has stated, "[w]e do not wish to upset the balancing of the interests of secured creditors and debtors which the legislature has achieved. Therefore, we will not extend the Tennessee Consumer Protection Act to cover repossessions without a clear expression of our legislature's intention to cover these transactions." *Davenport, 2006 Tenn. App. LEXIS 790, 2006 WL 3627875, at *19; see also Hunter v. Wash. Mut. Bank, 2008 U.S. Dist. LEXIS 71587, 2008 WL 4206604, at *5 (E.D. Tenn. Sept. 10, 2008)* ("The Supreme Court of Tennessee has held that the TCPA does not apply to repossession and collateral disposition activities because that conduct does not affect the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property as

required by the TCPA.") (citing [*17] *Pursell, 937 S.W.2d at 841-42*). The Tennessee legislature has not clearly indicated that the TCPA should cover repossession actions.

In Schmidt v. Nat'l City Corp., this Court recognized that "[t]he actions of a bank in repossessing and disposing of its collateral do not constitute violations of the [TCPA], even if the bank acted wrongfully in repossessing the collateral." *2008 U.S. Dist. LEXIS 102371, 2008 WL 5248706, at *8 (E.D. Tenn. Dec. 17, 2008)*. The plaintiffs in Schmidt argued that they suffered damages because their home was foreclosed upon. *2008 U.S. Dist. LEXIS 102371, [WL] at *1*. The plaintiffs filed a TCPA claim against the mortgage holder (the bank) that foreclosed upon their home. *2008 U.S. Dist. LEXIS 102371, [WL] at 8*. The bank moved for summary judgment on the TCPA claim and the Court granted the motion. Id. In particular, the Court found that the TCPA did not apply to the bank's foreclosure. Id.

The reasoning of *Schmidt* applies in the present case. Plaintiff has filed a claim under the TCPA against the mortgage holder (Wells Fargo). This claim is based upon statements that were made concerning the foreclosure date. As the Court recognized in Schmidt, when a debtor defaults on a mortgage payment, and the mortgage holder forecloses upon the collateral that [*18] secured the loan (in this case, the Property), the TCPA does not apply. Id. Accordingly, Plaintiff's TCPA claim is **DISMISSED WITH PREJUDICE.**

### 3. Promissory Estoppel

Wells Fargo argues that promissory estoppel should not apply because "promissory estoppel is not an exception to the statute of frauds." [Wells Fargo's Memorandum of Law in Support of its Motion to Dismiss, Doc. 7 at 10]. While promissory estoppel is not an exception to the Statute of Frauds, it does provide an independent cause of action. [3] Therefore, the Court must determine whether Plaintiff has alleged facts supporting a promissory estoppel claim.

> 3   As the Tennessee Court of Appeals has recognized, "the thrust of the cases is that promissory estoppel is not recognized as an exception to the Statute of Frauds." *Nationsbank, N.A. (South) v. Millington Homes Inv., Ltd., 1999 Tenn. App. LEXIS 107, 1999 WL 79204, at *3 (Tenn. Ct. App. Feb. 19, 1999)*. Rather, equitable

estoppel, "a distinct and disparate doctrine, is recognized in Tennessee as an exception to the Statute of Frauds." Id. (citations omitted). This doctrine has been followed in cases "where to enforce the Statute of Frauds would make it an instrument of hardship and oppression, verging on [*19] actual fraud." Id. (quoting *Baliles v. Cities Serv. Co., 578 S.W.2d 621, 624 (Tenn. 1979)*).

To establish a claim for promissory estoppel, the party must show the following:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Amacher v. Brown-Forman Corp., 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991)*. As one court has stated, "[t]o successfully state a claim for promissory estoppel, the asserting party must first show that a promise was made and that it *reasonably relied upon the promise to its detriment." Hermosa Holdings, Inc. v. Mid-Tennessee Bone & Joint Clinic, P.C., 2009 Tenn. App. LEXIS 282, 2009 WL 711125, at *8 (Tenn. Ct. App. Mar. 16, 2009)* (emphasis added) (citations omitted). In other words, "in order for the theory of promissory estoppel to apply, Appellant must show that the promises made . . . *induced an action or forbearance* by Appellant to her detriment in reliance on those promises . . ." *Cochran v. Robinhood Lane Baptist Church, 2005 Tenn. App. LEXIS 814, 2005 WL 3527627, at *5 (Tenn. Ct. App. Dec. 27, 2005)* [*20] (emphasis added). A party demonstrates "reasonable reliance" by showing that there was a "substantial change of position by the promisee in reliance on the promise . . ." *Alden v. Presley, 637 S.W.2d 862, 864 (Tenn. 1982)*. Accordingly, the Court must determine whether Plaintiff-- assuming all factual allegations in the complaint are true-- substantially changed his position as a result of promises made by ASC representatives.

In this case, Plaintiff did not substantially change his position in reliance upon any statements. Assuming that ASC representatives told Plaintiff that he would be "reconsidered" for a "work-out plan," Plaintiff was still

obligated to pay his Loan. Plaintiff was never formally relieved of this obligation, and Plaintiff admits that he was unable to repay the Loan. In addition, Plaintiff never made alternate arrangements to pay for the Loan. Although Plaintiff was told that he would be "reconsidered" for a "work-out plan," he was never told that an arrangement had been reached. Such arrangement, if made, might have constituted a substantial change in position. *See Burger King Corp. v. Hinton, Inc., 203 F.Supp. 2d 1357, 1364 (S.D. Fla. 2007)* (denying a claim for promissory [*21] estoppel because the plaintiff did not provide "conclusive evidence showing that they received an instruction from BKC [Burger King Corporation] to cease their regular payments, as a 'workout plan' would be formulated as an alternative."); *see also Osceola Inv. v. Union Planters Nat'l Bank of Memphis, 1990 Tenn. App. LEXIS 36, 1990 WL 4338, at *3 (Tenn. Ct. App. Jan. 25, 1990)* (rejecting a plaintiff's claim for promissory estoppel arising out of a bank's failure to approve a loan because there existed "no proof that the Plaintiff changed its plans in reliance on the promise."). At most, Plaintiff was told that the foreclosure would be delayed. Even assuming that ASC representatives told Plaintiff that the foreclosure would be delayed, he did not change his position in reliance upon those statements. Plaintiff did not make any payments under the Loan, nor did ASC representatives agree to a "work-out plan." Plaintiff did not take any "action or forbearance" in relying upon the statements concerning foreclosure. *Cochran, 2005 Tenn. App. LEXIS 814, 2005 WL 3527627, at *5.* Instead, Plaintiff remained in the same position that he was previously in: unable to avoid foreclosure. Because Plaintiff has failed to allege any facts that show he substantially [*22] changed his position in reliance upon the statements made by ASC representatives, his promissory estoppel claim is **DISMISSED WITH PREJUDICE.**

**4. Intentional Misrepresentation**

According to the complaint, Wells Fargo "misrepresented the intentions and actions which the Defendants took when they proceeded with the foreclosure sale of the property on July 14, 2009." [Plaintiff's Complaint, Doc. 1 at 9]. To establish a claim for intentional misrepresentation, Plaintiff must show:

(1) the defendant made a representation of an existing or past fact;

(2) the representation was false when made;

(3) the representation was in regard to a material fact;

(4) the false representation was made either knowingly or without belief in its truth or recklessly;

(5) plaintiff reasonably relied on the misrepresented material fact;

(6) plaintiff suffered damage as a result of the misrepresentation.

*Walker v. Sunrise Pontiac-GMC Truck, 249 S.W.3d 301, 311 (Tenn. 2008)* (citations omitted).

With regard to the first element, Wells Fargo argues that "it is unclear . . . whether Plaintiff's father was told that the foreclosure was delayed, was being delayed, or would be delayed." [Wells Fargo's Memorandum of Law in Support [*23] of its Motion to Dismiss, Doc. 7 at 12 n.9]. However, in the complaint, Plaintiff alleges that during the July 6, 2009 phone call an ASC representative told his father that "she would delay the foreclosure, in fact, *she was doing so at that time.*" [Plaintiff's Complaint, Doc. 1 at 7] [emphasis added]. The present tense "was doing" indicates that the ASC representative made a statement concerning a fact that existed at that time. Thus, with regard to at least the July 6, 2009 phone call, the first element has been met.

Even assuming that an ASC representative made a false statement during the July 6, 2009 phone call, Plaintiff has failed to show that he reasonably relied upon that statement. As Wells Fargo correctly argues, Plaintiff did not materially change his position in reliance upon the statements concerning foreclosure. [*See* Wells Fargo's Memorandum of Law in Support of its Motion to Dismiss, Doc. 7 at 13-14]. In fact, Plaintiff did not change his position at all:

There is not one single allegation that Plaintiff took some action, or chose not to take some action, that might have prevented the foreclosure because he was told the foreclosure would not occur on July 14, 2009. Instead, [*24] Plaintiff

maintained the same position that he had been in for months, i.e., Plaintiff could not cure the default and was completely dependent on the availability of a workout option. Put simply, Plaintiff has not alleged that anything changed from prior to the alleged misrepresentation to after it.

[Id. at 13]. For the same reasons that the Plaintiff did not show "reasonable reliance" in the context of his promissory estoppel claim [4], the Court finds that Plaintiff has failed to show "reliance" to support an intentional misrepresentation claim. Because Plaintiff has failed to show that he substantially changed his position in reliance upon the statements made by ASC representatives, his intentional misrepresentation claim is **DISMISSED WITH PREJUDICE**.

4 *See* Part III.B.3

## IV. CONCLUSION

For the foregoing reasons, Wells Fargo's Motion to Dismiss [Doc. 6] is **GRANTED IN PART AND DENIED IN PART**. While the Statute of Frauds does not bar Plaintiff's claims, he has failed to plead sufficient facts to survive a 12(b)(6) motion. Accordingly, Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

/s/ Thomas W. Phillips

United States District Judge





Caution
As of: Dec 05, 2011

Andrea Marks, Plaintiff, vs. BANK OF AMERICA, N.A.; a foreign corporation,
FEDERAL NATIONAL MORTGAGE ASSOCIATION dba Fannie Mae, a
Federally Chartered Corporation, Black Corporations 1-5, White Partnerships 1-5,
John Does 1-5 and Jane Does 1-5, Defendant.

No. 03:10-cv-08039-PHX-JAT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

*2010 U.S. Dist. LEXIS 61489*

June 21, 2010, Decided
June 22, 2010, Filed

**COUNSEL:** [*1] For Andrea Marks, a single woman, Plaintiff: Lisa Jeanette Counters, The Counters Firm, Maricopa, AZ.

For Bank of America, N.A., a foreign corporation, Federal National Mortgage Association, a Federally Chartered Corporation doing business as Fannie Mae, Defendants: Ann-Martha Andrews, David Winthrop Cowles, Emily Snow Cates, Lewis & Roca LLP, Phoenix, AZ.

**JUDGES:** James A. Teilborg, United States District Judge.

**OPINION BY:** James A. Teilborg

**OPINION**

**ORDER**

Plaintiff Andrea Marks argues that Defendant Bank of America N.A. ("Defendant") breached an agreement with the U.S. Treasury in which she was a third-party beneficiary. Plaintiff argues that Defendant did not fulfill contractual obligations per the Home Affordable Modification Program ("HAMP") Guidelines. As such, Plaintiff maintains that a suspension of any foreclosure or trustee's sale pending disposition of her request is mandated. (Pl. Amended Complaint P 21). Pending before the Court is Defendant's Rule 12(b)(6) Motion to Dismiss. (Doc. # 15). For the reasons that follow, the Court dismisses Plaintiff's complaint with prejudice.

**I. Background**

Plaintiff's property ("the Property") is located in Prescott Valley, Arizona. (Pl. Amended Complaint P 1). Plaintiff financed [*2] the purchase of the Property with funds underwritten or otherwise backed by Defendant Fannie Mae. (Pl. Amended Complaint P 2). Defendant Bank of America N.A. ("Defendant") is now servicing loans formerly owned by Countrywide Mortgage as a result of Defendant's acquisition of Countrywide

Mortgage. (Pl. Amended Complaint P 6).

. On August 17, 2009, Plaintiff retained New York Financial to assist her in submitting an application to Defendant for a loan modification under HAMP. (Pl. Amended Complaint P 8). Plaintiff submitted her application on October 2, 2009. (Pl. Amended Complaint P 9). Defendant advised her that Plaintiff qualified for assistance and modification of her loan. (*Id.*). Defendant informed Plaintiff that her mortgage payment would be reduced by almost fifty percent. (*Id.*). Plaintiff accepted the offer and requested the loan modification paperwork. (*Id.*). Plaintiff offered to make a payment and Defendant sought to obtain the modified payment from Plaintiff; however, Defendant was unable to process the payment. (*Id.*). Defendant advised her to send the payment with the signed loan modification documents she would receive within two weeks. (*Id.*).

Plaintiff waited for loan documents [*3] for two weeks. (Pl. Amended Complaint P 11). Defendant then informed Plaintiff that "there could be more delay in getting the paper work for her signature." (*Id.*). During a November 2009 call between Plaintiff and Defendant, Defendant told Plaintiff it had "45 days to get the paperwork" to her. (Pl. Amended Complaint P 12). Two weeks later, Defendant advised Plaintiff that the foreclosure date had been "pushed back" and that the paperwork delay seemed to be some sort of a "bank error" that would be corrected. (Pl. Amended Complaint P 12-13).

In January 2010, Defendant foreclosed the Property and initiated a Forcible Entry and Detainer action. (Pl. Amended Complaint P 16).

## II. Legal Standard

To survive a 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of *Federal Rule of Civil Procedure 8(a)(2)*. *Rule 8(a)(2)* requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has a "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*.

Although a complaint attacked for failure [*4] to state a claim does not need detailed factual allegations,

the pleader's obligation to provide the grounds for relief requires "more' than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555* (internal citations omitted). The factual allegations of the complaint must be sufficient to raise a right to relief above a speculative level. *Id. Rule 8(a)(2)* "requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id.* (citing 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202, pp. 94, 95 (3d ed. 2004)).

The *Rule 8* pleading standard demands more than "an unadorned, the-defendant-unlawfully-harmed-me-accus ation." *Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (citing *Twombly, 550 U.S. at 555*). A complaint that offers nothing more than naked assertions will not suffice. To survive a motion to dismiss, a complaint must contain sufficient factual matter, which, if accepted [*5] as true, states a claim to relief that is "plausible on its face." *Iqbal, 129 S.Ct. at 1949*. Facial plausibility exists if the pleader pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Plausibility does not equal "probability," but plausibility requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citing *Twombly, 550 U.S. at 557*).

In deciding a motion to dismiss under *Rule 12(b)(6)*, the Court must construe the facts alleged in the complaint in the light most favorable to the drafter [1] of the complaint and the Court must accept all well-pleaded factual allegations as true. *See Schwarz v. U.S., 234 F.3d 428, 435 (9th Cir. 2000)*.

> 1 Given the procedural posture of the case and the pending Motion, the Court must construe the facts alleged in the Amended Complaint in the light most favorable to Plaintiff.

## III. Analysis

In support of Defendant's Motion to Dismiss,

2010 U.S. Dist. LEXIS 61489, *5

Defendant argues that Plaintiff [*6] does not have: (1) standing to bring a suit for breach of contract; (2) an express, private right of action to sue for a violation of the HAMP; and (3) an implied, private right of action to sue for a violation of the HAMP. Based on the following reasons, the Court grants Defendant's Motion to dismiss with prejudice.

## A. No Standing to State a Claim for Breach of Contract

Plaintiff attempts to sue on an agreement between Defendant and the U.S. Department of Treasury as a third-party beneficiary. [2] (Doc. # 1-2, p. 5-6). Defendant maintains that Plaintiff lacks standing to make a breach of contract claim because Plaintiff is not an intended beneficiary. (Doc. # 15, p.1, 4-6). The Court agrees with Defendant and finds that Plaintiff lacks standing to bring suit for breach of contract because Plaintiff is, at most, an incidental beneficiary.

> 2   Plaintiff has not provided the Court with a copy of the agreement referred to in Plaintiff's Amended Complaint (Doc. # 1-2) or in Plaintiff's Response to Defendant's Motion to Dismiss (Doc. # 23).

In order to present a claim for breach of contract, a plaintiff must allege the formation of a contract, its breach, and damages. *E.g., Chartone, Inc. v. Bernini, 207 Ariz. 162, 83 P.3d 1103, 1111 (Ariz. App. 2004).* [*7] Before a third party can present a claim for breach of contract, they must show that the contract was made for their direct benefit—that they are an intended beneficiary of the contract. *Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206 (9th Cir. 2000).* The Ninth Circuit defines third party beneficiaries as:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Id at 1211.* (citing the *RESTATEMENT (SECOND) OF CONTRACTS § 302* (1979)). "To sue as a third-party beneficiary of a contract, the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *Klamath, 204 F.3d at 1211.*

"One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention [*8] to confer a right on him or her." *Id.* (citing RESTATEMENT OF CONTRACTS § 302(1)(b) cmt. d.). Under the HAMP, a qualified borrower would not be reasonable in relying on an agreement between a participating servicer and the U.S. Department of Treasury as manifesting an intention to confer a right on the borrower because the agreement does not *require* that the participating servicer modify eligible loans. [3] *Escobedo, 2009 U.S. Dist. LEXIS 117017, 2009 WL 4981618, *3.* Even Fannie Mae, which has rights under the Agreement, cannot force a participating servicer to make a particular loan modification. *Id.* Fannie Mae can take steps against a participating servicer, but cannot impose a modification. *Id.* Thus, a borrower could not require the servicer to make any particular loan modification under the HAMP Agreement.

> 3   The agreement in *Escobedo* set forth Home Affordable Modification Program Guidelines. The Guidelines set forth eligibility requirements and state: "[P]articipating servicers are required to consider all eligible loans under the program guidelines unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements." *Escobedo v. Countrywide Home Loans, Inc., 2009 U.S. Dist. LEXIS 117017, 2009 WL 4981618, at *3 (S.D. Cal. 2009).*

Furthermore, [*9] the Ninth Circuit has held that parties who benefit from government contracts are generally assumed to be incidental beneficiaries, and may not enforce the contract absent *clear intent* to the contrary. *Klamath, 204 F.3d 1206, 1210-11 (9th Cir. 2000)* (emphasis added). *See* RESTATEMENT OF CONTRACTS § 313(cmt. a) ("governmental contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested."). *See also County of Santa Clara v. Astra USA, Inc., 588 F.3d 1237, 1244 (9th*

2010 U.S. Dist. LEXIS 61489, *9

*Cir. 2009)* (outlining the difficulty of demonstrating third-party beneficiary status in the context of government contracts).

"Clear intent" is not shown "by a contract's recitation of interested constituencies, [v]ague, hortatory pronouncements, statement[s] of purpose, explicit reference to a third party or even a showing that the contract 'operates to the [third parties'] benefit and was entered into with [them] in mind." *County of Santa Clara, 588 F.3d at 1244* (internal quotations and citations omitted). Instead, the contract's precise language must demonstrate a clear intent to rebut the presumption that the plaintiff is an incidental [*10] beneficiary. *Id.*

For example, in *Klamath* the Ninth Circuit held that although a contract between the United States and a dam operator operated to the irrigators' benefit and was "undoubtedly entered into with the irrigators in mind," nothing in the contract evinced an intention of the parties to the contract to grant the irrigators enforceable rights. *204 F.3d at 1211-12.* As the Ninth Circuit explained, "[T]o allow them intended third-party beneficiary status would open the door to all users receiving a benefit from the Project achieving similar status, a result not intended by the Contract." *Id. at 1212.*

By applying the *Klamath* reasoning, the *Escobedo* court found that the Plaintiff was an incidental beneficiary of the HAMP agreement. *Escobedo, 2009 U.S. Dist. LEXIS 117017, WL 4981618, at *2-3.* As such, the court denied plaintiffs' cause of action for breach of contract under the HAMP agreement. *Id.* The court reasoned that the agreement between Countrywide Home Loans and the U.S. Treasury was entered into in part for the benefit of qualified borrowers, but the language of the contract does not show that the parties intended to grant qualified borrowers the right to enforce the agreement. *2009 U.S. Dist. LEXIS 117017, [WL] at *3. See Villa v. Wells Fargo Bank N.A., 2010 U.S. Dist. LEXIS 23741, 2010 WL 935680, at *3 (S.D. Cal. 2010).*

Even [*11] though one District Court in California allowed Plaintiff to proceed with a breach of contract claim, that Plaintiff had plead sufficient facts to plausibly support his third-party beneficiary theory by identifying the contract at issue and attaching a copy of the contract to his complaint. *Reyes v. Saxon Mortgage Servs., 2009 U.S. Dist. LEXIS 125235, 2009 WL 3738177 (S.D. Cal. 2009).* However, another District Court recently noted that, "although the overall HAMP program undoubtably

has a goal of assisting homeowners, the HAMP Agreement *does not express any intent to grant borrowers a right to enforce the HAMP contract* between the government and loan servicer." *Benito v. Indymac Mortgage Serv., 2010 U.S. Dist. LEXIS 51259, 2010 WL 2130648, *7 (D. Nev. 2010)* (emphasis added).

Here, Defendant was not obligated to modify Plaintiff's loan. As a result, the Agreement does not grant Plaintiff the *right* to enforce the provisions of the agreement. Because Defendant was not required to admit or deny Plaintiff's loan, only to *consider,* Plaintiff could not have been reasonably believed that Defendant was obligated to modify her loan.

In addition, Plaintiff is not an intended beneficiary. If the Court were to grant Plaintiff third-party beneficiary status, [*12] the Court would be opening the door to potentially 3-4 million homeowners filing individual claims. *See Villa, 2010 U.S. Dist. LEXIS 23741, 2010 WL 935680, at *1* (stating that the breadth and indefiniteness of a class of beneficiaries is entitled to some weight in negating the inference of intended beneficiary status). Allowing such a large number of potential plaintiffs clearly contravenes the purpose of the HAMP as an administrative tool to effectuate the goals of the EESA. *Williams v. Geithner, 2009 U.S. Dist. LEXIS 104096, 2009 WL 3757370, *2 (D. Minn. 2009).* Also, permitting these individual claims would undermine Freddie Mac's role as the compliance officer for the HAMP. U.S. Dep't of Treasury, Supplemental Directive 2009-08, at 4 (Nov. 3, 2009). [4]

4   For further discussion, see *infra* II.B.

As in *Klamath* and *Escobedo,* Plaintiff is an incidental beneficiary to a governmental contract between Defendant and the U.S. Treasury. Plaintiff claims that the contract was intended to benefit homeowners like her. However, Plaintiff's claim does not plausibly meet the requisite "clear intent" standard. While the intent of the HAMP might be to benefit qualified borrowers, statements of purpose are not enough to defeat the presumption against intended [*13] beneficiaries under government contracts. Rather, Plaintiff is an incidental beneficiary because there is no clear intent to the contrary.

Because Plaintiff is not an intended beneficiary of the agreement between Defendant and the U.S. Dept. of Treasury, Plaintiff does not have standing to sue for a

breach of contract claim. As such, the Court grants Defendant's Motion to Dismiss.

## B. No Express Private Right of Action Exists Under HAMP.

Furthermore, Plaintiff's allegations regarding breach of contract are simply an attempt at enforcing a private right of action under HAMP. *See Aleem v. Bank of Am., N.A., 2010 U.S. Dist. LEXIS 11944, 2010 WL 532330, *4 (C.D. Cal. 2010). See also Ung v. GMAC Mortg., 2009 U.S. Dist. LEXIS 115900, 2009 WL 2902434, *9-11 (C.D. Cal. 2009)* (dismissing, with prejudice, TARP-based claims pled as the basis for state law claims). Plaintiff's arguments under HAMP refer to recently enacted and rapidly evolving areas of legislative and administrative action. Below, the Court provides the requisite history to explain that an express right to sue fund recipients, like Defendant, does not exist under the HAMP. *See id.*

On October 8, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 [*14] (codified *12 U.S.C. § 5201 et seq.*) ("EESA"). Section 109 required the Secretary of the Treasury ("the Secretary") to take certain measures in order to encourage and facilitate loan modifications. *12 U.S.C. § 5219.* However, Section 109 did not create any private right of action against servicers for grievances relating to the EESA. *Ramirez v. Litton Loan Serv., LP, 2009 U.S. Dist. LEXIS 52484, 2009 WL 1750617, *1 (D. Ariz. 2009); Barrey v. Ocwen Loan Serv., LLC, 2009 U.S. Dist. LEXIS 109848, 2009 WL 1940717, *1 (D. Ariz. 2009).*

The EESA authorized the Secretary of the Treasury, FHFA, Fannie Mae, and Freddie Mac to create the Making Home Affordable Program on February 18, 2009, which consists of two components: (1) the Home Affordable Refinance Program, and (2) the HAMP. *Williams, 2009 U.S. Dist. LEXIS 104096, 2009 WL 3757370, *2.* The HAMP aims to financially assist three to four million homeowners who have defaulted on their mortgages or who are in imminent risk of default by reducing monthly payments to sustainable levels.

The HAMP works by providing financial incentives to participating mortgage servicers to modify the terms of eligible loans. On March 4, 2009, the Secretary issued guidelines under the HAMP requiring lenders to consider borrowers for loan modifications [*15] and suspend foreclosure activities while a given borrower was being evaluated for a modification. U.S. Dep't of the Treasury, Home Affordable Modification Program Guidelines (Mar. 4, 2009). [5]

> 5    The HAMP guidelines are available at http://www.ustreas.gov/press/releases/re ports/modification_program_guidelines.pd f (last visited on June 15, 2010).

Per designation by the Secretary, Freddie Mac serves as compliance officer for the HAMP. U.S. Dep't of Treasury, Supplemental Directive 2009-08, at 4 (Nov. 3, 2009). [6] The HAMP requires mortgagees to collect, retain, and transmit mortgagor and property data to Freddie Mac in order to ensure compliance with the program. *See* Supplemental Directive 2009-01, at 13-14, 19-21 (Apr. 6, 2009); Supplemental Directive 2009-06 (Sept. 11, 2009). As the compliance agent, Freddie Mac is charged with conducting "independent compliance assessments" including "evaluation of documented evidence to confirm adherence . . . to HAMP requirements" such as the evaluation of borrower eligibility. Supplemental Directive 2009-01, at 25-26.

> 6    Supplemental Directives cited herein are available at www.hmpadmin.com/portal/programs/hamp/se rvicer.html [*16] (last visited on June 15, 2010).

Nowhere in the HAMP Guidelines, nor in the EESA, does it expressly provide for a private right of action. Rather, Congressional intent expressly indicates that compliance authority was delegated solely to Freddie Mac. By delegating compliance authority to one entity, Freddie Mac, Congress intended that a private cause of action was not permitted. *See Reyes-Gaona v. N.C. Growers Ass'n, 250 F.3d 861, 865 (4th Cir. 2001)* (reiterating that "the doctrine of *expressio unis est exclusio alterius* instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded.").

Because Plaintiff is precluded from asserting a private cause of action under the HAMP, even disguised as a breach of contract claim, Defendant's Motion to Dismiss is warranted.

## 2. No Implied Right of Action under the HAMP

In addition to not expressly intending a private cause

Case 2:12-cv-02344-JPM-dkv   Document 1-2   Filed 05/02/12   Page 161 of 177   PageID 169

Page 6
2010 U.S. Dist. LEXIS 61489, *16

of action, the Court will not imply a right of action under the HAMP either.

"In the absence of clear evidence of congressional intent, [a court] may not usurp the legislative power by unilaterally creating a cause of action." *In re Digimarc Corp. Derivative Litig., 549 F.3d 1223, 1230-31 (9th Cir. 2008).* [*17] Thus, to determine whether a federal statute was intended to create a private cause of action, the Supreme Court requires consideration of the following four factors: (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted-- that is, [whether] the statute create[s] a federal right in favor of the plaintiff"; (2) whether "there [is] any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether the cause of action is "consistent with the underlying purposes of the legislative scheme"; and (4) whether "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* (quoting *Cort v. Ash, 422 U.S. 66, 78, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975)).*

First, Plaintiff is not one of the class for whose "especial benefit" the HAMP was enacted. While Plaintiff may be a part of a class of homeowners whom EESA and HAMP are *intended to benefit,* the statute sweeps much more broadly than their "especial benefit." These statutes are addressed to large-scale economic phenomena affecting not only [*18] distressed homeowners, but also financial institutions and homeowners at large. The statutes alter the mechanics of home foreclosure in an effort to stem the downward spiral of home prices as a national phenomenon. The economic stimulus effort attempts to promote the welfare of foreclosure parties generally, but it does not connote the power to delay foreclosures.

Second, legislative intent does not create a cause of action under the HAMP. The HAMP eases restrictions on lenders and servicers and encourages loan modifications. *12 U.S.C. § 5219.* Specifically, the HAMP was intended to effectuate the goals of the EESA. *Williams, 2009 U.S. Dist. LEXIS 104096, 2009 WL 3757370,* *2. In addition, legislative history indicates that the right to initiate a cause of action lies with the Secretary via the Administrative Procedure Act. [7] Allowing the Plaintiff to assert a private cause of action would contravene clear legislative intent. *See Alexander v. Sandoval, 532 U.S.*

*275, 290, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)* (stating that the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others).

> 7 Under the Administrative Procedure Act ("APA"), any judicial review would be limited due to the strictures [*19] of the delegating statute, the EESA, in addition to rule and adjudication guidelines set forth under the APA. *See 12 U.S.C. § 5229(a); 5 U.S.C. §§ 553, 554, 556, and 706.*

Next, Plaintiffs proposed cause of action would not further the underlying legislative scheme. As previously mentioned, Freddie Mac was designated as the compliance officer. As such, the enforcement of the modification program is contemplated only from the top down. Furthermore, the HAMP Guidelines already impose extensive data reporting requirements on servicers. *See Supplemental Directive 2009-01, at 13-14, 19-21.* Plaintiffs cause of action would not further the legislative intent because the HAMP Guidelines already designated a scheme to correct for any mortgagee wrongdoing.

Last, loan modification requirements for pending foreclosure proceedings, are generally relegated to state law. Real property interests and contract rights are paradigms of state law concern. In Arizona, the courts have already expressly rejected the suggestion that EESA creates a private right of action against lenders. *See Ramirez, 2009 U.S. Dist. LEXIS 52484, 2009 WL 1750617, at *1; Barrey, 2009 U.S. Dist. LEXIS 109848, 2009 WL 1940717, at *1.* Because the HAMP is the *administrative* program to accomplish [*20] the EESA's goals, a private right of action is clearly precluded.

Because Plaintiffs claim fails to meet the requisite four factors to allow for an implied private right of action, the Court finds that Defendant's Motion to Dismiss with prejudice is further warranted.

## C. Quiet Title

Plaintiff's quiet title claim is based on the claim for breach of contract as explained above. Since that claim fails, Plaintiff's quiet title claim also fails.

## D. Declaratory and Injunctive Relief

2010 U.S. Dist. LEXIS 61489, *20

Plaintiff's claim for declaratory and injunctive relief is also based on the claim for breach of contract. Again, since the claim for breach of contract fails, Plaintiff's claim for declaratory and injunctive relief also fails.

## IV. Conclusion

Because Plaintiff is an incidental and not an intended beneficiary, Plaintiff lacks standing to bring a suit for breach of contract. Furthermore, Plaintiff does not have an express or implied private right of action to sue for violations of the HAMP.

Accordingly,

**IT IS ORDERED** that Defendant's 12(b)(6) Motion to Dismiss (Doc. # 15) is granted with prejudice.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly and close this case.

DATED this 21st day [*21] of June, 2010.

/s/ James A. Teilborg

James A. Teilborg

United States District Judge



MILTON J. CONSTANTIN Plaintiff-Appellant VS THE UNIVERSITY OF TENNESSEE Defendant-Appellee

APPEAL No. 86-7-II

Court of Criminal Appeals of Tennessee

*1986 Tenn. Crim. App. LEXIS 2380*

**July 9, 1986, Filed**

**SUBSEQUENT HISTORY:** [*1] Application for Permission to Appeal Denied, Concurring In Results Only, September 22, 1986

**PRIOR HISTORY:** APPEALED FROM THE TWENTIETH JUDICIAL DISTRICT, PART II, FOR DAVIDSON COUNTY, TENNESSEE THE HONORABLE C. ALLEN HIGH, CHANCELLOR

**DISPOSITION:** The judgment of the Chancellor is affirmed with costs assessed against the plaintiff and the cause remanded to the Chancery Court for the collection of costs and further necessary proceedings.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff professor filed an action against defendant University of Tennessee after he was dismissed from his teaching position. The professor sought to be reinstated to his position and reimbursed for his lost salary. He appealed after the Chancery Court, Part II, for Davidson County, Twentieth Judicial District (Tennessee), dismissed the complaint for lack of jurisdiction pursuant to *Tenn. Code Ann. § 29-10-101.*

**OVERVIEW:** The professor's complaint asserted that, when he was originally hired, the University's personnel policies provided for the automatic grant of tenure after seven years. He had been continually promoted during the 19 years that he had worked for the University; it had never informed him that the funding source for his employment would affect his tenure status. The professor alleged that he had a de facto tenure contract with the University. The professor did not assert that the University had executed a written tenure contract, and he did not attach a written contract to the complaint as required by Tenn. R. Civ. P. 10.03. The University filed a motion to dismiss on the ground that the complaint failed to state a legal cause of action and on the ground that the trial court lacked jurisdiction to hear the matter. In affirming the dismissal, the court noted that although former *Tenn. Code Ann. § 29-10-101(a)(1)* allowed the State to be sued upon an express contract, *§ 29-10-101(a)(1)* did not allow the University to be sued upon an implied contract. The sovereign immunity statute, *Tenn. Code Ann. § 20-13-102,* deprived the trial court of jurisdiction to entertain the action.

**OUTCOME:** The court affirmed the judgment and assessed costs against the professor.

**LexisNexis(R) Headnotes**

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom to Petition*
[HN1] See *Tenn. Const. art. 1, § 17.*

1986 Tenn. Crim. App. LEXIS 2380, *1

Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview
Education Law > Immunities > School District Immunity
Governments > State & Territorial Governments > Claims By & Against
[HN2] See Tenn. Code Ann. § 20-13-102.

Governments > State & Territorial Governments > Claims By & Against
[HN3] The legislature makes provision for the State to be sued upon an express contract.

Civil Procedure > Equity > General Overview
Governments > Courts > Authority to Adjudicate
Governments > State & Territorial Governments > Claims By & Against
[HN4] See former Tenn. Code Ann. § 29-10-101(a)(1).

Education Law > Civil Liability > General Overview
Education Law > Immunities > Statutory Immunity
Governments > State & Territorial Governments > Claims By & Against
[HN5] The University of Tennessee, may, pursuant to Tenn. Code Ann. § 29-10-101(a)(1), be sued in the chancery or circuit courts of Davidson County upon express contract or breach thereof, but not upon an implied contract.

Contracts Law > Types of Contracts > Implied-in-Fact Contracts
Contracts Law > Types of Contracts > Implied-in-Law Contracts
[HN6] Contracts are express when their terms are stated by the parties, and they are often said to be implied when their terms are not so stated. Thus, an implied contract is one inferred from the conduct of the parties, though not expressed in words. Contracts may be implied either in law or in fact. Contracts implied in fact are inferred from the facts and circumstances of the case, and are not formally or explicitly stated in words. It is often said that the only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, whether oral or written, while in the latter their agreement is arrived at by a consideration of their acts and conduct, and that in both of these cases there is, in fact, a contract existing between

the parties, the only difference being in the character of evidence necessary to establish it. In other words, in an express contract all the terms and conditions are expressed between the parties, while in an implied contract some one or more of the terms and conditions are implied from the conduct of the parties.

Civil Procedure > Pleading & Practice > Pleadings > Complaints > General Overview
Contracts Law > Breach > Causes of Action > General Overview
[HN7] If there is a written contract to form the basis of a plaintiff's claim, Tenn. R. Civ. P. 10.03 requires him to attach it to the complaint.

COUNSEL: JERROLD L. BECKER, LOCKRIDGE & BECKER, P.C., P. O. Box 107, Knoxville, Tennessee 37901 ATTORNEY FOR PLAINTIFF-APPELLANT

BEAUCHAMP E. BROGAN, General Counsel, ALAN M. PARKER, Associate General Counsel, The University of Tennessee, 810 Andy Holt Tower, Knoxville, Tennessee 37996-0184 ATTORNEYS FOR DEFENDANT-APPELLEE

JUDGES: SAMUEL L. LEWIS, JUDGE, wrote the opinion. HENRY F. TODD, Presiding Judge, M.S., concur. BEN H. CANTRELL, Judge, dissents, separate opinion.

OPINION BY: LEWIS

OPINION

    SAMUEL L. LEWIS, Judge

OPINION

    Plaintiff Milton J. Constantin filed his complaint on September 24, 1984, in which he alleged that the defendant, The University of Tennessee, notwithstanding its recognition of his de facto tenure as a Professor of Agriculture, dismissed him without cause.

    He [*2] sought reinstatement as a full Professor in the Institute of Agriculture at The University of Tennessee and reimbursement for all loss of salary incurred since December 30, 1981.

    The defendant filed its motion to dismiss "upon the grounds that the complaint fails to state a cause of action

1986 Tenn. Crim. App. LEXIS 2380, *2

and for a lack of subject matter jurisdiction."

The Chancellor, subsequent to oral argument, dismissed plaintiff's complaint on the ground, *inter alia*, that it was based upon an implied contract and that, pursuant to *Tenn. Code Ann. § 29-10-101*, the court was without jurisdiction to entertain the suit.

The pertinent portion of the complaint is as follows:

On or about June 16, 1960, the Plaintiff was notified by Nathan S. Hall, Laboratory Director, the University of Tennessee, College of Agriculture and Home Economics, Agricultural Experiment Station, of his appointment to the University of Tennessee/A.E.C. Agricultural Research Laboratory, Oak Ridge, Tennessee, as an assistant scientist. At that time, he was notified that his annual salary was to be Six Thousand ($6,000.00) Dollars and that he would enjoy the regular fringe benefits offered to all University of Tennessee employees. [*3]

On or about September 1, 1961, the Plaintiff was promoted to Associate Professor within the College of Agriculture and continued in his assignment with the Agricultural Experiment Station.

Thereafter, the Plaintiff was promoted to Professor and finally, on May 21, 1979, the Plaintiff became Professor and Associate Director of the Comparative Animal Research Laboratory (hereinafter referred to as "CARL") within the University of Tennessee, Institute of Agriculture.

At the time of his initial employment with the Defendant, the personnel policies of the University of Tennessee, Knoxville campus, stated in part that after a probationary period not to exceed seven (7) years, the teacher would be granted tenure. Prior to 1971, such action was

automatic without specific review by the Chancellor, President or Board of Trustees. Further, Plaintiff was never informed that the funding source for his employment with the Defendant would affect his tenure status.

Plaintiff contends that the actions of the Defendant and its representatives prior to October 20, 1980 constituted de facto recognition of his status as a tenured professor of the faculty of the Institute of Agriculture. Further, [*4] he contends that other members of the faculty within the Institute were granted tenure under circumstances similar to his and that the actions of Dean Gossett in October of 1980 were in response to losing the "CARL" contract and not because the Plaintiff was not a competent tenured member of the Institute of Agriculture's faculty.

Plaintiff contends that his reduction in salary and denial of continued employment with the Defendant is a violation of the Defendant's tenure policy, as he was not terminated for cause, for age, or because of financial exigency. Accordingly, Plaintiff contends that he is entitled to be maintained at his former tenured rank of full Professor at the Institute of Agriculture and demands reinstatement to said position. Further the Plaintiff demands that he be reimbrused for all loss of salary he has incurred since December 30, 1981.

*Article 1, Section 17, of the Constitution of Tennessee* provides in part as follows: [HN1] "Suits may be brought against the state in such manner and in such courts as the legislature may by law direct."

*Tennessee Code Annotated § 20-13-102* provides:

[HN2] (a) No court in the state shall have any power, jurisdiction, or authority [*5] to entertain any suit against the state,

1986 Tenn. Crim. App. LEXIS 2380, *5

or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds, or property, and all such suits shall be dismissed as to the state or such officers, on motion, plea, or demurrer of the law officer of the state, or counsel employed for the state.

(b) No statutory or other provision authorizing the University of Tennessee and its board of trustees to sue and be sued shall constitute a waiver of sovereign immunity.

However, [HN3] the legislature has made provision for the state to be sued upon an express contract.

*Tennessee Code Annotated § 29-10-101(a)(1)* [1] at all times pertinent to our inquiry provided:

[HN4] The several circuit and chancery courts of Davidson County, Tennessee, shall, subject to appeal as provided by law, have jurisdiction to enter judgments against the state founded upon any express contract or breach thereof with the state and shall determine all questions of fact involved without the intervention of a jury, subject to the limitations of this chapter.

1     *T.C.A. §§ 29-10-101 - 29-10-103* were repealed, effective January 1, 1985, by Chapter 972, § 19(b), Public Acts of 1984.

[*6] The defendant, [HN5] The University of Tennessee, may, pursuant to *Tenn. Code Ann. § 29-10-101(a)(1)*, be sued in the chancery or circuit courts of Davidson County upon "express contract or breach thereof," but not upon an implied contract.

The question before us then is, does the plaintiff's complaint allege an express or implied contract.

[HN6] Contracts are express when their

terms are stated by the parties, and they are often said to be implied when their terms are not so stated. Thus, an implied contract is one inferred from the conduct of the parties, though not expressed in words.

Contracts may be implied either in law or in fact. Contracts implied in fact are inferred from the facts and circumstances of the case, and are not formally or explicitly stated in words. It is often said that the only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, whether oral or written, while in the latter their agreement is arrived at by a consideration of their acts and conduct, and that in both of these cases there is, in fact, a contract existing between the parties, the only difference being in the character [*7] of evidence necessary to establish it. In other words, in an express contract all the terms and conditions are expressed between the parties, while in an implied contract some one or more of the terms and conditions are implied from the conduct of the parties.

*17 Am. Jur. 2d Contracts § 3 (1964).*

Plaintiff's complaint does not allege express words or writings were ever given to him by the defendant which could be considered an express contract.

Plaintiff's complaint alleges a *de facto* tenure contract which arose by implication from the defendant's conduct. He alleges that it was an informal system and that tenure was to be inferred by the conduct of the parties at some point not to exceed seven years after initial employment. Plaintiff expressly states in his complaint that no formal tenure system existed when he was employed.

If [HN7] there was a written contract to form the basis of plaintiff's claim, he failed to attach it to the complaint as required by Rule 10.03, Tennessee Rules of Civil Procedure.

The Chancellor properly held that he was without

1986 Tenn. Crim. App. LEXIS 2380, *7

jurisdiction to entertain plaintiff's complaint.

Plaintiff also complains that the "Trial Court erred in not allowing [*8] the appellant to amend the complaint at the time of the hearing."

We have searched this record and find nothing to show that plaintiff attempted to amend his complaint prior to hearing, at the hearing, or at any time after the hearing.

The "ORDER OF DISMISSAL" does state: "Annual appointment letters and a faculty handbook, which petitioner at oral argument claims to represent his express contract, are not attached to the complaint as required by Tenn. R. Civ. P., Rule No. 10.03, and are not even mentioned in the complaint, and are not a part of the record."

It cannot be said from the foregoing that the plaintiff ever moved to amend his complaint or that he even offered the letters and faculty handbook for the Chancellor's consideration.

The Chancellor cannot be held in error for failing to allow an amendment that was never offered.

Plaintiff's issues are without merit.

The judgment of the Chancellor is affirmed with costs assessed against the plaintiff and the cause remanded to the Chancery Court for the collection of costs and further necessary proceedings.

**DISSENT BY:** CANTRELL

**DISSENT**

BEN H. CANTRELL, Judge.

I respectfully dissent from the opinion of the majority and would hold that [*9] the complaint filed by the appellant stated a cause of action which, at least, required an answer by the university.

As I read the complaint it makes the following allegations:

"(1) That at the time of the appellant's employment by the University of Tennessee, the university had a policy of automatically granting tenure to anyone who served longer than seven consecutive years.

(2) That the appellant was hired in 1960; on September 1, 1961 he was promoted to Associate Professor within the College of Agriculture; that he ultimately was promoted to Professor, and finally on May 21, 1979 he became Professor and Associate Director of the Comparative Animal Research Laboratory.

(3) That the appellant therefore acquired tenure with the university. That the appellant's dismissal from the university violated the rights he had acquired as a tenured teacher."

These allegations in the complaint, it seems to me, allege an express contract which had continued for the requisite period of time to give the appellant rights as a tenured teacher. Therefore, his termination must be in accordance with the requirements for dismissal of any tenured teacher. See *Chapdelaine vs. Torrence*, [*10] *532 S.W.2d 542 (Tenn. 1976)*.

I would agree that the appellant should have attached as exhibits to his complaint the relevant documents, minute entries, or regulations of the university which supported his claim. However, I do not think his complaint should be dismissed for the failure to do so.

I would hold that the complaint states a cause of action and, therefore, would reverse the action of the court below.

Westlaw.

Slip Copy, 2010 WL 1754358 (M.D.Tenn.)
(Cite as: 2010 WL 1754358 (M.D.Tenn.))

Only the Westlaw citation is currently available.

United States District Court,
M.D. Tennessee,
Nashville Division.
AMERICAN NATIONAL PROPERTY AND
CASUALTY COMPANY, Plaintiff,
v.
CAMPBELL INSURANCE, INC., et al., Defendants.

No. 3:08-0604.
April 30, 2010.

Jonathan D. Rose, Thor Y. Urness, Bradley Arant
Boult Cummings LLP, Nashville, TN, for Plaintiff.

Steven W. Keyt, Benjamin T. Reese, Cherie D.
Jewell, Leitner, Williams, Dooley & Napolitan,
PLLC, Chattanooga, TN, Brian C. Neal, John R.
Wingo, Frost, Brown & Todd, LLC, Nashville, TN,
John R. McCann, Melissa Ann Maravich, Taylor A.
Cates, Burch, Porter & Johnson, PLLC, Memphis,
TN, for Defendants.

*MEMORANDUM and ORDER*
ALETA A. TRAUGER, District Judge.

*1 Plaintiff American National Property And
Casualty Company ("ANPAC") filed a Motion To
Dismiss (Docket Entry No. 189) the counterclaim
included by Tommy Campbell ("Campbell") in the
Answer and Counterclaim (Docket Entry No. 176) to
ANPAC's Third Amended Complaint (Docket Entry
No. 160). Defendant Campbell filed a response in
opposition to the motion to dismiss (Docket Entry
No. 192). ANPAC then filed a motion for leave to
file a reply and attached a reply brief. (Docket Entry
No. 198). ANPAC's motion for leave to file the reply
brief is granted.

In ruling on the motion to dismiss for failure to
state a claim under Federal Rule of Civil Procedure
12(b)(6), the Court must accept as true Campbell's
allegations as plaintiff against ANPAC as defendant
and construe the allegations in Campbell's favor. *See
Morgan v. Church's Fried Chicken,* 829 F.2d 10, 11-
12 (6th Cir.1987). "To survive a motion to dismiss, a
complaint must contain sufficient factual matter, ac-

cepted as true, to 'state a claim to relief that is plausi-
ble on its face.' " *Ashcroft v. Iqbal,* --- U.S. ----, 129
S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 550,
127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim
has facial plausibility when the plaintiff pleads fac-
tual content that allows the court to draw the reason-
able inference that the defendant is liable for the mis-
conduct alleged." *Id* A complaint must contain either
direct or inferential allegations respecting all of the
material elements to sustain a recovery under some
viable legal theory. *Id.* at 944; *Scheid v. Fanny
Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th
Cir.1988).

In the counterclaim, Campbell alleged that he en-
tered into an Agent Agreement with ANPAC on June
16, 1997 ("the 1997 Agreement"). He attached a
copy of the 1997 Agreement to the Answer and
Counterclaim as Exhibit A. Campbell further alleged
that Section IV of the 1997 Agreement provided for
post-termination compensation as set forth in an at-
tached "Post-Termination Compensation Schedule."
The Post-Termination Compensation Schedule pro-
vided that payments were to begin within sixty (60)
days after termination. Campbell further alleged he
met all requirements for eligibility under paragraph 3.
(Docket Entry No. 176, Counterclaim ¶¶ 1-2.)

Campbell alleged that the 1997 Agreement, in-
cluding the Post-Termination Compensation Sched-
ule, was in full force and effect until Campbell was
terminated by ANPAC by letter dated June 10, 2008.
Campbell attached a copy of the termination letter to
the Answer and Counterclaim as Exhibit B. Campbell
further alleged that the termination letter, in the note
at the bottom of page 2, recited language contained in
the 1997 Agreement which is not contained in the
Agent Agreement between ANPAC and Campbell
Insurance, Inc. Campbell also alleged that the termi-
nation letter was addressed to him and sent to his
home address as opposed to the business address of
Campbell Insurance, Inc. (*Id.* ¶ 3.)

*2 Campbell further alleged that ANPAC failed
and refused to pay post-termination compensation as
provided in the 1997 Agreement, and ANPAC's fail-
ure to honor the 1997 Agreement is a breach of con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1754358 (M.D.Tenn.)
**(Cite as: 2010 WL 1754358 (M.D.Tenn.))**

tract. (*Id.* ¶ 4.) Finally, Campbell alleged he is entitled to posttermination compensation as provided in the 1997 Agreement, and he seeks damages for breach of contract in excess of $75,000.00, along with other relief. (*Id.* ¶ 5 & Prayer for Relief.)

ANPAC seeks dismissal of the counterclaim on the ground that the 2005 Agreement signed by Campbell (attached to the Third Amended Complaint as Exhibit 1, Docket Entry No. 161) expressly superseded the 1997 Agreement. ANPAC contends that Campbell admitted within the four corners of the pleadings that he, along with Campbell Insurance, Inc., and Colleen Campbell, entered into the 2005 Agreement. In the Second Amended Complaint, ANPAC alleged:

> On January 24, 2005, American National entered into an Agent Agreement with Campbell Insurance, Tommy Campbell and Colleen Campbell (the "Agent Agreement"). A true and correct copy of the Agent Agreement is attached hereto as **Exhibit 1.**

(Docket Entry No. 66, Second Amended Complaint ¶ 10.) In response to this averment, Campbell and the other Campbell Defendants responded, "Admitted." (Docket Entry No. 83, Answer to the Second Amended Complaint ¶ 10.) ANPAC also points out that Campbell himself alleged, in his Second Counterclaim contained within the Second Amended Answer (Docket Entry No. 83, Counterclaim at 16 ¶ 1), that "Campbell Insurance, Inc. and Tommy Campbell entered into the agency agreement with ANPAC on January 24, 2005." ANPAC further claims that Campbell admitted he signed the 2005 Agreement when he responded to ¶¶ 14 & 15 of the Third Amended Complaint. However, what Campbell and the other Campbell Defendants actually said in those paragraphs was:

> 14. It is admitted that ANPAC entered into an agreement with Campbell Insurance on or about January 24, 2005. Tommy Campbell and Colleen Campbell signed the agreement as representatives of Campbell Insurance.
>
> 15. It is admitted that Tommy Campbell and Colleen Campbell signed the agreement as representatives of Campbell Insurance.

(Docket Entry No. 176, Answer to Third Amended Complaint ¶¶ 14-15.)

Campbell contends he is not bound by any admissions he may have made prior to his Answer and Counterclaim to the Third Amended Complaint because the Third Amended Complaint and his Answer and Counterclaim to the Third Amended Complaint superseded all of the previous pleadings. Under Sixth Circuit law, a statement made in a pleading, even if the pleading is subsequently amended or superseded, can constitute an admission against interest, but the pleading containing the admission must be admitted into evidence at trial for the purpose of establishing the admission, and the better practice is for the court *not* to take judicial notice of the admission. *Shell v. Parrish,* 448 F.2d 528, 530 (6th Cir.1971); *Pennsylvania R.R. Co. v. City of Girard,* 210 F.2d 437, 440 (6th Cir.1954). In light of these cases and because the case is now before the Court on a Rule 12(b)(6) motion to dismiss, the Court will not resolve-solely on the pleadings and without competent evidence-whether Campbell's statements made in prior pleadings amount to admissions against interest.

**\*3** Even assuming for present purposes that Campbell entered into the 2005 Agreement as ANPAC alleges, Campbell's signature on the 2005 document alone does not resolve the matters in dispute between the parties. ANPAC claims the 1997 Agreement was expressly superseded by the 2005 Agreement, and it is true the 2005 Agreement Campbell signed says: "This Agreement supersedes any and all previous Agreements of whatever kind between the parties." At first blush, this language would appear to render the 1997 Agreement irrelevant, and especially its Section IV, which provided for post-termination compensation, which is the subject of Campbell's counterclaim. On further examination, however, it appears that a major difference between the 1997 and 2005 Agreements is the deletion of Section IV in the 2005 Agreement. As a result of the deletion of Section IV, the sections of the 2005 Agreement were renumbered accordingly. Consequently, Section VI in the 1997 Agreement, titled "RESERVED RIGHTS AND CONDITIONS OF THE COMPANY," became Section V, with the same title and nearly verbatim language, in the 2005 Agreement.

Campbell points to a footnote in the termination letter he received from ANPAC in June 2008 (Docket

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1754358 (M.D.Tenn.)
(Cite as: 2010 WL 1754358 (M.D.Tenn.))

Entry No. 176-2) as evidence that ANPAC knew it was terminating the 1997 Agreement when it sent the termination letter addressed only to Campbell at his home address. The footnote stated in part:

Additionally, under Section VI-RESERVED RIGHTS AND CONDITIONS OF THE COMPANY, ANPAC may deduct, from any compensation due you, for any and all debts or claims you have with the Company. Therefore, any commissions payable are being retained by the Company and applied to your Agent Advance Agreement (AAA) deficit.

(*Id.* at 2.) Campbell contends the letter's reference to Section VI-RESERVED RIGHTS AND CONDITIONS OF THE COMPANY could only have meant the 1997 Agreement.

ANPAC asserts that Campbell is just trying to capitalize on a typographical error in the footnote of the termination letter, noting that "Section VI" should have read "Section V." Whether the difference in section numbers can be attributed to typographical error requires review of evidence that is not before the Court on a Rule 12(b)(6) motion to dismiss. Moreover, the 2005 Agreement (in Section V), similarly to the 1997 Agreement (in Section VI), provided (emphasis added):

F. SOLE AGREEMENT
    This Agreement, with the attached Schedules and Supplements, constitutes the sole agreement and supersedes any and all prior Agreements between you and the Company. **This Agreement shall not impair your right to monies, if any, earned under a prior Agreement or Agreements with the Company.**

(Docket Entry No. 161, Ex. 1 at 8.) [FN1]

    FN1. The only difference in Section F. as between the two agreements was that the 2005 Agreement added the words "any and" before "all prior Agreements between you and the Company."

Thus, while both the 1997 and the 2005 Agreements provided that a later agreement would supersede all prior agreements, both Agreements also con-

tained the language: "This Agreement shall not impair your right to monies, if any, earned under a prior Agreement or Agreements with the Company." Whether the 1997 Agreement was still in force and not superseded at the time of Campbell's termination in June 2008 and whether Campbell is entitled to claim post-termination compensation under the 1997 Agreement are mixed questions of law and fact that require further factual and legal development.

*4 At this juncture, the allegations of Campbell's counterclaim satisfy the pleading standards of *Iqbal* and *Twombly*. Campbell alleges the elements of a breach of contract claim and sufficient facts to support the claim. *See BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn.Ct.App.2006) (observing elements of breach of contract are: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of contract). Campbell alleges the existence of a 1997 Agreement with ANPAC which included a provision for Campbell's post-termination compensation, a breach of that agreement due to ANPAC's failure to pay Campbell any post-termination compensation, and damages resulting from the breach. Because Campbell's counterclaim pleads a claim for breach of contract under Tennessee law and Campbell has alleged sufficient facts to support his claim under *Iqbal* and *Twombly*,

    (1) ANPAC's Motion To Dismiss (Docket Entry No. 189) is hereby DENIED.

    (2) ANPAC's Motion For Leave To File Reply To Defendant Tommy Campbell's Response To Plaintiff's Motion To Dismiss (Docket Entry No. 198) is hereby GRANTED and the Clerk is directed to file the reply, which appears as an attachment to Docket Entry No. 198, under a separate docket entry number.

    (3) The case is hereby returned to the Magistrate Judge for further case management.

    It is so ORDERED.

M.D.Tenn.,2010.
American Nat. Property and Cas. Co. v. Campbell Ins., Inc.
Slip Copy, 2010 WL 1754358 (M.D.Tenn.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2010 WL 1754358 (M.D.Tenn.)
(Cite as: 2010 WL 1754358 (M.D.Tenn.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





Cited
As of: Dec 05, 2011

DOUGLAS C. YORK, M.D. v. JOSEPH V. BATSON, ET AL.

No. M2007-02418-COA-R3-CV

COURT OF APPEALS OF TENNESSEE, AT NASHVILLE

*2008 Tenn. App. LEXIS 535*

July 17, 2008, Session
September 16, 2008, Filed

**PRIOR HISTORY:** [*1]
*Tenn. R. App. P. 3*; Appeal as of Right; Judgment of the Chancery Court Affirmed. Appeal from the Chancery Court for Williamson County. No. 31733. Robert E. Lee Davies, Judge.

**DISPOSITION:**    Judgment of the Chancery Court Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The Chancery Court for Williamson County, Tennessee, granted appellee buyers' motion for summary judgment, dismissing all of appellant seller's agency, breach of contract, equitable estoppel, and wrongful inducement of a breach of contract claims, but declined to grant summary judgment in favor of the buyers on their counterclaim. The seller appealed.

**OVERVIEW:** The seller argued that the trial court erred in its finding that the buyer was not acting as the seller's agent in the purchase of certain real property and in granting his motion for summary judgment. The appellate court concluded that the buyer was not acting as the seller's agent in his dealings with a third party. At no time did the seller propose that the buyer obtain the third party tract in the seller's name. There was no indication that the seller had any control over the buyer. The buyer ultimately obtained the third party tract in his own name. The undisputed facts did not support the seller's claim for equitable estoppel against the buyer. There was no proof that the buyer's conduct was consistent with the terms of the oral agreement. The Statute of Frauds barred the seller's claim that an enforceable contract existed between himself and the buyer. The trial court declined to grant summary judgment on the buyers' counterclaim as they failed to satisfy the prima facie elements necessary to establish a claim for wrongful inducement of a breach of contract claim. The seller did not act with malicious intent in informing the third party of his agreement with the buyer.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of*

*Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards >*
*Genuine Disputes*
[HN1] It is well settled that a motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law, *Tenn. R. Civ. P. 56.04*. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. On a motion for summary judgment, the court must take the strongest legitimate view of evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence.

*Civil Procedure > Summary Judgment > Burdens of*
*Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards >*
*Genuine Disputes*
[HN2] Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery material, that there is a genuine, material fact dispute to warrant a trial. In this regard, *Rule 56.05* provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial.

*Civil Procedure > Summary Judgment > Appellate*
*Review > Standards of Review*
*Civil Procedure > Summary Judgment > Standards >*
*Appropriateness*
*Civil Procedure > Appeals > Standards of Review > De*
*Novo Review*
[HN3] Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. Because only questions of law are involved, there is no presumption of correctness regarding a trial court's grant or denial of summary judgment. Therefore, the appellate court's review of the trial court's grant of summary judgment is de novo on the record before the appellate court.

*Business & Corporate Law > Agency Relationships >*
*Causes of Action & Remedies > Burdens of Proof*
*Business & Corporate Law > Agency Relationships >*
*Establishment > Elements > Right to Control by*

*Principal*
[HN4] An important element of an agency relationship is that the object of the contract be for the benefit of the principal The principal test of agency is whether the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent. Furthermore, the burden of proof is on the person attempting to establish an agency that the alleged agent was in fact the agent of the alleged principal and was authorized to do the acts done.

*Contracts Law > Statutes of Frauds > General Overview*
[HN5] See *Tenn. Code Ann. §29-2-101(a)(4)* (Supp. 2007).

*Contracts Law > Defenses > Equitable Estoppel >*
*Statutes of Frauds*
*Contracts Law > Statutes of Frauds > Exceptions >*
*Partial Performance*
[HN6] The purpose of the Statute of Frauds, *Tenn. Code Ann. §29-2-101(a)(4)*, is to reduce contracts to a certainty in order to avoid perjury on one hand and fraud on the other. It is well settled in Tennessee that an oral contract for the sale of land will not be enforced on the basis of partial performance, nor will partial performance take an oral agreement out of the Statute of Frauds. The harshness of this rule has, however, been eased by the application of the doctrine of equitable estoppel. Equitable estoppel is only allowed as an exception to the Statute of Frauds in exceptional cases where to enforce the Statute of Frauds would make it an instrument of hardship and oppression, verging on actual fraud: Equitable estoppel, in the modern sense, arises from the 'conduct' of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of law unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.

*Contracts Law > Defenses > Equitable Estoppel >*
*Statutes of Frauds*
[HN7] Because the doctrine of equitable estoppel only

2008 Tenn. App. LEXIS 535, *1

applies in extraordinary cases as a bar to the Statute of Frauds, *Tenn. Code Ann. §29-2-101(a)(4)*, the following must be shown with respect to the party against whom estoppel is asserted: 1. Conduct which amounts to a false representation or concealment of material facts; 2. Intention, or at least expectation, that such conduct shall be acted upon by the other party; and 3. Knowledge of the real facts.

*Contracts Law > Defenses > Equitable Estoppel > Statutes of Frauds*
[HN8] Equitable estoppel also requires that the following elements be shown with respect to the party asserting estoppel: 1. Lack of knowledge and the means of knowledge of the truth as to the facts in question; 2. Reliance upon the conduct of the party estopped; and 3. Action based thereon of such a character as to change his or her position prejudicially.

*Contracts Law > Breach > Causes of Action > Elements of Claims*
*Contracts Law > Third Parties > General Overview*
[HN9] See *Tenn. Code Ann §47-50-109.*

*Contracts Law > Breach > Causes of Action > Elements of Claims*
*Contracts Law > Third Parties > General Overview*
[HN10] In Tennessee, there is both a common law and a statutory tort called wrongful inducement of breach of contract that allows recovery when a third party causes a breach of contract, *Tenn. Code Ann. § 47-50-109.*

*Contracts Law > Breach > Causes of Action > Elements of Claims*
[HN11] In addition to the existence of a legal contract, in order to establish a cause of action for wrongful inducement of a breach of contract, the plaintiff must also prove that: (1) the alleged wrongdoer was aware of the contract; (2) the alleged wrongdoer maliciously intended to induce a breach; (3) that, as a proximate result of the wrongdoer's action, a breach actually occurred, and (4) the plaintiff suffered damage.

**COUNSEL:** Emily K. Moore, Franklin, TN, Appellant.

Douglas S. Hale, Franklin, TN, Appellant.

Thomas J. Elmlinger, Nashville, TN, Appellees.

**JUDGES:** J. STEVEN STAFFORD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

**OPINION BY:** J. STEVEN STAFFORD

**OPINION**

This is a summary judgment case. Appellant and Appellee entered into an oral agreement for the exchange of land. Appellee negotiated the purchase of the property with a third party which he then was to exchange with Appellant. When Appellee decided to keep the property for himself, Appellant filed suit, alleging agency, breach of contract, equitable estoppel, and wrongful inducement of a breach of contract. Appellees filed a counter-claim for wrongful inducement of a breach of contract. The trial court granted Appellees' motion for summary judgment, dismissing all of Appellant's claims, but declined to grant summary judgment in favor of Appellees on their counter-claim. Finding no error, we affirm.

**OPINION**

Appellant [*2] Douglas C. York, M.D. is the owner of a ten-acre tract of unimproved land located at the intersection of Highway 96 East and Trinity Road in Williamson County (the "York Tract"). In 2004, Appellee Joseph V. Batson and Appellee Claudine Drueke were looking for undeveloped land on which to build a house. Mr. Batson wrote to Dr. York, expressing his interest in the York Tract. Dr. York responded that the York Tract was not for sale.

Dr. York also owns a one-hundred-acre farm in Williamson County. In 2004, he was interested in expanding his farm by acquiring adjoining land. One of the parcels adjoining Dr. York was owned by Gary D. Kiviniemi (the "Kiviniemi Tract"). [1]

> 1  Several years prior, Mr. Kiviniemi had leased property from Dr. York. Mr. Kiviniemi had fallen behind on his rents, and Dr. York had evicted him from the property. Because of this "bad blood," Dr. York initially decided to approach Mr. Kiviniemi about purchasing his property through an intermediary Wayne Jones. Mr. Kiviniemi told Mr. Jones that he would sell the property for $ 222,000; however, Mr. Kiviniemi ultimately broke off discussions with Mr. Jones.